FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2009 DEC 30  AM 9: 36

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

SHIRLEY L. PHELPS-ROPER,       )
                    Plaintiff,  )
                                )
        vs.                     )   Case No. _4:09cv3268_
                                )   **COMPLAINT FOR**
DAVE HEINEMAN, In His Capacity as  )  **DECLARATORY AND**
Governor of the State of Nebraska;  )  **INJUNCTIVE RELIEF**
JON BRUNING, In His Capacity as  )
Attorney General of the State of Nebraska;  )
L. KENNETH POLIKOV, In His Capacity as  )
Sarpy County Attorney;          )   **CLAIM OF**
JOHN W. STACEY, In His Capacity as  )  **UNCONSTITUTIONALITY**
Chief of the Bellevue Police Department;  )  **OF TWO NEBRASKA**
CITY OF BELLEVUE, NEBRASKA;     )   **STATE STATUTES**
GARY MIXAN, In His Capacity as  )   **(per Local Rule 9.1[b])**
Mayor of the City of Bellevue;  )
KAY DAMMAST, In Her Capacity as  )
City Clerk of Bellevue, Nebraska;  )
DONALD KLEINE, In His Capacity as  )
Douglas County Attorney;        )
ALEX HAYES, In His Capacity as  )
Chief of the Omaha Police Department;  )
STEVEN M. CURRY, In His Capacity as  )
Merrick County Attorney;        )
ANTHONY McPHILLIPS, In His Capacity as  )
Sheriff of Merrick County;      )
JOE SMITH, In His Capacity as   )
Madison County Attorney;        )
WILLIAM L. MIZNER, In His Capacity as  )

1

Chief of the Norfolk Police Department; )
NATHAN COX, In His Capacity as )
Cass County Attorney; )
WILLIAM (BILL) BRUEGGEMANN, In His )
Capacity as Sheriff of Cass County; )
HONORABLE TODD J. HUTTON, In His )
Capacity as Sarpy County Judge; )
NEBRASKA SUPREME COURT; )
LEONARD HOULOOSE, in His Capacity as )
Chief of the Papillion Police Department; and, )
JOHN/JANE DOE(S), in Their Official )
Capacities, )
    )
                    Defendants. )

## Parties

1.  Shirley L. Phelps-Roper (Plaintiff) is a United States citizen and a member of the Westboro Baptist Church (WBC). As part of her sincerely held religious beliefs, plaintiff regularly protests at funerals including funerals of United States soldiers. Plaintiff has frequently participated in these protests throughout the United States and desires to continue said protests in the State of Nebraska. Plaintiff is a resident of Kansas, the mother of eleven children, who has picketed numerous times in Nebraska, and plans to picket in Nebraska in the future.

2.  Dave Heineman is and was at all relevant times the Governor of the State of Nebraska. The civil administration of the laws of the State of Nebraska is vested in the Governor in Nebraska (Neb. Rev. Stat. §81-101); and the Governor may be served when sued in his official capacity by serving the office of the Attorney General pursuant to Neb. Rev. Stat. §25-510.02(1).

3.  Jon Bruning is and was at all relevant times the Attorney General of the State of Nebraska, and authorized to appear for the state to prosecute in any court any cause or

2

matter including criminal in which the state may be a party, and as such is responsible for the enforcement of the state statutes at issue herein. (Neb. Rev. Stat. §84-203.) Also the Attorney General is to be notified when a challenge is made to a state statute, under Nebraska law. (Rule 5.1, Nebraska Rules of Civil Procedure.) This defendant may be served by leaving a copy at the Office of the Attorney General pursuant to Neb. Rev. Stat. §25-510.02(1).

4. L. Kenneth Polikov is and was at all relevant times the County Attorney for Sarpy County, Nebraska. The County Attorney has the duty to prosecute criminal actions arising under the laws of the state in which the state is a party. (Neb. Rev. Stat. §23-1201.)

5. John W. Stacey is and was at all relevant times the Chief of Police for the City of Bellevue, Nebraska, who with his police officers has the power to arrest. (Neb. Rev. Stat. §16-323).

6. The City of Bellevue is a city of the first class, with a municipal government consisting of a mayor and six member city council representing five wards and one at-large position. This defendant may be served by serving the chief executive officer or clerk of the city, pursuant to Neb. Rev. Stat. §25-510.02(2).

7. Gary Mixan is currently Mayor of the City of Bellevue, Nebraska; and at the time of the events complained of herein was a member of the City Council of the City of Bellevue, Nebraska; he was and is the chief executive officer of the City of Bellevue; and may be served on behalf of the City pursuant to Neb. Rev. Stat. §25-510.02(2).

3

8. Kay Dammast is and was at all relevant times the City Clerk of Bellevue, Nebraska, responsible for administering the permit ordinances of the City; and may be served on behalf of the City pursuant to Neb. Rev. Stat. §25-510.02(2).

9. Gary Troutman is the current City Administrator, appointed by the Mayor, confirmed by the City Council, and responsible for the day-to-day operation of the City of Bellevue, Nebraska; and may be served on behalf of the City pursuant to Neb. Rev. Stat. §25-510.02(2).

10. Donald Kleine is and was at all relevant times the County Attorney for Douglas County, Nebraska. The County Attorney has the duty to prosecute criminal actions arising under the laws of the state in which the state is a party. (Neb. Rev. Stat. §23-1201.)

11. Alex Hayes is currently Chief of Police for the City of Omaha, Nebraska, who with his police officers has the power to arrest. (Neb. Rev. Stat. §16-323).

12. Steven M. Curry is currently County Attorney for Merrick County, Nebraska. The County Attorney has the duty to prosecute criminal actions arising under the laws of the state in which the state is a party. (Neb. Rev. Stat. §23-1201.)

13. Anthony McPhillips is and was at all relevant times the Sheriff of Merrick County, Nebraska, who with his deputies has the power to arrest. (Neb. Rev. Stat. §23-1701.02.)

14. Joe Smith is currently County Attorney for Madison County, Nebraska. The County Attorney has the duty to prosecute criminal actions arising under the laws of the state in which the state is a party. (Neb. Rev. Stat. §23-1201.)

4

15. William L. Mizner is and was at all relevant times the Chief of Police for the City of Norfolk, Nebraska, who with his police officers has the power to arrest. (Neb. Rev. Stat. §16-323).

16. Nathan Cox is and was at all times relevant County Attorney for Cass County, Nebraska. The County Attorney has the duty to prosecute criminal actions arising under the laws of the state in which the state is a party. (Neb. Rev. Stat. §23-1201.)

17. William (Bill) Brueggemann is and was at all times relevant the Sheriff of Cass County, Nebraska, who with his deputies has the power to arrest. (Neb. Rev. Stat. §23-1701.02.)

18. Honorable Todd J. Hutton is and was at all relevant times a County Judge in Sarpy County, Nebraska, presiding over the pending cases of *State of Nebraska vs. Shirley Phelps-Roper*, Case Nos. CR-07-5060 and CR-07-5061, in the County Court of Sarpy County, Nebraska.

19. The Nebraska Supreme Court is the highest appellate court in the Nebraska judicial system; the criminal cases against plaintiff are pending before that court as of this writing, and thus that court is named here as may be necessary for injunctive relief depending upon the status of that court's jurisdiction as to the criminal cases. This defendant may be served by serving the Attorney General pursuant to Neb. Rev. Stat. §25-510.02(1).

20. Leonard Houloose is and was at all relevant times the Chief of Police for the City of Papillion, Nebraska, who with his police officers has the power to arrest. (Neb. Rev. Stat. §16-323).

5

21. John/Jane Doe(s) is/are other officials who take office/positions as successors to any named defendants, and/or who otherwise are necessary for full relief herein.

22. At all relevant times the defendants were and are acting in their official capacities and acting under color of law.

## Introduction

23. This lawsuit challenges the Nebraska Flag Mutilation Statute (Neb. Rev. Stat. §28-928), facially and as applied; the Nebraska Funeral Picketing Act (Neb. Rev. Stat. §§ 28-1320.01-28-1320.03), facially and as applied; the application of the Nebraska criminal statutes prohibiting Disturbing the Peace (Neb. Rev. Stat. § 28-1322), Contributing to the Delinquency of a Minor (Neb. Rev. Stat. § 28-709) and Negligent Child Abuse (Neb. Rev. Stat. § 28-707) to plaintiff's protected religious speech and use of the flag to express ideas, in a pending criminal prosecution (Case Nos. 07-5060 and 07-5061, in the County Court of Sarpy County, Nebraska); and the Bellevue City Ordinance requiring a permit for assembling and picketing (Bellevue City Code Sections 28-111 to 28-133), facially and as applied.

24. Plaintiff and other members of her church, Westboro Baptist Church of Topeka, Kansas (WBC), have been picketing daily for nearly twenty years all over the country, addressing religious issues including fornication, adultery (including divorce-and-remarriage), homosexuality, abortion, idolatry, and other sins, focusing on the institutionalization of these sins in this nation, all pursuant to what they believe to be their duty from the Scriptures to publicly address these sins of this nation. During this picketing plaintiff and WBC members carry signs; sing hymns and parodies; and use

6

the American and various other flags (of other nations, of branches of the military, of various states, the homosexual "rainbow" flag, etc.) to express their views about the sins of this nation and the crisis this nation is in with God, with the wrath of God pouring out on the nation. Also pursuant to sincerely held religious beliefs, and many passages in the Scriptures, when plaintiff and WBC members worship their God through this religious picketing, their children accompany them; and specifically, many of plaintiff's eleven children frequently accompany her on the picket line.

Beginning June 15, 2005, plaintiff and other WBC members began conducting pickets in connection with funerals and memorials of soldiers killed in Iraq and Afghanistan because of the public nature of these events and the public dialogue that was occurring worldwide in connection with these events; and because of what plaintiff believes to be a direct relationship between the sins of this nation and the soldiers being killed in battle (and other horrific deaths of Americans, e.g., 911, Katrina, tornadoes, shootings, etc.). The whole world is talking about the soldiers dying, and whether God is blessing America; plaintiff and WBC members believe it is imperative that they participate in that public dialogue at the events that were and are the center of the public dialogue.

In response, Nebraska passed a law which was signed by the Governor on April 4, 2006, limiting the distance of funeral picketing an hour before and two hours after the funeral. That law has been applied in varying ways to plaintiff and WBC members, while being applied very differently to others present and picketing and engaging in protest activities, allowing them to be much closer to the location of the death event.

7

The law has also been applied to plaintiff and WBC members in a fashion that unduly limits or completely prohibits speech.

Also in response, Bellevue police arrested plaintiff on June 5, 2007, during a funeral picket, because one of plaintiff's minor sons was standing on an American flag. A month later, on July 5, 2007, plaintiff was charged in Sarpy County with four counts, in one action with violation of the Nebraska flag mutilation statute; and in another action with three counts, disturbing the peace, negligent child abuse and contributing to the delinquency of a child. Plaintiff sought relief in the state court on the constitutional issues, because of the protected nature of her acts in picketing and in using the flag, or her son using the flag, to express ideas. The county judge assigned denied relief; the district court denied relief; and on appeal the Nebraska Supreme Court granted a petition to bypass directly to them, and then declined to review the constitutional issues.

Immediately after these actions by Bellevue and Sarpy County officials in arresting and charging plaintiff, and on July 25, 2007, the City of Bellevue denied plaintiff a permit to picket in Bellevue on June 30, 2007 (at all); and added a condition to a permit issued July 27, 2007, to other WBC members, that they could not use the flag or a depiction of the flag in any fashion. Also in the immediate aftermath of Bellevue's and Sarpy County's actions, two additional jurisdictions (Omaha/Douglas County and Norfolk/Madison County) specifically began enforcing the Nebraska flag mutilation statute against plaintiff and other WBC members for the

first time, threatening plaintiff and other WBC members with arrest and prosecution for using the flag to express ideas.

In all these ways Nebraska officials, state and local, have expressly punished, prohibited, restrained and chilled plaintiff's protected religious speech and picketing; religious practices pertaining to the upbringing and teaching of her children; and use of the flag to express ideas; all of which are protected by the United States and Nebraska Constitutions. The words and deeds of Nebraska officials reflect a plan, design, policy and scheme to prohibit the words of plaintiff and other WBC members based upon content, and laws have been passed and used with this express intent. Unless defendants are enjoined from enforcing and applying the state flag mutilation and funeral picketing laws; from applying the state laws concerning disturbing the peace, negligent child abuse and contributing to the delinquency of a minor to protected activities; and from enforcing and applying the Bellevue ordinances concerning permits for assemblies; plaintiff will be irreparably harmed and effectively chilled from expressing her religious beliefs through non-disruptive, non-disorderly picketing and protests that are protected by the First and Fourteenth Amendments.

25. This action seeks entry of a declaratory judgment finding that the Nebraska funeral picketing and flag mutilation statutes are unconstitutional facially, and as applied; that the Nebraska laws against disturbing the peace, negligent child abuse and contributing to the delinquency of a minor are being applied unconstitutionally to plaintiff's protected activities; that the Sarpy County prosecution is an unconstitutional punishment and chilling of and restraint upon protected activities and has resulted in a

prior restraint on plaintiff's speech and expressive activities; and, that the Bellevue permit ordinances are unconstitutional facially, and as applied. This action also seeks preliminary and permanent injunctions against further enforcement of the Nebraska funeral picketing law; the Nebraska flag mutilation law; the state laws regarding disturbing the peace, negligent child abuse and contributing to the delinquency of a minor, as to plaintiff's picketing and related activity; the Sarpy County criminal prosecution; and Bellevue permit ordinances.

## Jurisdiction and Venue

26. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343, 1651 and 2201 and 42 U.S.C. § 1983 and 1988.

27. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## Facts

### *Background*

28. Plaintiff is a member of Westboro Baptist Church (WBC), an Old School Baptist Church in Topeka, Kansas, whose members believe the Bible is the Word of God, so they follow the Bible and the doctrines of grace contained therein. Based on these doctrines, plaintiff and other church members believe that acceptance and institutionalization by society of the sin of homosexuality and other grave sins (including fornication, adultery [divorce/remarriage], idolatry, murder [abortion], greed, etc.) prompts divine judgment. They further believe that God is punishing America for her sins; for teaching full generations to be proud about their sin and to ignore the word of God and their duty to God; and for institutionalizing sin in the

10

schools, churches, and other social institutions; by killing Americans, including American soldiers.

29. Along with other members of WBC, plaintiff has long expressed her sincerely held religious beliefs by engaging in picketing and protesting. For many years, they have picketed and protested near funerals of people who published and glorified their homosexual behavior; persons whose lifestyles they believed to be sinful, but who are touted as heroic upon their death; persons whose actions while alive had supported homosexuality and other activities they consider sinful; and persons whose life, death and funeral are the topic of public interest and attention. The purpose of picketing and protesting near funerals is to use an available public platform to publicize the church's religious message, and to warn the living since it is too late for the dead. The funerals of American soldiers are an international platform where the question of whether God is cursing or blessing America is being discussed. Plaintiff believes that this public platform is the only place where her religious message can be delivered in a timely and relevant manner to those attending the funeral and to those participating in the related public events and displays outside the funeral. Also plaintiff pickets near funeral-related events to voice dissent from the prevailing public messages conveyed (especially by leaders) at such events, including messages related to patriotism, heroism, God's blessings, and other issues of morality.

30. Plaintiff and other church members have conducted over 40,000 pickets, including between 250 and 300 in connection with funerals or memorials.

11

31. All of Plaintiff's pickets and protests are conducted lawfully and peacefully, on public
sidewalks and right-of-ways, and plaintiff and other church members routinely
schedule pickets in connection with funerals or memorials so that they finish/end the
picket when the funeral or memorial service begins (so they are only picketing before,
or on a rare occasion after because of scheduling issues or delays, not during, the
funeral or memorial).

32. Against this backdrop of picketing, which began in early 1991, in early 2005 plaintiff
and other WBC members discerned that the death events (funerals, memorials, vigils,
etc.) of soldiers killed in Iraq and Afghanistan had become significant public events;
that only one message was being delivered internationally in connection with those
death events, to wit, that the dead person was a hero gone to heaven; that the lives,
deaths and death events were receiving extensive media coverage; that various and
sundry religious, political and other leaders were attending, speaking, and making
huge public platforms of these events; and that no one was expressing the view that
these soldiers were dying because of the sins of this nation.  Further, plaintiff and
other WBC members discerned that pursuant to their religious beliefs, they had a duty
from the Scriptures to deliver that message on that platform to warn the living to stop
sinning lest they incur further wrath from God on themselves, their households and
this nation.  So they began conducting pickets at a distance from these death events,
using signs, song, parodies and flags.  All of these pickets have been conducted a
distance from the location of the event; usually before (a few rare occasions after) the
event, never during the event; and never involving going inside, disrupting, or

12

stopping the flow of foot or vehicle traffic. Instead, the pickets involve standing on public right-of-ways holding signs, singing a cappella and holding, dragging, hanging, wearing and standing on flags to express ideas consistent with the picket signs. Plaintiff and other WBC members at all times comply with every police order issued, even if they are questioned/questionable; and obey all laws.

33. Recently the Fourth Circuit Court of Appeals (in the context of setting aside a large verdict against plaintiff, her church, her pastor, and another member of her church) said that the picketing of funerals by plaintiff and other WBC members is public speech on public issues, specifically saying regarding the signs, that "they involve matters of public concern, including the issue of homosexuals in the military, the sex-abuse scandal within the Catholic Church, and the political and moral conduct of the United States and its citizens. Such issues are not subjects of 'purely private concern,' [citation omitted], but rather are issues of social, political, or other interest to the community [citations omitted]," *Snyder v. Phelps*, 580 F.3d 206, 222-223 (4th Cir. 2009).

### *Passage of the Nebraska Funeral Picketing Statute*

34. On July 23, 2005, such pickets began to be held in Nebraska, the first being in Omaha. After three such pickets (in Omaha, Beatrice and Papillion), Nebraska Senator Mike Friend introduced Legislative Bill 773 proposing to amend the existing Nebraska law on unlawful picketing to include picketing of a funeral. LB 773 proposed to make it a class III misdemeanor to picket within 100 feet of the premises of any location where a funeral is being held. The proposed language to be added to

13

Neb. Rev. Stat. § 28-1317 was this: "A person commits the offense of unlawful picketing if, either singly or by conspiring with others, he or she ...(b) Pickets within one hundred feet of the premises of any location where a funeral is being conducted. For purposes of this section, funeral means the ceremonies, processions, and memorial services held in connection with the burial or cremation of the dead." (Underlined language is the new language; emphasis in original.)

35. The Judiciary Committee of the Nebraska Legislature held a hearing on January 25, 2006, on this proposed law. Significant changes to the proposed law from that committee included a) making funeral picketing a separate criminal offense, instead of adding it to the existing unlawful picketing statute; b) adding legislative intent language; c) prohibiting picketing within 300 feet instead of 100; d) removing funeral processions; e) adding a time frame of one hour before and two hours after the commencement of the service; and, f) adding language declaring an emergency so the law would go into effect immediately upon signing.

36. In his comments introducing the proposed law to the Judiciary Committee, Senator Friend stated: "There is one particular group that travels the nation to a degree, and lately the Midwest, to protest at funerals, and notably military funerals. They have visited Nebraska on a couple occasions, and last month, I guess, they were in Papillion. Their speech is utterly despicable and to me it's deplorable." The President of the Nebraska Funeral Directors Association (and general manager of a Lincoln funeral home) requested that the distance be increased from 100 to 300 feet. Among other reasons for this request: "First and foremost, it would help ensure that

14

the actions and appearance of demonstrators do not interrupt the solemnity of the occasion.   Imagine, if you can, the funeral service that was recently held to commemorate the life of Senator Exon being disrupted by a group of demonstrators that did not have the same beliefs as the senator.   A distance of 100 feet would have allowed them to gather on the grounds of the Capitol here."

In the May 2006 Legislative Research Division's *A Review: Ninety-Ninth Legislature Second Session, 2006*, a description of the Nebraska funeral picketing law states:   "Nebraska becomes the sixth state to restrict protests at funerals with the passage of LB 287.   The bill responds directly to the actions of the congregants of a small Baptist church in Topeka, Ks., who picket at the funerals of soldiers killed in Iraq and Afghanistan, including at least two in Nebraska, because they believe God is striking down Americans for harboring homosexuals.   Members of this church have protested at the funerals of AIDS victims and prominent individuals for years."

37. The final version of the Nebraska funeral picketing law states:

> **Section 28-1320.01 – Unlawful picketing of a funeral; legislative findings.**
> (1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.
> (2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced.   Therefor [sic], the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.
> **Section 28-1320.02 – Unlawful picketing of a funeral; terms, defined.**

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

**Section 28-1320.03 – Unlawful picketing of a funeral; penalty.**

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor.

38. Before the Nebraska legislature passed the Nebraska funeral picketing statute, or before officials began enforcing it as described below, the Eighth Circuit Court of Appeals issued its opinion in *Olmer v. City of Lincoln*, 192 F.3d 1176 (8th Cir. 1999). In that case, an ordinance in Lincoln, Nebraska, which was much more narrowly written than the Nebraska funeral picketing statute, was held unconstitutional because it reached more speech than necessary for the asserted government interest. That ordinance only prohibited picketing one half hour before and one half hour after a scheduled service on a religious organization's exterior premises, including parking lots, and on the immediately adjacent sidewalk. The City claimed it had a legitimate interest in preserving the right of its citizens to exercise their religion freely. Concluding that the ordinance went beyond protecting this right to worship in private, the Court said: "If, for example, anti-abortion protestors were to attempt to enter a church without permission, or to interrupt church services with their own speech, the city could doubtless prosecute them under a general trespass or disturbing-the-peace provision, or, if necessary, adopt a more specific prohibition directed against

16

disturbing or interrupting services of worship. The present ordinance goes way beyond that. It goes beyond the church building and church property, and seeks to forbid peaceful communication on property belonging to the public, even though the communication may be completely truthful, and even though there is absolutely no physical interference with access to the church." 192 F.3d at 1180-1181. The Nebraska legislature thus was on notice that the language written into the state statute was too broad. Further, the Eighth Circuit ruled that a preliminary injunction should have been granted to plaintiff in *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008), in October, 2008, for a similarly defective law, yet the Nebraska statute has not been repealed.

39. Also before the Nebraska funeral picketing statute was passed, state officials were aware of the context and dynamics, and knew that plaintiff and other WBC members were not engaging in disruptive picketing and were not intruding on the funerals. They also knew that there was a public debate underway in connection with the soldier's funerals in Nebraska, in which plaintiff and other WBC members were participating, and that plaintiff/WBC's viewpoints were unpopular, including in the minds/eyes of state officials. They also knew that the funerals of soldiers in Nebraska were significant public events. One illustration of these facts is a memorial service held in Lincoln, Nebraska, on February 25, 2006. This memorial service was attended by elected officials who all spoke at the memorial service, including United States Senators Chuck Hagel and Ben Nelson, defendant Governor Dave Heineman, Representative Jeff Fortenberry, and Mayor Coleen Seng. Also before the memorial

17

service began, at least a hundred citizens including military/veteran bike riders from the Patriot Guard Riders and American Legion Riders, stood outside the church, on the same side as the church, engaged in expressive activity; and members of WBC stood across the street engaged in expressive activity; there were no disruptions of any kind. All of the dialogue by the members of these two groups, the officials present, and citizens – directly in connection with this memorial service – reflected the important public debate taking place, and how these events were occurring. Also media coverage of this soldier's funeral and memorial service, by local and national media outlets, reflect that there is a *content* debate occurring about the significance of the dying soldiers. The extensive media coverage before, during and after the funeral and memorial service, about the life, death, funeral and memorial service, and the context of it all in connection with this soldier's death, is typical of what happens with nearly all of these soldiers' funerals and memorial services, and others' funerals and memorial services. All of this was known to the Governor and the Senator who proposed the bill, when this law was passed and signed.

### *The Application of the Nebraska Funeral Picketing Statute*

40. Nebraska officials have consistently applied the Nebraska funeral picketing statute as expected, to wit, very broadly, discriminatorily against plaintiff and other WBC members vis-à-vis others engaged in protest activities at the same events; and in a manner that restrained, chilled and prohibited speech and other expressive activities.

41. On May 28, 2006, WBC members conducted a picket in Bellevue, Nebraska, connected with the death of a soldier. WBC members were required to stay 300 feet

18

4:09-cv-03268-LSC-FG3   Doc # 1   Filed: 12/30/09   Page 19 of 69 - Page ID # 19

from the curb line; the building was set hundreds of feet off the road; law enforcement present advised that the County Attorney instructed them to measure 300 feet from the curb line. At the same time, hundreds of motorcycle drivers and other citizens were permitted to stand on the church property engaging in protest activities, lining the walkway up to the entrance; and lining the sidewalk immediately in front of the church.

42. On June 20, 2006, WBC members, including plaintiff, conducted a picket in Beatrice, Nebraska, connected with the death of a soldier. Plaintiff and other WBC members were required to stand at least 300 feet from the property line. At the same time, 60-70 bikers were engaged in protest activities directly in front of the church, on the church property and on the sidewalk immediately adjacent to the church. Plaintiff wrote the Chief of the Beatrice Police Department in advance of the funeral proposing a location that complied with the 300 foot law. The Chief wrote back requiring plaintiff and others to stand at a different location, further away, stating that this was the designated area and the spot requested would violate the statute. Plaintiff and other WBC members complied with the directives of the Chief when conducting the picket.

43. WBC members including plaintiff planned on the same date, June 20, 2006, to conduct a picket in the Village of Clarks in Merrick County, Nebraska. In advance of this date, a WBC representative contacted law enforcement (per their regular practice of doing so) to advise of the plan to picket. Defendant McPhillips, in his capacity as Sheriff of Merrick County, advised the WBC representative that if plaintiff or other

WBC members stepped foot in Clarks they would be arrested; that if they were 300 feet away he would find something to arrest them for, failure to turn a blinker on, not parking right, disorderly conduct, or "one peep" out of the picketers; and that he would have plenty of law enforcement to carry out his threats. In the course of this discussion Sheriff McPhillips told the WBC representative that "this is no religion;" their message "has nothing to do with religion;" and, "this is a bunch of idiots, that is what it is; you don't follow the Bible; you're a bunch of idiots." Therefore plaintiff and other WBC members were not allowed to conduct the picket in Clarks, Merrick County, Nebraska, as planned. Defendant McPhillips made statements to the media that he would not allow plaintiff or WBC members to picket anywhere one hour before and one hour after the funeral, and that "numerous" law enforcement agencies would be present. When the funeral was conducted in Clarks, fire trucks, police, veterans, bikers with flags and citizens were permitted to be directly in front of the funeral site; to line the procession route; and lead and follow the procession; all according to media reports, which also reported that WBC members were not permitted to be present or picket.

44. On July 8, 2006, WBC members conducted a picket in Omaha, Nebraska, in connection with a soldier's funeral. Law enforcement designated a place for the WBC members to picket, at least 300 feet if not more away. At the same time Omahans were invited to line the route and participate in protest activities, and the Mayor commented publicly about protecting the family and funeral goers from seeing the WBC picketers. Again on December 17, 2006, WBC members conducted a picket

in Omaha, in connection with an event held in a veterans' building.  WBC members were required to stand behind an orange line spray painted on the ground, at least 500 feet from the building.

45. On August 10, 2006, WBC members conducted a picket in Pender, Nebraska, in connection with a soldier's funeral.  Law enforcement designated a place for the WBC members to picket two blocks from the church, in a park; and surrounded the WBC members physically.  At the same time, bikers and citizens were permitted to stand on church property, on the sidewalk in front of the church and leading up to the entrance, engaging in protest activities.

46. On September 5, 2006, plaintiff and other WBC members conducted a picket in Minden, Nebraska.  They were required to be at least 300 feet away, with a line marked in paint that they had to stand behind.  At the same time, hundreds of Patriot Guard riders and citizens were permitted to be directly in front of the church, including on the sidewalk directly in front of the church, engaging in protest activities.

47. On February 16, 2007, WBC members conducted a picket in McCook, Nebraska, in connection with the death of a soldier.  WBC members were required to stand at least 300 feet away; and, they were surrounded by police officers, Sheriff's deputies and Nebraska Highway Patrol members, blocking them from sight.  At the same time, bikers and citizens were permitted to be directly in front of the building with flags, engaging in protest activities.

48. On April 17, 2007, WBC members conducted a picket in York, Nebraska, in connection with a soldier's funeral. The event was held in the York City Auditorium. WBC members were required to stand over 600 feet from the building. Bikers and citizens were permitted to be directly in front of the building engaging in protest activities.

49. On June 5, 2007, plaintiff and other WBC members scheduled a picket in Bellevue, Nebraska, in connection with the death of a soldier. Upon arrival, law enforcement directed the eight picketers to stand in a small space marked by spray paint, which was between 500 and 1200 feet from the church (depending on whether you follow the path or go as the crow flies). Bikers and citizens with flags lined up from the church down to the main street (Harvell Drive), being permitted to stand directly in front of and on the same side of the street as the church, much closer to the church than WBC members, to engage in protest activities, including revving motorcycle engines (which is a common activity by the bikers outside of funerals).

Before going to this picket, plaintiff obtained a permit from the City of Bellevue, which designated that the picketers would stand across the street from the "T" intersection at Kayleen and Harvell Drive, standing on the south side of Harvell Drive. When plaintiff and other members arrived and began getting signs out, Officer Joe Gray of the Bellevue Police Department directed them, "You're supposed to stay within the lines." When plaintiff asked what the basis was for keeping them in a small square of space, Officer Gray advised, "That's what the permit says." When plaintiff said the Supreme Court said public sidewalks are held in trust for robust

22

public debate, Officer Gray responded, "Not when it's picketing, no it's not." Within a few minutes, plaintiff was arrested by Bellevue police, and taken to the Sarpy County jail. Throughout the picket, the remaining picketers were required to stay in a small box of space, well over 500 feet from the church, while counter picketers were permitted to be directly in front of and up into the property of the church, engaging in protest activities.

50. On October 29, 2008, WBC made contact with defendant Brueggemann in his capacity as Sheriff of Cass County, Nebraska, to notify law enforcement of planned pickets on October 31 and November 1, 2008, in connection with funerals. When a WBC representative called for defendant Brueggemann to follow up on the letter, she was transferred to defendant Cox, in his capacity as County Attorney for Cass County. Defendant Cox discussed the details of when and where the pickets would be held; said he would inform the officers; and said he would be back in touch to finalize plans. Thereafter defendant Cox made himself unavailable for follow up phone calls until late on October 30, 2008, at which time he advised that he had commenced an action in the district court and gotten an injunction against plaintiff, WBC and other members, and that if they came to picket they would be served with process and required to appear in court in the case. The case filed was styled *State of Nebraska ex rel. Cox v. Westboro Baptist Church, et al*, Case No. CI 08 520, in the District Court in and for Cass County, Nebraska. He advised he did this because of the community reaction. Thus, WBC members were deterred from conducting this religious picket.

23

### *The Nebraska Flag Mutilation Statute*

51. The Nebraska flag mutilation statute states as follows:

**Section 28-928 – Mutilating a flag; penalty; flag, defined.**

(1) A person commits the offense of mutilating a flag if such person intentionally casts contempt or ridicule upon a flag by mutilating, defacing, defiling, burning, or trampling upon such flag.

(2) Flag as used in this section shall mean any flag, ensign, banner, standard colors, or replica or representation thereof which is an official or commonly recognized symbol of the United States or the State of Nebraska.

(3) Mutilation of a flag is a Class III misdemeanor.

52. Before June 5, 2007, on more than a dozen occasions plaintiff and other WBC members had conducted pickets in Nebraska, during which pickets United States flags were used to express ideas, including by holding them upside down, hanging them from a belt, loop, or tied to a leg, and dragging them on the ground or stepping on them; by laying them on the ground and standing on them; and otherwise; all clearly conveying disagreement with this nation's policies, articulated by plaintiff and other WBC members in signs, words and songs, that the nation is in distress, in trouble with God; and that the flag is the symbol of proud sin today, on the international stage; and otherwise. It is very obvious in the picketing activity of plaintiff and WBC members that the use of the flag has only one purpose, to wit, to express ideas and viewpoints.

53. On June 5, 2007, as described further below, plaintiff was arrested when her minor son stood on the flag during a picket in Bellevue, Nebraska. Yet after plaintiff was taken to jail, as other WBC members continued picketing, at least one of them held a flag upside down in the presence of law enforcement and this was permitted.

24

54. Thereafter, on July 23, 2007, the City of Bellevue, Nebraska denied a permit to plaintiff and WBC members to picket in Bellevue on July 30, 2007. Then, on July 27, 2007, city officials altered their response to allow some WBC members other than plaintiff (who was prohibited by name) to picket, with various written restrictions, including no use or depiction in any fashion of the United States flag. Thus, plaintiff and WBC members were restrained from conducting this picket, and from using flags in expressive activities. At the same time, dozens or more bikers and citizens were permitted to be directly in front of the church where the funeral was held on July 30, 2007, engaging in protest activities including using flags. Again, on December 24, 2009, plaintiff and other WBC members applied for a permit with the City of Bellevue, for pickets on December 30, 2009; defendant Stacey advised a WBC representative that the permits would be granted but that no use of the United States or Nebraska flags of any kind would be permitted during the pickets (without regard to whether the circumstances presented disruption or breach of the peace or threat of either); though other flags (Israel, homosexual) would be allowed.

55. Also thereafter, and on June 12, 2007, law enforcement officials in Omaha began enforcing the Nebraska flag mutilation statute against plaintiff and other WBC members for the first time, expressly for the stated reason that Bellevue was doing so. On numerous occasions before June 5, 2007, plaintiff and other WBC members picketed in Omaha using flags, in the immediate presence of law enforcement, and this activity was permitted without comment or objection. On numerous occasions *since* June 5, 2007, plaintiff and other WBC members have picketed in Omaha, and

on each such occasion law enforcement have expressly forbidden the use of the flag in any fashion on pain of arrest and prosecution. Specifically, Deputy Chief Mark Sundermeier expressly stated on June 11, 2007 to a WBC representative (and thereafter to plaintiff personally), that the flag statute would be enforced as to the United States and Nebraska flags (only). Since June 11, 2007, and continuing to date, law enforcement officials in Omaha have consistently declined to change their position that flags cannot be used during pickets, on request by plaintiff and other WBC members.

56. The language of the police officials in Omaha, Nebraska, on June 11, 2007 was so strong and threatening that plaintiff and other WBC members were deterred from conducting a picket at all on June 12, 2007.

57. Pickets were conducted in Omaha by plaintiff and/or other WBC members at least on these additional dates, and on each occasion plaintiff and other WBC members were chilled and restrained from expressing themselves through the use of the United States and Nebraska flags during pickets: July 29, 2007; December 10, 2007; June 17, 2008; August 10, 2008; November 21, 2008; May 12, 2009; May 16, 2009. During the funerals of July 29, 2007 and June 17, 2008, counter picketers were permitted to use the flag in expressive activity.

58. On July 30, 2007, WBC members conducted a picket in Norfolk, Nebraska, in connection with a funeral. When a WBC representative contacted law enforcement officials in advance per their usual practice, she was advised by Cpt. Steve Hecker that if any WBC member used the flag during the demonstration, their personal

26

information would be taken; their names provided to the County Attorney; and then depending on what happened in Bellevue, they would later be prosecuted. This chilled and restrained WBC members from using their flags to express ideas on July 30, 2007. At the same time, bikers and citizens were permitted to use flags in expressive activity, and also permitted to be directly in front of the church where the funeral was held engaging in protest activities.

59. On December 28, 2009, a WBC representative spoke with defendant Houloose regarding a planned picket for December 30, 2009, by plaintiff and other WBC members, to be held in Papillion, Nebraska. Although defendant Houloose told the representative on December 24, 2009, that the Nebraska flag mutilation statute would not be enforced against plaintiff's and other WBC members' expressive activities during picketing, on December 28, 2009, he reversed himself, saying words to the effect, "I know that you are in litigation with the Bellevue Police Department and I suspect that will go to the Supreme Court or the Nebraska Court of Appeals. So we're going to enforce the Nebraska flag statute." Then he clarified that this meant the United States and Nebraska flags could not be used during the picket; and that other flags could be. Thus, plaintiff and other WBC members are restrained once again in their ability to engage in expressive activities using the United States and Nebraska flags in the course of their religious picketing.

60. In the time period since June 5, 2007, when Bellevue officials arrested plaintiff for her son standing on a flag, some Nebraska jurisdictions have permitted the use of flags by plaintiff and other WBC members to express ideas, including by dragging,

standing on, and holding it upside down, including Spalding, Nebraska; Page, Nebraska (though on September 18, 2008, one member of the State Highway Patrol confronted plaintiff about the use of the flag, but after being asked if he was going to arrest her, he allowed plaintiff to continue using the flag, with it hanging from her waist and hitting the ground); and Lincoln, Nebraska.

61. Each time jurisdictions in Nebraska have prevented plaintiff and other WBC members from using the flag during picketing, since the arrest of plaintiff of June 5, 2007, none of them have ever limited this prohibition by their words or by the circumstances existing during the pickets, to situations where there was a threat or actuality of any disruption or breach of peace. Instead, the flag use was disallowed in advance and was absolute.

## The Arrest & Prosecution of Plaintiff for Picketing and for Her and Her Son Using a Flag for Expressive Activities During the Picket

62. On June 5, 2007, after picketing for a few minutes, in Bellevue, Nebraska, six Bellevue Police Department officers arrested plaintiff and took her to the Sarpy county jail. Officer John McDaniel first approached plaintiff saying, "I'm under the understanding that you guys have been arrested or somebody's been arrested with your group in Fremont, Nebraska, for mutilating or defacing the flag." That was not true. Shortly Officer Gray said, "Kicking the flag around on the ground is a violation of the law." Plaintiff then referred to *Texas v. Johnson* "where the Supreme Court says that you can even burn the flag, because it is an expression of free speech," to which Officer Gray replied, "We're not in Texas. We're in Nebraska." Another

4:09-cv-03268-LSC-FG3 Doc # 1 Filed: 12/30/09 Page 29 of 69 - Page ID # 29

WBC member said, "It's the United States Supreme Court," to which Officer Gray replied, "We're not going to go through that." A little later plaintiff referred to a flag hanging off her side touching the ground, asking "So, are you suggesting that *this* flag violates your law?" To which Officer McDaniel replied, "No, what we're. What we're concerned with is the young man. The young kid stepping on the, the American flag." Plaintiff had three of her minor sons with her, and one of them was standing on a flag. A little later Officer McDaniel turned to another officer and said, "Can you get that statute that we passed out?" Shortly, after conferring with one or more superiors at the station, Officer Pettit told plaintiff, "Put your signs down for me," and then, "Shirley, right now you're going to be under arrest for contributing to the delinquency of a minor." The officers seized two United States flags that belonged to plaintiff and other WBC members. The statements by the arresting officers at the time of the arrest reflect that they knew they were acting contrary to clearly established constitutional law, but they were not interested in hearing about that law and did not consider it to apply to Nebraska. Also their statements reflect a plan in advance of the arrival of plaintiff and other WBC members to find a reason to arrest them, reflected in comments about a supposed arrest in another city (which did not happen; plaintiff and WBC members have never picketed in the city referred to by the officers); and reflected in the officers having a copy of the flag statute that was passed out and discussed in advance earlier that day.

After diligently seeing to it that the remaining picketers were on the sidewalk and in the little square they were told to stand in, Officer Gray then spoke with plaintiff's

4:09-cv-03268-LSC-FG3 Doc # 1 Filed: 12/30/09 Page 30 of 69 - Page ID # 30

adult daughter, saying, "I need to get some information. Your mom wants to relinquish the younger kids into your custody, so." One or two officers stayed with the rest of the picketers, while two left to take plaintiff to jail. The remaining officers diligently ensured the children left behind did not step on the grass. No mention was made, as the children and adults continued picketing, of any least concern that any child was in real or perceived any danger. When the time on the permit drew nigh, the picketers packed up and left. An officer followed the picketers for another ten minutes and then left them. The words and actions of the officers before, during and after the arrest of plaintiff reflects that they knew plaintiff's minor children were not in danger of any kind, and that no threat or existence of violence or harm was present at any time.

Before plaintiff and other WBC members traveled to Bellevue, a WBC representative had conversations with Bellevue Police Department staff wherein the police were specifically told how many minors were coming, and their ages. If there was any danger at the scene of the picket, they could have revoked the permit. Information about minors is one of the pieces of information the Bellevue permit ordinances requires. The only danger plaintiff's children faced on June 5, 2007, was the danger of seeing their mother hauled off to jail in handcuffs for protected activity.

While all this was taking place, hundreds of Bellevue police, and other agency personnel (law enforcement, firefighters, emergency responders, etc.), were congregated inside and outside the church; in large numbers; with numerous vehicles; and hundreds of bikers and citizens were directly in front of the church with flags and

30

banners, all participating in expressive conduct; many using flags in that expressive conduct; none of them subject to the restraints placed on plaintiff and other WBC members. The statements of officials including police and prosecutor related to these events reflect beyond question that the difference in the treatment was because of the difference in the ideas and viewpoints expressed.

Meanwhile plaintiff was taken to the Sarpy County jail. Upon arrival a female corrections officer confronted her about the message on her shirt, to wit, God Hates America. This message was on the back of the shirt. The corrections officer then came around to the front and saw the message on the front of the shirt, to wit, God Hates Fags. She said words to the effect, "I agree with the front, but not with the back." Then she added, "I don't agree with either, God don't hate nobody. How dare you have a shirt that says something like that?" A little later this jail employee required plaintiff to remove her shirt. A review of photos of plaintiff being arrested, compared to her photo taken at the jail, shows the message-bearing outer shirt has been removed.

Meanwhile family members/attorneys at home in Topeka, Kansas, attempted to contact staff at the police department and prosecutor's office, seeking relief on plaintiff's behalf, and were turned away.

63. On June 5, 2007, Captain Herb Evers sent an e-mail to info@phelpschartered.com, where plaintiff was employed and where the attorneys were who attempted to contact police and prosecutor staff for relief, stating: "I believe it was Jonathan Phelps that left me a voice mail on my work cell while I was talking with Rebekah Phelps-Davis.

Sorry I did not return the call however duty calls and we were very busy with about 1000 friends and family laying to rest a brother in public safety. This is just to say I did receive the message and I DID NOT get the arrestee released from jail." (Emphasis in original.)

64. After several hours in jail, plaintiff was issued a ticket for Mutilating a Flag contrary to Neb. Rev. Stat. §28-928 and Contributing to the Delinquency of a Minor contrary to Neb. Rev. Stat. §28-709, and then permitted to bond out. Plaintiff remains under bond to this date.

65. On June 5, 2007, defendant Stacey caused a picture of plaintiff from her arrest (mug shot) to be placed on the Website of the Bellevue Police Department, together with this language:

Bellevue Police Force Resources Stretched During Bailey Funeral

Bellevue Police resources were stretched on Tuesday, June 5th with one of the largest funerals this city has ever seen. Specialist William Bailey, a dedicated soldier and a volunteer firefighter was killed by a roadside IED in IRAQ and the immense outpouring of support from citizens miles away required several roadways to be shut down to accommodate everyone. Chief Stacey said that department resources were stretched even farther during the event, when a group of Kansas protestors arrived to protest the funeral. He added, "This, as we all know is their right as a citizen of this fine country. They went a little too far when the mother of a 10 year-old child allowed her child to desecrate the flag of the United States next to two Bellevue Police Officers." Desecration of the flag is against the law in Nebraska.

The mother, Shirley Phelps-Roper, was arrested and taken to jail. Phelps-Roper is a member of the Westboro Baptist Church in Kansas. The group is known for protesting at the funerals of U.S. soldiers and for its belief that the deaths of soldiers is God's retribution for a nation that harbors gays and lesbians. She is

charged with flag mutilation, disturbing the peace and contributing to the delinquency of a minor. She was booked and released on bail.

This statement remains on the Bellevue Police Department Website to this day, under 2007 Story Archive. See http://www.bellevuepd.com/200707.html (last viewed 12/22/2009).

66. On July 5, 2007, plaintiff was charged with one count of mutilating a flag in *State of Nebraska v. Shirley L. Phelps-Roper*, Case No. CR-07-5060; and, in a separate criminal complaint (Case No. CR-07-5061), plaintiff was charged with one count of disturbing the peace, one count of contributing to the delinquency of a minor, and one count of negligent child abuse; all having allegedly been done on June 5, 2007, at Harvell & Fairfax.

### *Efforts to Obtain Review of the Constitutional Issues in the State Court System*

67. Plaintiff sought relief in the County Court of Sarpy County from the prosecutions, through a motion to quash. On February 3, 2009, defendant Hutton issued orders denying the motions to quash, saying: "The flag mutilation statute prohibits 'intentional … casting contempt' or 'ridicule' of the flag thru 'mutilating, defacing, defiling, burning, or trampling upon such a flag.' In that form this statute is content based. The statute 'is directly related to expression' thus precluding the content neutral *O'Brien* standard of review."

The order also states that the Nebraska statute is "analytically indistinguishable" from the Flag Protection Act declared unconstitutional in 1990. The court then found: "The landmark 1989 and 1990 U.S. Supreme Court decisions of *Texas v. Johnson* and

33

*U.S. v. Eichman* have brought into question the constitutionality of Nebraska's flag mutilation law. ... Defendant's motion to quash presents an issue of first impression in the Nebraska court system. There have been no reported cases in which the Nebraska Supreme Court has issued an opinion regarding the constitutionality of this statute nor has the court referenced the *Johnson* and *Eichman* decisions as precedence. It is the Nebraska Supreme court which brings finality to questions regarding whether an act of the Legislature violates the state Constitution. ... This case is pending before the County Court; a court of limited jurisdiction. ... Although Nebraska's flag mutilation statute is vulnerable under a *facial challenge* analysis, it can be narrowly applied to those circumstances where an accused, through words and conduct of an inherently inflammatory nature, intentionally seeks to create an environment designed to provoke a person to retaliate, thereby inciting a breach of peace." Also, even though there is no dispute that the only basis for the other three charges – disturbing the peace, contributing to the delinquency of a minor, and negligent child abuse – is the fact that plaintiff's minor son stood on a flag during a picket – the court similarly declined to grant relief on those counts.

68. Plaintiff also sought relief from the Nebraska Supreme Court. An appeal was taken to the district court, which denied review. An appeal was taken from there to the Court of Appeals. In both cases plaintiff asked the Nebraska Supreme Court to bypass and transfer the appeal to the Nebraska Supreme Court, because the case involved questions of state or federal constitutional interpretations, questions of law regarding the validity of statutes, and issues of significant public interest. On November 12,

34

2009, the Nebraska Supreme Court granted the bypass motions and dismissed the appeals for lack of jurisdiction. The cases are still pending before the Nebraska Supreme Court as of this writing on a request for rehearing, and have not yet been returned to the County Court.

## *Defendant Polikov's Statements of Purpose in the Prosecution*

69. Defendant Polikov has made repeated public statements about his prosecution of plaintiff. His comments reflect his purpose of silencing plaintiff and other WBC members; his awareness that the Nebraska flag mutilation statute is contrary to established Supreme Court precedent; and his knowledge that plaintiff's actions were not illegal under existing law. His public commentary before and after filing charges includes: "I think the actions stepped across the line of civility and common decency and that's why we have rules and that's why I'm selected to enforce those." "Obviously with the mutilation of the flag we face freedom of expression problems, but there is no doubt in my mind that this defendant stepped across the lines of common decency and civility and that changes the situation from free speech." And, "The supreme Court said if you're going to burn a flag and it's expressing yourself that's constitutional. In that fact pattern it didn't address the fact pattern that we face where we have an individual that inserts herself in someone else's environment and then tries to, uh, I believe incite a response and it's predictable in a situation like that where you could end up with some violent reaction and then we come over to the why we're placing the child in a bad situation as well. ... She should be ashamed for putting her child in that situation. As well as—Yeah, as well as putting the family of

William Bailey in a situation like that and other soldiers similarly situated and a community that was expressing sympathy." After praising the police for doing a "great job" which "resulted in no violence," defendant Polikov complains that plaintiff and other WBC members were "playing games with the system and they just not ought to be able to do that." In further public commentary defendant Polikov said, "Tuesday's circumstance was different because she was involved in a potentially volatile situation where Bailey's friends, family and fellow soldiers had come to pay their respects. You might illicit a violent response. That's against community peace and community law. This isn't a demonstration in the town square against the war. The Supreme Court feels you can burn a flag because it's self expression. When you're provocative, invading other people's space, you can be held accountable." Also, "Who knows what would have happened if someone were driving by and saw that mother and child doing that to the flag." And, "Perhaps Phelps-Roper isn't clear on what the flag represents or how it should be used. 'It's certainly not meant to be used in this way,' he said. 'She was using it to incite a response.'" Further, "[Polikov] tells us that with the soldiers, firefighters, police and protestors all being in close proximity during the alleged incident, violence was possible." Also, "The Court was narrowly split [in Texas v. Johnson], 5-4, and was 'pretty liberal' at the time. Today's court, bolstered by traditionalist Bush appointees, might take a different view, he said." "If Sandra Day O'Connor was the county judge, I'd win this case." Defendant Polikov also said publicly he intended to request a law be passed by Sarpy County. "My goal would be you have to be out of sight, out of sound."

36

70. To justify his method of using prosecutorial power to punish, chill and restrain protected religious picketing, defendant Polikov made reference in his public statements to an incident in Seaford, Delaware, involving WBC picketers. That incident of May 22, 2006, resulted in several individuals being prosecuted for striking two WBC members, and for doing damage to two vehicles. Thus, defendant Polikov is relying on the criminal acts of others in a different jurisdiction to justify this unlawful prosecution. Also, a state official in Delaware used the same method as defendant Polikov, which apparently defendant Polikov is endorsing, to wit, officials using their official status and voice to make public statements about the *content of* and their disagreement with plaintiff's and other WBC members' viewpoints, to punish and deter protected speech. Four days before WBC members were scheduled to be in Delaware, where they picketed five blocks from the church where the funeral was held, a statement was attributed to Delaware State Senator James Vaughn in the local paper as follows: "I think we should turn a platoon of Marines – armed U.S. Marines – loose on them. That would take care of things in a hurry." The local paper saw fit to repeat this statement in an editorial the day before the picket. This method by officials of making public statements that have the effect of stirring people up, attempting to incite a "heckler's veto," with the goal of deterring, punishing and chilling speech, is the same method at issue in this case. A "heckler's veto" is not allowed under this nation's rule of law (e.g., *Brown v. Louisiana*, 383 U.S. 131, 133 & footnote 1, 86 S.Ct. 719 & footnote 1, 15 L.Ed.2d 637 [1966]), and certainly should not be encouraged by someone with prosecutorial power. No one should be surprised

37

there were people at the counter picket in Seaford, Delaware, ready to commit violence against WBC members, given the statements published in the media attributed to Senator Vaughn. A large crowd formed at this picket. The police did a good job containing the crowd and keeping them separate from the WBC picketers, and responding to the criminal acts of these individuals. No one was seriously harmed or required hospitalization or medical care. This picket was conducted five blocks from the church where the funeral was being held, and the illegal acts of those who engaged in violence and property damage, did so because they disagreed with the words, and because they had tactic permission from one of their leaders. Plaintiff was not at that picket, nor were there any minor children at that picket, because WBC members have learned in nearly 20 years of picketing that undisciplined words from officials can have the effect of stirring up people to attempted violence in the hopes that will silence words with which they disagree. In this instant case, defendant Polikov is using such undisciplined words to stir up emotions in the hope those emotions will carry the prosecution instead of the merits.

71. Defendants Polikov and Stacey apparently have an unconstitutional modus operandi of applying generic-seeming state laws to protected speech in an effort to punish, chill, restrain and prohibit the speech. In April 2009 these two defendants entered a Consent Decree and Judgment in *Hansen v. Polikov*, Case No. 07CV3261 in this Court, wherein they agreed not to apply the Nebraska Unlawful Picketing Statute (Neb. Rev. Stat. §28-1317(b) and (e)) or the Nebraska Disturbing the Peace Statute (Neb. Rev. Stat. §28-1322) against peaceful protesting.

38

72. No violence of any kind, or even any threat of violence, occurred during the June 5, 2007 picket, before or after police detained, questioned and arrested plaintiff. After having communicated in good faith with the Bellevue Police Department in advance of their picket, at all times during the June 5, 2007, picket plaintiff and all other WBC members complied with all police orders, lawful and unlawful. Police were notified of the number and ages of minors that would be attending, as part of the permit application process, including updated information the morning of the picket. If there truly was any threat to the safety of the children or any risk of disruption or a breach of the peace, they could have and would have pulled the permit. Instead, many police officers were attending the funeral, and defendant Polikov's statements illustrate that in fact the complaint he and the police had – which led to the arrest and prosecution – was the content of the message about the deceased soldier, whom they considered "a brother in public safety."

### *The Bellevue Assembly Permit*

73. On July 23, 2007, plaintiff and other WBC members applied for a permit with the City of Bellevue to conduct a picket on July 30, 2007. The purpose of the picket was a religious demonstration and expression was set out in detail in an attachment to the application. The application requested permission to picket at the same location for which a permit had been granted on June 5, 2007.

74. On July 23, 2007, the request for permit was added based to the agenda of the City Council meeting, presented as an emergency add-on. Captain Herb Evers addressed the council on behalf of the Bellevue Police Department. Captain Evers read several

paragraphs from plaintiff's writing about their religious beliefs to the council. He then told the council that on June 5, "there had been a funeral held, for, um, Bailey, a firefighter here in the city of Bellevue and a soldier who was killed in Iraq and, uh, the Westboro Baptist Church came to the funeral and protested. They violated the law at their protest. Based on that and based on our ordinance of, uh, 28-129, um, we the city have the, uh, authority to deny this permit, um, with the assumption that, um, their act or activity might be violative of the law. It was violative of the law at their past activity. We are assuming that this next activity, um, on Monday coming would also be violative of the law. Um, therefore, I submit this to the Council to see if the council, uh, believes it to be prudent to disapprove this application for the permit to assemble."   One council member stated:   "Herb, was this the same bunch that desecrated our flag?"   Captain Evers: "Yes, sir, it is. The exact same person." Council Member Stacey:   "I'll make a motion that we deny."   Council Member Sanborn: "Second."   Then Council Member Hatcher said "we need a – a reason to deny," and "if you don't have a reason I would consider it a, uh, safety issue...." As further discussion continued, Captain Evers stated:   "It was the – their protest, their activities last time were manpower intensive and cost this city a lot of money," this contrary to his e-mail and the posting on the Bellevue Police Department Website, which indicated all the manpower was focused on attending and participating in the funeral, with only six officers at the most involved with plaintiff and other WBC members.   Council Member Ott noted that there were "men and women in the uniform out here" in the audience.   Then Council Member, now Mayor Mixan

(defendant Mixan in this action), raised constitutional concerns. Captain Evers assured him that no matter what they did plaintiff and WBC members would sue them anyway. Council Member Erickson agreed, adding: "Uh, it's just – I talked to the guy the other day, and he says, 'What in the world are you talking about here, desecrating the flag? It's just a piece of cloth.' And [gasp] I just said that's absolutely, uh, according to my colleague here, it's stupid remark, and it is a stupid remark." Then a member of the church where the funeral was to be held for which the permit was requested came to the podium to clarify that the church was in no way approving this. Then as it neared time to vote, Council Member Cascio stated: "If think if we deny the permit, we'll have less issues than if we let this permit go on. I – I – I can't see – I can't see approving this … to disrespect this funeral. So I'm going to support denying this permit." Then the council voted 8-0 to deny the permit. Not once did the City Council or any other city official, including law enforcement personnel from the Bellevue Police Department, make a single mention of the safety or wellbeing of plaintiff's children or any other child during the picket as a concern. Their focus was, instead, entirely on silencing a message with which they disagreed.

75. The Bellevue city ordinances regarding permits for assemblies state as follows:

### ARTICLE V. PARADES, MEETINGS, ETC.
### DIVISION 1. GENERALLY
### Sec. 28-111. Enforcement.

Nothing contained in this article shall prohibit the authority of any officer to arrest a person engaged in any acts or activities granted a permit under this article, if the conduct of said person violates the laws, or obstructs the public streets and sidewalks of the city, or constitutes acts that cause a breach of the peace. (Ord. No. 2152, 2, 12-8-80)

### Sec. 28-112. Dispersal of activity.

41

Whenever the free passage of any street or sidewalk in the city shall be obstructed by a crowd, congregation, parade, meeting, assembly or procession, or the conduct of two (2) or more persons, except as authorized by any permit issued pursuant to this article, the persons comprising said group shall disperse or move when directed to do so by a police officer. It shall be unlawful for any person to refuse, and said refusal shall be a violation of this article. (Ord. No. 2152, 10, 12-8-80)

### Secs. 28-113—28-124. Reserved.

### DIVISION 2. PERMIT

### Sec. 28-125. Required.

It shall be unlawful for any person to organize or hold or participate in any parade, meeting, assembly or procession of persons and/or vehicles on the streets, sidewalks or other public places within the city unless such activity shall have first been authorized by a written permit therefor. (Code 1964, 14-66; Ord. No. 2152, 1, 12-8-80)

### Sec. 28-126. Application.

Any person desiring a permit required by the provisions of this article shall make application therefor to the city, which application shall contain the following information:

> (1) The name and local and permanent address of the applicant.
> (2) The name and address of the person the applicant represents.
> (3) The exact time and date of commencement and termination of each act or activity desired.
> (4) The purpose, location and route of such act or activity, if applicable.
> (5) The person, group, association or body to be authorized under the permit to do such act or activity and the number of persons to participate.
> (6) The age of any minors who may participate in such activity, and the name of the person who will be responsible for such minors.
> (7) Such other relevant information as the city may require for the investigation of the applicant. (Ord. No. 2152, 3, 12-8-80)

### Sec. 28-127. Matters considered in determining issuance of permit.

In deciding whether to issue a permit under the provisions of this article, the city shall consider:

> (1) Number of persons to participate;
> (2) Anticipated traffic conditions at the time and date proposed for the activity;
> (3) Schedule of other similar activities for which permits may have been issued;
> (4) Adequacy of adult supervision for any minors scheduled to participate;
> (5) Availability of city personnel whose presence on duty may be required by the activity and by the necessity to protect the general public;

(6) Adequacy of public facilities in the location proposed for the activity and the normal public use of public facilities in the proposed location. (Ord. No. 2152, 4, 12-8-80)

**Sec. 28-128. Denial, modifications.**

If the city determines from the application that the proposed parade or march will unduly interfere with and impede traffic on the public streets, alleys and ways over which the parade or march will pass, and the public streets, alleys and ways that intersect the public streets, alleys and ways over which the parade or march will pass, the city shall so advise the applicant in writing and give, in reasonable details, the reason the city will not issue a permit for such parade or march, and shall suggest such modifications in the said application, which, if made, will not unreasonably interfere with and impede normal traffic on the public streets, alleys and ways by said parade or march. Such modifications may include:

(1) Changing or altering the route of the march or parade;

(2) Changing the date and/or time of day the parade or march will be made;

(3) Changing or altering the length of the march or parade;

(4) Changing the width of the parade or march, i.e., from requiring the whole width of the public street, alley or way to a lesser part of the width, to be specified;

(5) Any combination of the foregoing suggested areas of modifications;

(6) Any other modifications that will cause the said parade or march to not unduly interfere with and impede normal traffic on the said public streets, alleys and ways of the city.

If such suggested modifications shall be incorporated in an amended application for a permit, the city shall forthwith issue a permit for such parade or march. (Ord. No. 2152, 6, 12-8-80)

**Sec. 28-129. Issuance.**

The permit required by this article shall be issued by the city upon supplication therefor; provided, however, that such permit may be denied or refused if it shall appear that the applicant therefor or the act or activity requested by such application shall be violative of law. (Ord. No. 2152, 5, 12-8-80)

**Sec. 28-130. Contents of permit.**

Upon issuance of a permit required by this article, the same shall contain therein all information contained in the application therefor and a signed copy of the same shall be kept with the application on file at city hall. (Ord. No. 2152, 11, 12-8-80)

**Sec. 28-131. Display.**

Every person having a permit issued under the provisions of this article shall have such permit in his possession during the activity permitted thereby, and shall display such permit upon the request of any law enforcement officer. Failure to display such permit shall be deemed a misdemeanor. (Ord. No. 2152, 8, 12-8-80)

**Sec. 28-132. Deviation from permit.**

43

It shall be unlawful for any person participating in any act or activity for which a permit has been granted under the provisions of this article to deviate from or alter any of the terms or conditions of such permit. (Ord. No. 2152, 7, 12-8-80)
**Sec. 28-133. Revocation.**
Any permit issued under the provisions of this article may be revoked by the city for the violation by the permittee of any law. (Ord. No. 2152, 9, 12-8-80)
Supp. No. 12

76. On July 25, 2007, defendant Dammast wrote WBC saying the permit was denied. On July 27, 2009, the City then issued a permit to WBC allowing seven members to picket, with restrictions including an express statement that "Ms. Shirley Phelps-Roper will not be among the participants." Also that the picketers would be required to stand at a specific location well beyond 300 feet. Also that "no United States flags, including depictions of the United States flag, will be displayed or used for any purpose in furthering the assembly." Given these limits, plaintiff was expressly restrained from religious picketing. Also given these limits, and the immediate past acts of the officials of Bellevue in arresting plaintiff, all WBC members were restrained from religious picketing on July 30, 2007. At the same time dozens or more bikers and citizens were permitted to be directly in front of the church engaging in protest activities at this funeral.

## Legal Theories

77. Plaintiff has standing herein because she has for many years engaged in and continues to engage in picketing, including picketing at funerals; because she has used and continues to use the flag in expressive and communicative activity; because she has had and will continue to have her children participate with her in her religious picketing and expressive and communicative activity; because she has been and is

being prosecuted for her religious picketing and expressive and communicative use of the flag and having her children participate therein; because defendant Polikov has made public statements indicating he intends to prosecute plaintiff further because of the viewpoint conveyed in her communicative use of the flag and for having her children participate; and because she has requested permits from Bellevue, will continue to request permits from Bellevue, and has expressly been denied a permit by Bellevue. For all of these reasons, and because the Nebraska funeral picketing law expressly targeted her activity and the activity of other members of her church; plaintiff has standing to bring these claims.

**COUNT I: The Nebraska Funeral Picketing Law is Unconstitutional on its Face**

*Defendants Heineman, Bruning, Curry, McPhillips, Cox and Brueggemann*

78. All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

79. The Nebraska funeral picketing law is unconstitutional on its face, for at least the reasons stated below, and for such other reasons as founded in law.

80. The Nebraska funeral picketing law is overbroad in that it prohibits speech at a far greater distance than whatever privacy zone it purports to protect.

81. The Nebraska funeral picketing law is overbroad in that it prohibits speech that is peaceful in character, and does not limit its coverage to speech or activity that is disruptive or undertaken to disrupt, narrowly tailoring it to its stated purpose of preserving the peaceful character of funerals. The law was written to cover peaceful and non-peaceful and disruptive and non-disruptive pickets. It is well known amongst

45

the officials of this nation, including legislative and law enforcement, that plaintiff and other WBC members do not go into the funeral; do not disrupt the funeral; do not interfere with anyone in the funeral; do not engage in or threaten violence or disruption of any kind. Thus in order to achieve the stated goal of impacting the picketing of plaintiff and other WBC members, this law had to be written this broadly; so it was written too broadly because it did not have at its inception a legitimate, compelling or other government purpose.

82. The Nebraska funeral picketing law is overbroad in that is fails to leave open ample and adequate alternative channels for the dissemination of a particular message to a particular audience.

83. The Nebraska funeral picketing law is overbroad in that it prohibits speech beyond that necessary to meet any legitimate, compelling or other government interest, both as to time frame and distance. The government does not have a legitimate, compelling or other interest in silencing speech on issues of public importance on public right-of-ways; this goes beyond any reasonable zone of privacy. Even if there is a privacy right in funerals which are public events about people whose lives, deaths and funerals are given broad coverage in the media, where the funerals are attended by the public-at-large, and often the platform for public officials and figures to express viewpoints, that zone of privacy is very limited, and should not go beyond, at the most, prohibiting disruption or interruption or intrusion into the funeral itself; it certainly does not extend to 300 feet as the statute says, or to the much greater distances where various officials have arbitrarily placed plaintiff and other WBC

members (see section below on as-applied challenge); nor does it justify a full prohibition which has occurred in some jurisdictions.

84. The Nebraska funeral picketing law is vague because it requires picketers to comply with a time frame tied to the beginning and ending of a funeral but requires no notice or posting of times so that there is no way to comply with the law.

85. The Nebraska funeral picketing law is vague because it requires picketers to remain a specified (overbroad) distance away during a specified (overbroad) time frame, but it does not provide any means of knowing where to begin the measuring of the distance.

86. The Nebraska funeral picketing law is facially unconstitutionally overbroad and vague in its time frames; since the original version included funeral processions, and since an hour before and two hours after is overbroad and not tied logically to anything else, it appears this is an effort to remove picketers from the funeral procession route, which is broader than necessary for the asserted government interests.  Whether or not this was or is the purpose, the time frames are broader than necessary to achieve any legitimate, compelling or other government interest, including those asserted.

**COUNT II: The Nebraska Funeral Picketing Law is Unconstitutional as Applied**

*Defendants Heineman, Bruning, Curry, McPhillips, Cox and Brueggemann*

87. All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

88. The Nebraska funeral picketing law is unconstitutional as applied for at least the reasons stated below, and for such other reasons as founded in law and fact.

47

89. Even if the Nebraska funeral picketing law was facially valid, it has been applied to plaintiff and other WBC members so that far more speech than the statute states is burdened, up to and including prior restraints on speech.

90. The Nebraska funeral picketing law is applied in varying ways, as to distance and time frame, by varying jurisdictions, accompanied by threats of arrest and prosecution, such that it has been applied as a restraint on protected speech.

91. The Nebraska funeral picketing law has been discriminatorily applied to one viewpoint, and thus is a content-based law in its application, rendering it invalid because no government interest asserted by the Nebraska legislature warrants a content-based enforcement of the law.

92. The Nebraska funeral picketing law is applied to peaceful, lawful, non-disruptive picketing, in public places, and as such is overbroad, beyond what is necessary for any legitimate, compelling or other government interest.

93. The Nebraska funeral picketing is applied to picketing which is non-intrusive, outside of any reasonable zone o++f privacy, in public places, beyond what is necessary for any legitimate, compelling or other government interest.

## COUNT III: The Nebraska Flag Mutilation Statute
## is Unconstitutional on its Face

*Defendants Heineman, Bruning, Polikov, Stacey, Mixan, Troutman, Dammast, City of Bellevue, Kleine, Hayes, Smith, Mizner, Hutton, Stacey & Houloose*

94. All factual allegations set forth above are incorporated here by reference as though set out verbatim.

95. The Nebraska flag mutilation statute is unconstitutional on its face for the reasons stated below, and for such other reasons as founded in law.

96. The Nebraska flag mutilation statute is unconstitutional on its face in that it criminalizes protected expressive activity, and specifically the use of the flag to express a viewpoint or idea. The language of the statute expressly prohibits mutilating, defacing, defiling, burning or trampling upon the flag *only* if done intentionally to cast contempt or ridicule upon a flag. Thus only by using the flag to express an idea or to communicate one specific viewpoint, to wit, contempt or ridicule, is this conduct prohibited. Thus the conduct prohibited is prohibited *because* it has expressive elements, which is precisely what the Supreme Court has said is unconstitutional.

97. The Nebraska flag mutilation statute is unconstitutional on its face in that it reflects no legitimate, compelling or other government purpose or interest, and therefore reaches protected speech and expressive conduct contrary to the constitution. The statute is on its face content-based and therefore must be held to the most exacting level of scrutiny; the legislature did not include any statement of intent that manifests a legitimate, compelling or other  government interest that supports a prohibition against anyone expressing contempt or ridicule for the flag. A conviction under this statute depends on the likely communicative impact of the expressive conduct which the statute prohibits. And, the statute only prohibits communicating contempt or ridicule for the flag, which means the State of Nebraska is, by this statute, criminalizing a specific viewpoint. It is unconstitutional for the state to try to foster or

49

impose its own view of the flag by prohibiting expressive conduct that it characterizes as contempt or ridicule (even if there could be a common understanding of these terms).

98. The Nebraska flag mutilation statute is unconstitutional on its face because it does not limit its application to expressive conduct that is disruptive or causes a breach of the peace. A person is prohibited from peacefully casting contempt or ridicule upon the flag in any situation under any circumstances, without any requirement that a breach of the peace actually have occurred. A suggestion that plaintiff or her son's use of the flag *could* have led to a breach of the peace does not rehabilitate this statute on its face because 1) there was no breach of the peace, and more importantly, 2) the statute does not require any actual or threatened breach of the peace for the statute to be violated and for arrest and prosecution to occur. As the Supreme Court said in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989): "To accept [the state's] arguments that it need only demonstrate 'the potential for a breach of the peace,' ... and that every flag burning necessarily possesses that potential, would be to eviscerate our holding in *Brandenburg [v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1960)]. This we decline to do," 491 U.S. at 409, 109 S.Ct. at 2542.

99. The Nebraska flag mutilation statute is unconstitutional on its face because it discriminates based on content in that it only criminalizes expressive conduct with two flags, to wit, the United States flag and the Nebraska flag; and no other. Thus a person can cast contempt or ridicule upon any other flag by mutilating, defacing, defiling, burning, or trampling upon such flag (such as the army flag, the Israeli flag,

the Swedish flag, the "gay pride" flag, etc.) without committing a crime. This defect further underscores the lack of any legitimate state interest behind this statute, because the only way the statute applies is based on content, and it is either under inclusive or over broad as to the content it covers, depending on an individual's viewpoint.

100.   The Nebraska flag mutilation statute is unconstitutionally vague because there is no definition for contempt or ridicule, and that intent is the critical element of the offense. Also there is no definition of mutilating, defacing or defiling. All of these terms are subject to broad interpretation and application, and for this further reason the statute is facially unconstitutional.

### COUNT IV: The Nebraska Flag Mutilation Statute is Unconstitutional as Applied to Plaintiff

*Defendants Heineman, Bruning, Polikov, Stacey, Mixan, Troutman, Dammast, City of Bellevue, Kleine, Hayes, Smith, Mizner, Hutton, Stacey & Houloose*

101.   All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

102.   The Nebraska flag mutilation statute is unconstitutional as applied to plaintiff for the reasons stated below, and for such other reasons as founded in law and fact.

103.   Even if the Nebraska flag mutilation statute did not, on its face, punish expressive conduct, it is being applied to plaintiff and other WBC members to prohibit conduct which under the circumstances is clearly communicative and expressive in nature. In all instances relevant to this lawsuit, the conduct prohibited under the Nebraska statute, and the conduct for which plaintiff is being prosecuted, was the use of the flag

51

in the immediate context of picketing about religious and moral issues, with the flag being drug, stood on or held upside down immediately juxtaposed to signs such as America is Doomed, God Hates the U.S.A., Mourn for Your Sin, Fags Doom Nations, Thank God for IEDs, God is Your Enemy, and so forth. No rational observation can be made other than to conclude that plaintiff's use of the flag was fueled by an intent to convey a particularized message and that the likelihood was great that the message would be understood by those who viewed it. Clearly the flag is being used to express ideas about the condition of this nation, and it is only for that use that defendants have arrested, ticketed, prosecuted, and restrained plaintiff and other WBC members in the use of the flag. Indeed, defendant Polikov's claim that there might have been a breach of the peace if someone had objected to how plaintiff and her son used the flag only makes sense if the message being conveyed was understood.

104. Even if the Nebraska flag mutilation statute did require a showing of a threat or immediate breach of the peace, the manner in which the statute is being applied is in circumstances when there is no threat or breach of the peace. On the day plaintiff was arrested, there was no threat or breach of the peace. Defendant Polikov's many public statements in connection with his unlawful prosecution of plaintiff reflect that he is applying the law to a situation where there *could have been* or *might have been* some breach of the peace, manifesting his understanding that there in fact was no breach of the peace, and manifesting the fact that the prosecution of plaintiff under this statute is based not upon a breach of the peace caused by her use and her son's use of the flag, but by the possibility of the same. Similarly, when the Bellevue City Council denied

plaintiff a permit to picket, and granted other WBC members a permit only if accepting the condition that no flag or depiction of a flag be used in any way, there was no suggestion or indication of a threat or breach of the peace. When plaintiff and other WBC members have picketed in other cities in Nebraska, where as enumerated above, officials have prohibited the use of the flag, they have not limited their prohibition to situations where there was a threat or breach of the peace; nor during pickets in Nebraska have there been threats or breaches of the peace when plaintiff and other WBC members picketed. Further, when the various jurisdictions of Nebraska began banning the use of flags during plaintiff's and other WBC members' picketing – after Bellevue began enforcing the statute – none of them have limited their ban to situations where there is a threat or actual disruption or breach of the peace. Instead, the prohibition against using the flag is imposed in advance of the picket, without any context; and whenever there are counter picketers (which is often), they are expressly allowed to use the flag in their expressive activities while plaintiff and other WBC members are not.

105.   The Nebraska flag mutilation statute is further unconstitutional in its application, because even as plaintiff and other WBC members are prohibited from using flags, other persons at the same event who are engaging in protest activities are permitted to use the flag. Thus the law is enforced in a discriminatory manner.

106.   The Nebraska flag mutilation statute is further unconstitutional in its application in that the vague terms contempt and ridicule are susceptible to being applied to unpopular or dissenting viewpoints, and in fact are being thus applied to plaintiff and

53

other WBC members. Only the viewpoint plaintiff articulates – that this nation is in distress with God for its sin, and the flag is a symbol of the doom of this nation and the hypocritical sinful international reputation the nation has – is treated as one of contempt or ridicule, even though in plaintiff's religious views this is the only message of hope for this nation. This form of content-based application is possible because of the language of the statute; and in fact the law is being applied in this discriminatory manner.

107.    The Nebraska flag mutilation statute is further unconstitutional in its application, because its application is even broader than the language of the statute, in that plaintiff and other WBC members have been prohibited from holding or wearing the flag upside down, not just from mutilating, defacing, defiling, burning or trampling upon the flag. Plaintiff and WBC members have been prohibited from even having the flag out during their pickets.

108.    The Nebraska flag mutilation statute is further unconstitutional in its application because in the affidavit justifying a warrantless arrest of plaintiff on June 5, 2007, the Bellevue Police Department officer making the affidavit cited plaintiff's use of an army flag as part of the basis for the arrest, even though the army flag is not included in the statute's definition of flag.    This reflects that any flag which any law enforcement considers to be due reverence can be protected under this overbroad statute.

109.    The Nebraska flag mutilation statute is further unconstitutional in its application because it has been applied to plaintiff and other WBC members only as to the United

54

States and Nebraska flags, but not as to other flags, including the United States Army and other military flags, the Israeli flag, the Sweden flag, and other national flags from other countries. This content-based application of the law further underscores that it is content-based, and that it only applies when ideas are expressed, and only to a very narrow subject matter.

### COUNT V: The Prosecution of Plaintiff is Unconstitutional and the State Statutes Used in that Prosecution are Unconstitutional as Applied

*Defendants Polikov, Hutton and/or Nebraska Supreme Court*

110. All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

111. The prosecution of plaintiff is unconstitutional for the reasons stated below and such other reasons as are found in law and fact.

112. The prosecution of plaintiff is unconstitutional in that it was filed and is being pursued pursuant to a custom, policy and practice to punish, chill, restrain and prohibit protected religious picketing by plaintiff and other WBC members, and to punish, chill, restrain and prohibit the use of the flag in expressive activity by plaintiff and other WBC members.

113. The prosecution of plaintiff is unconstitutional in that it is based solely on protected activity, to wit, standing on a flag to express an idea during the course of picketing, a traditionally expressive activity.

114. The prosecution of plaintiff is unconstitutional in that it is based on a facially unconstitutional statute, one which is flagrantly and patently violative of express

constitutional provisions, given its very clear prohibition against actions with the flag only when and because those actions communicate an idea or viewpoint.

115. The prosecution of plaintiff is unconstitutional in that it has amounted to an unlawful prior restraint, by a) the Bellevue City Council (at the urging of the Bellevue Police Department) using the charges as a basis to deny plaintiff a permit to picket in Bellevue, and b) defendant Polikov in his public statements making it clear he will prosecute plaintiff further if she pickets or uses the flag for expressive activity in Bellevue, or Sarpy County, Nebraska.

116. The prosecution of plaintiff is unconstitutional in that it is part of an overall effort by defendant Polikov and other officials to punish plaintiff for picketing funerals, and to put plaintiff out of sight and sound with her message.

117. The prosecution of plaintiff is unconstitutional and should be enjoined, without deferring to the state proceedings, in that it is part of an overall effort to deter, chill, restrain and prohibit plaintiff's speech, which is an improper use of prosecutorial power. Defendant Polikov has articulated his understanding that the law he is using is not valid; and that there was no threat or breach of the peace and no threat or harm done to plaintiff's children; thus, this prosecution is being pursued in bad faith, not with a reasonable expectation of securing a valid conviction, but rather to discourage plaintiff from engaging in protected speech and other expressive activities, and from having her children participate in the same.

118. The prosecution of plaintiff is unconstitutional and should be enjoined without deferring to the state proceedings, because there is no adequate opportunity available

56

to plaintiff to have the constitutional issues addressed and redressed.  Plaintiff has raised constitutional issues with the County Court to whom the case is assigned, who though agreeing at least that the Nebraska flag mutilation statute is facially unconstitutional, denied relief because the County Court is not an appellate level court.  The Nebraska Supreme Court declined to review that decision.  Thus, the issues have been presented to the state courts, and plaintiff has been turned away in spite of the clear and acknowledged unconstitutionality of the proceedings.

119.   The prosecution of plaintiff for disturbing the peace is patently in bad faith and without a reasonable expectation of a valid conviction, based on defendant Polikov's statements that the peace *could have been* disturbed if someone took offense at what plaintiff and her son were doing with the flag; thus he knows the peace was not disturbed.  Further, when plaintiff was arrested, she was not charged with disturbing the peace.  Further, the video footage and all other evidence about the actual events show that there was no disturbance of any kind.

120.   The prosecution of plaintiff for contributing to the delinquency of a minor and negligent child abuse is patently in bad faith and without a reasonable expectation of a valid conviction, based on defendant Polikov's statements that the child *could have been* hurt because of people reacting to plaintiff's picketing of a funeral and how she and her son used the flag; thus he knows in fact the child was not harmed or threatened with harm.  Further, the video footage shows no harm to the children was occurring; and the fact that all but one or two of the officers left the scene, leaving the children behind to continue picketing, demonstrates the falseness of these claims.  The

57

use of these more generic laws, that do not on the face apply to expressive activity or protected speech or activity – filed in a separate action from the flag mutilation case – is a modus operandi designed to discourage plaintiff from further speech and expressive activity.

121.   Plaintiff has a long-recognized and important substantive due process right to control the care and custody of her children; in the absence of some evidence of child abuse or harm – something beyond plaintiff's children participating with her in protected religious speech, picketing and expressive activity – which clearly is absent in this case, it violates these substantive due process rights to prosecute plaintiff under these statutes.  To justify doing so because of the potential for someone to act or react unlawfully to protected speech and expressive activity, done in a lawful, peaceful, non-disruptive manner, is to try to silence plaintiff's speech and protected activities through a heckler's veto through her children, and is unconstitutional.

## COUNT VI: The Bellevue Permit Ordinances are Unconstitutional on Their Face
### *Defendants Mixan, Troutman, Dammast and City of Bellevue*

122.   All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

123.   The Bellevue permit ordinances are unconstitutional on their face for at least the reasons stated below, and for such further reasons as are founded in law.

124.   The Bellevue permit ordinances fail to establish a time frame for the City to respond to, grant or deny the permit request that is narrow enough to ensure no

58

restraint on speech, in that the ordinances place no time restraint on the City to decide the request.

125. The Bellevue permit ordinances contain no statement of purpose or intent, making it impossible to determine if the various provisions of the act are narrowly tailored to a legitimate, compelling or other government interest.

126. The Bellevue permit ordinances ask the purpose of the parade, meeting, assembly or procession, thereby enabling decision makers to deny the permit based on the purpose (and in fact that is exactly what the City did in this instance).

127. The Bellevue permit ordinances on their face apply to as few as one person, requiring "any person" who wishes to organize, hold or participate in any parade, meeting, assembly or procession of persons (no number provided), to obtain a permit. Thus, even if a legitimate interest had been stated in the ordinance, such as crowd control or traffic control, the ordinances are not narrowly tailored to such a purpose. (Twice the City required seven members of WBC to get a permit. A number as small as seven is too broad; if the interest asserted by the government is crowd control, the requirement should be narrowly tailored so only a crowd large enough to impact traffic or require crowd control should be required to obtain a permit in advance.)

128. The Bellevue permit ordinances on their face require a person to obtain a license every time he or she wishes to engage in expressive activity, thereby permitting the decision maker to rely upon past speech in deciding whether to grant the permit.

129. The Bellevue permit ordinances on their face lack sufficient standards to offset the inherent risk of restraining or chilling speech in a permit scheme that targets

traditionally expressive activities, like meeting, parading, assembling and being in a procession.

130.   The Bellevue permit ordinances on their face allow a permit to be denied for activity that appears to be unlawful, rather than limiting it to activity which on the face of the application is unlawful; which is overbroad, especially when coupled with the provision that allows the permit to be revoked if the permittee violates any law (§28-133) plus the provision that states the holder of the permit may be arrested for engaging in illegal activity during the time of the permit (§28-111), which is far broader protection than the government needs, even if it was tied to a legitimate, compelling or other government interest, which these ordinances do not contain.

131.   The Bellevue permit ordinances on their face lack standards to ensure decision makers do not rely on content of traditionally expressive activities in granting or denying the permit.

132.   Even though the ordinances are aimed at conduct commonly associated with expression, the Bellevue permit ordinances on their face lack any appeal process or means of having the decision to deny a permit reviewed, thereby burdening more speech than necessary and leaving no ability for the permit requester to seek review resulting in a prior restraint on speech. Further, there is no standard of review or standards or criteria for a reviewer to use, to ensure an objective review occurs, thus leaving open any review to the same risk of content-based decision making. (In fact, Captain Evers appears to view the City Council as both original decision maker and reviewer, judging by his comments, which were reinforced by the City Attorney,

whose legal analysis – "the appeal is what the appeal is" – only reinforced the utter lack of any procedure or criteria or objective guidelines for making this decision that patently prohibited and restrained traditionally expressive activity.)

## COUNT VII: The Bellevue Permit Ordinances are Unconstitutional as Applied to Plaintiff

*Defendants Stacey, Mixan, Troutman, Dammast and City of Bellevue*

133.   All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

134.   The Bellevue permit ordinances are unconstitutional as applied to plaintiff for the reasons stated below, and such further reasons as are founded in law and fact.

135.   The Bellevue permit ordinances were unconstitutionally applied to plaintiff as a prior restraint, prohibiting her from engaging in expressive activity.

136.   The Bellevue permit ordinances were used to restrain plaintiff and other WBC members from using the flag to express an idea, as a further prior restraint on expressive activity.

137.   The Bellevue permit ordinances were applied to plaintiff based on the content of her religious speech, and as such were applied in an overbroad manner because there was no legitimate, compelling or other government interest in restricting this viewpoint.

138.   The Bellevue permit ordinances were applied discriminatorily, being used to place plaintiff and other WBC members further away from the funeral location than

Nebraska law permitted, while no such limit was placed on counter picketers who were in fact not required to have a permit on the same dates for the same events.

139.   The Bellevue permit ordinances were applied unconstitutionally in that the City Council gave itself broad discretion to deny the permit based upon content and viewpoint, and unabashedly did so, while openly concocting specious reasons such as safety and impact on law enforcement manpower.

## Count VIII: Substantive Due Process Rights

*Defendants Stacey, Polikov & Hutton*

140.   All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

141.   By arresting, ticketing, and prosecuting plaintiff, and making ongoing public comments about his intent to further prosecute plaintiff, for her children participating in religious demonstrations and expressive activity with her; and by charging plaintiff with negligent child abuse and contributing to the delinquency of a minor, defendants have wrongfully interfered with plaintiff's substantive due process rights to raise her children in accordance with her religious beliefs.

142.   Defendants have no legitimate, compelling or other  interest in interfering with plaintiff's substantive due process rights related to her children, because there is no evidence of any kind that plaintiff endangered her children at any time, including during the events of June 5, 2007, in Bellevue, Nebraska.  Defendant Polikov has stated publicly that he bases the prosecution of plaintiff for negligent child abuse and contributing to the delinquency of a minor solely upon the fact that plaintiff picketed

near a funeral when law enforcement and others were mourning the loss of a firefighter/soldier, and her son stood on a flag. The only interest asserted in this prosecution is an interest in silencing one specific viewpoint about the dying soldiers and their funerals.

### Chilling Effect on Plaintiff's Speech; Prior Restraints; the Need for Injunctive Relief
*All Defendants*

143.   All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim. Every factual and legal argument is applied hereby to every defendant when/as appropriate, whether or not specifically stated, if it is now known or later discovered that any such defendant participated in any of the acts at issue herein which deprived plaintiff of her constitutional rights.

144.   The combined and cumulative effect of the acts of these officials – particularly the Bellevue and Sarpy County officials – is that plaintiff has been chilled in her free speech and expression; she is under bond for her free speech and expression; she has been subjected to a prior restraint because of her free speech and expression; and she faces further and ongoing threats of more prior restraints, more arrests, and more prosecutions, all of them because of her free speech and expression; and her substantive due process rights to raise her children consistent with her faith is in jeopardy.

145.   Further, the combination of these activities by all of these defendants, at times in concert with each other, reflects a policy, custom and practice by the defendants to

ignore established constitutional law, precedent and principles; and to enact, enforce and apply laws with the express and at times expressed purpose of stopping picketing, speech and expressive activity by plaintiff and other WBC members, because they disagree with the content, viewpoint and ideas expressed therein, reminiscent of an era when civil rights laws became necessary in this country. Seldom do the facts in this case reflect a good faith effort to balance competing rights and to identify carefully and narrowly tailored prohibitions to clearly identified legitimate, compelling or other government interests.

146.  All such conduct by defendants, as enumerated and detailed herein, is contrary to the First and Fourteenth Amendments of the United States Constitution; the Nebraska Constitution (the parameters of the constitutional right to freedom of speech are the same under the Nebraska and U.S. Constitutions, *Village of Winslow v. Sheets*, 261 Neb. 203, 622 N.W.2d 595 [2001]); and contrary to and redressable under 42 U.S.C. §1983.

147.  As a result of the passage and enforcement of the Nebraska funeral picketing act, plaintiff has been and will continue to be unable to exercise her constitutional right to engage in peaceful and non-violent picketing.

148.  As a result of the enforcement of the Nebraska flag mutilation statute, plaintiff has been and will continue to be unable to exercise her constitutional right to use the flag in expressive activity, and to express ideas and viewpoints.

149.  As a result of the enforcement of the Bellevue permit ordinances, plaintiff has been and will continue to be unable to exercise her constitutional right to engage in

peaceful and non-violent picketing, and to use the flag in expressive activity, and to express ideas and viewpoints.

150.  As a result of the prosecution of plaintiff in Sarpy County, plaintiff has been and will continue to be unable to exercise her constitutional right to engage in peaceful and non-violent picketing, and to use the flag in to express ideas and viewpoints, and to involve her children in her religious picketing and use of the flag, without threat of further prosecution and without the chilling and restraining effect of the current prosecution.

151.  Because of the constitutional infirmities in the language and application of the statutes and ordinances challenged herein, as well as the pending prosecution of plaintiff as part of an overall scheme to chill, punish, restrain and deter her protected picketing and use of the flag to express ideas, plaintiff is likely to prevail on the merits in this case. The ongoing threat of arrest, prosecution, and denial of permits, all for engaging in constitutionally protected activities, flagrantly violates the constitutional rights of plaintiff contrary to 42 U.S.C. Section 1983.

152.  Plaintiff is suffering ongoing irreparable injury by being deprived of her ability to engage in constitutionally protected peaceful and non-violent pickets on issues of religious, political and social concern; to use the flag in connection with that picketing to express ideas and viewpoints; and to have her minor children participate with her in her religious picketing as part of her sincerely held religious beliefs about her duty to her children and how to raise them in the Scriptures. Plaintiff has no adequate remedy at law.

65

153. Neither the defendants, nor any other third party, will suffer any injury if injunctive relief is issued.

154. The public interest favors the issuance of relief to protect the constitutional rights at stake in this case.

## Prayer for Relief

155. All factual allegations and applicable legal arguments set forth above are incorporated here by reference as though set out verbatim.

156. Plaintiff prays for the following relief

    a. A declaratory judgment that the Nebraska flag mutilation statute is unconstitutional on its face.

    b. A declaratory judgment that the Nebraska flag mutilation statute is unconstitutional as applied to plaintiff.

    c. A preliminary injunction against the enforcement of the Nebraska flag mutilation statute.

    d. A preliminary injunction against the application of the Nebraska flag mutilation statute to plaintiff's protected religious picketing and related activities, including specifically the use of the United States and Nebraska flags to express ideas.

    e. A permanent injunction against the enforcement of the Nebraska flag mutilation statute.

    f. A permanent injunction against the application of the Nebraska flag mutilation statute to plaintiff's protected religious picketing and related

activities, including specifically the use of the United States and Nebraska flags to express ideas.

g. A declaratory judgment that the Nebraska funeral picketing law is unconstitutional on its face.

h. A declaratory judgment that the Nebraska funeral picketing law is unconstitutional as applied to plaintiff.

i. A preliminary injunction against the enforcement of the Nebraska funeral picketing law.

j. A preliminary injunction against the application of the Nebraska funeral picketing law to plaintiff's protected religious picketing.

k. A permanent injunction against the enforcement of the Nebraska funeral picketing law.

l. A permanent injunction against the application of the Nebraska funeral picketing law to plaintiff's protected religious picketing.

m. A declaratory judgment that the prosecution of plaintiff is unconstitutional, and the Nebraska statutes on disturbing the peace, contributing to the delinquency of a minor and negligent child abuse are unconstitutional as applied to plaintiff and her religious picketing and involvement of her children in her religious picketing.

n. A preliminary injunction against the prosecution of plaintiff.

o. A permanent injunction against the prosecution of plaintiff.

p. A preliminary injunction against the application of the Nebraska statutes on disturbing the peace, contributing to the delinquency of a minor and negligent child abuse to plaintiff's religious picketing and involvement of her children in her religious picketing.

q. A permanent injunction against the application of the Nebraska statutes on disturbing the peace, contributing to the delinquency of a minor and negligent child abuse to plaintiff's religious picketing and involvement of her children in her religious picketing.

r. A declaratory judgment that the Bellevue permit ordinances are unconstitutional on their face.

s. A declaratory judgment that the Bellevue permit ordinances are unconstitutional as applied to plaintiff.

t. A preliminary injunction against the enforcement of the Bellevue permit ordinances.

u. A preliminary injunction against the application of the Bellevue permit ordinances to plaintiff's religious picketing and related activities, including specifically her use of the United States and Nebraska flags to express ideas.

v. A permanent injunction against the enforcement of the Bellevue permit ordinances.

w. A permanent injunction against the application of the Bellevue permit ordinances to plaintiff's religious picketing and related activities, including

68

specifically her use of the United States and Nebraska flags to express ideas.

x. Attorney's fees and costs.

y. Such further relief as the Court deems appropriate in law and equity as appropriate and necessary to fully effectuate plaintiffs' remedies to assure no further constitutional violations occur and that plaintiff is thus able to fully exercise all of her constitutional rights without limit or repercussion.

**Trial**

Plaintiff requests a trial in Lincoln, Nebraska.

Respectfully submitted,

Margie J. Phelps – [pro hac vice pending]
Attorney at Law
3734 SW 12th St.
Topeka, KS 66604
785-408-4598 (ph)
785-233-0766 (fx)
margie.phelps@cox.net
Attorney for Plaintiff
**Verification of Shirley L. Phelps-Roper**

I have studied the allegations of the Complaint and verify that they are true and correct to the best of my knowledge, belief and understanding, based upon information and belief.

Shirley L. Phelps-Roper

69