FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2009 DEC 30  AM 10: 12

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHIRLEY L. PHELPS-ROPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:09 CV 3268 |
| | ) |
| DAVE HEINEMAN, In His Capacity as | ) |
| Governor of the State of Nebraska; et al, | ) |
| | ) |
| Defendants. | ) |

## **BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff submits the following brief, including factual and legal arguments, in support of her motion for preliminary injunctive relief. An evidentiary submission is made herewith, and the citations below are to that evidentiary submission.

## **Facts**

1. This lawsuit challenges the Nebraska Flag Mutilation Statute (Neb. Rev. Stat. §28-928), facially and as applied; the Nebraska Funeral Picketing Act (Neb. Rev. Stat. §§ 28-1320.01-28-1320.03), facially and as applied; the application of the Nebraska criminal statutes prohibiting Disturbing the Peace (Neb. Rev. Stat. § 28-1322), Contributing to the

1

Delinquency of a Minor (Neb. Rev. Stat. § 28-709) and Negligent Child Abuse (Neb. Rev. Stat. § 28-707) to plaintiff's protected religious speech and use of the flag to express ideas, in a pending criminal prosecution (Case Nos. 07-5060 and 07-5061, in the County Court of Sarpy County, Nebraska); and the Bellevue, Nebraska, City Ordinance requiring a permit for assembling and picketing (Bellevue City Code Sections 28-111 to 28-133), facially and as applied.

2.  Plaintiff moves the Court for preliminary injunctive relief herein as follows:

   a.  A preliminary injunction against the enforcement of the Nebraska funeral picketing law, Nev. Rev. Stat. §§28-1320.01, 28-1320.02 and 28-1320.03.

   b.  A preliminary injunction against the application of the Nebraska funeral picketing law to picketing by plaintiff and WBC members, Nev. Rev. Stat. §§28-1320.01, 28-1320.02 and 28-1320.03.

   c.  A preliminary injunction against the enforcement of the Nebraska flag mutilation statute, Neb. Rev. Stat. §28-928.

   d.  A preliminary injunction against the application of the Nebraska flag mutilation statute, Neb. Rev. Stat. §28-928, to use of the United States and Nebraska flags for expressive activities during and related to picketing by plaintiff, her children, and WBC members.

   e.  A preliminary injunction against the prosecution of plaintiff in *State of Nebraska v. Phelps-Roper*, Case Nos. CR-07-5060 and CR-07-5061.

   f.  A preliminary injunction against the application of the Nebraska statutes on disturbing the peace (Neb. Rev. Stat. §28-1322), contributing to the delinquency of a minor (Neb. Rev. Stat. §28-709) and negligent child abuse (Neb. Rev. Stat. §28-707), to the

2

picketing and use of the flag as expressive activities by plaintiff, her children, and WBC members.

g.  A preliminary injunction against the enforcement of the Bellevue permit ordinances, Article V, Division 1, §§28-111, 28-112, 28-125, 28-126, 28-127, 28-128, 28-129, 28-130, 28-131, 28-132 and 28-133, of the City Ordinances of Bellevue, Nebraska (§§28-113—28-124 are Reserved).

h.  A preliminary injunction against the application of the Bellevue permit ordinances enumerated at paragraph (g.) above to the picketing and use of the American and Nebraska flags in expressive activities by plaintiff, her children and other WBC members.

For all of the factual and legal reasons set forth below, plaintiff submits that this motion for preliminary injunction, in all particulars, is warranted, and plaintiff so moves. The enforcement and application of these state and local provisions, coupled with the pending prosecutions and threats of further prosecutions, all have the effect of depriving plaintiff of clearly-established constitutional rights, to picket in public places, to speak on public issues, to use the flag in an expressive way in her speech on public issues, and to involve her children in her religious picketing. The two state statutes and the city permit ordinances have glaring facial constitutional defects; and the application of those laws, particularly in the combined and synergistic way they have been applied to plaintiff and other WBC members, with a flagrant intent of silencing and restraining speech and other expressive activity because of its content, reflect an unconstitutional scheme to punish,

3

silence, prohibit and restrain speech, all contrary to the First and Fourteenth Amendments

of the United States Constitution, and the Nebraska Constitution.

## Background Information

3. Plaintiff is a United States citizen and a member of the Westboro Baptist Church (WBC). As

   part of her sincerely held religious beliefs, she regularly protests at funerals including funerals

   of United States soldiers. She has frequently participated in these protests throughout the

   United States, and desires to continue said protests in the State of Nebraska. Plaintiff is a

   resident of Kansas, the mother of eleven children, and a licensed attorney. Plaintiff has

   picketed numerous times in Nebraska, and plans to picket in Nebraska in the future. Shirley

   Phelps-Roper Affidavit, ¶ 2.

4. Plaintiff's church, WBC, is an Old School Baptist Church in Topeka, Kansas, whose members

   believe the Bible is the Word of God, so they follow the Bible and the doctrines of grace

   contained therein. Based on these doctrines, they believe that acceptance and

   institutionalization by society of the sin of homosexuality and other grave sins (including

   fornication, adultery [divorce/remarriage], idolatry [worshiping any image, person, thing or

   idea], murder [abortion], greed, etc.) prompts divine judgment. They further believe that God

   is punishing America for its sins; for teaching full generations to be proud about their sin and

   to ignore the word of God and their duty to God; and for institutionalizing sin in the schools,

   churches, and other social institutions; by killing Americans, including American soldiers.

   They are powerfully persuaded that we are living in the Last of all Days; that the destruction

   of this nation is imminent; that the return of Christ in power and glory to punish the

   disobedient and claim his own is coming soon; and that all of those events told of by the

4

prophets, apostles and Christ himself, about the last days, are coming to pass before our very eyes, with Antichrist in the White House; with the fullness of the Gentiles nearly complete; and the restoration of the righteous obedient Jews drawing nigh. Thus, they believe the *only* loving thing to do with their fellow man at this time is to warn him to watch in all things; search the Scriptures daily to see if these things be so; put away and mourn for their sins; and obey God, because that is the only hope for any human at this hour. Many more details about the message and picketing by plaintiff and her fellow church members can be found at www.godhatesfags.com, www.godhatesamerica.com, www.godhatestheworld.com, www.signmovies.com, www.beastobama.com and www.jewskilledjesus.com. Shirley Phelps-Roper Affidavit, ¶ 3.

5. Along with other members of WBC, plaintiff has long expressed her sincerely held religious beliefs by engaging in picketing and protesting. For many years, they have picketed and protested near funerals of people who published and glorified their homosexual behavior; persons whose lifestyles they believed to be sinful, but who were touted as heroic upon their death; persons whose actions while alive had supported homosexuality and other activities the Bible says are sinful; and persons whose life, death and funeral are the topic of public interest and attention. The purpose of picketing and protesting near funerals, in their view, is to use an available public platform to publicize the church's religious message, and to warn the living since it is too late for the dead. They believe the funerals of American soldiers are an international platform where the question of whether God is cursing or blessing America is being discussed. They believe that this public platform is the only place where their religious message can be delivered in a timely and relevant manner to those attending the funeral and to

5

those participating in the related public events and displays outside the funeral. Also they picket near funeral-related events to voice dissent from the prevailing public messages conveyed (especially by leaders) at such events, including messages related to patriotism, heroism, God's blessings, and other issues of morality and how God is dealing with this nation at this hour. Shirley Phelps-Roper Affidavit, ¶ 4.

6. WBC members have conducted over 40,000 pickets, including at least 300 in connection with funerals or memorials. All of the pickets they conduct are conducted lawfully and peacefully, on public sidewalks and right-of-ways. They routinely schedule pickets in connection with funerals or memorial services so that they finish and end when the funeral or memorial service begins (so they are only picketing before, or on a rare occasion after because of scheduling issues or delays, not during, the funeral or memorial service). Shirley Phelps-Roper Affidavit, ¶5; Rebekah Phelps-Davis Affidavit, ¶¶ 2 and 4; Fred W. Phelps, Jr. Affidavit, ¶¶ 2 and 4; Jonathan Phelps Affidavit, ¶¶ 2, 4 and 5 and Attachment 1; Rachel Hockenbarger Affidavit, ¶¶ 2 and 5.

7. Also pursuant to sincerely held religious beliefs, and many passages in the Scriptures, when plaintiff and other WBC members worship God through this religious picketing, their children accompany them. Specifically, many of plaintiff's eleven children frequently accompany her on the picket line. Her children have not been harmed on the picket line. Aside from her belief from the Scriptures that the Lord her God will be unto her and other church members a wall of fire about (Zechariah 2:5; see also Mark 12:1 and Job 1:10; some of the many ways the Bible expresses how God protects his people), they are also practical and circumspect about caring for their children, teaching them how to behave on the picket line, and keeping them

6

safe. Their religious beliefs permeate all aspects of their lives, and their children are with them in all those activities, as they believe the Bible says they should be. Pursuant to their beliefs, their position is that they teach them the words; show them the application of the words; and teach them to discern the signs of the times, by watching what is going on around them. They believe in order for their children to understand the condition of this nation – and why they should come out from among her and not partake of her rebellious ways – they must *see* the conditions; and that their children are entitled to learn the truth and serve God. Shirley Phelps-Roper Affidavit, ¶ 6.    Also see Rachel Hockenbarger Affidavit, ¶ 3; Mrs. Hockenbarger has for nine years carried a caseload as an attorney of cases involving Children in Need of Care (CINC) and has seen abuse and neglect on a daily basis; her children, ranging in age from 2-13 years, participate in the pickets and have not been harmed; she states that she is very familiar with plaintiff's children and other children of the Westboro Baptist Church; and none of them are abused or neglected by participating in their parents' religious picketing.

8. Against this backdrop of picketing, which began in early 1991, in early 2005 plaintiff and other WBC members discerned that the death events (funerals, memorial services, vigils, etc.) of soldiers killed in Iraq and Afghanistan had become significant public events. They saw that only one message was being delivered internationally in connection with those death events, to wit, that the dead person was a hero gone to heaven. They saw that routinely the lives, deaths and death events were receiving extensive media coverage and public attention, with various and sundry religious, political and other leaders attending, speaking, and making huge public platforms of these events. They believed no one was saying that these soldiers were dying because of the sins of this nation, which they are powerfully persuaded is true. They

7

believe that instead all of the discussion was about the creature, not the Creator; and words of how this nation was going to overcome these awful curses by their own hands; and they believe that no one was giving God the glory. Further, they concluded that pursuant to their religious beliefs, they had a duty from the Scriptures to deliver, *on that platform*, the message that God was killing these soldiers; to warn the living to stop sinning lest they incur further wrath from God on themselves, their households and this nation. They believe such passages as Ezekiel 3 and 33 give powerful directives to the people of God, to be watchers and to lift up their voices *when the sword comes* (the expositors say this expressly includes when war comes), and tell them to stop their transgressions. If they don't say these things, they believe, as the Apostle Paul stated in Acts 20, the blood of their fellow man will be on their hands; which they believe is an elegant and powerful way of saying they (plaintiff and WBC members) will be in the same trouble as their fellow man are in for sinning against God. This matter of picketing at these soldiers' funerals, and the funerals of others whom God kills, is an imperative to plaintiff and her fellow church members, and they have deeply held religious convictions that they must do this picketing at these events. They believe the very question of whether God is killing them is on the table in this nation, and it must be addressed. Shirley Phelps-Roper Affidavit, ¶ 7. Also see Rebekah Phelps-Davis Affidavit, ¶¶ 2 and 4; Fred W. Phelps, Jr. Affidavit, ¶¶ 2 and 4; Jonathan Phelps Affidavit, ¶¶ 2, 4 and 5 and Attachment 1; Rachel Hockenbarger Affidavit, ¶¶ 2 and 5.

9. So plaintiff and other church members began conducting pickets in connection with these death events, using signs, songs, parodies and flags. All of these pickets have been conducted a distance from the location of the event; usually before (on a few rare occasions, after) the

8

event, never during the event; and never involving going inside, disrupting, or stopping the flow of foot or vehicle traffic. Instead, the pickets involve standing on public right-of-ways holding signs, singing a cappella, saying words when appropriate and necessary, and holding, dragging, hanging, wearing and standing on flags to express ideas consistent with the picket signs. Plaintiff and other church members at all times comply with every police order issued, even if they are questioned/questionable; and obey all laws. Shirley Phelps-Roper Affidavit, ¶ 8.

10. Recently the Fourth Circuit Court of Appeals (in the context of setting aside a large verdict against plaintiff, her church, her pastor, and another member of her church) said that the picketing of soldiers' funerals and memorial services by plaintiff and other WBC members is public speech on public issues, specifically saying regarding the signs, that "they involve matters of public concern, including the issue of homosexuals in the military, the sex-abuse scandal within the Catholic Church, and the political and moral conduct of the United States and its citizens. Such issues are not subjects of 'purely private concern,' [citation omitted], but rather are issues of social, political, or other interest to the community [citations omitted]," *Snyder v. Phelps*, 580 F.3d 206, 222-223 (4th Cir. 2009). See also Shirley Phelps-Roper Affidavit, ¶ 9.

### *The Nebraska Funeral Picketing Statute*

11. In response to the picketing by plaintiff and other WBC members, Nebraska passed a law which was signed by the Governor on April 4, 2006, limiting the distance of funeral picketing an hour before and two hours after the funeral commences. That law has been applied in varying ways to plaintiff and other WBC members, while being applied very differently to

others present and picketing and engaging in protest activities, allowing them to be much closer to the location of the death event. The law has also been applied to plaintiff and other WBC members in a fashion that unduly limits or completely prohibits speech. The law states that those engaged in protest activities must be 300 feet away. The law does not say 300 feet from where (the building, the property line, etc.). Yet WBC members, including plaintiff, have been placed substantially more than 300 feet away from the building and the property on many occasions; and at the same time others engaged in protest activities have been directly in front of the building, on the property, on the sidewalk directly in front of the property, and even out in the streets, never put 300 feet away from anything. Shirley Phelps-Roper Affidavit, ¶ 10.

12. On July 23, 2005, such pickets began to be held in Nebraska, the first being in Omaha. After three such pickets (in Omaha, Beatrice and Papillion), Nebraska Senator Mike Friend introduced Legislative Bill 773 proposing to amend the existing Nebraska law on unlawful picketing to include picketing of a funeral. LB 773 proposed to make it a class III misdemeanor to picket within 100 feet of the premises of any location where a funeral is being held. The proposed language to be added to Neb. Rev. Stat. § 28-1317 was this: "A person commits the offense of unlawful picketing if, either singly or by conspiring with others, he or she ...(b) Pickets within one hundred feet of the premises of any location where a funeral is being conducted. For purposes of this section, funeral means the ceremonies, processions, and memorial services held in connection with the burial or cremation of the dead." (Underlined language is the new language; emphasis in original.) Shirley Phelps-Roper Affidavit, ¶ 11 and Attachment 1.

13. The Judiciary Committee of the Nebraska Legislature held a hearing on January 25, 2006, on this proposed law. Significant changes to the proposed law from that committee included a) making funeral picketing a separate criminal offense, instead of adding it to the existing unlawful picketing statute; b) adding legislative intent language; c) prohibiting picketing within 300 feet instead of 100; d) removing funeral processions; e) adding a time frame of one hour before and two hours after the commencement of the service; and, f) adding language declaring an emergency so the law would go into effect immediately upon signing. Shirley Phelps-Roper Affidavit, ¶ 12 and Attachment 1.

14. In his comments introducing the proposed law to the Judiciary Committee, Senator Friend stated: "There is one particular group that travels the nation to a degree, and lately the Midwest, to protest at funerals, and notably military funerals. They have visited Nebraska on a couple occasions, and last month, I guess, they were in Papillion. Their speech is utterly despicable and to me it's deplorable." The President of the Nebraska Funeral Directors Association (and general manager of a Lincoln funeral home) requested that the distance be increased from 100 to 300 feet. Among other reasons for this request: "First and foremost, it would help ensure that the actions and appearance of demonstrators do not interrupt the solemnity of the occasion. Imagine, if you can, the funeral service that was recently held to commemorate the life of Senator Exon being disrupted by a group of demonstrators that did not have the same beliefs as the senator. A distance of 100 feet would have allowed them to gather on the grounds of the Capitol here." Shirley Phelps-Roper Affidavit, ¶ 13 and Attachment 1.

11

15. In the May 2006 Legislative Research Division's *A Review: Ninety-Ninth Legislature Second Session, 2006*, a description of the Nebraska funeral picketing law states: "Nebraska becomes the sixth state to restrict protests at funerals with the passage of LB 287. The bill responds directly to the actions of the congregants of a small Baptist church in Topeka, Ks., who picket at the funerals of soldiers killed in Iraq and Afghanistan, including at least two in Nebraska, because they believe God is striking down Americans for harboring homosexuals. Members of this church have protested at the funerals of AIDS victims and prominent individuals for years." Shirley Phelps-Roper Affidavit, ¶ 14 and Attachment 1.

16. The final version of the Nebraska funeral picketing law states:

### Section 28-1320.01 – Unlawful picketing of a funeral; legislative findings.

(1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.

(2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor [sic], the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.

### Section 28-1320.02 – Unlawful picketing of a funeral; terms, defined.

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

### Section 28-1320.03 – Unlawful picketing of a funeral; penalty.

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor.

17. Before the Nebraska legislature passed the Nebraska funeral picketing statute, or before officials began enforcing it as described below, the Eighth Circuit Court of Appeals issued its opinion in *Olmer v. City of Lincoln*, 192 F.3d 1176 (8th Cir. 1999). In that case, an ordinance in Lincoln, Nebraska, which was much more narrowly written than the Nebraska funeral picketing statute, was held unconstitutional because it reached more speech than necessary for the asserted government interest. That ordinance only prohibited picketing one half hour before and one half hour after a scheduled service on a religious organization's exterior premises, including parking lots, and on the immediately adjacent sidewalk. The City claimed it had a legitimate interest in preserving the right of its citizens to exercise their religion freely. Concluding that the ordinance went beyond protecting this right to worship in private, the Court said: "If, for example, anti-abortion protestors were to attempt to enter a church without permission, or to interrupt church services with their own speech, the city could doubtless prosecute them under a general trespass or disturbing-the-peace provision, or, if necessary, adopt a more specific prohibition directed against disturbing or interrupting services of worship. The present ordinance goes way beyond that. It goes beyond the church building and church property, and seeks to forbid peaceful communication on property belonging to the public, even though the communication may be completely truthful, and even though there is absolutely no physical interference with access to the church." 192 F.3d at 1180-1181. The Nebraska legislature thus was on notice that the language written into the state statute was too broad. Further, the Eighth Circuit ruled that a preliminary injunction should have been

13

granted to plaintiff in *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008), in October, 2008, for a similarly defective law, yet the Nebraska statute has not been repealed.

18. Also before the Nebraska funeral picketing statute was passed, state officials were aware of the context and dynamics, and knew that plaintiff and other WBC members were not engaging in disruptive picketing and were not intruding on the funerals. They also knew that there was a public debate underway in connection with the soldier's funerals in Nebraska, in which plaintiff and other WBC members were participating, and that plaintiff/WBC's viewpoints were unpopular, including in the minds/eyes of state officials. They also knew that the funerals of soldiers in Nebraska were significant public events. One illustration of these facts is a memorial service held in Lincoln, Nebraska, on February 25, 2006. This memorial service was attended by elected officials who all spoke at the memorial service, including United States Senators Chuck Hagel and Ben Nelson, defendant Governor Dave Heineman, Representative Jeff Fortenberry, and Mayor Coleen Seng. Also before the memorial service began, at least a hundred citizens including military/veteran bike riders from the Patriot Guard Riders and American Legion Riders, stood outside the church, on the same side as the church, engaged in expressive activity; and members of WBC stood across the street engaged in expressive activity; there were no disruptions of any kind. All of the dialogue by the members of these two groups, the officials present, and citizens – directly in connection with this memorial service – reflected the important public debate taking place, and how these events were occurring. Also media coverage of this soldier's funeral and memorial service, by local and national media outlets, reflect that there is a *content* debate occurring about the significance of the dying soldiers. The extensive media coverage before, during and after the

14

funeral and memorial service, about the life, death, funeral and memorial service, and the context of it all in connection with this soldier's death, is typical of what happens with nearly all of these soldiers' funerals and memorial services, and others' funerals and memorial services. All of this was known to the Governor and the Senator who proposed the bill, when this law was passed and signed. Jonathan Phelps Affidavit, ¶ 4 and Attachment 1.

19. Nebraska officials have consistently applied the Nebraska funeral picketing statute as expected, to wit, very broadly, discriminatorily against plaintiff and other WBC members vis-à-vis others engaged in protest activities at the same events; and in a manner that restrained, chilled and prohibited speech and other expressive activities. Shirley Phelps-Roper Affidavit, ¶ 10.

20. On May 28, 2006, WBC members conducted a picket in Bellevue, Nebraska, connected with the death of a soldier. WBC members were required to stay 300 feet from the curb line; the building was set hundreds of feet off the road; law enforcement present advised that the County Attorney instructed them to measure 300 feet from the curb line. At the same time, hundreds of motorcycle drivers and other citizens were permitted to stand on the church property engaging in protest activities, lining the walkway up to the entrance; and lining the sidewalk immediately in front of the church. Jonathan Phelps Affidavit, ¶ 6; Sara Phelps Affidavit, Photos 9 and 10.

21. On June 20, 2006, WBC members, including plaintiff, conducted a picket in Beatrice, Nebraska, connected with the death of a soldier. Plaintiff and other WBC members were required to stand at least 300 feet from the property line. At the same time, 60-70 bikers were engaged in protest activities directly in front of the church, on the church property and on the

15

sidewalk immediately adjacent to the church. Plaintiff wrote the Chief of the Beatrice Police Department in advance of the funeral proposing a location that complied with the 300 foot law. The Chief wrote back requiring plaintiff and others to stand at a different location, further away, stating that this was the designated area and the spot requested would violate the statute. Plaintiff and other WBC members complied with the directives of the Chief when conducting the picket. Shirley Phelps-Roper Affidavit, ¶ 15 and Attachment 2; Sara Phelps Affidavit, Photos 11 and 12; Megan Phelps-Roper Affidavit, Attachment 13, Photos 11-13.

22. WBC members including plaintiff planned on the same date, June 20, 2006, to conduct a picket in the Village of Clarks in Merrick County, Nebraska. In advance of this date, a WBC representative contacted law enforcement (per their regular practice of doing so) to advise of the plan to picket. Defendant McPhillips, in his capacity as Sheriff of Merrick County, advised the WBC representative that if plaintiff or other WBC members stepped foot in Clarks they would be arrested; that if they were 300 feet away he would find something to arrest them for, failure to turn a blinker on, not parking right, disorderly conduct, or "one peep" out of the picketers; and that he would have plenty of law enforcement to carry out his threats. In the course of this discussion Sheriff McPhillips told the WBC representative that "this is no religion;" their message "has nothing to do with religion;" and, "this is a bunch of idiots, that is what it is; you don't follow the Bible; this is Wiccan is what it is; you're a bunch of idiots." Therefore plaintiff and other WBC members were not allowed to conduct the picket in Clarks, Merrick County, Nebraska, as planned. Defendant McPhillips made statements to the media that he would not allow plaintiff or WBC members to picket anywhere one hour before and one hour after the funeral, and that "numerous" law enforcement agencies would be present.

16

When the funeral was conducted in Clarks, fire trucks, police, veterans, bikers with flags and citizens were permitted to be directly in front of the funeral site; to line the procession route; and lead and follow the procession; all according to media reports, which also reported that WBC members were not permitted to be present or picket. Shirley Phelps-Roper Affidavit, ¶ 16; Rebekah Phelps-Davis Affidavit, ¶¶ 6-7 and Attachment 1.

23. On July 8, 2006, WBC members conducted a picket in Omaha, Nebraska, in connection with a soldier's funeral. Law enforcement designated a place for the WBC members to picket, well over 300 feet away, over a block away from the building. In advance of the protest, a WBC representative spoke with Deputy Chief Mark Sundermeier, who said they could stand anywhere, so long as it was 300 feet away (without specifying where the 300 feet began). When they arrived however, they were required by law enforcement on the scene to stand much further away. Another group, including members of the Patriot Guard (bikers group), were observed standing immediately next to the building, and stringing down the street, and in the street, with flags and motorcycles, all considerably closer to the building, including right next to it. Also during the picket WBC members were at times standing near law enforcement officers, and heard them speaking about and referring to the Mayor in discussion about making sure the procession did not come through until the WBC picket ended. As they left, from the highway they observed the procession being escorted by police toward the funeral location. Also they observed a very large flag held up by two fire trucks right by the location of the funeral. Rebekah Phelps-Davis Affidavit, ¶ 8; Sara Phelps Affidavit, Photos 13 and 14.

24. On August 10, 2006, WBC members conducted a picket in Pender, Nebraska, in connection with a soldier's funeral. Law enforcement designated a place for the WBC members to picket

17

two blocks from the church, in a park; and surrounded the WBC members physically. At the same time, bikers and citizens were permitted to stand on church property, on the sidewalk in front of the church and leading up to the entrance, engaging in protest activities. Rachel Hockenbarger Affidavit, ¶ 6 and Attachment 1; Sara Phelps Affidavit, Photos 15 and 16.

25. On September 5, 2006, plaintiff and other WBC members conducted a picket in Minden, Nebraska. They were required to be at least 300 feet away, with a line marked in paint that they had to stand behind. At the same time, hundreds of Patriot Guard riders and citizens were permitted to be directly in front of the church, including on the sidewalk directly in front of the church, engaging in protest activities. Shirley Phelps-Roper Affidavit, ¶17 and Attachment 3; Sara Phelps Affidavit, Photos 17 and 18.

26. On February 16, 2007, WBC members conducted a picket in McCook, Nebraska, in connection with the death of a soldier. WBC members were required to stand at least 300 feet away, with numerous law enforcement by them. At the same time, bikers and citizens were permitted to be directly in front of the building with flags, engaging in protest activities. Jonathan Phelps Affidavit, ¶ 7 and Attachment 2; Sara Phelps Affidavit, Photos 23-25; Megan Phelps-Roper Affidavit, Attachment 13, Photos 14-18, which show bikers and citizens directly in front of the building; up on the top of the steps of the building; on the sidewalk directly in front of the building; straddling across a street (blocking traffic); and using flags and signs in expressive activity.

27. On April 17, 2007, WBC members conducted a picket in York, Nebraska, in connection with a soldier's funeral. The event was held in the York City Auditorium. WBC members were required to stand over 600 feet from the building. Bikers and citizens were permitted to be

directly in front of the building including on the public sidewalk directly in front of the building, engaging in protest activities.    Affidavit of Jonathan Phelps, ¶8; Sara Phelps Affidavit, Photos 28-30 (Photo 28 shows the WBC picketer a *long* ways away from the other group engaged in protest activities); Megan Phelps-Roper Affidavit, Attachment 13, Photos 19-22, which show bikers, citizens and law enforcement directly in front of this government building, including on the sidewalk immediately in front of the building, engaged in protest activity.

28. On June 5, 2007, plaintiff and other WBC members scheduled a picket in Bellevue, Nebraska, in connection with the death of a soldier.   Upon arrival, law enforcement directed the eight picketers to stand in a small space marked by spray paint, which was between 500 and 1200 feet from the church (depending on whether you follow the path or go as the crow flies). Bikers and citizens with flags lined up from the church down to the main street (Harvell Drive), being permitted to stand directly in front of and on the same side of the street as the church, much closer to the church than WBC members, to engage in protest activities, including revving motorcycle engines (which is a common activity by the bikers outside of funerals). Affidavit of Shirley Phelps-Roper, ¶ 18.

29. Plaintiff went back to the scene of these events on July 7, 2007, and took measurements of the distance from the church to the street; from entrance into the church to the intersection; and, from the intersection to where plaintiff and the other WBC members were placed. See Shirley Phelps-Roper Affidavit, ¶ 18 and Attachment 4.  A review of the photos of the WBC members, and the pink square marked for them to stand in, shows that it is about a 17 foot (maximum) long area by about three feet wide at the most, for eight people to picket in.  These

19

photos also show that massive space was available, for full city blocks in length, for hundreds of officials, bikers and citizens, to engage in unfettered and government/officially-sponsored expressive activity. See Megan Phelps-Roper Affidavit, Attachment 2 (a series of timed photos from the scene from where WBC was standing); and, Attachment 13, Photos 1-10. Given the amount of activity outside the church, directly up against the church, and on the sidewalks immediately adjacent to the church, on June 5, 2007, by city officials and various other officials, bikers and citizens – it is utterly absurd for 1) the Nebraska legislature to put forth a peaceful environment outside funerals as a government interest; 2) the City of Bellevue to pretend they had an issue about how much space seven WBC picketers would take up on July 30, 2007 (when they denied a permit); and 3) Captain Herbert Evers (or anyone else with the Bellevue Police Department), to put forth the claim (as he did in the City Council meeting on July 23, 2007) that there was an issue about law enforcement personnel being dispatched at some substantial expense *for WBC members' sake*. Clearly hordes of them are participating in expressive activities outside the church, in uniform, presumably on duty; and this is the same Captain Evers who told Jonathan Phelps in an e-mail on June 5, 2007, that 1000 of them had been participating in "laying to rest a brother in public safety." The cost to the city of the participation of various city officials in expressive activities outside of the church (and apparently inside of the church), on the sidewalk, on the church property, spread out over blocks, with massive numbers of official vehicles, causes the few minutes that a few officer spent keeping WBC members in the 17-foot box, and off the grass (even though they drew most of the box *on* the grass), and arresting plaintiff, a little mother of eleven, for holding up a few signs in a small south-forty corner of this massive event, to pale in such a measure that it

20

is at best disingenuous and at worst outright deceitful for Captain Evers to have suggested otherwise. The simple fact is that these officials – who all swore an oath to uphold the Constitution which includes the First Amendment – were in a frenzy of patriotic worship on June 5, 2007; and they angrily vented that spleen by wrongfully and unlawfully restraining the speech of plaintiff and WBC members, and punishing plaintiff for her speech and expressive activity by an outrageously unlawful arrest and prosecution. The accumulation of all the facts immediately surrounding the events shows this is so. The wrong is compounded every day a) the prosecution is pending (which has lingered for two and half years already); and b) these officials continue to deny permits, prohibit the use of the American and Nebraska flags in expressive activity, and systematically overreach in the application of the Nebraska funeral picketing law while blatantly discriminatorily allowing the group whose views they agree with to be directly in front of the locations of these funerals and memorial services. Worse still, the actions of denying permits and disallowing the use of the flags, is often justified by the unlawful and unconstitutional pending prosecution. This compounding of wrongs has reached a level of unconstitutionality that rivals the early years of the racial equality civil rights movement in this country. (Your counsel here and some of your affiants including plaintiff have participated in civil rights litigation on behalf of minorities in Kansas for many years.)

30. Before going to this picket, plaintiff obtained a permit from the City of Bellevue, which designated that the picketers would stand across the street from the "T" intersection at Kayleen and Harvell Drive, standing on the south side of Harvell Drive. Shirley Phelps-Roper Affidavit, ¶ 19 and Attachment 5. When plaintiff and other members arrived and began getting signs out, Officer Joe Gray of the Bellevue Police Department directed them, "You're

21

supposed to stay within the lines." When plaintiff asked what the basis was for keeping them in a small square of space, Officer Gray advised, "That's what the permit says." When plaintiff said the Supreme Court said public sidewalks are held in trust for robust public debate, Officer Gray responded, "Not when it's picketing, no it's not." Within a few minutes, plaintiff was arrested by Bellevue police, and taken to the Sarpy County jail. Throughout the picket, the remaining picketers were required to stay in a small box of space, well over 500 feet from the church, while counter picketers were permitted to be directly in front of and up into the property of the church, engaging in protest activities. Shirley Phelps-Roper Affidavit, ¶ 19; Megan Phelps-Roper Affidavit, Attachment 1 (video of incident) and Attachment 3 (transcript of video), p. 2. More details of the arrest and prosecution are set forth below.

31. On October 29, 2008, WBC made contact with defendant Brueggemann in his capacity as Sheriff of Cass County, Nebraska, to notify law enforcement of planned pickets on October 31 and November 1, 2008, in connection with funerals. When a WBC representative called for defendant Brueggemann to follow up on the letter, she was transferred to defendant Cox, in his capacity as County Attorney for Cass County. Defendant Cox discussed the details of when and where the pickets would be held; said he would inform the officers of the planned picket; and said he would be back in touch to finalize plans. Thereafter defendant Cox made himself unavailable for follow-up phone calls until late on October 30, 2008, at which time he advised that he had commenced an action in the district court and gotten an injunction against plaintiff, WBC and other members, and that if they came to picket they would be served with process and required to appear in court in the case. The case filed was styled *State of Nebraska ex rel. Cox v. Westboro Baptist Church, et al*, Case No. CI 08 520, in the District

22

Court in and for Cass County, Nebraska. He advised he did this because of the community

reaction. Thus, WBC members were deterred from conducting this religious picket. Affidavit

of Rebekah Phelps-Davis, ¶ 10 and Attachment 2.

### The Nebraska Flag Mutilation Statute

32. The Nebraska flag mutilation statute states as follows:

### Section 28-928 – Mutilating a flag; penalty; flag, defined.

(1) A person commits the offense of mutilating a flag if such person intentionally casts
contempt or ridicule upon a flag by mutilating, defacing, defiling, burning, or trampling
upon such flag.

(2) Flag as used in this section shall mean any flag, ensign, banner, standard colors, or replica
or representation thereof which is an official or commonly recognized symbol of the
United States or the State of Nebraska.

(3) Mutilation of a flag is a Class III misdemeanor.

33. Before June 5, 2007, on more than a dozen occasions plaintiff and other WBC members had

conducted pickets in Nebraska, during which pickets United States flags were used to express

ideas, including by holding them upside down, hanging them from a belt, loop, or tied to a leg,

and dragging them on the ground or stepping on them; by laying them on the ground and

standing on them; and otherwise; all clearly conveying disagreement with this nation's

policies, articulated by plaintiff and other WBC members in signs, words and songs, that the

nation is in distress, in trouble with God; and that the flag is the symbol of proud sin today, on

the international stage; and otherwise. It is very obvious in the picketing activity of plaintiff

and WBC members that the use of the flag has only one purpose, to wit, to express ideas and

viewpoints. After June 5, 2007 – because of the unlawful actions of the Bellevue Police

Department and Sarpy County officials – plaintiff and other WBC members have been

23

expressly prohibited from using and restrained in using the American and Nebraska flags in expressive activities on numerous occasions. See Shirley Phelps-Roper Affidavit, ¶¶ 33-36, 38; Sara Phelps Affidavit, Photos 1-40; Rebekah Phelps-Davis Affidavit, ¶¶ 3, 8, 11, 13-16; Fred Phelps, Jr. Affidavit, ¶¶3 and 5; Rachel Hockenbarger Affidavit, ¶ 4 and Attachment 1; Jonathan Phelps Affidavit, ¶¶ 3, 7, 9 and 11; and Megan Phelps-Roper Affidavit, ¶ 11.

34. On June 5, 2007, as described further below, plaintiff was arrested when her minor son stood on the flag during a picket in Bellevue, Nebraska. Yet after plaintiff was taken to jail, as other WBC members continued picketing, at least one of them held a flag upside down in the presence of law enforcement and this was permitted. Megan Phelps-Roper Affidavit, ¶ 11.

35. Thereafter, on July 23, 2007, the City of Bellevue, Nebraska denied a permit to plaintiff and WBC members to picket in Bellevue on July 30, 2007. Then, on July 27, 2007, city officials altered their response to allow some WBC members other than plaintiff (who was prohibited by name) to picket, with various written restrictions, including no use or depiction in any fashion of the United States flag. Thus, plaintiff and WBC members were restrained from conducting this picket, and from using flags in expressive activities. At the same time, dozens or more bikers and citizens were permitted to be directly in front of the church where the funeral was held on July 30, 2007, engaging in protest activities including using flags. Shirley Phelps-Roper Affidavit, ¶ 32 and Attachment 13; Jonathan Phelps Affidavit, ¶ 11; Rebekah Phelps-Davis Affidavit, ¶¶ 11 and 12 and Attachment 3.

36. Again, on December 24, 2009, plaintiff and other WBC members applied for a permit with the City of Bellevue, for pickets on December 30, 2009; defendant Stacey advised a WBC representative that the permits would be granted but that no use of the United States or

24

Nebraska flags of any kind would be permitted during the pickets (without regard to whether the circumstances presented disruption or breach of the peace or threat of either); though other flags (Israel, homosexual) would be allowed. Rebekah Phelps-Davis Affidavit, ¶ 15.

37. Also after the June 5, 2007 arrest in Bellevue, and on June 12, 2007, law enforcement officials in Omaha began enforcing the Nebraska flag mutilation statute against plaintiff and other WBC members for the first time, expressly for the stated reason that Bellevue was doing so. On numerous occasions before June 5, 2007, plaintiff and other WBC members picketed in Omaha using flags, in the immediate presence of law enforcement, and this activity was permitted without comment or objection. On numerous occasions *since* June 5, 2007, plaintiff and other WBC members have picketed in Omaha, and on each such occasion law enforcement have expressly forbidden the use of the flag in any fashion on pain of arrest and prosecution. Specifically, Deputy Chief Mark Sundermeier expressly stated on June 11, 2007 to a WBC representative (and thereafter to plaintiff personally), that the flag statute would be enforced as to the United States and Nebraska flags (only). Since June 11, 2007, and continuing to date, law enforcement officials in Omaha have consistently declined to change their position that flags cannot be used during pickets, on request by plaintiff and other WBC members. Shirley Phelps-Roper Affidavit, ¶ 35; Rebekah Phelps-Davis Affidavit, ¶ 13.

38. The language of the police officials in Omaha, Nebraska, on June 11, 2007 was so strong and threatening that plaintiff and other WBC members were deterred from conducting a picket at all on June 12, 2007. Shirley Phelps-Roper Affidavit, 35.

39. Pickets were conducted in Omaha by plaintiff and/or other WBC members at least on these additional dates, and on each occasion plaintiff and other WBC members were chilled and

restrained from expressing themselves through the use of the United States and Nebraska flags during pickets:   July 29, 2007; December 10, 2007; June 17, 2008; August 10, 2008; November 21, 2008; May 12, 2009; May 16, 2009. During the funerals of July 29, 2007 and June 17, 2008, counter picketers were permitted to use the flag in expressive activity. Shirley Phelps-Roper Affidavit, ¶ 36.

40. On July 30, 2007, WBC members conducted a picket in Norfolk, Nebraska, in connection with a funeral. When a WBC representative contacted law enforcement officials in advance per their usual practice, she was advised by Cpt. Steve Hecker that if any WBC member used the flag during the demonstration, their personal information would be taken; their names provided to the County Attorney; and then depending on what happened in Bellevue, they would later be prosecuted. This chilled and restrained WBC members from using their flags to express ideas on July 30, 2007. At the same time, bikers and citizens were permitted to use flags in expressive activity, and also permitted to be directly in front of the church where the funeral was held engaging in protest activities.

41. On December 28, 2009, a WBC representative spoke with defendant Houloose regarding a planned picket for December 30, 2009, by plaintiff and other WBC members, to be held in Papillion, Nebraska. Although defendant Houloose told the representative on December 24, 2009, that the Nebraska flag mutilation statute would not be enforced against plaintiff's and other WBC members' expressive activities during picketing, on December 28, 2009, he reversed himself, saying words to the effect, "I know that you are in litigation with the Bellevue Police Department and I suspect that will go to the Supreme Court or the Nebraska Court of Appeals. So we're going to enforce the Nebraska flag statute." Then he clarified

26

that this meant the United States and Nebraska flags could not be used during the picket; and that other flags could be. Thus, plaintiff and other WBC members are restrained once again in their ability to engage in expressive activities using the United States and Nebraska flags in the course of their religious picketing. Rebekah Phelps-Davis Affidavit, ¶ 14; Jonathan Phelps Affidavit, ¶ 9.

42. In the time period since June 5, 2007, when Bellevue officials arrested plaintiff for her son standing on a flag, some Nebraska jurisdictions have permitted the use of flags by plaintiff and other WBC members to express ideas, including by dragging, standing on, and holding it upside down, including Spalding, Nebraska; Page, Nebraska (though on September 18, 2008, one member of the State Highway Patrol confronted plaintiff about the use of the flag, but after being asked if he was going to arrest her, he allowed plaintiff to continue using the flag, with it hanging from her waist and hitting the ground); and Lincoln, Nebraska.   Shirley Phelps-Roper Affidavit, ¶ 37.

43. Each time jurisdictions in Nebraska have prevented plaintiff and other WBC members from using the flag during picketing, since the arrest of plaintiff of June 5, 2007, none of them have ever limited this prohibition by their words or by the circumstances existing during the pickets, to situations where there was a threat or actuality of any disruption or breach of peace. Instead, the flag use was disallowed in advance and was absolute.   Shirley Phelps-Roper Affidavit, ¶ 38.

*The Arrest & Prosecution of Plaintiff for Picketing and for Her and Her Son Using Flag in Expressive Activity During a Picket*

44. On June 5, 2007, after picketing for a few minutes, in Bellevue, Nebraska, six Bellevue Police

Department officers arrested plaintiff and took her to the Sarpy county jail. Officer John

McDaniel first approached plaintiff saying, "I'm under the understanding that you guys have

been arrested or somebody's been arrested with your group in Fremont, Nebraska, for

mutilating or defacing the flag." That was not true. Shortly Officer Gray said, "Kicking the

flag around on the ground is a violation of the law." Plaintiff then referred to *Texas v.

Johnson* "where the Supreme Court says that you can even burn the flag, because it is an

expression of free speech," to which Officer Gray replied, "We're not in Texas. We're in

Nebraska." Another WBC member said, "It's the United States Supreme Court," to which

Officer Gray replied, "We're not going to go through that." A little later plaintiff referred to a

flag hanging off her side touching the ground, asking "So, are you suggesting that *this* flag

violates your law?" To which Officer McDaniel replied, "No, what we're. What we're

concerned with is the young man. The young kid stepping on the, the American flag."

Plaintiff had three of her minor sons with her, and one of them was standing on a flag. A little

later Officer McDaniel turned to another officer and said, "Can you get that statute that we

passed out?" Shortly, after conferring with one or more superiors at the station, Officer Pettit

told plaintiff, "Put your signs down for me," and then, "Shirley, right now you're going to be

under arrest for contributing to the delinquency of a minor." The officers seized two United

States flags that belonged to plaintiff and other WBC members. The statements by the

arresting officers at the time of the arrest reflect that they knew they were acting contrary to

clearly established constitutional law, but they were not interested in hearing about that law and did not consider it to apply to Nebraska. Also their statements reflect a plan in advance of the arrival of plaintiff and other WBC members to find a reason to arrest them, reflected in comments about a supposed arrest in another city (which did not happen; plaintiff and WBC members have never picketed in the city referred to by the officers); and reflected in a copy of the flag statute being passed out to the officers and discussed in advance, earlier that day. Shirley Phelps-Roper Affidavit, ¶¶ 20 and 21; Megan Phelps-Roper Affidavit, Attachment 1 (video of arrest); Attachment 2, photos of the arrest; Attachment 3, transcript of the video.

45. When plaintiff was taken to the Sarpy County Jail upon being arrested she was asked to sign a waiver related to her arrest, which she declined to do. This apparently was why Officer Pettit did an affidavit, which states: "At this time I noticed that she also had an American flag, and an army flag, wrapped around her waist, that was dragging on the ground, and which she was constantly walking and standing on." See Shirley Phelps-Roper Affidavit, ¶ 22 and Attachment 6. So apparently plaintiff was arrested for her son standing on an American flag, *and* for having an American flag tied around her waist, *and* for having an *army flag* tied around her waist (which is not covered by the Nebraska flag mutilation statute). (At a minimum this reflects a significant lack of training of Bellevue Police Department officers.)

46. After diligently seeing to it that the remaining picketers were on the sidewalk and in the little square they were told to stand in, Officer Gray then spoke with plaintiff's adult daughter, saying, "I need to get some information. Your mom wants to relinquish the younger kids into your custody, so." One or two officers stayed with the rest of the picketers, while two left to take plaintiff to jail. The remaining officers diligently ensured the children left behind did not

29

step on the grass (even though the pink box marked in spray paint was about two-thirds on the grass). No mention was made, as the children and adults continued picketing, of any least concern that any child was in real or perceived any danger. When the time on the permit drew nigh, the picketers packed up and left. An officer followed the picketers for another ten minutes and then left them. The words and actions of the officers before, during and after the arrest of plaintiff reflects that they knew plaintiff's minor children were not in danger of any kind, and that no threat or existence of violence or harm was present at any time. Megan Phelps-Roper Affidavit, ¶ 11; Fred Phelps, Jr. Affidavit, ¶¶ 6-10.

47. Before plaintiff and other WBC members traveled to Bellevue, a WBC representative had conversations with Bellevue Police Department staff wherein the police were specifically told how many minors were coming, and their ages. If there was any danger at the scene of the picket, they could have revoked the permit. Information about minors is one of the pieces of information the Bellevue permit ordinances requires. The only danger plaintiff's children faced on June 5, 2007, was the danger of seeing their mother hauled off to jail in handcuffs for protected activity. Rebekah Phelps-Davis Affidavit, ¶ 9; Fred Phelps, Jr. Affidavit, ¶¶ 6-10.

48. While all this was taking place, hundreds of Bellevue police, and other agency personnel (law enforcement, firefighters, emergency responders, etc.), were congregated inside and outside the church; in large numbers; with numerous vehicles; and hundreds of bikers and citizens were directly in front of the church with flags and banners, all participating in expressive conduct; many using flags in that expressive conduct; none of them subject to the restraints placed on plaintiff and other WBC members. The statements of officials including police and prosecutor related to these events reflect beyond question that the difference in the treatment

30

was because of the difference in the ideas and viewpoints expressed. Megan Phelps-Roper Affidavit, Attachment 1, Attachment 2, Attachment 13, Photos 1-10; Fred Phelps, Jr. Affidavit, ¶¶ 6-10.

49. Meanwhile plaintiff was taken to the Sarpy County jail. Upon arrival a female corrections officer confronted her about the message on her shirt, to wit, God Hates America. This message was on the back of the shirt. The corrections officer then came around to the front and saw the message on the front of the shirt, to wit, God Hates Fags. She said words to the effect, "I agree with the front, but not with the back." Then she added, "I don't agree with either, God don't hate nobody. How dare you have a shirt that says something like that?" A little later this jail employee required plaintiff to remove her shirt. A review of photos of plaintiff being arrested, compared to her photo taken at the jail, shows the message-bearing outer shirt has been removed. Shirley Phelps-Roper Affidavit, ¶ 23; Megan Phelps-Roper Affidavit, Attachment 2. (Plaintiff is not at this time making claims for damages against Bellevue or Sarpy County for the actions of the jail and police officials. This information is offered at this point to show the milieu in Sarpy County.)

50. Also meanwhile family members/attorneys at home in Topeka, Kansas, attempted to contact staff at the police department and prosecutor's office, seeking relief on plaintiff's behalf, and were turned away. Jonathan Phelps Affidavit, ¶ 10.

51. On June 5, 2007, Captain Herb Evers sent an e-mail to info@phelpschartered.com, where plaintiff was employed and where the attorneys were who attempted to contact police and prosecutor staff for relief, stating: "I believe it was Jonathan Phelps that left me a voice mail on my work cell while I was talking with Rebekah Phelps-Davis. Sorry I did not return the

call however duty calls and we were very busy with about 1000 friends and family laying to rest a brother in public safety. This is just to say I did receive the message and I DID NOT get the arrestee released from jail." (Emphasis in original.) Jonathan Phelps Affidavit, ¶ 10 and Attachment 3.

52. After several hours in jail, plaintiff was issued a ticket for Mutilating a Flag contrary to Neb. Rev. Stat. §28-928 and Contributing to the Delinquency of a Minor contrary to Neb. Rev. Stat. §28-709, and then permitted to bond out. Plaintiff remains under bond to this date. Shirley Phelps-Roper Affidavit, ¶ 24 and Attachment 7; Fred Phelps, Jr. Affidavit, ¶ 11.

53. On June 5, 2007, defendant Stacey caused a picture of plaintiff from her arrest (mug shot) to be placed on the Website of the Bellevue Police Department, together with this language:

Bellevue Police Force Resources Stretched During Bailey Funeral

Bellevue Police resources were stretched on Tuesday, June 5th with one of the largest funerals this city has ever seen. Specialist William Bailey, a dedicated soldier and a volunteer firefighter was killed by a roadside IED in IRAQ and the immense outpouring of support from citizens miles away required several roadways to be shut down to accommodate everyone. Chief Stacey said that department resources were stretched even farther during the event, when a group of Kansas protestors arrived to protest the funeral. He added, "This, as we all know is their right as a citizen of this fine country. They went a little too far when the mother of a 10 year-old child allowed her child to desecrate the flag of the United States next to two Bellevue Police Officers." Desecration of the flag is against the law in Nebraska.

The mother, Shirley Phelps-Roper, was arrested and taken to jail. Phelps-Roper is a member of the Westboro Baptist Church in Kansas. The group is known for protesting at the funerals of U.S. soldiers and for its belief that the deaths of soldiers is God's retribution for a nation that harbors gays and lesbians. She is charged with flag mutilation, disturbing the peace and contributing to the delinquency of a minor. She was booked and released on bail.

This statement remains on the Bellevue Police Department Website to this day, under 2007 Story Archive. See http://www.bellevuepd.com/200707.html (last viewed 12/22/2009). Shirley Phelps-Roper Affidavit, ¶ 25 and Attachment 8.

54. On July 5, 2007, plaintiff was charged with one count of mutilating a flag in *State of Nebraska v. Shirley L. Phelps-Roper*, Case No. CR-07-5060; and, in a separate criminal complaint, *State of Nebraska v. Shirley L. Phelps-Roper*, Case No. CR-07-5061, plaintiff was charged with one count of disturbing the peace, one count of contributing to the delinquency of a minor, and one count of negligent child abuse; all having allegedly been done on June 5, 2007, at Harvell & Fairfax in Bellevue, Nebraska. Shirley Phelps-Roper Affidavit, ¶ 26 and Attachment 9.

## *Effort to Obtain Review of the Constitutional Issues in the State Court System*

55. Plaintiff sought relief in the County Court of Sarpy County from the prosecutions, through a motion to quash. On February 3, 2009, defendant Hutton issued orders denying the motions to quash, saying: "The flag mutilation statute prohibits 'intentional … casting contempt' or 'ridicule' of the flag thru 'mutilating, defacing, defiling, burning, or trampling upon such a flag.' In that form this statute is content based. The statute 'is directly related to expression' thus precluding the content neutral *O'Brien* standard of review."

The order also states that the Nebraska statute is "analytically indistinguishable" from the Flag Protection Act declared unconstitutional in 1990. The court then found: "The landmark 1989 and 1990 U.S. Supreme Court decisions of *Texas v. Johnson* and *U.S. v. Eichman* have brought into question the constitutionality of Nebraska's flag mutilation law. … Defendant's motion to quash presents an issue of first impression in the Nebraska court system. There have been no reported cases in which the Nebraska Supreme Court has issued

33

an opinion regarding the constitutionality of this statute nor has the court referenced the *Johnson* and *Eichman* decisions as precedence. It is the Nebraska Supreme court which brings finality to questions regarding whether an act of the Legislature violates the state Constitution. ... This case is pending before the County Court; a court of limited jurisdiction.

...   Although Nebraska's flag mutilation statute is vulnerable under a *facial challenge* analysis, it can be narrowly applied to those circumstances where an accused, through words and conduct of an inherently inflammatory nature, intentionally seeks to create an environment designed to provoke a person to retaliate, thereby inciting a breach of peace." Also, even though there is no dispute that the only basis for the other three charges – disturbing the peace, contributing to the delinquency of a minor, and negligent child abuse – is the fact that plaintiff's minor son stood on a flag during a picket – the court similarly declined to grant relief on those counts. Thus, in spite of the complete lack of any evidence – with the event having been fully videotaped and documented – of any disruption, intent to disruption, or other behavior besides peaceful lawful expression – and while recognizing the statute is unconstitutional on its face – the county court denied relief. Shirley Phelps-Roper Affidavit ¶ 27 and Attachment 10.

56. Plaintiff also sought relief from the Nebraska Supreme Court.  An appeal was taken to the district court, which denied review.  An appeal was taken from there to the Court of Appeals. In both cases plaintiff asked the Nebraska Supreme Court to bypass and transfer the appeal to the Nebraska Supreme Court, because the case involved questions of state or federal constitutional interpretations, questions of law regarding the validity of statutes, and issues of significant public interest.  On November 12, 2009, the Nebraska Supreme Court granted the

34

bypass motions and dismissed the appeals for lack of jurisdiction. Shirley Phelps-Roper Affidavit, ¶ 28 and Attachment 11.

### *Defendant Polikov's Statements of Purpose in the Prosecution*

57. Defendant Polikov has made repeated public statements about his prosecution of plaintiff. His comments reflect his purpose of silencing plaintiff and other WBC members; his awareness that the Nebraska flag mutilation statute is contrary to established Supreme Court precedent; and his knowledge that plaintiff's actions were not illegal under existing law. His public commentary before and after filing charges includes: "I think the actions stepped across the line of civility and common decency and that's why we have rules and that's why I'm selected to enforce those." "Obviously with the mutilation of the flag we face freedom of expression problems, but there is no doubt in my mind that this defendant stepped across the lines of common decency and civility and that changes the situation from free speech." And, "The supreme Court said if you're going to burn a flag and it's expressing yourself that's constitutional. In that fact pattern it didn't address the fact pattern that we face where we have an individual that inserts herself in someone else's environment and then tries to, uh, I believe incite a response and it's predictable in a situation like that where you could end up with some violent reaction and then we come over to the why we're placing the child in a bad situation as well. … She should be ashamed for putting her child in that situation. As well as—Yeah, as well as putting the family of William Bailey in a situation like that and other soldiers similarly situated and a community that was expressing sympathy." After praising the police for doing a "great job" which "resulted in no violence," defendant Polikov complains that plaintiff and other WBC members were "playing games with the system and they just not ought to be able

35

to do that." In further public commentary defendant Polikov said, "Tuesday's circumstance was different because she was involved in a potentially volatile situation where Bailey's friends, family and fellow soldiers had come to pay their respects. You might illicit a violent response. That's against community peace and community law. This isn't a demonstration in the town square against the war. The Supreme Court feels you can burn a flag because it's self expression. When you're provocative, invading other people's space, you can be held accountable." Also, "Who knows what would have happened if someone were driving by and saw that mother and child doing that to the flag." And, "Perhaps Phelps-Roper isn't clear on what the flag represents or how it should be used. 'It's certainly not meant to be used in this way,' he said. 'She was using it to incite a response.'" Further, "[Polikov] tells us that with the soldiers, firefighters, police and protestors all being in close proximity during the alleged incident, violence was possible." Also, "The Court was narrowly split [in Texas v. Johnson], 5-4, and was 'pretty liberal' at the time. Today's court, bolstered by traditionalist Bush appointees, might take a different view, he said." "If Sandra Day O'Connor was the county judge, I'd win this case." Defendant Polikov also said publicly he intended to request a law be passed by Sarpy County. "My goal would be you have to be out of sight, out of sound." Megan Phelps-Roper Affidavit, Attachments 4-10.

58. To justify his method of using prosecutorial power to punish, chill and restrain protected religious picketing, defendant Polikov made reference in his public statements to an incident in Seaford, Delaware, involving WBC picketers. That incident of May 22, 2006, resulted in several individuals being prosecuted for striking two WBC members, and for doing damage to two vehicles. Thus, defendant Polikov is relying on the criminal acts of others in a different

jurisdiction to justify this unlawful prosecution. Also, a state official in Delaware used the same method as defendant Polikov, which apparently defendant Polikov is endorsing, to wit, officials using their official status and voice to make public statements about the *content of* and their disagreement with plaintiff's and other WBC members' viewpoints, to punish and deter protected speech. Four days before WBC members were scheduled to be in Delaware, where they picketed five blocks from the church where the funeral was held, Delaware State Senator James Vaughn was quoted in the local paper saying: "I think we should turn a platoon of Marines – armed U.S. Marines – loose on them. That would take care of things in a hurry." The local paper saw fit to repeat this statement in an editorial the day before the picket. This method by officials of making public statements that have the effect of stirring people up, attempting to incite a "heckler's veto," with the goal of deterring, punishing and chilling speech, is the same method at issue in this case. A "heckler's veto" is not allowed under this nation's rule of law (e.g., *Brown v. Louisiana*, 383 U.S. 131, 133 & footnote 1, 86 S.Ct. 719 & footnote 1, 15 L.Ed.2d 637 [1966]), and certainly should not be encouraged by someone with prosecutorial power. No one should be surprised there were people at the counter picket in Seaford, Delaware, ready to commit violence against WBC members, given the statements published in the media attributed to Senator Vaughn. A large crowd formed at this picket. The police did a good job containing the crowd and keeping them separate from the WBC picketers, and responding to the criminal acts of these individuals. No one was seriously harmed or required hospitalization or medical care. This picket was conducted five blocks from the church where the funeral was being held, and the illegal acts of those who engaged in violence and property damage, did so because they disagreed with the words, and

37

because they had tactic permission from one of their leaders. Plaintiff was not at that picket, nor were there any minor children at that picket, because WBC members have learned in nearly 20 years of picketing that undisciplined words from officials have the effect of stirring up people to attempted violence in the hopes that will silence words with which they disagree. In this instant case, defendant Polikov is using such undisciplined words to stir up emotions in the hope those emotions will carry the prosecution instead of the merits. See Affidavit of Fred Phelps, Jr., ¶ 12 and Attachment 1.

59. Defendants Polikov and Stacey apparently have an unconstitutional modus operandi of applying generic-seeming state laws to protected speech in an effort to punish, chill, restrain and prohibit the speech. In April 2009 these two defendants entered a Consent Decree and Judgment in *Hansen v. Polikov*, Case No. 07CV3261 in this Court, wherein they agreed not to apply the Nebraska Unlawful Picketing Statute (Neb. Rev. Stat. §28-1317(b) and (e)) or the Nebraska Disturbing the Peace Statute (Neb. Rev. Stat. §28-1322) (one of the statutes used on plaintiff) against peaceful protesting. Shirley Phelps-Roper Affidavit, ¶ 29 and Attachment 12.

60. No violence of any kind, or even any threat of violence, occurred during the June 5, 2007 picket, before or after police detained, questioned and arrested plaintiff. After having communicated in good faith with the Bellevue Police Department in advance of their picket, at all times during the June 5, 2007, picket plaintiff and all other WBC members complied with all police orders, lawful and unlawful. Shirley Phelps-Roper Affidavit, ¶ 30.

61. On the day of plaintiff's arrest, there was no mention to her by any police officer or official that any of her minor children participating in the June 5, 2007 picket, were in any kind of

38

danger. Further, Officer Pettit's affidavit makes no mention of the children being in any kind of danger. The affidavit states: "Approaching the protestors, I noticed that there was a juvenile male, 10 years of age, that was standing atop an American flag. He was later identified as Jonah Phelps-Roper. After asking who was the parent of this juvenile, Shirley L. Phelps-Roper stated that he was her child." Then as to the children: "Mr. [sic] Phelps-Roper was then arrested for Mutilating a Flag (28-928), and for Contributing to the delinquency of a Child (28-709). Her underage children were turned over to their adult uncle and their adult sibling, per Shirley's request." See Shirley Phelps-Roper Affidavit, Attachment 6. Thus, the only action by or toward any of plaintiff's children that resulted in her being charged with crimes about her children was one of her sons standing on an American flag.

## *The Bellevue Assembly Permit*

62. On July 23, 2007, plaintiff and other WBC members applied for a permit with the City of Bellevue to conduct a picket on July 30, 2007. The purpose of the picket was a religious demonstration and expression was set out in detail in an attachment to the application. The application requested permission to picket at the same location for which a permit had been granted on June 5, 2007. Shirley Phelps-Roper Affidavit, ¶ 32 and Attachment 13; Rebekah Phelps-Davis Affidavit, ¶¶ 11 and 12 and Attachment 3; Megan Phelps-Roper Affidavit, Attachment 11.

63. On July 23, 2007, the request for permit was added based to the agenda of the City Council meeting, presented as an emergency add-on. Captain Herb Evers addressed the council on behalf of the Bellevue Police Department. Captain Evers read several paragraphs from plaintiff's writing about their religious beliefs to the council. He then told the council that on

June 5, "there had been a funeral held, for, um, Bailey, a firefighter here in the city of Bellevue and a soldier who was killed in Iraq and, uh, the Westboro Baptist Church came to the funeral and protested. They violated the law at their protest. Based on that and based on our ordinance of, uh, 28-129, um, we the city have the, uh, authority to deny this permit, um, with the assumption that, um, their act or activity might be violative of the law. It was violative of the law at their past activity. We are assuming that this next activity, um, on Monday coming would also be violative of the law. Um, therefore, I submit this to the Council to see if the council, uh, believes it to be prudent to disapprove this application for the permit to assemble." One council member stated: "Herb, was this the same bunch that desecrated our flag?" Captain Evers: "Yes, sir, it is. The exact same person." Council Member Stacey: "I'll make a motion that we deny." Council Member Sanborn: "Second." Then Council Member Hatcher said "we need a – a reason to deny," and "if you don't have a reason I would consider it a, uh, safety issue.…" As further discussion continued, Captain Evers stated: "It was the – their protest, their activities last time were manpower intensive and cost this city a lot of money," this contrary to his e-mail and the posting on the Bellevue Police Department Website, which indicated all the manpower was focused on attending and participating in the funeral, with only six officers at the most involved with plaintiff and other WBC members. Council Member Ott noted that there were "men and women in the uniform out here" in the audience. Then Council Member, now Mayor Mixan (defendant Mixan in this action), raised constitutional concerns. Captain Evers assured him that no matter what they did plaintiff and WBC members would sue them anyway. Council Member Erickson agreed, adding: "Uh, it's just – I talked to the guy the other day, and he says, 'What in the

40

world are you talking about here, desecrating the flag? It's just a piece of cloth.' And [gasp] I

just said that's absolutely, uh, according to my colleague here, it's stupid remark, and it is a

stupid remark." Then a member of the church where the funeral was to be held for which the

permit was requested came to the podium to clarify that the church was in no way approving

this. Then as it neared time to vote, Council Member Cascio stated: "If think if we deny the

permit, we'll have less issues than if we let this permit go on. I – I – I can't see – I can't see

approving this ... to disrespect this funeral. So I'm going to support denying this permit."

Then the council voted 8-0 to deny the permit. Not once did the City Council or any other city

official, including law enforcement personnel from the Bellevue Police Department, make a

single mention of the safety or wellbeing of plaintiff's children or any other child during the

picket as a concern. Their focus was, instead, entirely on silencing a message with which they

disagreed. Megan Phelps-Roper Affidavit, Attachment 1 (video of City Council meeting of

July 23, 2007) and Attachment 11 (transcript of video of City Council meeting of July 23,

2007).

64. The Bellevue city ordinances regarding permits for assemblies state as follows:

## ARTICLE V. PARADES, MEETINGS, ETC.
## DIVISION 1. GENERALLY
### Sec. 28-111. Enforcement.

Nothing contained in this article shall prohibit the authority of any officer to arrest a
person engaged in any acts or activities granted a permit under this article, if the conduct
of said person violates the laws, or obstructs the public streets and sidewalks of the city, or
constitutes acts that cause a breach of the peace. (Ord. No. 2152, 2, 12-8-80)

### Sec. 28-112. Dispersal of activity.

Whenever the free passage of any street or sidewalk in the city shall be obstructed
by a crowd, congregation, parade, meeting, assembly or procession, or the conduct of two
(2) or more persons, except as authorized by any permit issued pursuant to this article, the
persons comprising said group shall disperse or move when directed to do so by a police

41

officer. It shall be unlawful for any person to refuse, and said refusal shall be a violation of this article. (Ord. No. 2152, 10, 12-8-80)

**Secs. 28-113—28-124. Reserved.**

**DIVISION 2. PERMIT**

**Sec. 28-125. Required.**

It shall be unlawful for any person to organize or hold or participate in any parade, meeting, assembly or procession of persons and/or vehicles on the streets, sidewalks or other public places within the city unless such activity shall have first been authorized by a written permit therefor. (Code 1964, 14-66; Ord. No. 2152, 1, 12-8-80)

**Sec. 28-126. Application.**

Any person desiring a permit required by the provisions of this article shall make application therefor to the city, which application shall contain the following information:

(1) The name and local and permanent address of the applicant.

(2) The name and address of the person the applicant represents.

(3) The exact time and date of commencement and termination of each act or activity desired.

(4) The purpose, location and route of such act or activity, if applicable.

(5) The person, group, association or body to be authorized under the permit to do such act or activity and the number of persons to participate.

(6) The age of any minors who may participate in such activity, and the name of the person who will be responsible for such minors.

(7) Such other relevant information as the city may require for the investigation of the applicant. (Ord. No. 2152, 3, 12-8-80)

**Sec. 28-127. Matters considered in determining issuance of permit.**

In deciding whether to issue a permit under the provisions of this article, the city shall consider:

(1) Number of persons to participate;

(2) Anticipated traffic conditions at the time and date proposed for the activity;

(3) Schedule of other similar activities for which permits may have been issued;

(4) Adequacy of adult supervision for any minors scheduled to participate;

(5) Availability of city personnel whose presence on duty may be required by the activity and by the necessity to protect the general public;

(6) Adequacy of public facilities in the location proposed for the activity and the normal public use of public facilities in the proposed location. (Ord. No. 2152, 4, 12-8-80)

**Sec. 28-128. Denial, modifications.**

If the city determines from the application that the proposed parade or march will unduly interfere with and impede traffic on the public streets, alleys and ways over which the parade or march will pass, and the public streets, alleys and ways that intersect the public streets, alleys and ways over which the parade or march will pass, the city shall so advise the applicant in writing and give, in reasonable details, the reason the city will not issue a permit for such parade or march, and shall suggest such modifications in the said application, which, if made, will not unreasonably interfere with and impede normal traffic

on the public streets, alleys and ways by said parade or march. Such modifications may
include:

    (1) Changing or altering the route of the march or parade;

    (2) Changing the date and/or time of day the parade or march will be made;

    (3) Changing or altering the length of the march or parade;

    (4) Changing the width of the parade or march, i.e., from requiring the whole width
       of the public street, alley or way to a lesser part of the width, to be specified;

    (5) Any combination of the foregoing suggested areas of modifications;

    (6) Any other modifications that will cause the said parade or march to not unduly
       interfere with and impede normal traffic on the said public streets, alleys and
       ways of the city.

If such suggested modifications shall be incorporated in an amended application for a
permit, the city shall forthwith issue a permit for such parade or march. (Ord. No. 2152, 6,
12-8-80)

**Sec. 28-129. Issuance.**

The permit required by this article shall be issued by the city upon supplication therefor;
provided, however, that such permit may be denied or refused if it shall appear that the
applicant therefor or the act or activity requested by such application shall be violative of
law. (Ord. No. 2152, 5, 12-8-80)

**Sec. 28-130. Contents of permit.**

Upon issuance of a permit required by this article, the same shall contain therein all
information contained in the application therefor and a signed copy of the same shall be
kept with the application on file at city hall. (Ord. No. 2152, 11, 12-8-80)

**Sec. 28-131. Display.**

Every person having a permit issued under the provisions of this article shall have such
permit in his possession during the activity permitted thereby, and shall display such
permit upon the request of any law enforcement officer. Failure to display such permit
shall be deemed a misdemeanor. (Ord. No. 2152, 8, 12-8-80)

**Sec. 28-132. Deviation from permit.**

It shall be unlawful for any person participating in any act or activity for which a permit
has been granted under the provisions of this article to deviate from or alter any of the
terms or conditions of such permit. (Ord. No. 2152, 7, 12-8-80)

**Sec. 28-133. Revocation.**

Any permit issued under the provisions of this article may be revoked by the city for the
violation by the permittee of any law. (Ord. No. 2152, 9, 12-8-80)

Supp. No. 12

65. On July 25, 2007, defendant Dammast wrote WBC saying the permit was denied. On July 27,

2009, the City then issued a permit to WBC allowing seven members to picket, with

restrictions including an express statement that "Ms. Shirley Phelps-Roper will not be among

the participants." Also that the picketers would be required to stand at a specific location well beyond 300 feet. Also that "no United States flags, including depictions of the United States flag, will be displayed or used for any purpose in furthering the assembly." Given these limits, and the fact that the Bellevue officials had engaged in gross violations of plaintiff's and other WBC members' constitutional rights, including arresting and prosecuting plaintiff, an in terrorem impact prevented plaintiff and other WBC members from participating in the picketing and other expressive activities they had planned; and, plaintiff was expressly restrained from religious picketing. Also given these limits, and the immediate past acts of the officials of Bellevue in arresting plaintiff, all WBC members were restrained from religious picketing on July 30, 2007. At the same time dozens or more bikers and citizens were permitted to be directly in front of the church engaging in protest activities at this funeral. Shirley Phelps-Roper Affidavit, ¶ 32 and Attachment 13; Jonathan Phelps Affidavit, ¶ 11; Rebekah Phelps-Davis Affidavit, ¶¶ 11 and 12 and Attachment 3.

## *The Chilling Effect of Defendants' Actions*

66. The officials of Nebraska, with particular concentration in the state legislature, and by local officials in Omaha, Bellevue, Papillion and Sarpy County, have engaged in acts which individually restrain and prohibit protected activity. The combination of these actions – especially when these officials articulate that they are engaging in prohibitive acts *because of* the acts of others – has created a raw hostility towards plaintiff's and other WBC members' protected religious speech and expressive activity. The use of arrest and prosecution is a powerful deterrent to a group of people who are conscientious, law-abiding, and know the law as lawyers. (This is in addition to the specific instances where official action, such as

threatening to arrest if plaintiff was in the city; or filing an injunction action in county court; or ordering plaintiff and other WBC members not to use flags, or denying a permit, specifically restraining plaintiff and other WBC members from picketing and expressive activity.) Plaintiff expects the rank and file citizenry to adamantly disagree with her religious message; after twenty years that is obvious; and in fact, the very hatred of the words is part and parcel of the condition of things making them necessary. It is another thing altogether for state and local officials to use their government power, in spite of a sworn oath to uphold the Constitution, to run roughshod over constitutional rights. Plaintiff and other WBC members have been longsuffering, seeking relief, urging these officials to reconsider, complying with various illegal orders and directives and decisions. Today the impact of these combined activities is to have a powerful chilling effect on plaintiff's constitutional rights. There is no legitimate government interest of any kind, weight, level or type which justifies these actions by these officials. Plaintiff imperils herself every time she engages in protected activity in Nebraska, exposing herself to further arrest and prosecution. There is a complete absence of good faith by these officials. Plaintiff and other WBC members and representatives have consistently communicated with law enforcement, in advance of their pickets. The WBC picketers always comply with police directives. This picketing has been taking place for nearly twenty years. The law enforcement community across the nation is familiar with the manner and practices of the WBC picketers, including specifically plaintiff. WBC's representative has talked to literally hundreds of law enforcement, and knows from what they tell her that they talk to each other, and they all know that the picketers will obey them (see Rebekah Phelps-Davis Affidavit, ¶ 11). It was not necessary to arrest plaintiff; it was a crass

45

and heavy-handed tactic. The police could have simply asked her to stop using the flag. It is not necessary to prosecute plaintiff; and doing so is merely part of the overall scheme to punish and restrain her speech, picketing and expressive activities. This is a classic example of where a federal court is needed to intervene when state and local officials will not comply with clear and well-established constitutional principles, and when the rule of law has broken down, resulting in gross civil rights violations.

## Legal Arguments & Authorities

### Plaintiff has Standing

67. Plaintiff has standing herein because she has for many years engaged in and continues to engage in picketing, including picketing at funerals; because she has used and continues to use the flag in expressive and communicative activity; because she has had and will continue to have her children participate with her in her religious picketing and expressive and communicative activity; because she has been specifically restrained from engaging in picketing and using the flag in expressive and communicative activity; because she has been and is being prosecuted for her religious picketing and expressive and communicative use of the flag and having her children participate therein; because defendant Polikov has made public statements indicating he intends to prosecute plaintiff further because of the viewpoint conveyed in her communicative use of the flag and for having her children participate; and because she has requested permits from Bellevue, will continue to request permits from Bellevue, and has expressly been denied a permit by Bellevue. For all of these reasons, and because the Nebraska funeral picketing law expressly targeted her activity and the activity of other members of her church; plaintiff has standing to bring these claims. See *St. Paul Area*

46

*Chamber of Commerce v. Gaertner*, 439 F.3d 481 (8th Cir. 2006); *Harmon v. City of Kansas City, Missouri*, 197 F.3d 321 (8th Cir. 1999); *Krantz v. City of Fort Smith*, 160 F.3d 1214 (8th Cir. 1998); *United Food and Commercial Workers International Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 4422 (8th Cir. 1988); *Postscript Enterprises, Inc. v. Westfall*, 771 F.2d 1132 (8th Cir. 1985).

## *The Nebraska Funeral Picketing Law is Unconstitutional on Its Face & As Applied*

68. Plaintiff seeks an injunction against the enforcement and application of the Nebraska funeral picketing law, because it is unconstitutional on its face and as applied to plaintiff and other WBC members. The Nebraska funeral picketing law "regulates traditional public fora. A traditional public forum is one traditionally used as a forum for expression, such as a public street or a sidewalk," *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2009), *cert. denied, Nixon v. Phelps-Roper*, 129 S.Ct. 2865, 174 L.Ed.2d 578, 2009 U.S. LEXIS 4769 (U.S. 2009).

. "The statute must therefore satisfy the standard of review for traditional public fora. A content-neutral time, place and manner regulation may be imposed in a public forum if it: (1) serves a significant government interest; (2) is narrowly tailored; and (3) leaves open ample alternative channels of communication." *Phelps-Roper v. Nixon, supra,* 545 F.3d at 691. The State of Nebraska claims an interest in the privacy of grieving families and preserving the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral. The Eighth Circuit recently reversed a trial court's denial of a preliminary injunction to this same plaintiff regarding the Missouri funeral picketing law, saying:

> The district court found the state has a significant interest in preserving and protecting the sanctity and dignity of memorial and funeral services, as well as protecting the privacy of family and friends of the deceased during a time of

mourning and distress. *Phelps-Roper v. Nixon*, 504 F.Supp. 691, 696 (W.D. Mo. 2007). The supreme Court has not addressed this issue, but has recognized the state's interest in protecting citizens from unwanted communications while in their homes, *Frisby [v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1980)] at 482, and when otherwise "captive" *Madsen v. Women's Health Ctr.,* 512 U.S. 753, 768, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). One other circuit court, which recently analyzed the constitutionality of similar funeral protest statutes, has extended *Frisby* and acknowledged the state has an interest in protecting mourners, which were found to be a captive audience, from unwanted speech during a burial or funeral. See *Phelps-Roper v. Strickland*, 539 F.3d 356, 362-67 (6th Cir. 2008) (finding the state interest was significant); *McQueary v. Stumbo*, 453 F.Supp.2d 975, 992 (E.D.Ky. 2006) (assuming, without finding, for the purpose of preliminary injunction, the state has an interest in protecting funeral attendees from unwanted communications so obtrusive they are impractical to avoid).

We note our own opinion in *Olmer v. Lincoln*, 192 F.3d 1176, 1178 (8th Cir. 1999), which affirmed a preliminary injunction enjoining the enforcement of an ordinance that "restrict[ed] to certain areas the 'focused picketing' of churches and other religious premises thirty minutes before, during, and thirty minutes after any scheduled religious activity" because it violated the *First Amendment*. In Olmer, we held the government has no compelling interest in protecting an individual from unwanted speech outside the residential context. *Id*. At 1182 (refusing to allow other locations, even churches, to claim the same level of constitutionally protected privacy afforded to the home by Frisby). We stated:

> As the Supreme Court said in Frisby, 'the home is different,' and, in our view, unique. Allowing other locations, even churches, to claim the same level of constitutionally protected privacy would, we think, permit government to prohibit too much speech and other communication. We recognize that lines have to be drawn, and we choose to draw the line in such a way as to give the maximum possible protected to speech, which is protected by the express words of the Constitution.

Id. … Because of our holding in *Olmer*, we conclude Phelps-Roper is likely to prove any interest the state has in protecting funeral mourners from unwanted speech is outweighed by the *First Amendment* right to free speech.

*Phelps-Roper v. Nixon, supra*, 545 F.3d at 691-692. This language by the Eighth Circuit suggests the entirety of the Nebraska funeral picketing law is invalid, given its broad scope and failure to narrowly tailor the prohibition on speech to the asserted government interests.

69. The Nebraska funeral picketing law is overbroad in that it prohibits speech at a far greater distance than whatever privacy zone it purports to protect. Even if the Supreme Court would recognize a privacy right in the funerals of soldiers which are turned into massive public events, with broad participation by government officials, community-wide invitations and participations, media in attendance inside and out, before, during and after; and a variety of people directly in front of the building engage in public communication before, during and after, about the funerals in the context of substantial public issues; and even if the Supreme Court would put these events on the same standing as residences and abortion clinics – no matter what activity is taking place in them (in this instance a high-profile public event rife with public-issue expressive activity) – the distance of 300 feet (especially when nothing indicates "from where") – is too broad for this zone of privacy. The law prohibits activity *not* in the church, *not* on the grounds of the cemetery, *not* inside or up close to the event; but out on the public sidewalks. Thus anything that removes picketers further away than *directly in front of* the location, is too broad. The Supreme Court has only upheld a 100-foot distance in the context of abortion clinics, *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). In *Brown v. City of Pittsburgh*, 2009 U.S.App. LEXIS 23979 (3rd Cir. 10/30/2009), the Court said that the combination of a 100-foot distance plus 15-foot buffer zone was too broad. If the government has a legitimate interest in keeping those engaged in protest activities a distance from a funeral, that interest should be balanced carefully with First

Amendment interests, so that those wishing to engage in expressive activity *targeted at the audience going into the funeral* still have an alternative form of communication. Instead, 300 feet puts picketers further away than necessary for privacy, and cuts off alternative forms of communication.

> The Eighth Circuit has found other anti-picketing regulations did not leave open ample alternative channels for communication of the information. When addressing whether a permanent injunction should issue in *Kirkeby*, the Court reasoned:
>
> > [P]laintiffs wish to express an opinion about an individual to that individual and others, and they wish to direct their message at that individual. ... Therefore, allowing them to picket in the town square or even the next block does not satisfy the second Ward requirement [of leaving open ample alternative channels for communication]. These time limits do not give the plaintiffs enough opportunity to direct their intended message at their intended recipients.
>
> *Kirkeby v. Furness*, 92 F.3d 655, 662 (9th Cir. 1996).  By analogy, Phelps-Roper presents a viable argument that those who protest or picket at or near a military funeral wish to reach an audience that can only be addressed at such occasion and to convey to and through such an audience a particular message. ... She is likely to prevail in proving [the Missouri law] fails to afford open, ample and adequate alternative channels for the dissemination of her particular message.

*Phelps-Roper v. Nixon, supra*, 545 F.3d at 693.

70. The Nebraska funeral picketing law is overbroad in that it prohibits speech that is peaceful in character, and does not limit its coverage to speech or activity that is disruptive or undertaken to disrupt, narrowly tailoring it to its stated purpose of preserving the peaceful character of funerals.  The law was written to cover peaceful and non-peaceful and disruptive and non-disruptive pickets.  This is particularly important, because it is well known throughout this

nation that plaintiff and her fellow church members do not engage in disruptive conduct, such

as civil disobedience; and instead picket peacefully and without violence, obeying all laws.

> In addition, [the Missouri law] does not limit itself to activity that targets,
> disrupts, or is otherwise related to the funeral, memorial service or procession.
> …   While the Sixth Circuit concluded a similar ordinance was limited to
> activity that was directed at a funeral or burial service, the statute involved in
> that case defined "other protest activities" to include "any action that is
> *disruptive or undertaken to disrupt or disturb a funeral or burial service*."
> *Phelps-Roper*, 539 F.3d at 368 (emphasis added).   Because the Missouri
> statute does not contain any such provisions, Phelps-Roper is likely to prove
> the statute does not limit its coverage to activity that targets or disrupts a
> funeral or burial service.

*Phelps-Roper v. Nixon, supra*, 545 F.3d at 693.

71. The Nebraska funeral picketing law is overbroad in that is fails to leave open ample and

adequate alternative channels for the dissemination of a particular message to a particular

audience, as addressed above.   By making the distance broader than necessary for the privacy

right asserted, the government has, effectively, cut off an ample and adequate alternative

channel for disseminating plaintiff's message to a particular audience.

72. The Nebraska funeral picketing law is vague because it requires picketers to comply with a

time frame tied to the beginning and ending of a funeral but requires no notice or posting of

times so that there is no way to comply with the law.

73. The Nebraska funeral picketing law is vague because it requires picketers to remain a

specified (overbroad) distance away during a specified (overbroad) time frame, but it does not

provide any means of knowing where to begin the measuring of the distance.

51

74. The Nebraska funeral picketing law is overbroad by prohibiting picketing in the 300-foot distance for a full hour before and a full two hours after the start time of the funeral. The privacy interest asserted is satisfied by prohibiting disruption of the funeral

75. Even if the Nebraska funeral picketing law was facially valid, it has been applied to plaintiff and other WBC members so that far more speech than the statute states is burdened, up to and including prior restraints on speech. The Nebraska funeral picketing law is applied in varying ways, as to distance and time frame, by varying jurisdictions, accompanied by threats of arrest and prosecution, such that it has been applied as a restraint on protected speech. The facts set forth above, with evidentiary support, reflect that there is no consistent manner in which the law is enforced, *except* plaintiff and WBC members are always further away from the event than counter picketers engaging in protest activities. Plaintiff and other WBC members have been placed many hundreds of feet away, sometimes blocks away; are often blocked by law enforcement and other officials and/or their vehicles; and the application of the law is clearly carried out with the goal and purpose of putting plaintiff and other WBC members out of sight and sound of their intended audience, while allowing those with a different message to be in sight and sound of the same audience. The point at which the measuring starts varies; the number of feet from that point varies, with officials blatantly going well beyond three hundred feet from *anything*, let alone the entrance to the funeral or related event. The law is applied in a manner that is extremely overbroad; going well beyond any legitimate interest in privacy or peace (especially given the noisy nature of the counter picketers, who often have motorcycle engines revving and congregate in large and often noisy numbers); and has the effect of prohibiting far more speech than is necessary, if properly narrowly tailored to any legitimate

government interest. And, on some occasions, the breadth of the application has been so great
that it has resulted in plaintiff and other WBC members being restrained from speaking at all.

76. The Nebraska funeral picketing law has been discriminatorily applied to one viewpoint, and
thus is a content-based law in its application, rendering it invalid because no government
interest asserted by the Nebraska legislature warrants a content-based enforcement of the law.
Officials in Nebraska routinely require plaintiff and other WBC members to be substantially
further away from the funeral than others who are engaged in protest activities, as established
by the factual statements and supporting evidence discussed above. In *Carey v. Brown*, 447
U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Court affirmed the Seventh Circuit's
decision reversing a trial court and holding that the Illinois residential picketing statute was
unconstitutional because it discriminated between lawful and unlawful conduct based on the
content of the demonstrator's communication, by exempting picketing concerning a labor
dispute from its coverage. So when members of a civil rights group participated in a peaceful
demonstration on the public sidewalk in front of the mayor's home, protesting his alleged
failure to support the busing of schoolchildren to achieve racial integration, they were
convicted under the law, while anyone engaged in labor picketing was not. "The State's
interest in protecting the well-being, tranquility, and privacy of the home is certainly of the
highest order in a free and civilized society. 'The crucial question, however, is whether [the
Illinois statute] advances that objective in a manner consistent with the command of the *Equal
Protection Clause*.' *Reed v. Reed*, 404 U.S. [71], 76 [(1971)]." *Police Department of
Chicago v. Mosely*, 408 U.S., at 99. And because the statute discriminates among pickets
based on the subject matter of their expression, the answer must be 'No.'" *Carey v. Brown*,

53

*supra*, 447 U.S. at 471, 100 S.Ct. at 2296. The manner in which the Nebraska funeral picketing law has been applied is content-based, with those who have a popular and so-called patriotic viewpoint being permitted to engage in expressive activity far closer to the audience than plaintiff and WBC members, who are required to be substantially removed from the audience, and on some occasions have been altogether restrained and forbidden to speak.

77. It may be suggested that the families of the dead soldiers (or other persons) "invite" the bikers, officials and community-at-large to the funerals or memorial services, so they should be permitted to be closer. In this regard, the norm in this nation is to run an obituary and announce when and where a funeral or memorial service will be held, so in that sense, everyone is invited, *to come inside to the service.* And, it might be said that a private funeral home or church may have whosoever on the property they desire, and if they desire to have the guests of the family on the front lawn or in the parking lot, they can do so. (This certainly distracts from the Legislature's claim that a purpose in the Nebraska funeral picketing law is a peaceful environment for the funeral or memorial service.) But this case is *not* about what goes on inside the building or on the private properties where these events are held. *Rather*, it is about what happens on public sidewalks and easements. No family, funeral home, church, or other private person has the right to invite or un-invite anyone to those public places. The evidence in this case is that groups other than WBC, individuals other than plaintiff, are *routinely* permitted to be on the sidewalk and in the streets – literally – well within the 300-foot prohibited area, before, during and after funerals and memorial services. Indeed, it is just *assumed* that this is perfectly fine. Yet if plaintiff or the members of WBC attempted to place themselves in those locations, they would be arrested. Further, it is just *assumed* that any

group other than WBC, or any individual other than plaintiff, is at full liberty to use an American flag in any fashion he or she sees fit during these episodes of expressive activity.

78. The Nebraska funeral picketing law is applied to peaceful, lawful, non-disruptive picketing, in public places, and as such is overbroad, beyond what is necessary for any legitimate, compelling or other government interest. This is the same defect that the statute has on its face. The law does not limit its application to instances of disruption; instead, it applies to peaceful picketing; and in each instance, it has been applied to plaintiff and other WBC members when they were engaged in peaceful non-disruptive picketing. As discussed above, the Eighth Circuit specifically said in *Phelps-Roper v. Nixon, supra*, that a statute which prohibits non-disruptive non-intrusive peaceful picketing is not valid in light of any government interest. This statute allows this on its face; and in fact in every day application it has been applied to peaceful, non-disruptive, non-intrusive picketing by plaintiff and other WBC members every time, because that is the only kind of picketing they do.

## *The Nebraska Flag Mutilation Statute is Unconstitutional on its Face & As Applied*

79. The Nebraska flag mutilation statute is unconstitutional on its face in that it criminalizes protected expressive activity, and specifically the use of the flag to express a viewpoint or idea. The language of the statute expressly prohibits mutilating, defacing, defiling, burning or trampling upon the flag *only* if done intentionally to cast contempt or ridicule upon a flag. Thus only by using the flag to express an idea or to communicate one specific viewpoint, to wit, contempt or ridicule, is this conduct prohibited. Thus the conduct prohibited is prohibited *because* it has expressive elements, which is precisely what the Supreme Court has said is unconstitutional.

80. The Nebraska flag mutilation statute is unconstitutional on its face in that it reflects or articulates no legitimate, compelling or other government purpose or interest, and therefore reaches protected speech and expressive conduct contrary to the constitution. The statute is on its face content-based and therefore must be held to the most exacting level of scrutiny; the legislature did not include any statement of intent that manifests a legitimate, compelling or other government interest that supports a prohibition against anyone expressing contempt or ridicule for the flag. A conviction under this statute depends on the likely communicative impact of the expressive conduct which the statute prohibits. And, the statute only prohibits communicating contempt or ridicule for the flag, which means the State of Nebraska is, by this statute, criminalizing a specific viewpoint. It is unconstitutional for the state to try to foster or impose its own view of the flag by prohibiting expressive conduct that it characterizes as contempt or ridicule (even if there could be a common understanding of these terms).

81. The Nebraska flag mutilation statute is unconstitutional on its face because it does not limit its application to expressive conduct that is disruptive or causes a breach of the peace. A person is prohibited from peacefully casting contempt or ridicule upon the flag in any situation under any circumstances, without any requirement that a breach of the peace actually have occurred. A suggestion that plaintiff or her son's use of the flag *could* have led to a breach of the peace does not rehabilitate this statute on its face because 1) there was no breach of the peace, and more importantly, 2) the statute does not require any actual or threatened breach of the peace for the statute to be violated and for arrest and prosecution to occur. As the Supreme Court said in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989): "To accept

56

[the state's] arguments that it need only demonstrate 'the potential for a breach of the peace,' ... and that every flag burning necessarily possesses that potential, would be to eviscerate our holding in *Brandenburg [v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1960)]. This we decline to do," 491 U.S. at 409, 109 S.Ct. at 2542.

In *Street v. New York*, 394 U.S. 576, 22 L.Ed.2d 572, 89 S.Ct. 1354 (1969) (citing *Stromberg v. California*, 283 U.S. 359, 75 L.Ed. 1117, 51 S.Ct. 532 [1931] and *West Virginia Board of Education v. Barnette*, 319 U.S. 624 [1943]), the Supreme Court established that criminalizing contempt for the flag (in that case by spoken words), in the absence of any evident threat to the peace, violated the First Amendment. This reasoning continued in the Court's opinion in *Texas v. Johnson*, which is now established law. When the state asserted as an interest keeping the peace, the Court rejected that position because there was no evidence of breach of the peace. A prosecution based on what *could* have happened (especially when all such dire hypotheticals rest squarely upon the communicative aspect of the flag's use) is simply not allowed. No one claims there was a breach of the peace in this instance, and in fact defendant Polikov specifically said there was no breach of the peace and no violence. When the state asserted an interest in preserving the flag as a symbol of nationhood and national unity, the Court honed in on the fact that this interest inevitably led to criminalizing the communicative aspect of expressive conduct.

When Congress passed the 1989 Flag Protect Act which prohibited knowingly mutilating, physically defiling, burning, maintaining on the floor or ground, or trampling upon any flag of the United States, the Court moved quickly to strike that law as unconstitutional. In *United States v. Eichman*, 469 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990), the Court affirmed

the decisions of two district courts finding that the defendants in two criminal cases could not be convicted under this federal law for burning the flag (one in Washington in protest of the passage of the act; one in the District of Columbia, on the steps of the United States Capitol, in protest of various aspects of the government's domestic and foreign policy), without violating the First Amendment of the Constitution. The Court said burning the flag was expressive conduct, and declined to reconsider *Texas v. Johnson*. The Court said the law suppressed expressive conduct out of concern for its likely communicative impact, by its stated desire to preserve the flag as a symbol, which purpose implicated the communicative impact. The Court also said the law had to be subjected to the highest level of scrutiny because it was content-based given its purpose and language. The Court also said the government's asserted interest of preserving the flag's function as an incident of sovereignty would not save the law, because burning a flag does not threaten to interfere with the association between flag and nation. And the Court said even assuming there was a national consensus favoring outlawing flag-burning, suggesting that the government's interest in suppressing speech becomes more weighty as popular opposition to that speech grows is foreign to the First Amendment. The four justices dissenting did so because they believed a person could express themselves short of or in other ways besides flag-burning, and the desire to use that specific method to communicate (by choice) did not outweigh the societal interest in preserving the symbolic value of the flag. Thus even the dissenters recognize some protection for use of the flag in expressive activity, but apparently draw the line in their minds at burning it. Limiting flag-burning has never been the majority view, and it is longstanding law in this nation that use of

the flag for expressive purposes in peaceful and non-disruptive ways and settings is protected activity.

82. The Nebraska flag mutilation statute is unconstitutional on its face because it discriminates based on content in that it only criminalizes expressive conduct with two flags, to wit, the United States flag and the Nebraska flag; and no other. Thus a person can cast contempt or ridicule upon any other flag by mutilating, defacing, defiling, burning, or trampling upon such flag (such as the army flag, the Israeli flag, the Swedish flag, the "gay pride" flag, etc.) without committing a crime. This defect further underscores the lack of any legitimate state interest behind this statute, because the only way the statute applies is based on content, and it is either under inclusive or over broad as to the content it covers, depending on an individual's viewpoint. Just as the courts have disallowed laws that distinguish between labor picketing vis-à-vis non-labor picketing, or racial cross-burning vis-à-vis other acts of trespass and property-burning; a law that disallows only *some* symbols to be protected from expressive activity because of the communicative impact, while not providing the same protection to other similar symbols, is a content-based prohibition.

83. The Nebraska flag mutilation statute is unconstitutionally vague because there is no definition for contempt or ridicule, and that intent is the critical element of the offense. Also there is no definition of mutilating, defacing or defiling. All of these terms are subject to broad interpretation and application, and for this further reason the statute is facially unconstitutional. In *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), the Court held that the words "treats contemptuously" in a Massachusetts statute were void for vagueness, after the appellee was convicted under the statute for wearing a small cloth version

of the United States flag sewn on the seat of his trousers. "Flag contempt statutes have been characterized as void for lack of notice on the theory that 'what is contemptuous to one man may be a work of art to another,'" 415 U.S. at 573, 94 S.Ct. at 1247. Further, "[t]he statutory language under which Goguen was charged, [fails] to draw reasonably clear lines between the kinds of nonceremonial treatment that are criminal and those that are not. Due process requires that all 'be informed as to what the State commands or forbids,' [citation omitted], and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law. [Citation omitted.]  Given today's tendencies to treat the flag unceremoniously, those notice standards are not satisfied here." *Id.*, 415 U.S. at 574, 94 S.Ct. at 1247-1248. This is not a hypothetical concern in this case.  Plaintiff fervently believes that communicating alongside her picket signs the danger this nation is in by virtue of its sin is an urgent matter, and the opposite of contempt; using the flag to convey this warning to her fellow man is not contemptuous, but the only message of hope. Of course the greatest defect in the statute is seen in any attempt to define "contempt" or "ridicule," because that puts the government squarely in the business of regulating ideas and viewpoints, without any legitimate interest in doing so. And, leaving this language open to interpretation by law enforcement, is precisely the constitutional error that led to plaintiff being arrested and prosecuted. "In such cases, perhaps the most meaningful aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement. It is in this regard that the statutory language under scrutiny has its most notable deficiencies." *Ibid*.

60

84. Even if the Nebraska flag mutilation statute did not, on its face, punish expressive conduct, it is being applied to plaintiff and other WBC members to prohibit conduct which under the circumstances is clearly communicative and expressive in nature. In all instances relevant to this lawsuit, the conduct prohibited under the Nebraska statute, and the conduct for which plaintiff is being prosecuted, was the use of the flag in the immediate context of picketing about religious and moral issues, with the flag being drug, stood on or held upside down immediately juxtaposed to signs such as America is Doomed, God Hates the U.S.A., Mourn for Your Sin, Fags Doom Nations, Thank God for IEDs, God is Your Enemy, and so forth. No rational observation can be made other than to conclude that plaintiff's use of the flag was fueled by an intent to convey a particularized message and that the likelihood was great that the message would be understood by those who viewed it. Clearly the flag is being used to express ideas about the condition of this nation, and it is only for that use that defendants have arrested, ticketed, prosecuted, and restrained plaintiff and other WBC members in the use of the flag. Indeed, defendant Polikov's claim that there might have been a breach of the peace if someone had objected to how plaintiff and her son used the flag only makes sense if the message being conveyed was understood.

85. Even if the Nebraska flag mutilation statute did require a showing of a threat or immediate breach of the peace, the manner in which the statute is being applied is in circumstances when there is no threat or breach of the peace. On the day plaintiff was arrested, there was no threat or breach of the peace. Defendant Polikov's many public statements in connection with his unlawful prosecution of plaintiff reflect that he is applying the law to a situation where there *could have been* or *might have been* some breach of the peace, manifesting his understanding

61

that there in fact was no breach of the peace, and manifesting the fact that the prosecution of

plaintiff under this statute is based not upon a breach of the peace caused by her use and her

son's use of the flag, but by the possibility of the same. Similarly, when the Bellevue City

Council denied plaintiff a permit to picket, and granted other WBC members a permit only if

accepting the condition that no flag or depiction of a flag be used in any way, there was no

suggestion or indication of a threat or breach of the peace. When plaintiff and other WBC

members have picketed in other cities in Nebraska, where as enumerated above, officials have

prohibited the use of the flag, they have not limited their prohibition to situations where there

was a threat or breach of the peace; nor during pickets in Nebraska have there been threats or

breaches of the peace when plaintiff and other WBC members picketed. Further, when the

various jurisdictions of Nebraska began banning the use of flags during plaintiff's and other

WBC members' picketing – after Bellevue began enforcing the statute – none of them have

limited their ban to situations where there is a threat or actual disruption or breach of the

peace. Instead, the prohibition against using the flag is imposed in advance of the picket,

without any context; and whenever there are counter picketers (which is often), they are

expressly allowed to use the flag in their expressive activities while plaintiff and other WBC

members are not. It has become standard fare – as the recent events of December 24 and

December 29, 2009 in Bellevue and Papillion reflect – for Nebraska officials to preemptively

enforce this law, advising WBC's representative in advance that any use of the Nebraska or

American flags will be subject to arrest and prosecution, before there is any context from

which a determination of threat of breach of the peace can be made. These officials have dealt

with plaintiff and other WBC members repeatedly, and they *know* their approach is peaceful

62

and lawful, and that there in fact have *not* been breaches of the peace in Nebraska in connection with plaintiff's picketing.

86. The Nebraska flag mutilation statute is further unconstitutional in its application, because even as plaintiff and other WBC members are prohibited from using flags, other persons at the same event who are engaging in protest activities are permitted to use the flag for expressive activity. Thus the law is enforced in a discriminatory manner. This underscores the pernicious nature of the flag mutilation statute (as well as the funeral picketing statute). "The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940).

87. The Nebraska flag mutilation statute is further unconstitutional in its application in that the vague terms contempt and ridicule are susceptible to being applied to unpopular or dissenting viewpoints, and in fact are being thus applied to plaintiff and other WBC members. Only the viewpoint plaintiff articulates – that this nation is in distress with God for its sin, and the flag is a symbol of the doom of this nation and the hypocritical sinful international reputation the nation has – is treated as one of contempt or ridicule, even though in plaintiff's religious views this is the only message of hope for this nation. This form of content-based application is possible because of the language of the statute; and in fact the law is being applied in this discriminatory manner.

63

88. The Nebraska flag mutilation statute is further unconstitutional in its application, because its application is even broader than the language of the statute, in that plaintiff and other WBC members have been prohibited from holding or wearing the flag upside down, not just from mutilating, defacing, defiling, burning or trampling upon the flag. Plaintiff and WBC members have been prohibited from even having the flag out during their pickets.

89. The Nebraska flag mutilation statute is further unconstitutional in its application because in the affidavit justifying a warrantless arrest of plaintiff on June 5, 2007, the Bellevue Police Department officer making the affidavit cited plaintiff's use of an army flag as part of the basis for the arrest, even though the army flag is not included in the statute's definition of flag. This reflects that any flag which any law enforcement considers to be due reverence can be protected under this overbroad statute.

90. The Nebraska flag mutilation statute is further unconstitutional in its application because it has been applied to plaintiff and other WBC members only as to the United States and Nebraska flags, but not as to other flags, including the United States Army and other military flags, the Israeli flag, the Sweden flag, and other national flags from other countries. This content-based application of the law further underscores that it is content-based, and that it only applies when ideas are expressed, and only to a very narrow subject matter.

### *The Prosecution of Plaintiff is Unconstitutional, Brought Under an Unconstitutional Statute, Brought in Bad Faith, and Brought with the Purpose of Punishing, Chilling and Restraining Speech and Expressive Activity*

91. The prosecution of plaintiff is unconstitutional in that it was filed and is being pursued pursuant to a custom, policy and practice to punish, chill, restrain and prohibit protected

religious picketing by plaintiff and other WBC members, and to punish, chill, restrain and prohibit the use of the flag in expressive activity by plaintiff and other WBC members.

92. The prosecution of plaintiff is unconstitutional in that it is based solely on protected activity, to wit, standing on a flag to express an idea during the course picketing, a traditionally expressive activity.

93. The prosecution of plaintiff is unconstitutional in that it is based on a facially unconstitutional statute, one which is flagrantly and patently violative of express constitutional provisions, given its very clear prohibition against actions with the flag only when and because those actions communicate an idea or viewpoint.

94. The prosecution of plaintiff is unconstitutional in that it has amounted to an unlawful prior restraint, by a) the Bellevue City Council (at the urging of the Bellevue Police Department) using the charges as a basis to deny plaintiff a permit to picket in Bellevue, and b) defendant Polikov in his public statements making it clear he will prosecute plaintiff further if she pickets or uses the flag for expressive activity in Bellevue, or Sarpy County, Nebraska.

95. The prosecution of plaintiff is unconstitutional in that it is part of an overall effort by defendant Polikov and other officials to punish plaintiff for picketing funerals, and to put plaintiff out of sight and sound with her message.

96. The prosecution of plaintiff is unconstitutional and should be enjoined, without deferring to the state proceedings, in that it is part of an overall effort to deter, chill, restrain and prohibit plaintiff's speech, which is an improper use of prosecutorial power. Defendant Polikov has articulated his understanding that the law he is using is not valid; and that there was no threat or breach of the peace and no threat or harm done to plaintiff's children; thus, this prosecution

is being pursued in bad faith, not with a reasonable expectation of securing a valid conviction, but rather to discourage plaintiff from engaging in protected speech and other expressive activities, and from having her children participate in the same. From the minute plaintiff was arrested, defendant Polikov made it clear he was going to use his prosecutorial power to punish her for picketing a soldier's funeral, and for using the flag to express an idea that he considers indecent, uncivil, and inflammatory. He has also made it clear that he is fully aware that existing law protects the plaintiff's right to use the American flag as expressive activity. He hopes by some form of popular demand or jury nullification to deprive her of that right, and has made repeated public statements (which are highly inappropriate, given that he is speaking to the potential fact finder, a fact which cannot have escaped his attention) designed to motivate the legal system to deprive her of this well-settled right. (It is doubtful that mounting a campaign against plaintiff's religious picketing and expressive activity, to stop her picketing and put her out of sight and sound [being dissatisfied with the Nebraska funeral picketing act] is within the scope of defendant Polikov's duties as a prosecutor, which calls into question his immunity from damages in light of the Eighth Circuit's recent decision in *McGhee v. Pottawattamie County*, 547 F.3d 922 [8[th] Cir. 2008], *cert. granted, Pattawattamie County v. McGhee*, 129 S.Ct. 2002, 173 L.Ed.2d 1083, 2009 U.S. LEXIS 3008 [U.S. 2009].)

### *The Abstention Doctrine Does Not Apply, and Should Not Prevent Enjoining The Prosecution*

97. The prosecution of plaintiff is unconstitutional and should be enjoined without deferring to the state proceedings, because there is no adequate opportunity available to plaintiff to have the constitutional issues addressed and redressed. Plaintiff has raised constitutional issues with the County Court to whom the case is assigned, who though agreeing that the Nebraska flag

mutilation statute is facially unconstitutional, denied relief because the County Court is not an appellate level court. The Nebraska Supreme Court declined to review that decision. Thus, the issues have been presented to the state courts, and plaintiff has been turned away in spite of the clear and acknowledged unconstitutionality of the proceedings.

98. The prosecution of plaintiff for disturbing the peace is bad faith and without a reasonable expectation of a valid conviction, based on defendant Polikov's statements that the peace *could have been* disturbed if someone took offense at what plaintiff and her son were doing with the flag; thus he knows the peace was not disturbed. Further, when plaintiff was arrested, she was not charged with disturbing the peace. Further, the video footage and all other evidence about the actual events show that there was no disturbance of any kind. Further, the affidavit in support of the arrest by Officer Pettit doesn't state a single fact suggesting any type of disturbance.

99. The prosecution of plaintiff for contributing to the delinquency of a minor and negligent child abuse is patently in bad faith and without a reasonable expectation of a valid conviction, based on defendant Polikov's statements that the child *could have been* hurt because of people reacting to plaintiff's picketing of a funeral and how she and her son used the flag; thus he knows in fact the child was not harmed or threatened with harm. Further, the video footage shows no harm to the children was occurring; and the fact that all but one or two of the officers left the scene, leaving the children behind to continue picketing, demonstrates the falseness of these claims. The use of these more generic laws, that do not on the face apply to expressive activity or protected speech or activity – filed in a separate action from the flag mutilation case – is a modus operandi designed to discourage plaintiff from further speech and

67

expressive activity. The only potential for harm to plaintiff's children on June 5, 2007, was the anxiety they would naturally experience seeing their mother arrested like a common criminal, hauled off in handcuffs to jail, because she engaged in peaceful, lawful picketing. The affidavit of probable cause makes no mention of the children being in danger, and in fact the police had no hesitancy in turning the children over to two adults *to continue picketing at the exact same location*, as indicated in the affidavit, and on the video footage. As the Affidavit of Rachel Hockenbarger reflects, plaintiff's children are well cared for, and have picketed often with their mother and not been harmed. Mrs. Hockenbarger is an attorney with nine years experience as an attorney with a caseload of children in need of care cases; she sees neglect and abuse every day; and she states unequivocally that these children (as well as her children aged 2-13 who accompany her on pickets) are not abused or neglected.

100.    Plaintiff has a long-recognized and important substantive due process right to control the care and custody of her children; in the absence of some evidence of child abuse or harm – something beyond plaintiff's children participating with her in protected religious speech, picketing and expressive activity – which clearly is absent in this case, it violates these substantive due process rights to prosecute plaintiff under these statutes. To justify doing so because of the potential for someone to act or react unlawfully to protected speech and expressive activity, done in a lawful, peaceful, non-disruptive manner, is to try to silence plaintiff's speech and protected activities through a heckler's veto through her children, and is unconstitutional.

101.    The *Younger* abstention doctrine applies when 1) the federal action would disrupt an ongoing state judicial proceeding, 2) which implicates important state interest, and 3) which

68

provides an adequate opportunity to raise constitutional challenges. *Cormack v. Settle Beshears*, 474 F.3d 528, 532 (8th Cir, 2007), citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed. 116 (1982). Elements two and three are missing in this case, so the abstention doctrine does not apply, and should not prevent the issuance of a preliminary injunction.

102. As to the second element of *Younger* abstention – important state interests – there is no legitimate state interest in using prosecutorial powers to bring charges based on your personal disagreement, or the community's disagreement, with a religious viewpoint, using a flagrantly an unconstitutional statute, or generic-seeming and clearly inapposite statutes applied for flagrantly unconstitutional purposes, without any hope or interest in a conviction, but rather a goal of punishing and restraining speech, experimenting with well-settled constitutional law in the process. Where the state may under normal circumstances be entitled to a presumption that it will safeguard federal constitutional rights, *Norwood v. Dickey*, 409 F.3d 901, 904 (8th Cir. 2005), that presumption has been forfeited in this case. Even a single arrest and prosecution – if not made with any expectation of securing valid convictions, but rather as part of a plan to employ arrests, seizures, and threats of prosecution under color of various statutes to harass plaintiff and discourage her and other church members from asserting constitutional rights – is subject to intervention by the federal courts. "[In *Younger* the Court] also suggested that abstention might not be appropriate if the statute the state was seeking to enforce was 'flagrantly and patently violative of express constitutional prohibitions,' [citations omitted], [and] the Supreme Court left open the possibility of an exception to *Younger* for

69

preemption claims that are 'facially conclusive,'" *Cedar Rapids Cellular Telephone v. Miller*,

280 F.3d 874, 880 (8th Cir. 2002).

And in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 119 S.Ct.

936, 142 L.Ed.2d 940 (1999), in a concurring in part and concurring in the judgment opinion

by Justice Ginsburg, joined by Justice Breyer as to Part I, this language is found:

> In *Younger,* this Court declared that federal restraint of state prosecutions is permissible only if the state defendant establishes " great and immediate" irreparable injury, beyond " that incidental to every criminal proceeding brought lawfully and in good faith." 401 U.S., at 46, 47, 91 S.Ct. 746 (internal quotation marks omitted). A chilling effect, the Court cautioned, does not " by itself justify federal intervention." *Id.,* at 50, 91 S.Ct. 746. *Younger* recognized, however, the prospect of extraordinary circumstances in which immediate federal injunctive relief might be obtained. The Court referred, initially, to bad faith, harassing police and prosecutorial actions pursued without " any expectation of securing valid convictions." *Id.,* at 48, 91 S.Ct. 746 (internal quotation marks omitted).[FN1] Further, the Court observed that there may be other " extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment," for example, where a statute is " flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Id.,* at 53-54, 91 S.Ct. 746 (internal quotation marks omitted).

> > FN1. Specifically, the *Younger* Court noted that Dombrowski's complaint made substantial allegations that " ' threats to enforce the statutes ... [were] not made with any expectation of securing valid convictions, but rather [were] part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.' " 401 U.S., at 48, 91 S.Ct. 746 (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 482, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)).

> In *Oestereich,* the Selective Service Board had withdrawn a ministry student's statutory exemption from the draft after he engaged in an act of protest. See 393 U.S., at 234, 89 S.Ct. 414. The student brought suit to restrain his

induction, and this Court allowed the suit to go forward, notwithstanding a statutory bar of preinduction judicial review. Finding the Board's action " blatantly lawless," the Court concluded that to require the student to raise his claim through habeas corpus or as a defense to a criminal prosecution would be " to construe the Act with unnecessary harshness." *Id.,* at 238, 89 S.Ct. 414.

> The precedent in point suggests that interlocutory intervention in Immigration and Naturalization Service (INS) proceedings would be in order, notwithstanding a statutory bar, if the INS acts in bad faith, lawlessly, or in patent violation of constitutional rights. Resembling, but more stringent than, the evaluation made when a preliminary injunction is sought, see, *e.g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (" The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits." ), this test would demand, as an essential element, demonstration of a strong likelihood of success on the merits. The merits of respondents' objection are too uncertain to establish that likelihood. The Attorney General argued in the court below and in the petition for certiorari that the INS may select for deportation aliens who it has reason to believe have carried out fundraising for a foreign terrorist organization. See App. to Pet. for Cert. 20a; Pet. for Cert. 21-25. Whether the INS may do so presents a complex question in an uncharted area of the law, which we should not rush to resolve here.

525 U.S. at 493-494, 119 S.Ct. at 948.

In *Entergy, Arkansas, Inc. v. Nebraska,* 210 F.3d 887 (8th Cir. 2000), the Central Interstate Low-Level Radioactive Waste Commission and utilities brought an action against the State of Nebraska, its environmental and health departments, and state officials, alleging that Nebraska had delayed and then wrongfully denied a license for a proposed low-level radioactive waste disposal facility. The district court granted a motion for a preliminary injunction barring further Nebraska administrative proceedings concerning the denied license, and the state appealed. On appeal, the Court upheld the injunction because the Commission had established irreparable harm by showing bad faith. The Court found

bad faith on the part of Nebraska, and that state officials had continuously and substantially interfered with the licensing process in order to deny a license. The Court noted evidence that Nebraska was biased against licensing low level nuclear waste disposal, including evidence of continuing interference by the former governor, statements by him during his campaign, statements by his aide, and the fact that the director of licensing agency consulted with him about key licensing decisions. Thus the Court concluded that abstention doctrines did not apply because the Commission had made a substantial showing of Nebraska' bad faith. See 210 F.3d at 893-895. The Court further stated:

> Injunctive relief is appropriate when legal process is used not to provide an impartial forum for the resolution of legal disputes, but rather to impede the exercise of federal rights. *See Dombrowski v. Pfister,* 380 U.S. 479, 489-90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Although federal courts are generally reluctant to interfere with ongoing state administrative proceedings, *see Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), the deference owed such proceedings does not apply if they are used to harass or discourage the exercise of a federal right. *See Younger v. Harris,* 401 U.S. 37, 48, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Such abuse of legal process "sufficiently establish[es] the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention." *Id.* To show this type of injury, a party must show that state officers abused the legal process, either to further a forbidden purpose or to discriminate against a particular group. *See id.; see also Lewellen v. Raff,* 843 F.2d 1103, 1112 (8th Cir.1988).

210 F.3d at 899.

In *Lewellen v. Raff,* 843 F.2d 1103 (8th Cir. 1988), the Court upheld an injunction of state criminal proceedings against a black attorney where the attorney showed that the prosecution was initiated in part because he was black. The Court said, "The federal courts have

consistently and repeatedly affirmed that their abhorrence of enjoining a pending state prosecution must yield when the state prosecution threatens a party with 'great and immediate irreparable injury," 843 F.2d at 1109. Further, "A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights 'will justify an injunction *regardless* of whether valid convictions conceivably could be obtained.' *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (emphasis added). The state does not have any legitimate interest in pursuing such a prosecution; '[p]erhaps the most important comity rationale of *Younger* deference—that of respect for the State's legitimate pursuit of its substantive interests—is therefore inapplicable.' *Wilson v. Thompson*, 493 F.2d 1375, 1383 (5th Cir. 1979) (citations omitted)," 843 F.2d at 1109-1110.

In *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir. 1981) (quoted from by the Eighth Circuit in *Lewellen* above), the Court said, "Moreover, although multiple prosecutions of at least Mr. Fitzgerald were pending, the threat of multiple or repeated prosecutions is not necessary to establish bad faith prosecution," "Nor is it necessary for plaintiff to prove that the prosecution could not possibly result in a valid conviction," and "this court enunciated a test which permits a state criminal proceeding to be enjoined if the plaintiff establishes that the conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered," 636 F.2d at 944-945.

103. As to the third element of *Younger* – an adequate opportunity in the state system to raise constitutional challenges – it is important to note that the County Court judge to whom the

criminal cases against plaintiff are assigned, has acknowledged the facial unconstitutionality of the Nebraska flag mutilation statute, but has declined relief. Efforts to obtain relief from the Nebraska Supreme Court have also failed. No one is claiming the statute is valid, or the prosecution is valid; the courts are simply refusing to give relief. This prosecution has been pending for two and a half years; it is used routinely by various Nebraska officials as justification for prior restraints on expressive activity, all as set out in detail in the factual submission herewith. It is difficult to imagine a more glaring example of the state system failing to provide an adequate remedy.

If a state's remedies are inadequate or unavailable, exhaustion of state remedies is not required, and abstention is not appropriate. *Cormack v. Settle-Beshears*, 474 F.3d 528, 531, citing *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 196-197, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). A party has to present the constitutional issues to the state court proceedings, and get turned away, before the party can say there is not an adequate remedy. See *Norwood v Dickey*, 409 F.3d at 903 ("Norwood did not present his constitutional claims before either the Arkansas Commission or the Arkansas Supreme Court, nor did he allege in his complaint that he presented his constitutional claims..."). In *National City Lines, Inc. v. LLC Corporation*, 687 F.2d 1122 (8th Cir. 1982), a corporation seeking to make a tender offer sued to challenge the Missouri Takeover Bid Disclosures Act and Missouri Insurance Holding Companies Act. The district court found the provisions unconstitutional. One of the subsidiary corporations of LLC filed an action in state court. The issue was whether the federal court should abstain in light of the pending state court case. The Eighth Circuit found that abstention was not required because the state court

74

had expressly abstained from considering the constitutional issues, deciding they should be resolved by the federal court, see 687 F.2d at 1127.

In *Walker v. Wegner*, 624 F.2d 60 (8th Cir. 1980), the Court upheld the district court's order granting a preliminary injunction against a state agency that had issued a cease and desist order against a church to stop soliciting for contributions until an administrative hearing was held, finding that *Younger* abstention did not apply. The Court held that while an appeal from that administrative agency's findings to the state court system might resolve the constitutional issues, requiring such action would constitute a prior restraint on First Amendment rights. "[A]bstention is appropriate when the State's interest in enforcing certain of its laws with a nexus to criminal laws overrides the interests of the Federal government. The Federal courts' interest in vindicating and protecting Federal rights and Federal interests must be attained without unduly interfering with the legitimate activities of the states. ... Since the Federal action herein challenges the *First Amendment* validity of the very statute that authorizes the administrative proceeding in the first place, appellees would not be afforded an adequate opportunity to adjudicate their claims if forced to proceed through the State administrative process. Therefore, even were we to concede that the administrative action here is a 'pending state proceeding' under *Younger*, which we do not, the available 'remedy' is not an adequate remedy at law. ... [A]lthough an appeal from the administrative proceeding to the South Dakota court system might resolve the dispute, requiring such action would permit a considerable delay and the holding of an administrative hearing that the appellees claim the State has no right to hold. This prior restraint on appellees' *First Amendment* right would be without the benefits of the safeguards prescribed by the United

75

States Supreme Court in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)." 624 F.2d at 62-63. This case is especially applicable here since, as the evidence shows, Bellevue, Papillion (Sarpy County seat), Omaha and other jurisdictions are using the pending criminal prosecution as the reason to place a prior restraint on plaintiff's and other WBC members' use of the American and Nebraska flags as expressive activity.

Further, even if all three elements required for *Younger* abstention are present, federal courts should not abstain under *Younger* if bad faith, harassment, or some extraordinary circumstances making the need for federal equitable relief pressing, would make abstention inappropriate. *Aaron v. Target Corporation*, 357 F.3d 768, 778 (8th Cir. 2004). See also *Yamaha Motor Corporation, U.S.A. v. Riney*, 21 F.3d 793 (9th Cir. 1994). Perhaps one of the events described in the detailed factual submissions in this case, standing alone, would be insufficient to establish a pressing need for federal court equitable intervention. However, the cumulative impact of the arrest (which was *totally* unnecessary); the prosecution which rests at its core on a grossly unconstitutional statute; the multiple campaign-like public statements by defendant Polikov reflecting an fervent effort by him to use whatever government power he has to punish, silence, and restrain plaintiff – putting her out of sight and sound – because he is dissatisfied with the limits of the Nebraska funeral picketing statute; and the use of this errant prosecutor's actions to justify multiple prior restraints on speech; leads to a pressing need for the federal court to intervene with equitable relief. For all these reasons, plaintiff respectfully submits that *Younger* abstention does not apply in this case; and that the prosecutions should be enjoined, along with further threats and acts of arrest or prosecution.

### *The Bellevue Permit Ordinances are Unconstitutional on Their Face & As Applied*

104.   The sheer volume of the Bellevue, Nebraska permit ordinances might tempt a person to think they are comprehensive and constitutional. However, to the contrary, on the face of the ordinances, there are glaring constitutional defects, which spring from the absence of any statement of purpose, leading to a hodgepodge of requirements that lack any foundation of legitimate government interest. Further, this lends the permit scheme of Bellevue to easy abuse, which is what has occurred in this case.

Licensing schemes uniquely pose a threat to expressive activity. Thus, there is a relaxing (so to speak) of the rule of law that permits a facial challenge to a licensing or permit laws *because of* how they are applied (contrary to the general rule that a facial challenge *assumes* a proper application). "The cases ... indicate that the rule is not based upon any assumption that application for the license would be refused or would result in the imposition of other unlawful regulations. **Rather, it derives from an appreciation of the character of the evil inherent in a licensing system**. The power of the licensor [is] pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. **It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion**. *Thornhill v. Alabama, supra*, 310 U.S. 88, 97, 60 S.Ct. 736, 741-742, 84 L.Ed. 1093 (1940); emphasis added.

In *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Court discussed permit ordinances. "[M]any decisions of this Court over the last 30 years, [hold] that a law subjecting the exercise of *First Amendment* freedoms to the prior

restraint of a license, without narrow, objective, and definite standards to guide the licensing authority is unconstitutional;" also saying that a general purpose of "public welfare, peace, safety, health, decency, good order, morals or convenience," was inadequate. 394 U.S. at 150-151, 89 S.Ct. at 938-939. Further, "we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places," 394 U.S. at 153, 89 S.Ct. at 940. And the Court said, "it is less than realistic to ignore the surrounding relevant circumstances" in which the ordinance exists, 394 U.S. at 156, 89 S.Ct. at 942.

In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court said, "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. [Numerous citations omitted.] And these evils engender identifiable risks to free expression that can be effectively alleviated only through a facial challenge. First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. ... Self-censorship is immune to an 'as-applied' challenge, for it derives from the individual's own actions, not an abuse of government power. ... Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship. ... Second, the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." 486 U.S. at 758, 108 S.Ct. at 2144. And the Court said when a law threatens these two risks – self-censorship and difficulty

in detecting content-based censor – courts must entertain an immediate facial attack on the law. 486 U.S. at 759; 108 S.Ct. at 2145. Two aspects of the licensing system in the City of Lakewood that made it particularly vulnerable, were that it required renewal of the license annually, so that viewpoint or content by speech already uttered could enter in; and, it was narrowly directed at conduct commonly associated with expression (in that case, the circulation of newspapers).

These cases reveal that the Bellevue, Nebraska permit ordinances are facially unconstitutional. They lack any guidelines or statement of purpose; they leave to the City the broad discretion to deny for any reason they deem fit; and they require renewal of the license for every single event. Looking at the immediate circumstances and context, we do not have to speculate about whether these ordinances can be used to censor speech – that is precisely how the City Council and Bellevue Police Department used them. They bypassed the City Clerk's office; put the application for permit on an emergency agenda; and spoke of their ability to vote to deny the permit *wholly based on content of speech and expressive activity*. Various of the members of that body articulated their disagreement with the *content* of the expressive activity, after the police captain who brought the matter to them read extensively from a statement of religious purpose by plaintiff. They spoke of stopping funeral picketing; they spoke of stopping the use of the American flag as expressive activity; and gave only nominal lip-service to any legitimate government interest. These references were *patently* untrue, such as Captain Evers suggesting there was a crowd control problem. On June 5, 2007, there were eight WBC picketers who 6-8 officers interacted with for a few short minutes (their focus being almost exclusively on how they could arrest plaintiff). This compared to

hundreds, maybe even a thousand, people, involved in protest activity across the street and up the road to the church, with at least scores of the Bellevue police involved in the expressive activity. (Plaintiff has requested copies of any permit required of that group or those groups on June 5, 2007, and the City of Bellevue, through its counsel, has declined to respond in the absence of a search fee. A similar request was made for the July 30, 2007 protest activity engaged in by a large group at the same location; this request was similarly denied. Those permits will be requested in this litigation; the greatest likelihood is that there no other permits required.) So pretending crowd control or police resources was the issue – with eight picketers, compared to hundreds – was so grossly out of synch with the facts and circumstances as to constitute deceit and contrivance.

105. The Bellevue permit ordinances fail to establish a time frame for the City to respond, to grant or deny the permit request, that is narrow enough to ensure no restraint on speech. The ordinances place no time restraint on the City to decide the request. Further, no appeal or review process is made available in the ordinances, and no criteria or standards for review or appeal are set forth. In *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793 (8th Cir. 2006), the Court said: "Licensing schemes which implement content based regulations of protected speech must limit the time which the regulator has to decide on a particular license application and must have mechanisms for prompt judicial review. ... Where a scheme implements purely content neutral time, place, and manner restrictions, the Supreme Court has said that it need only provide limits on discretion and 'effective judicial review.'" 456 F.3d at 803-804. After applying the ordinances based on content and denying plaintiff a permit, the letter of July 25, 2007, from the City Clerk (Shirley Phelps-Roper Affidavit, Attachment 13)

made no mention of any appeal or review opportunity. Further, the City Council – at the urging of the police – had already bypassed the usual procedure and taken the permit application to the City Council, making it clear that no relief on review would be available from that body. Any resort to the judicial process in Nebraska would have been untimely and insufficient. The nature of the expressive activity regulated by the City through its permit ordinances is such that a prompt review is called for. "'Timing is of the essence in politics … When an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all,'" *Douglas v. Brownwell*, 88 F.3d 1511, 1523 (8th Cir. 1995).

106.   The Bellevue permit ordinances contain no statement of purpose or intent, making it impossible to determine if the various provisions of the act are narrowly tailored to a legitimate, compelling or other government interest. Even if the ordinance called for an immediate appeal to the City Council, there are no guidelines for the City Council to follow in determining whether to reverse the denial of the permit. Thus, "the permit schemes vest the City council with too much discretion to discriminate against disfavored speech or unpopular speakers," *Steele v. City of Bemidji*, 257 F.3d 902, 907-908 (8th Cir. 2001).

107.   The Bellevue permit ordinances ask the purpose of the parade, meeting, assembly or procession, thereby enabling decision makers to deny the permit based on the purpose (and in fact that is exactly what the City did in this instance).

108.   The Bellevue permit ordinances on their face apply to as few as one person, requiring "any person" who wishes to organize, hold or participate in any parade, meeting, assembly or procession of persons (no number provided), to obtain a permit. Thus, even if a legitimate interest had been stated in the ordinance, such as crowd control or traffic control, the

ordinances are not narrowly tailored to such a purpose. (Twice the City required eight and seven members of WBC to get a permit. A number as small as seven or eight is too broad; if the interest asserted by the government is crowd control, the requirement should be narrowly tailored so only a crowd large enough to impact traffic or require crowd control should be required to obtain a permit in advance.) "We are also concerned about the application of the permit requirement to groups of ten or more persons. We entertain doubt whether applying the permit requirement to such a small group is sufficiently tied to the City's interest in protecting the safety and convenience of citizens who use the public sidewalks and streets," *Douglas v. Brownwell, supra*, 88 F.3d 1511, 1524 (8th Cir. 1995).

109. The Bellevue permit ordinances on their face require a person to obtain a license every time he or she wishes to engage in expressive activity, thereby permitting the decision maker to rely upon past speech in deciding whether to grant the permit. That is exactly what the City did in this instance. They relied upon speech and expressive activity with which they disagreed to deny a permit when plaintiff requested it.

110. The Bellevue permit ordinances on their face lack sufficient standards to offset the inherent risk of restraining or chilling speech in a permit scheme that targets traditionally expressive activities, like meeting, parading, assembling and being in a procession.

111. The Bellevue permit ordinances on their face allow a permit to be denied for activity that appears to be unlawful, rather than limiting it to activity which on the face of the application is unlawful; which is overbroad, especially when coupled with the provision that allows the permit to be revoked if the permittee violates any law (§28-133) plus the provision that states the holder of the permit may be arrested for engaging in illegal activity during the time of the

82

permit (§28-111), which is far broader protection than the government needs, even if it was tied to a legitimate, compelling or other government interest, which these ordinances do not contain. "The Chief of Police may not apply the exception based on his belief that the proposed parade might cause unlawful conduct. Rather, the Chief of Police may deny the permit only when, *on its face*, the proposed parade will violate a law or an ordinance." *Douglas v. Brownwell, supra*, 88 F.3d 1511, 1523 (8th Cir. 1995); emphasis added. Compounding the wrong of arresting and prosecuting plaintiff for protected, peaceful, lawful, non-disruptive picketing and expressive activity – the City of Bellevue then used that wrongful arrest and prosecution to deny her a permit, using its provision that allows denial of a permit if it appears the activity will be unlawful. The *activity* on the face of the permit is not illegal, and this was an unconstitutional prior restraint, denying a permit on this basis.

112. The Bellevue permit ordinances on their face lack standards to ensure decision makers do not rely on content of traditionally expressive activities in granting or denying the permit.

113. Even though the ordinances are aimed at conduct commonly associated with expression, the Bellevue permit ordinances on their face lack any appeal process or means of having the decision to deny a permit reviewed, thereby burdening more speech than necessary and leaving no ability for the permit requester to seek review resulting in a prior restraint on speech. Further, there is no standard of review or standards or criteria for a reviewer to use, to ensure an objective review occurs, thus leaving open any review to the same risk of content-based decision making. (In fact, Captain Evers appears to view the City Council as both original decision maker and reviewer, judging by his comments, which were reinforced by the City Attorney, whose legal analysis – "the appeal is what the appeal is" – only reinforced the

utter lack of any procedure or criteria or objective guidelines for making this decision that patently prohibited and restrained traditionally expressive activity.)

114.   The Bellevue permit ordinances were unconstitutionally applied to plaintiff as a prior restraint, prohibiting her from engaging in expressive activity.

115.   The Bellevue permit ordinances were used to restrain plaintiff and other WBC members from using the flag to express an idea, as a further prior restraint on expressive activity.

116.   The Bellevue permit ordinances were applied to plaintiff based on the content of her religious speech, and as such were applied in an overbroad manner because there was no legitimate, compelling or other government interest in restricting this viewpoint.

117.   The Bellevue permit ordinances were applied discriminatorily, being used to place plaintiff and other WBC members further away from the funeral location than Nebraska law permitted, while no such limit was placed on counter picketers who were in fact not required to have a permit on the same dates for the same events.

118.   The Bellevue permit ordinances were applied unconstitutionally in that the City Council gave itself broad discretion to deny the permit based upon content and viewpoint, and unabashedly did so, while openly concocting specious reasons such as safety and impact on law enforcement manpower.

## *The Prosecution & Threats of Prosecution Violate Plaintiff's Substantive Due Process Rights to Raise her Children Consistent with Her Religious Beliefs*

119.   By arresting, ticketing, and prosecuting plaintiff, and making ongoing public comments about his intent to further prosecute plaintiff, for her children participating in religious demonstrations and expressive activity with her; and by charging plaintiff with negligent child

abuse and contributing to the delinquency of a minor, defendants have wrongfully interfered with plaintiff's substantive due process rights to raise her children in accordance with her religious beliefs.

120. Defendants have no legitimate, compelling or other interest in interfering with plaintiff's substantive due process rights related to her children, because there is no evidence of any kind that plaintiff endangered her children at any time, including during the events of June 5, 2007, in Bellevue, Nebraska. Defendant Polikov has stated publicly that he bases the prosecution of plaintiff for negligent child abuse and contributing to the delinquency of a minor solely upon the fact that plaintiff picketed near a funeral when law enforcement and others were mourning the loss of a firefighter/soldier, and her son stood on a flag. The only interest asserted in this prosecution is an interest in silencing one specific viewpoint about the dying soldiers and their funerals.

121. Because there was no disruption, and no breach of the peace, during the June 5, 2007 picket, defendant Polikov has mounted a campaign to convince the public that there was a *threat* of disruption. Given that a large portion of the people across the street and up to and outside of the church were *law enforcement* (see Megan Phelps-Roper Affidavit, Attachment 13, Photos 1-10; and Jonathan Phelps Affidavit, Attachment 3), this is a remarkable contention for defendant Polikov to make in his public campaign. If we cannot count on law enforcement personnel to keep the peace, where does that leave us? "'In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression,'" *Police Department of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). Even if there was a justifiable basis for the *suggestion* that there

85

*might* have been a disturbance of the peace during plaintiff's picketing and expressive use of the flag (by herself and her son), that possibility is not sufficient to charge her with a crime. The Nebraska disturbing the peace law is susceptible to being applied – and here is being applied – to peaceful, lawful, protected activity, without any requirement of a showing that there *in fact* was a disturbance.

122.   Even so – regardless of who was across the street, who drove by, or who may not have liked the words or expressive use of the American flag – it is unconstitutional to punish speech because it is inflammatory, and to punish speech and expressive conduct because someone may not like the words, and may *unlawfully* resort to violence.  In *Cox v. Louisiana*, 379 U.S. 356, 83 S.Ct. 453, 13 L.Ed.2d 471 (1965), a conviction for disturbing the peace of a black pastor who lead 1500-2000 students in a peaceful protest against businesses they believed discriminated against blacks, based on police officers saying his words were inflammatory, the Court said that the state "may not constitutionally punish appellant under this statute for engaging in the type of conduct which this record reveals," 379 U.S. at 545, 85 S.Ct. at 459. The only way to make plaintiff's behavior into disturbing the peace is *by the content of her message*.  That is precisely what the Court disapproved of in *Cox*.  The Court has said that participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.  That is called a "heckler's veto," and the Constitution – which all these defendants swore to uphold – eschews it. *Brown v. Louisiana*, 383 U.S. 131 & footnote 1, 86 S.Ct. 719, 15 L.ed.2d 637 (1966).

In *University Committee to End the War in Viet Nam v. Gunn*, 289 F.Supp. 469 (W.D.Tex. 1968) (Three-Judge Court), *appeal dismissed for want of jurisdiction*, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970), after the defendants were attacked by soldiers when they went to picket the president at Ft. Hood, they were arrested and charged with disturbing the peace. Though the charges were later dismissed, the Court reviewed the statute, and found it facially unconstitutional as overbroad and unduly vague. After discussing *Terminiello v. City of Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), where the trial court found that speech that invited dispute was protected, and could not be criminalized as breach of the peace if it stirred the public to anger, invited dispute, brought about a condition of unrest, or created a disturbance, the Court said: "Texas Article 474 suffers the same constitutional infirmity. It cannot be doubted that the provision regarding the use of loud and vociferous language would, on its face, prohibit speech which would stir the public to anger, would invite dispute, would bring about a condition of unrest, or would create a disturbance. In so doing, the statute on its face makes a crime out of what is protected First Amendment activity.    This is impermissible." 389 F.Supp. at 474.

The Nebraska Supreme Court has construed the Nebraska disturbing the peace statute in a way that allows it to be applied to First Amendment activity, see *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989) and *State v. Coomes*, 170 Neb. 298, 102 N.W.2d 454 (1960). Further, it is being applied to plaintiff in the criminal prosecution solely and exclusively for protected First Amendment activity, to wit, the use of the American flag in expressive activity. As such, the statute is overbroad on its face and/or in its application, and renders the prosecution of plaintiff invalid for this further reason.

87

123.   In addition to violating the First Amendment by applying the contributing to the

delinquency of a minor and child abuse statutes against plaintiff – for the sole reason that her

son participated in a religious picket including expressing his religious views by standing on a

flag – the application of these laws in this situation violates the substantive due process rights

of plaintiff under the Fourteenth Amendment.   As the language from the United States

Supreme Court below illustrates, along with the many precedents cited, plaintiff has the right

to raise her children in her faith.  It is no more proper to apply these laws against her for these

acts than it would be to apply the laws against a parent for taking a child to a Roman Catholic

Church, into a soldier's funeral, or to the group across the street engaged in expressive activity

on June 5, 2007.  Each parent in each situation is equally engaged in the practice of faith and

the involvement of their child in the practice of their faith.  The right of the parent to raise her

child is long standing, and certainly includes plaintiff's right to teach her children what she

believes the Scriptures say about obeying God and the consequence to a nation if it doesn't,

with equal force in their home, in their church, and in their public religious demonstrations.

> The Fourteenth Amendment provides that no State shall "deprive any person
> of life, liberty, or property, without due process of law."   We have long
> recognized that the Amendment's Due Process Clause, like its Fifth
> Amendment counterpart, "guarantees more than fair process." *Washington v.
> Glucksberg,* 521 U.S. 702,  719, 117 S.Ct. 2258 (1997).    The Clause also
> includes a substantive component that "provides heightened protection against
> government interference with certain fundamental rights and liberty interests."
> *Id.,* at 720, 117 S.Ct. 2258; see also *Reno v. Flores,* 507 U.S. 292, 301-302,
> 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
> The liberty interest at issue in this case-the interest of parents in the care,
> custody, and control of their children-is perhaps the oldest of the fundamental
> liberty interests recognized by this Court.   More than 75 years ago, in *Meyer
> v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we
> held that the "liberty" protected by the Due Process Clause includes the right
> of parents to "establish a home and bring up children" and "to control the

education of their own."   Two years later, in *Pierce v. Society of Sisters,* 268
U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the
"liberty of parents and guardians" includes the right "to direct the upbringing
and education of children under their control."   We explained in *Pierce* that
"[t]he child is not the mere creature of the State; those who nurture him and
direct his destiny have the right, coupled with the high duty, to recognize and
prepare him for additional obligations."   *Id.,* at 535, 45 S.Ct. 571.   We
returned to the subject in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438,
88 L.Ed. 645 (1944), and again confirmed that there is a constitutional
dimension to the right of parents to direct the upbringing of their children.  "It
is cardinal with us that the custody, care and nurture of the child reside first in
the parents, whose primary function and freedom include preparation for
obligations the state can neither supply nor hinder."  *Id.,* at 166, 64 S.Ct. 438.

In subsequent cases also, we have recognized the fundamental right of parents
to make decisions concerning the care, custody, and control of their children.
See, *e.g., Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551
(1972) ("It is plain that the interest of a parent in the companionship, care,
custody, and management of his or her children 'come[s] to this Court with a
momentum for respect lacking when appeal is made to liberties which derive
merely from shifting economic arrangements' " (citation omitted)); *Wisconsin
v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The
history and culture of Western civilization reflect a strong tradition of parental
concern for the nurture and upbringing of their children.  This primary role of
the parents in the upbringing of their children is now established beyond
debate as an enduring American tradition");  *Quilloin v. Walcott,* 434 U.S.
246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ("We have recognized on
numerous occasions that the relationship between parent and child is
constitutionally protected");  *Parham v. J. R.,* 442 U.S. 584, 602, 99 S.Ct.
2493, 61 L.Ed.2d 101 (1979) ("Our jurisprudence historically has reflected
Western civilization concepts of the family as a unit with broad parental
authority over minor children.   Our cases have consistently followed that
course"); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d
599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in
the care, custody, and management of their child");  *Glucksberg, supra,* at
720, 117 S.Ct. 2258 ("In a long line of cases, we have held that, in addition to
the specific freedoms protected by the Bill of Rights, the 'liberty' specially
protected by the Due Process Clause includes the righ[t] ... to direct the
education and upbringing of one's children" (citing *Meyer* and *Pierce*)).   In
light of this extensive precedent, it cannot now be doubted that the Due
Process Clause of the Fourteenth Amendment protects the fundamental right
of parents to make decisions concerning the care, custody, and control of their
children.

*Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S.Ct. 2054, 2059-2060, 147 L.Ed.2d 49 (2000).

124.    The Eighth Circuit has "long recognized that parents have a liberty interest in familial relationships and have an important substantive due process right to control the care and custody of their children," *Dornheim v. Sholes*, 430 F.3d 919, 925-926 (8th Cir. 2005). There the Court said state officials could investigate child abuse charges ***"if such action is properly founded upon a reasonable suspicion of child abuse*,**" 430 F.3d at 926; emphasis added. Here, there is zero evidence of any evidence or reasonable suspicion of child abuse. The affidavit of probable cause didn't contain the slightest whisper of suspicion of child abuse, and instead focused *exclusively* on the child's use of the flag in expressive activity, along with his mother's (plaintiff's). The fact that the police left the children at the picket site to continue picketing illustrates they had *zero* concern about whether those children were abused or neglected. This use of the statutes on child abuse and contributing to the delinquency of a minor is a ruse to draw attention from the clear fact that the Nebraska flag mutilation statute is unconstitutional. These officials know they are on shaky ground using that law, so they buttressed their mischief with generic laws about children. This is just an effort to make an end-run around the First Amendment, and to punish plaintiff through her children for her religious beliefs and expressive activities. See also *McCarthy v. Ozark School District*, 359 F.3d 1029, 1033-1034 (8th Cir. 2004) (court granted a temporary stay to permit non-immunized children to attend school and then the Arkansas legislature amended its laws on immunization so parents could, on religious grounds, decline the immunizations and still send their children to school; there is a far greater risk of harm by a non-immunized child than there

could or would ever be by a child participating in protected religious picketing and expressive use of the American flag; what a disgrace on this society if that is not so!)

## *Chilling Effect on Plaintiff's Speech; Prior Restraints; the Need for Injunctive Relief*

125.   The combined and cumulative effect of the acts of these officials – particularly the Bellevue and Sarpy County officials – is that plaintiff has been chilled in her free speech and expression; she is under bond for her free speech and expression; she has been subjected to a prior restraint because of her free speech and expression; and she faces further and ongoing threats of more prior restraints, more arrests, and more prosecutions, all of them because of her free speech and expression; and her substantive due process rights to raise her children consistent with her faith is in jeopardy.

126.   Further, the combination of these activities by all of these defendants, at times in concert with each other, reflects a policy, custom and practice by the defendants to ignore established constitutional law, precedent and principles; and to enact, enforce and apply laws with the express and at times expressed purpose of stopping picketing, speech and expressive activity by plaintiff and other WBC members, because they disagree with the content, viewpoint and ideas expressed therein, reminiscent of an era when civil rights laws became necessary in this country.   Seldom do the facts in this case reflect a good faith effort to balance competing rights and to identify carefully and narrowly tailored prohibitions to clearly identified legitimate, compelling or other government interests.

127.   All such conduct by defendants, as enumerated and detailed herein, is contrary to the First and Fourteenth Amendments of the United States Constitution; the Nebraska Constitution (the parameters of the constitutional right to freedom of speech are the same under the Nebraska

and U.S. Constitutions, *Village of Winslow v. Sheets*, 261 Neb. 203, 622 N.W.2d 595 [2001]);
and contrary to and redressable under 42 U.S.C. §1983.

128.    As a result of the passage and enforcement of the Nebraska funeral picketing act, plaintiff
has been and will continue to be unable to exercise her constitutional right to engage in
peaceful and non-violent picketing.

129.    As a result of the enforcement of the Nebraska flag mutilation statute, plaintiff has been
and will continue to be unable to exercise her constitutional right to use the flag in expressive
activity, and to express ideas and viewpoints.

130.    As a result of the enforcement of the Bellevue permit ordinances, plaintiff has been and
will continue to be unable to exercise her constitutional right to engage in peaceful and non-
violent picketing, and to use the flag in expressive activity, and to express ideas and
viewpoints.

131.    As a result of the prosecution of plaintiff in Sarpy County, plaintiff has been and will
continue to be unable to exercise her constitutional right to engage in peaceful and non-violent
picketing, and to use the flag in to express ideas and viewpoints, and to involve her children in
her religious picketing and use of the flag, without threat of further prosecution and without
the chilling and restraining effect of the current prosecution.

132.    Because of the constitutional infirmities in the language and application of the statutes and
ordinances challenged herein, as well as the pending prosecution of plaintiff as part of an
overall scheme to chill, punish, restrain and deter her protected picketing and use of the flag to
express ideas, plaintiff is likely to prevail on the merits in this case. The ongoing threat of
arrest, prosecution, and denial of permits, all for engaging in constitutionally protected

activities, flagrantly violates the constitutional rights of plaintiff contrary to 42 U.S.C. Section 1983, as well as the First and Fourteenth Amendments to the United States Constitution and the Nebraska Constitution, Section I-5.

133.   Plaintiff is suffering ongoing irreparable injury by being deprived of her ability to engage in constitutionally protected peaceful and non-violent pickets on issues of religious, political and social concern; to use the flag in connection with that picketing to express ideas and viewpoints; and to have her minor children participate with her in her religious picketing as part of her sincerely held religious beliefs about her duty to her children and how to raise them in the Scriptures. Plaintiff has no adequate remedy at law.

134.   Neither the defendants, nor any other third party, will suffer any injury if injunctive relief is issued.

135.   The public interest favors the issuance of relief to protect the constitutional rights at stake in this case.

136.   In *Phelps-Roper v. Nixon, supra*, 545 F.3d 685 (8th Cir. 2008), *cert. denied, Nixon v. Phelps-Roper,* 129 S.Ct. 2865, 174 L.Ed.2d 578, 2009 U.S. LEXIS 4769 (U.S. 2009), the Court reversed a trial court's denial of a motion for preliminary injunction against the Missouri funeral picketing law. In discussing the preliminary injunction request, the Court said:

> A court considering a motion for preliminary injunction must consider (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury in granting the injunction will inflict on the other party; (3) the probability of the movant succeeding on the merits; and (4) the public interest. Id. (citing *Dataphase Sys. Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The district court weighed these considerations

and concluded Phelps-Roper was not entitled to a preliminary injunction. We have weighed these same considerations and come to a contrary conclusion.

Peaceful picketing is an expressive activity protected by the *First Amendment*. *Olmer v. Lincoln,* 192 F.3d 1176, 1179 (8th Cir. 1999). It is well-settled law that a "loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality). If Phelps-Roper can establish a sufficient likelihood of success on the merits of her *First Amendment* claim, she will also have established irreparable harm as the result of the deprivation. See *Marcus v. Iowa Pub. Television,* 97 F.3d 1137, 1140-41 (8th Cir. 1996); *Kirkeby,* 52 F.3d at 775. Likewise, the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the *First Amendment* challenge because it is always in the public interest to protect constitutional rights. *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (quotation omitted); *Kirkeby,* 52 F.3d at 775 (citing *Frisby v. Schultz,* 487 U.S. 474, 479, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)). The balance of equities, too, generally favors the constitutionally-protected freedom of expression. In a *First Amendment* case, therefore, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue. *McQueary v. Stumbo,* 453 F. Supp.2d 975, 979 (E.D. Ky. 2006) (granting preliminary injunction to WBC precluding enforcement of Kentucky statute imposing time, place and manner restrictions on gatherings near funerals) (citing *Connection Distrib. Co.,* 154 F.3d at 288).

We begin with an assessment of the likelihood of success on the merits. In *Planned Parenthood,* 530 F.3d at 732-33, this Court clarified what is required to demonstrate a sufficient showing of likelihood of success on the merits. In general, "courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes." Id. Where a party seeks to enjoin preliminarily the implementation of a duly enacted statute -- as is the case here -- district courts must make "a threshold finding that a party is *likely* to prevail on the merits." Id. (emphasis added). The Court reasoned that by re-emphasizing "this more rigorous standard for determining a likelihood of success on the merits in these cases, we hope to

94

ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id. at 733.* In such cases, it is only after finding a party is likely to prevail on the merits that a district court should weigh the other Dataphase factors. *Id.* at 732.

545 F.3d at 689-690.   Then, after discussing the Missouri funeral picketing law, and concluding that plaintiff was likely to prevail on the merits, the Court concluded:

Because we conclude Phelps-Roper has demonstrated a likelihood of prevailing on the merits of her claim, we find she will suffer irreparable injury if the preliminary injunction is not issued. The injunction will not cause substantial harm to others, and the public is served by the preservation of constitutional rights. The district court abused its discretion when it concluded the balance of harms weighed toward denying the motion for a preliminary injunction based on its erroneous determination as to Phelps-Roper being unlikely to succeed on the merits.

545 F.3d at 694.

## Conclusion

Plaintiff submits that the constitutional violations in this case are substantial, obvious, and extreme, under well-settled law.  For a long period plaintiff and other WBC member have been subjected to prior restraints on their picketing and expressive activities by virtue of the two state statutes and the city permit ordinances at issue in this case.  Plaintiff continues to be under the restraint of pending criminal charges which are part of an overall effort to punish, chill and restrain her speech, and which criminal charges have had the direct and immediate effect of chilling and restraining her speech, as well as speech of other WBC members. Plaintiff has made every reasonable effort to function within these unconstitutional acts, and to seek relief in the state court system.  The only remedy at this hour is federal intervention.

There is a strong likelihood plaintiff will prevail on her claims herein, and for that reason, preliminary injunctive relief is appropriate herein. Plaintiff moves the Court for preliminary injunctive relief as enumerated herein.

Respectfully submitted,

Margie J. Phelps – [pro hac vice pending]
Attorney at Law
3734 SW 12th St.
Topeka, KS 66604
785-408-4598 (ph);
785-233-0766 (fx)
margie.phelps@cox.net
Attorney for Plaintiff

**Certificate of Service**

I hereby certify that the foregoing Brief in Support of Motion for Preliminary Injunction has been included with the Complaint and Motion for Preliminary Injunction with the Summons for service on each of the defendants herein.

Margie J. Phelps