**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| SHIRLEY L. PHELPS-ROPER, | ) | CASE NO. 4:09CV3268 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | & ORDER |
| DAVE HEINEMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Motion for Preliminary Injunction (Filing No. 5) and the Proposed Order (Filing No. 37) submitted by Plaintiff Shirley L. Phelps-Roper against all Defendants. For the reasons discussed below, the Plaintiff's Motion for Preliminary Injunction and Proposed Order will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Shirley Phelps-Roper ("Phelps-Roper") is a member of the Westboro Baptist Church ("WBC") and regularly protests at funerals, including the funerals of United States soldiers. (Filing No. 17, Amended Complaint, ¶ 28.) During these demonstrations, Phelps-Roper and other WBC members sing, carry signs, and use the American flag to express their religious beliefs. (*Id.* ¶ 24.) These demonstrations typically focus on the belief of the WBC that "God is punishing America for its sins . . . by killing Americans, including American soldiers." (Filing No. 6, Brief in Support of Motion for Preliminary Injunction, ¶ 4.)

In Counts I and II of her Amended Complaint, Phelps-Roper challenges the constitutionality of the Nebraska Funeral Picketing Law ("NFPL") both on its face and as applied to her. (Filing No. 17 ¶¶ 79-94.)

I.      **The Plain Language of the Statute**

The NFPL reads as follows:

**§ 28-1320.01 Unlawful picketing of a funeral; legislative findings**

(1)  The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.

(2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor, the Legislature declares that the purpose of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.

**§ 28-1320.02 Unlawful picketing of a funeral; terms, defined.**

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

**§ 28-1320.03 Unlawful picketing of a funeral; penalty.**

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor

Neb. Rev. Stat. §§ 28-1320.01 to 28-1320.03 (Reissue 2008).

2

## II.   Application of the Statute to Phelps-Roper

Phelps-Roper contends that the NFPL is unconstitutional on its face, and she describes several instances when the law has been applied to her in a manner that she believes was unconstitutional.  (Filing No. 6, ¶ 2.)  Specifically, her Brief in Support of Motion for Preliminary Injunction alleges that the following incidents occurred:

During a picket in Bellevue, Nebraska, on May 28, 2006, law enforcement officials required WBC members to stay 300 feet away from the curb line while other citizens engaging in "protest activities" were permitted to stand on church property. (*Id.* ¶ 20.)

During a June 20, 2006, protest in Beatrice, Nebraska, law enforcement officials denied a WBC-proposed protest location that was in compliance with the 300-foot restriction, instead requiring the WBC members to protest from a different area at a distance greater than 300 feet from the funeral.  (*Id.* ¶ 21.)  During that same protest, some 60-70 bikers were allowed to engage in "protest activities" within the 300-foot perimeter. (*Id.*)

A separate WBC protest planned for June 20, 2006, was thwarted when Defendant Sheriff Anthony McPhillips allegedly told WBC members that he planned to arrest them even if they protested in compliance with the NFPL.  (*Id.* ¶ 22.)  During the funeral, other citizens, including bikers and veterans, were permitted to be present.  (*Id.*)

WBC members picketed on July 8, 2006, in Omaha, Nebraska, but law enforcement personnel pushed them beyond the 300-foot limit.  At this event, WBC members noted that firefighters displaying a large flag were allowed to stand "right by the location of the funeral."  (*Id.* ¶ 23.)

On August 10, 2006, WBC members picketed in Pender, Nebraska, and were surrounded by law enforcement officers, while bikers and other citizens were allowed to engage in "protest activities" on the sidewalk in front of the church.  (*Id.* ¶ 24.)

At a September 5, 2006, picket in Minden, Nebraska, WBC members were required to comply with the 300-foot limit while other citizens were permitted to engage in "protest activities" within the restricted perimeter.  (*Id.* ¶ 25.)

WBC members picketed in McCook, Nebraska, on February 16, 2007, and were required to comply with the statutory 300-foot limit while other groups were allowed inside the perimeter.  (*Id.* ¶ 26.)

During an April 17, 2007, protest in York, Nebraska, WBC members were required to protest from a distance of 600 feet while other citizens were allowed to engage in "protest activities" on the public sidewalk directly in front of the building.  *(Id.* ¶ 27.)

During a June 5, 2007, protest in Bellevue, Nebraska, WBC members were required to protest from within a space delineated by law enforcement at a distance exceeding the 300-foot statutory perimeter.  (*Id.* ¶ 28.)  Bikers and other citizens present were not required to stay within the spray-painted space.  (*Id.*)

Phelps-Roper contends that these incidents demonstrate that the NFPL has been applied to limit or bar her protected speech.  (*Id.* ¶ 11.)  She argues that the incidents are part of a greater scheme to "punish, silence, prohibit, and restrain [Phelps-Roper's] speech" in violation of the First and Fourteenth Amendments of the United States Constitution.  (*Id.* ¶ 2.)

4

### III. Procedural Background

Phelps-Roper filed her Complaint and Motion for Preliminary Injunction on December 30, 2009.  (Filing Nos. 1, 5.)  She filed her First Amended Complaint on January 20, 2010, adding claims and defendants.   (Filing No. 17.)   On January 26, 2010, she filed a Submission of Proposed Order (Filing No. 37) and a proposed Order Granting Preliminary Injunction, arguing that the time to respond to her motion had passed, and the facts should be deemed admitted and the motion deemed uncontested.  (Filing No. 37-1).  After service on all Defendants was effected, and after the Court conferred with all parties, the Motion for Preliminary Injunction was set for hearing on February 25, 2010.   (Filing No. 41.) Several Defendants filed Motions to Abstain and Dismiss beginning February 8, 2010. (Filing Nos. 42, 47, 51, 52, 56, 72.)  Defendants Bruning, Heineman, Hutton, and Nebraska Supreme Court moved to continue the hearing until the Court decided whether to grant or deny the Defendants' respective Motions to Abstain and Dismiss.  (Filing No. 45.)  On February 23, 2010, this Court granted Defendants' Motion to Continue until the Court was able to resolve the Defendants' Motion to Abstain and Dismiss.  (Filing No. 70.)

On March 1, 2010, this Court granted the joint motion of Phelps-Roper and Defendants City of Bellevue, Kay Dammast, Gary Mixan, John W. Stacey, and Gary Troutman, to stay and reserve ruling on the Motions to Abstain and Dismiss until Phelps-Roper and the Bellevue Defendants could submit a joint stipulation to enter a consent decree.  (Filing No. 76.)  Their Joint Submission of Consent Decree was filed on March 10, 2010 (Filing No. 79).  The Court declined to enter the consent decree on April 19, 2010. (Amended Memorandum and Order, Filing No. 93 at 20.)  In the same order, the Court dismissed Counts VI and VII of the Amended Complaint as moot and dismissed Counts III

5

through V, and VII, under the *Younger* abstention doctrine, because of ongoing state criminal proceedings in which Phelps-Roper could raise her constitutional challenges.  (*Id.* 20-21.)   Defendants Judge Hutton and the Nebraska Supreme Court also were dismissed from the case.  (*Id.* 21.)

On April 26, 2010, the Court denied Phelps-Roper's Motion for Preliminary Injunction to the extent that the Motion sought to enjoin acts alleged in the dismissed Counts III through VIII. (Order, Filing No. 95.)   The Court also set the hearing on the Motion for Preliminary Injunction with respect to Phelps-Roper's remaining claims for May 10, 2010.  (*Id.* 1-2.) Prior to the hearing, the State Defendants moved to continue the hearing until the Eighth Circuit could rule on Phelps-Roper's interlocutory appeal of the Court's Amended Order of April 19, 2010.  (Filing No. 102.)  The Court denied the motion, allowing the issues to be revisited at the hearing.  (Filing No. 103.)  The hearing was held in Omaha, Nebraska, on May 10, 2010.  (Filing No. 108.)  At the hearing, the Court agreed to issue a written ruling on the Defendants' objections to Phelps-Roper's evidentiary materials, and the parties agreed to a briefing schedule (Filing No. 108.)  The issues now have been fully briefed, according to the agreed-upon schedule, and the Court now rules on the remaining issues.

## STANDARD OF REVIEW

In determining whether a preliminary injunction should issue, the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*).  A district court should weigh "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.*  A preliminary injunction is considered

6

an extraordinary remedy, and the burden of proving each of the *Dataphase* factors lies with the party seeking the injunction. *Watkins v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

**DISCUSSION**

In a First Amendment case, "the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). The threshold determination of likelihood of success ensures that "preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008); *see also Nixon*, 545 F.3d at 690. It is recognized that "if a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning." *Jones v. Gale*, 470 F.3d 1261, 1268 (8th Cir. 2006) (quoting *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 482 (8th Cir. 1990)); *see also Frisby v. Schultz*, 487 U.S. 474, 483 (1988) ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties."). Accordingly, this Court will begin by examining Phelps-Roper's likelihood of success on her facial and as-applied challenges to the NFPL, recognizing that "an appropriately deferential analysis" must be employed when the constitutionality of a state statute is challenged.

## I.      Level of Scrutiny

When a content-neutral statute is challenged on First Amendment grounds, a court is required to employ an intermediate level of scrutiny to determine the statute's constitutionality, *i.e.*, the statute may be upheld only if it is narrowly tailored to serve a significant government interest and leaves ample alternative channels for communications that are protected by the First Amendment.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).   A statute's neutrality is determined by looking to its plain meaning; the legislative intent is irrelevant.  *Nixon*, 545 F.3d at 691; *see also Hill v. Colorado*, 530 U.S. 703, 724-25 (2000) ("The contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support.")  Strict scrutiny is applied only to statutes that are content-based.  *Turner Broad. Sys, Inc.,* 512 U.S. at 642.  When strict scrutiny applies, the statute can be upheld only when it serves a compelling state interest and is narrowly drawn to achieve that purpose. *Id.* at 642, 653.

Phelps-Roper argues that this Court should apply strict scrutiny because the NFPL was enacted specifically to limit her speech.  The Eighth Circuit rejected a similar argument in *Nixon,* where it was alleged that a Missouri funeral-picketing statute was enacted with the specific purpose of silencing Phelps-Roper.  *Nixon*, 545 F.3d at 691.  The Eighth Circuit reasoned that the Missouri statute was content-neutral because it addressed picketing near funerals, in general, and not the expression of any specific viewpoint.  *Id.*

Phelps-Roper argues that the NFPL should be distinguished from the Missouri statute, because the NFPL prohibits protests where funerals are "targeted."  She compares the NFPL to the content-based statute held to be unconstitutionally overbroad in *R.A.V. v.*

*City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992).  The statute in *R.A.V.* prohibited a variety of symbolic speech, such a cross-burning, when engaged in by one who knew or had reasonable grounds to know that the conduct would arouse anger, alarm or resentment in others.   The Supreme Court said that "[t]he government may not regulate use [of expression] based on hostility - or favoritism - towards the underlying message expressed." *Id.*  This Court infers that the holding indicates that the government may not regulate expression based on the government's own hostility or favoritism towards the underlying message, nor based on the target audience's hostility or favoritism towards the message.

Unlike the statute at issue in *R.A.V.,* however, the NFPL does not regulate speech based on the speaker's message.   Instead, the NFPL is similar to the ban on targeted picketing of a residence, upheld by the Supreme Court in *Frisby v. Schultz*, 487 U.S. 474, 483 (1988).  In *Frisby*, the Court found that "targeted" or "focused" picketing did not imply a hostile message, and determined that the legislation in question was content-neutral.  *See id.* at 480-81; 487-88.  Like the legislation in *Frisby*, the NFPL specifically limits its scope to picketing or protest activities that target a particular audience.   Nothing in the statute indicates that the picketing or protest activities must be hostile to the funeral or its attendees in order to come under the reach of the NFPL.   Despite the State Defendants' alleged admission that the NFPL applies only to hostile messages at funerals, the Court is bound to examine the plain language of the statute.   On its face, the NFPL regulates *all* forms of picketing directed at funerals.

The purpose of the NFPL can be found on the face of the statute, at § 28-1320.01(2). Nothing in the plain language of the statute suggests that it is based on the content or view

point of the speech it restricts.   Accordingly, the Court will analyze the NFPL under intermediate scrutiny.

## II.   Application of Intermediate Scrutiny to Facial Challenge

A statute may impose a facially neutral time, place, and manner restriction on speech in a public forum[1] if the statute: "(1) serves a significant government interest; (2) is narrowly tailored; and (3) leaves open ample alternative channels of communication."   *Nixon,* 545 F.3d at 691 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Veneklase v. City of Fargo*, 248 F.3d 738, 744 (8th Cir. 2001) (en banc)).   A narrow reading of the NFPL satisfies each of these criteria and the statute survives intermediate scrutiny at this stage of the proceedings.

## A.   Significant Government Interest

The Nebraska Legislature summarized the of purpose of the NFPL, and the government's interest, as follows:

> (1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.
>
> The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor, the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the

---

[1]  Because the prohibitions in the NFPL reach beyond nonpublic fora to public fora such as the adjacent public sidewalks and streets, the statute must satisfy the standard for public fora.  *See Nixon*, 545 F.3d at 691.

> opportunity to communicate their message at a time and place that minimizes
> the interference with the rights of funeral participants.

Neb. Rev. Stat. § 28-1320.01 (Reissue 2008).

Accordingly, the stated purpose of the NFPL is to balance the rights of bereaved family members attending a funeral, against the First Amendment rights of picketers and protestors who focus or target their message at the funeral.  For the reasons discussed below, the Court concludes that the government has an interest in protecting family members attending a relative's funeral, because they are a captive audience when at the funeral, and they have a right to honor and mourn their dead.

### 1.   *Applicability of* Phelps-Roper v. Nixon

The government interest underlying the NFPL is distinguishable from, and more significant than, the government interest underlying the statute addressed in *Nixon*.  There, the Eighth Circuit ruled that a state's interest in protecting funeral attendees as a group was outweighed by Phelps-Roper's First Amendment right.  *Nixon*, 545 F.3d at 692.  However, it is not apparent that the ruling in *Nixon* would apply to a statute designed to protect a much narrower group:  family members of the deceased.  In *Nixon*, the Eighth Circuit reviewed a lower court's ruling on Phelps-Roper's motion to preliminarily enjoin the enforcement of Missouri's funeral picketing law.  The Missouri statute read, in relevant part:

> . . . (2) It shall be unlawful for any person to engage in picketing or other protest activities in front of or about any location at which a funeral is held, within one hour prior to the commencement of any funeral, and until one hour following the cessation of any funeral.  Each day on which a violation occurs shall constitute a separate offense.  Violation of this section is a class B misdemeanor, unless committed by a person who has previously pled guilty to or been found guilty of a violation of this section, in which case the violation is a class A misdemeanor.

(3) For the purposes of this section, "funeral" means the ceremonies, processions and memorial services held in connection with the burial or cremation of the dead.

Mo. Rev. Stat. § 578.501

In analyzing the significant government interest underlying the Missouri statute, the Eighth Circuit relied heavily on its previous decision in *Olmer v. Lincoln*, 192 F.3d 1176 (8th Cir. 1999).[2]   In *Olmer*, the Eighth Circuit affirmed a preliminary injunction against an ordinance that "restrict[ed] to certain areas the 'focused picketing' of churches and other religious premises thirty minutes before, during, and thirty minutes after any scheduled religious activity" because the prohibition violated the First Amendment.  *Olmer*, 192 F.3d at 1178.  The Eighth Circuit reasoned that churches are distinguishable from private residences because "'the home is different' and, in our view unique." *Id.* at 1182.  The Eighth Circuit concluded that while First Amendment lines must be drawn, it would do so "in such a way as to give the maximum possible protection to speech, which is protected by the express words of the Constitution." *Id.*

*Nixon* is not controlling in this case, because the Missouri statute in *Nixon* was drawn to protect a broad group.  Under the Missouri statute, it was unlawful for "any person to engage in picketing or other protest activities in front of or about any location at which a funeral is held, within one hour prior to the commencement of any funeral, and until one

_____

[2] In *Nixon*, the Eighth Circuit characterized its holding in *Olmer* as "the government has no compelling interest in protecting an individual from unwanted speech outside of the residential context." *Nixon*, 545 F.3d at 692.  However, this statement is not dispositive of the present case because, in order to satisfy intermediate scrutiny, the state need only show a *significant* government interest. *Id.* at 691.  Under *strict scrutiny*, a *compelling* state interest that is narrowly drawn to achieve that purpose must be shown to uphold a content based statute.  *Turner Broad. Sys.,* 512 U.S. at 642, 653.  As with the Missouri statute in *Nixon*, the NFPL is content-neutral and intermediate scrutiny applies.

hour following the cessation of any funeral."  Mo. Rev. Stat. § 578.501(2).  Because the statute lacked any specific guidance, the only government interest the Eighth Circuit could identify was the protection of funeral attendees, in general, from unwanted speech.  The Eighth Circuit held that Phelps-Roper would likely prove that her right to free speech outweighed that interest.  In contrast, the NFPL specifically states in § 28-1320.01(1) that "*families* have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of *families* to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities."  (emphasis added).  The stated purpose of the NFPL is "to *protect the privacy of grieving families* and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants."  *Id.* (emphasis added).

The NFPL is specific in articulating the interest it seeks to protect: The privacy of grieving families so that they may mourn the death of relatives in peace and dignity.[3]

---

[3]  The Eighth Circuit in *Olmer* demonstrated how a narrow group with certain characteristics may be protected from unwanted speech.  In *Olmer*, the city ordinance at issue  prohibited focused picketing on public sidewalks or rights of way adjoining religious premises.  *Olmer*, 192 F.3d at 1179.  The ordinance purported, among other things, to protect children from graphic representations of aborted fetuses used by anti-abortion protesters near a church.  *Id.* at 1178.  The Eighth Circuit stated "that the city's interest in protecting very young children from frightening images is constitutionally important; that is, the interest is significant, compelling, and legitimate."  *Id.* at 1180.  This conclusion was based on the Supreme Court's ruling that the state has a "compelling interest in protecting the physical and psychological well-being of minors."  *Sable Comm. of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).  While a state may have no compelling interest in protecting general churchgoers from such unwanted speech, the court in *Olmer* clearly said that a state would have an interest in protecting children in certain circumstances.

Because the governmental interest addressed by the statute in *Nixon* was much broader than that in the NFPL, the Eighth Circuit's holding in *Nixon* is not dispositive with respect to the issue of whether the NFPL serves a significant government interest.  Therefore, this Court must perform its own analysis of that issue.

2.   *The State's Interest in Protecting Family Members at Funerals and Burials*

The state has a significant interest in protecting family members at funeral services for two principal reasons.  First, due to the religious and cultural significance of funerals and burials, family of the deceased are a captive audience and are particularly vulnerable.  Second, family members have a personal stake in memorializing and honoring the dead, and the state has an interest in protecting family members in this context.

   a.    *Family Members at a Relative's Funeral are a Captive Audience*

The Supreme Court examined the "captive audience" argument in detail in *Frisby v. Schultz*, when it considered the constitutionality of an ordinance that "completely ban[ned] picketing before or about any residence."  *Frisby*, 487 U.S. at 476.  The Court explained that the "home is different" in meriting protection even from peaceful protesting because it is "the last citadel of the tired, the weary, and the sick."  *Id.* at 484 (quoting *Gregory v. Chicago*, 394 U.S. 111, 125 (1969) (Black, J. concurring)). The Court reasoned that the First Amendment allows the government "to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech."  *Id.* at 487 (citing *Consolidated Edison Co. v. Public Serv. Comm'n of New York*, 447 U.S. 530, 542 (1980)).  The Supreme Court noted that while targeted picketing continues, the "tensions and pressures may be psychological, not physical, but they are not for that reason, less inimical to family privacy and truly domestic tranquility."  *Id.* at 486.  For these reasons, and

14

"[b]ecause the picketing prohibited by the [ordinance] is speech directed primarily at those who are presumptively unwilling to receive it," the government had a substantial interest in banning it.  *Id.* at 488.

The Supreme Court extended its reasoning in *Frisby* to individuals entering health care facilities, in the interest of protecting "unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure."  *Hill v. Colorado*, 530 U.S. 703, 718 (2000) (internal citation and quotation omitted).  In *Hill*, the Supreme Court addressed a Colorado statute that prohibited a person from knowingly approaching "within eight feet of another person, without that person's consent, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person."  *Id.* at 707 (internal quotation omitted). The Supreme Court noted that persons entering a heath care facility are often in particularly vulnerable emotional and physical conditions.  *Id.* at 729.  Specifically, the Supreme Court stated that persons entering health care facilities "may be under special physical or emotional stress," and could "potential[ly] [suffer] physical and emotional harm when an unwelcome individual delivers a message (whatever its content) by physically approaching . . . at close range."  *Id.* at 718 n. 25.  Citing *Frisby*, the Court reasoned that "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it."  *Id.* at 716 (citing *Frisby*, 487 U.S. at  487.  The Court concluded that the state had a legitimate and substantial interest in protecting these persons from unwanted confrontations and encounters.  *Id.*

Nebraska has a significant interest in protecting family members, at funeral or burials, from confrontation by unwelcome messengers.  Just as the home is the "last citadel

15

of the tired, the weary, and the sick," the funeral and burial are the last citadels of grieving, bereaved, and emotionally devastated family members.  Because of the unique nature of funerals, family members are left with no ready means to avoid the pickets and protests that the NFPL seeks to restrict.  *Cf. Frisby*, 487 U.S. at 487.  It cannot be said that a family member's presence at the funeral of a relative is voluntary.  Simply stated, if family members "want to take part in an event memorializing the deceased, they must go to the place designated for the memorial event."  *McQueary v. Stumbo*, 453 F. Supp. 2d 975, 992 (E.D. Ky. 2006). Similar to persons entering a health care facility, family members at a relative's funeral are under special emotional stress, and could be subject to additional emotional harm when an unwelcome individual delivers a message, regardless of its content.  *See Hill*, 530 U.S. at 718 n. 25.  The NFPL seeks to prevent potential harm to family members caused by unwelcome picketers and protesters at a deceased relative's funeral.  This harm is "created by the medium of expression itself," namely, the protestors' presence at the family member's funeral.  *Frisby*, 487 U.S. at 487.  Family members attending a relative's funeral are captive to such presumptively undesired communication.  Because family members[4] attending funerals and burials are uniquely vulnerable to unwanted protest confrontations, this Court concludes that the NFPL serves a significant government interest.

Phelps-Roper argues that the NFPL is overbroad, because protesters can never know if their particular protests intrude upon the family.  The NFPL applies to picketing of

---

[4]  As noted above, although the Eighth Circuit in *Nixon* stated a state's interest in protecting funeral attendees from unwanted speech was outweighed by Phelps-Roper's First Amendment rights, this Court concludes that the state's interest in protecting *family* members is greater.

a funeral, which means "protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral." Neb. Rev. Stat. § 28-1320.02(2). The Supreme Court in *Frisby* concluded that the First Amendment allows the government "to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Frisby*, 487 U.S. at 487. The Supreme Court noted that residents of a home are a captive audience and that to those residents, "the home becomes something less than a home when and while the picketing continues." *Id.* at 486 (quoting *Carey v. Brown*, 447 U.S. 455, 478 (1980) (internal quotations omitted)). The Supreme Court further noted that the "evil of targeted residential picketing, the very presence of an unwelcome visitor at the home, is created by the medium of expression itself." *Id.* at 487 (internal quotations and citations omitted). Accordingly, targeted residential picketing may be prohibited because it "is speech directed primarily at those who are presumptively unwilling to receive it." *Id.* at 488.

The psychological tensions and pressures created by picketing at a family member's funeral are similar to those created by picketing at a home. Because the Court concludes that family members attending a deceased relative's funeral are also a captive audience, picket and protest activities directed at the funeral are presumptively unwanted regardless of content.

b.    *Family Members Have a Personal Stake in Honoring Their Dead*

The Supreme Court has recognized that "[f]amily members have a personal stake in honoring and mourning their dead." *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 168 (2004). For this reason, the Supreme Court in *Favish* held that family members have a right to control death images of their deceased relatives. *Id.* at 170. The

17

Supreme Court recognized that "[b]urial rites or their counterparts have been respected in almost all civilizations from time immemorial." *Id.* at 167-68. The Court alluded to the universal acceptance of Antigone's right to insist on respect for her brother's body. *Id.* at 168 (citing *Antigone of Sophocles*, 8 Harvard Classics: Nine Greek Dramas 255 (C. Eliot ed. 1909)). Accordingly, the respect traditionally afforded to the dead justified a right to privacy regarding death images of relatives. *Id.* The Supreme Court specified that the right to protect the death images of relatives belongs to the surviving family members. The Court stated "[a] privilege may be given to the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased." *Id.* at 168-69 (quoting *Shuyler v. Curtis*, 147 N.Y. 434, 447 (1985). Family members may object "to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own." *Id.* at 168.

The same reasoning applies to family members' privacy at funerals for their deceased relatives. The Supreme Court in *Favish* recognized the unique position of family members at the time of a deceased relative's passing. The unwarranted public exploitation of death images may be restricted, because that activity intrudes upon a family's grief, causes emotional trauma to family members, and degrades the loved one at a time when the family is most vulnerable and most intent on honoring the deceased. The same can be said of unwanted protest and picket activities directed at a funeral. Funerals are often the formalized rites that are "a sign of the respect a society shows for the deceased and for surviving family members." *Favish*, 541 U.S. at 168. Funerals represent the last

18

moments a family member shares with a deceased relative.[5]  The unique emotional state of surviving family members, and the importance of funeral rites for grieving relatives, further support the government's interest in protecting family members from intrusion at a time and place when they are most vulnerable.  Based on the reasoning in *Favish*, the government's interest in protecting family members from intrusion at funerals and burials is more significant than the government's interest in protecting *all* funeral attendees, addressed by the Eighth Circuit panel in *Nixon*.

Phelps-Roper argues that *Favish* is inapplicable to this case because the funerals at which she protests are very public and there can be no privacy interest at large public events.  However, public access to a funeral is irrelevant in this context. Family members at a relative's funeral are a captive audience and the state has a significant interest in protecting them from picket and protest activities that target the funeral.  The fact that a funeral receives media coverage, or that mourners other than family members attend it, does not make family members any less a captive audience or any less vulnerable to unwanted confrontation.  For this reason, Phelps-Roper has not met her burden of showing that her First Amendment rights outweigh a family member's right to avoid pickets and protests at a funeral or burial.

Phelps-Roper also argues that the NFPL cannot purport to protect the sensitivities of family members, without becoming a content-based regulation subject to strict scrutiny.

---

[5]  One commentator on Sophocles' Antigone noted the importance of the burial ceremony performed by the heroine on behalf of her deceased brother, stating that "[h]er duty had been done.  The Guard can remove the dust, but he cannot make the corpse unburied."  J.L. Rose, *The Problem of the Second Burial in Sophocles' Antigone*, 47 The Classical Journal, at 219.

In *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (2001), the Supreme Court examined a zoning ordinance that prohibited any adult movie theater from locating within one thousand feet of a family dwelling, residential zone, or school.   The Supreme Court reasoned that the ordinance was not aimed at the content of the expression in the theaters, but at curbing the secondary effects of adult theaters such as the quality of surrounding neighborhoods, crime rates, and property values.  *Id.* at 47-49.  Statutes that regulate the secondary effects of speech are subject to intermediate and not strict scrutiny.  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring). The NFPL protects against the secondary effects[6] of pickets and protests on family members attending funerals of deceased relatives.  The NFPL does not regulate the content of the speech, but the effect of picketing and protests on family members grieving their dead.  Unwanted or intrusive speech presumptively impinges upon a family member's privacy and grieving during the time of a funeral.  *See Frisby*, 487 U.S. at 488 (ordinance that restricts protest and picketing activities, that are directed at a captive audience, restricts speech that is presumptively unwanted).  The question of whether protest activities targeting a funeral impinge upon grieving family members' sensitivities is determined by considering the

---

[6] Although the "secondary effects" analysis traditionally has been applied to zoning ordinances regulating adult businesses, courts have applied it in other First Amendment contexts.  *See Burnson v. Freeman*, 504 U.S. 191, 206-08 (1992) (secondary effects on the voting process, caused by voter solicitation restrictions); *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 741-42 (1st Cir. 1995) (secondary effects of regulation of all entertainment during late night hours); *Wheeler v. Comm'r of Highways*, 822 F.2d 586, 594-95 (6th Cir. 1987) (secondary effects of billboards on highway scenic beauty); *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1554-58 (7th Cir. 1986) (secondary effects of door-to-door solicitation regulations).

secondary effects on the family, not by considering the content of the speech.  Accordingly, as discussed above, the NFPL is content-neutral on its face.

## B.    Narrowly Tailored

Phelps-Roper argues that the NFPL is not narrowly tailored because the 300-foot buffer is too great.  The NFPL defines picketing of a funeral as "protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral."  Neb. Rev. Stat. § 28-1320.02(2).  To be narrowly tailored, a statute must not burden substantially more speech than necessary to protect the state's significant interest.  *Nixon*, 545, F.3d at 692.  "To prevail, a plaintiff must show the challenged law either 'could never be applied in a valid manner' or it is 'written so broadly that [it] may inhibit the constitutionally protected speech of third parties.'"  *Id.* (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984)).

The Sixth Circuit in *Phelps-Roper v. Strickland*, 539 F.3d 356, 368 (6th Cir. 2008), addressed an Ohio funeral picketing statute that contained a similar 300-foot buffer and concluded it was not overbroad in the context of funeral picketing laws.  The court determined that the restriction was narrowly tailored for several reasons.  First, the Ohio statute was even more narrow than the restriction on targeted residential picketing upheld in *Frisby,* because it imposed the buffer zone only one hour before and one hour after the funeral, as opposed to the perpetual ban on picketing upheld in *Frisby.  Id.* at 370.  The court noted that even if a funeral protestor's speech was intended for an audience broader than funeral attendees, the statute was still valid because the state had an important interest in protecting funeral attendees.  *Id.*  Second, the Sixth Circuit found that the Ohio statute was narrower than the statute addressed in *Hill,* because its restrictions were in

21

place for a limited time and the distance limitations were necessary to protect individuals arriving at and departing from the funeral. *Id.* The court noted that a 300-foot barrier addressed the logistical problems of moving large groups from the site of funeral to the burial site. *Id.* at 371. Protection of access to the funeral through the buffer was critical to the government's interest of protecting funeral mourners at the time of the funeral. *Id.*

The Sixth Circuit's reasoning undermines Phelps-Roper's argument that the NFPL is not narrowly tailored. Like the Ohio statute in *Strickland*, the NFPL imposes the 300-foot buffer for a limited time before and after the funeral. At all other times, protestors may be as near to the funeral site as they wish. Although Phelps-Roper may be directing her protest activities at *all* funeral attendees, the government has an interest in protecting *family members* from unwanted communication. *See Hill*, 530 U.S. at 730-31 ("The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance.") The logistical problems involved in moving mourners from a funeral site to a burial site are no less present when a statute seeks to protect only mourning family members. The NFPL clearly states it is aimed at protecting family members where the funerals of their loved ones are "targeted for picketing or protest activities." Neb. Rev. Stat. § 28-1320.01(1). Accordingly, the NFPL's restrictions are narrowly limited to picketing or protest activities that *target* funerals. Any other speech or protest activities within the 300-foot buffer are not restricted. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 775 (stating that a 300-foot buffer around a residence is too large when it forbids all picketing within the buffer zone and suggesting that a restriction on the time and duration of the picket could accomplish the desired result). Based on the

22

reasoning in *Strickland*, Phelps-Roper is unlikely to meet her burden of showing that the 300-foot buffer renders the statute overly broad.

The Eighth Circuit's decision in *Nixon* also suggests that the NFPL is narrowly tailored.  The *Nixon* court concluded that the Missouri statute was overbroad because it did not limit itself to activity that "targets, disrupts, or [was] otherwise related to the funeral, memorial service, or procession."  *Id.* at 693.  The Eighth Circuit specifically distinguished the Missouri statute from the Ohio funeral picketing statute addressed in *Strickland* that banned activity *directed* at the burial service or funeral.  *Id.* (citing *Strickland*, 539 F.3d at 368).  The Eighth Circuit reasoned that Phelps-Roper was likely to show the Missouri statute was overbroad because it did not contain any such provisions.  *Nixon*, 545, F.3d at 693.  The NFPL avoids this pitfall, because the 300-foot buffer applies solely to picketing or protest activities that *target* funerals.  Thus, the Eighth Circuit's discussion in *Nixon* suggests that the NPFL is free of the defects of the Missouri statute that rendered it overbroad.

At the hearing on her Motion for Preliminary Injunction, Phelps-Roper also argued that the NFPL is overbroad because it does not identify where the 300-foot buffer begins. The NFPL restricts picketing and protest activities directed at a funeral "within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral." Neb. Rev. Stat. § 28-1320.02(2).  The NFPL does not expressly state where the measurement begins from the cemetery, mortuary, church, or other place of worship. However, in interpreting its own statutes, the Nebraska Supreme Court has found that measurements such as this have a definitive meaning.  For example, Neb. Rev. Stat. § 53-177 (Reissue 2004) prohibits the issuance of a license to sell liquor "within one hundred

and fifty feet of any church, school, hospital, or home for aged or indigent persons or for veterans, their wives or children."  The Nebraska Supreme Court has held that the distance should be determined "by measuring in a straight line from the nearest walls of the two buildings."  *Calvary Baptist Church v. Coonrad*, 77 N.W.2d 821, 825 (Neb. 1956).

The NFPL presents a comparable measurement.  As noted above, to show overbreadth a plaintiff must establish that the challenged statute could never be applied validly, or that it is written so broadly that it inhibits constitutionally protected speech of third parties.  *Nixon*, 545, F.3d at 692.  The Nebraska Supreme Court has not interpreted the scope and reach of any part of the NFPL.  However, the Nebraska Supreme Court's decision in *Calvary Baptist Church* indicates that a statute imposing a buffer zone is susceptible of a definitive interpretation.  Just as the distance between a church and a liquor store can be measured in a straight line between the nearest walls, the 300-foot buffer can be measured in a straight line between protestors and the nearest point of a cemetery, mortuary, church or other place of worship during a funeral.  Therefore, at this stage of the proceedings, the Court is not persuaded that the Phelps-Roper is likely to prove that the NFPL is not susceptible of a constitutional construction, or is so broad that it inhibits third parties in the exercise of their freedom of expression.

## C.    Alternative Means of Communicating Phelps-Roper's Message

Phelps-Roper argues that the NFPL does not provide ample alternatives for communication because it restricts her access to the very audience she wishes to reach. She quotes the Eighth Circuit's decision in *Nixon,* concluding that Phelps-Roper was likely to prove that the Missouri statute failed to provide open and adequate alternative channels for communicating her message.  *Nixon*, 545 F.3d at 694.  The Eighth Circuit compared the

24

Missouri statute's prohibition to the complete ban[7] on residential picketing addressed in *Kirkeby v. Furness*, 92 F.3d 655, 662 (8th Cir. 1996). In *Kirkeby*, the Eighth Circuit held that protesters targeting individuals in a residence were not afforded ample alternative means for communication when forced to go to the next block or to a town square. *Kirkeby*, 545 F.3d at 662. The Eighth Circuit in *Nixon* compared the Missouri statute to the restriction in *Kirkeby,* because Phelps-Roper wished to reach an audience that she alleged could only be addressed at the time and place of funerals. *Id.* at 693.

The Eighth Circuit also addressed the question of alternative channels of communication in the context of residential picketing in *Thornburn v. Austin*, 231 F.3d 1114, 1119-20 (8th Cir. 2000). The statute at issue in *Thornburn* prohibited protest activity focused on a particular residence. *Id.* at 1119. The Eighth Circuit held that the statute left ample alternative means of communication, noting that protection of residential tranquility and privacy was a significant government interest, and that the restriction was "limited to activity focused on a particular residence and does not prohibit general dissemination of a message." *Id.* (citing *Frisby*, 487 U.S. at 483-84). The Eighth Circuit determined that the restriction allowed ample alternative channels for communication, because protestors were

---

[7] In *Kirkeby*, the Fargo ordinance banned the carrying of written material, shouting, or other verbal protesting within 200 feet of a targeted residence. *Kirkeby*, 92 F.3d at 660. The Eighth Circuit determined that the restriction was content-based because it prohibited picketers from specifically identifying their targets. *Id.* It was also too broad because it restricted speech not related the protection of residents. *Id.* The ordinance failed to leave ample alternative channels for communication, because the buffer zone was too large and the ordinance imposed time limits that completely banned the protestor's contact with the targeted resident. *Id.* at 662.

free to march through neighborhoods, distribute literature, and even picket at a certain distance from the residence.[8]  *Id.* at 1120.

The NFPL is similar to the ordinance at issue in *Thornburn* and overcomes the defects of the Missouri statute at issue in *Nixon*.  As with the ordinance in *Thornburn*, the NFPL serves a significant government interest, *i.e.*, protection of family members mourning at a relative's funeral.  In contrast, the Missouri statute addressed in *Nixon* was not found to protect a significant interest, because it was drafted broadly to protect the entire body of funeral attendees.  The decision in *Thornburn* illustrates that when significant government interests are at stake, the messenger does not have complete control over the time, place, and manner of communicating a message.  Because the NFPL is narrowly tailored to protect a significant government interest, protestors are not entitled to unbridled discretion in selecting the time, place, and manner in which they express their message.

The NFPL is also distinguishable from the Missouri statute because the NFPL's scope is limited to protest activities that *target* funerals or burials.  In *Nixon*, the Missouri statute was overbroad because it did not narrow the scope of its restrictions to activities that targeted or disrupted funerals.  *Nixon*, 545 F.3d at 693.  In contrast, the ordinance in *Thornburn* was limited to protest activities that focused on, or targeted, a particular residence.  *Thornburn*, 231 F.3d at 1119.  Because the ordinance in *Thornburn* did not

---

[8]  The differing results in *Kirkeby* and *Thornburn* illustrate the key characteristics of targeted picketing statutes that leave ample alternative channels of communication.  Unlike the ordinance in *Kirkeby*, the NFPL is not content based, as it does not specifically prohibit picketers from identifying the target audience.  The NFPL's buffer zone is reasonable, to permit ingress to and egress from the funeral or burial.  The time limitations in the NFPL apply only to the buffer-zone and not to all protest and picketing activity.  The NFPL is more like the ordinance at issue in *Thornburn* than that at issue in *Kirkeby.*

prohibit general dissemination of a message, it was not overbroad. *Id.* The NFPL does not restrict general dissemination of a message throughout the buffer zone; it specifically restricts protest or picket activities *targeting* the funeral or burial. Although the NFPL keeps protesters targeting the funeral to a certain distance, their access to funeral attendees is not completely banned. The NFPL merely balances the significant interest of protecting a grieving family's privacy with the rights of funeral protestors by setting certain time and space limitations. This Court concludes that Phelps-Roper is unlikely to meet her burden of showing that the NFPL does not leave ample alternatives for her communication.

## III.   Other *Dataphase* Factors

The determining factor in issuing a preliminary injunction in a First Amendment case is the likelihood of success on the merits. *Nixon*, 545 F.3d at 690. Phelps-Roper has not demonstrated that she is likely to succeed on the merits of her claims, because the NFPL serves a significant government interest, is narrowly tailored, and provides ample alternative channels of communication. She likewise has not demonstrated that any of the other *Dataphase* factors weigh in her favor, and the Court will not issue a preliminary injunction on the basis of Phelps-Roper's facial challenges to the NFPL.

## IV.   Application of Intermediate Scrutiny to As-Applied Challenges

Phelps-Roper claims that even if the NFPL is constitutional, it has been applied unconstitutionally to her because (1) she has been kept farther than 300 feet from the place of funerals on several occasions, and (2) the law has been enforced strictly against her, while other protestors have been allowed to be closer to funerals.

First, to the extent that Phelps-Roper claims that the NFPL has been enforced beyond the language of the statute, a preliminary injunction would have no effect. A

27

preliminary injunction is used to prevent threatened or continuous injury, not to remedy past wrongs. *See, e.g., Watkins*, 346 F.3d at 844 (party seeking preliminary injunction must show threat of irreparable harm). Even if these instances demonstrate excessive enforcement in the past, a preliminary injunction on this claim could require only that the NFPL be enforced in accordance with its terms. At the preliminary injunction stage, the Court does not address whether Phelps-Roper should be compensated for unlawful enforcement of the NFPL, and the Court assumes that the government will enforce statutes according to their terms.

Second, the Court concludes that Phelps-Roper has not met her burden of showing that she has been treated differently from other protestors. As noted above, "[a] preliminary injunction is an extraordinary remedy . . . and the burden of establishing the propriety of the injunction is on the movant." *Id.* (internal citations omitted). A plaintiff seeking to enjoin government action is subject to the more rigorous standard of showing it is "likely to prevail on the merits." *Planned Parenthood*, 530 F.3d at 732. Phelps-Roper has not met that burden of demonstrating that she has been treated differently from other picketers or protestors who have targeted funerals.

Each of Phelps-Roper's illustrations describes citizens who were allowed within the 300-foot buffer while engaging in "protest activities." Phelps-Roper characterizes the citizens' actions as "protest activities" because the purpose of their presence was to protest Phelps-Roper's message. Even assuming that Phelps-Roper's descriptions of these instances are accurate, the Court need not accept her legal conclusions. If the actions of such third parties can be fairly characterized as "protest activities," no evidence indicates that those activities targeted the funeral or burial service, or was directed at a captive

28

audience that was presumptively unwilling to hear or see the communications. Other than conclusory allegations, Phelps-Roper presents no evidence to show that activities of third parties were the type of focused picketing described in *Frisby* or the type of picketing that the NFPL regulates. Because Phelps-Roper has failed to meet her burden of demonstrating that she is likely to prevail on the merits of these claims, the Court will not enter a preliminary injunction with respect to her as-applied challenges to the NFPL.

## CONCLUSION

The Nebraska Funeral Picketing Law is narrowly tailored to serve a significant government interest, *i.e.*, the protection of family members attending funeral and burial services, and leaves ample alternative channels for Phelps-Roper's communications that are protected by the First Amendment. She has not demonstrated that she is likely to prevail on the merits of her facial or as-applied challenges to the statute, and her motion for preliminary injunctive relief will be denied.

Accordingly,

IT IS ORDERED:

The Motion for Preliminary Injunction (Filing No. 5) and the Proposed Order docketed as a motion (Filing No. 37), submitted by Plaintiff Shirley L. Phelps-Roper against all Defendants, are both denied.


DATED this 21st day of June, 2010.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge

29