**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| SHIRLEY L. PHELPS-ROPER,<br><br>     **Plaintiff,**<br><br>  **vs.**<br><br>**DAVE HEINEMAN, In His Capacity as Governor of the State of Nebraska; JON BRUNING, In His Capacity as Attorney General of the State of Nebraska; DONALD KLEINE, In His Capacity as Douglas County Attorney; ALEX HAYES, In His Capacity as Chief of the Omaha Police Department; and JOHN/JANE DOE(S), in Their Official Capacities;**<br><br>     **Defendants.** | **4:09CV3268**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 223) and Motion in Limine (Filing No. 244) filed by Plaintiff Shirley L. Phelps-Roper ("Phelps-Roper"). Also before the Court is the Motion to Strike (Filing No. 249) filed by Defendants Jon Bruning ("Bruning") and Dave Heineman ("Heineman") (collectively the "State Defendants"). For the reasons stated below, the Motion for Summary Judgment and Motion in Limine will be denied, and the Motion to Strike will be denied as moot.

**PROCEDURAL BACKGROUND**

On December 30, 2009, Phelps-Roper brought this action to enjoin the enforcement of the Nebraska Funeral Picketing Law ("NFPL"), Neb. Rev. Stat. §§ 28-1320.01-1320.03 (Reissue 2006). The NFPL originally prohibited picketing within 300 feet of a funeral. Neb. Rev. Stat. §§ 28-1320.01(1), .03(1) (Reissue 2006). The Court denied Phelps-Roper's Motion for Preliminary Injunction, concluding that the State of

Nebraska (the "State") demonstrated a significant interest in protecting funeral attendees. (Filing No. 116).

Phelps-Roper appealed the decision to the United States Court of Appeals for the Eighth Circuit on July 16, 2010. (Filing No. 119.)  The Eighth Circuit Court initially reversed this Court's decision, concluding that *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008), controlled, and that "since Phelps-Roper was likely to succeed on the merits of her facial challenge under *Nixon*, the district court should have enjoined enforcement of the NFPL." *Phelps-Roper v. Troutman et al.*, 662 F.3d 485, 490 (2011).

The Eighth Circuit Court later granted rehearing *en banc* after it overruled aspects of the *Nixon* case in *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012) (*en banc*).   In *City of Manchester*, the Eighth Circuit said the government's interest in "protecting citizens from unwanted speech" was not limited to a residence and may "extend beyond the privacy of the home."  *City of Manchester*, 697 F.3d at 698.  The privacy interest of "mourners attending a funeral" is "analogous to those which the Supreme Court has recognized for individuals in their homes." *Id.* at 692.  The Eighth Circuit concluded that the ordinance at issue in *Manchester* was constitutional because the government had an interest in protecting citizens attending a funeral. *Id.* at 695. Further, the 300-foot buffer zone contemplated by that ordinance furthered the government interest and was narrowly tailored. *Id.* at 695.

On August 27, 2011, the Nebraska legislature amended the NFPL. The amendment extended the buffer zone from 300 feet to 500 feet. Neb. Rev. Stat. § 28-1302.02 (Reissue 2008 & Cum. Supp. 2012). The NFPL was otherwise unchanged.

The Eighth Circuit issued its opinion with respect to this case after its decision in *City of Manchester*, and after the amendment to the NFPL. *Phelps-Roper v. Troutman*, 712 F.3d 412, 415, 416 (8th Cir. 2013). The Eighth Circuit noted that because the NFPL was amended after Phelps-Roper filed her appeal, this Court did not have an opportunity to address the 500-foot buffer. *Id.* at 416. The Eight Circuit Court concluded that Phelps-Roper's facial and as-applied First Amendment challenges to the amended NFPL should be considered by this Court before being given consideration by the Eighth Circuit. *Id.* at 416-17. Accordingly, the Eighth Circuit remanded the case to this Court to consider the constitutionality of the 500-foot buffer zone, and whether the NFPL was unconstitutionally applied to Phelps-Roper. *Id.* at 417.

## UNDISPUTED FACTS

### I.     Parties

Phelps-Roper is a United States citizen, a resident of Kansas, and a member of the Westboro Baptist Church ("WBC"). As part of her sincerely held religious beliefs, she regularly protests at funerals including funerals of United States soldiers. She has participated in such protests throughout the United States, including Nebraska, and wants to continue her protests in Nebraska.

Heineman is and was at all relevant times the Governor of the State of Nebraska. The civil administration of the laws of the State of Nebraska is vested in the Governor of Nebraska. Bruning is and was at all relevant times the Attorney General of the State of Nebraska. Neb. Rev. Stat. § 84-203 (Reissue 2008) provides, in part, "The Attorney General is authorized to appear for the state and prosecute and defend, in any court or before any officer, board or tribunal, any cause or matter, civil or criminal, in which the

3

state may be a party or interested." Defendants dispute that § 84-203 supports Phelps-Roper's assertion that the Attorney General is responsible for the enforcement of the NFPL.

Donald Kleine ("Kleine") is and was at all relevant times the County Attorney for Douglas County, Nebraska. Kleine has the duty to prosecute criminal actions arising under the laws of the state, based on conduct occurring in Douglas County.  Alex Hayes ("Hayes") was the Chief of Police for the City of Omaha at some of the times alleged in the Third Amended Complaint, but is not the current chief (Kleine and Hayes are referred to collectively as the "Omaha Defendants"). Because Omaha is a Metropolitan Class City, the Omaha police have the power to arrest persons for violations of state laws and city ordinances. *See* Neb. Rev. Stat. §14-606 (Reissue 2012).

## II.    The Nebraska Funeral Picketing Law

The NFPL was enacted on April 4, 2006, and generally provides that "[a] person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral." Neb. Rev. Stat. § 28-1320.03[1]. Before the enactment of LB 284 in 2011, Neb. Rev. Stat. § 28-1320.02(2) provided: "Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church or other place of worship during a funeral."

At a hearing on January 25, 2006, a proponent of the NFPL bill, former Senator Mike Friend, stated: "There is one particular group that travels the nation to a degree, and lately the Midwest, to protest funerals, and notably military funerals. They have visited Nebraska on a couple occasions, and last month, I guess, they were in Papillion.

4

Their speech is utterly despicable and to me it's deplorable." (Filing No. 7 at ECF 38.) At the same hearing, the President of the Nebraska Funeral Directors Association (and general manager of a Lincoln funeral home) requested that the buffer zone proposed in the NFPL bill be increased from 100 to 300 feet, saying: "First and foremost, it would help ensure that the actions and appearance of demonstrators do not interrupt the solemnity of the occasion. Imagine, if you can, the funeral service that was recently held to commemorate the life of Senator Exon being disrupted by a group of demonstrators that did not have the same beliefs as the senator. A distance of 100 feet would have allowed them to gather on the grounds of the Capitol here." (*Id.*) The same person testified: "If [the NFPL bill] were amended to 300 feet, it would still allow for those citizens to exercise their right to protest, yet it would keep them far enough away to shield the families from additional stress and grief." (*Id.* at 38-39.)

In a May 2006 Legislative Research Division's publication, *A Review: Ninety-Ninth Legislature Second Session, 2006*, the NFPL is described as follows:

> Nebraska becomes the sixth state to restrict protests at funerals with the passage of LB 287. The bill responds directly to the actions of the congregants of a small Baptist church in Topeka, Ks., who picket at the funerals of soldiers killed in Iraq and Afghanistan, including at least two in Nebraska, because they believe God is striking down Americans for harboring homosexuals. Members of this church have protested at the funerals of AIDS victims and prominent individuals for years.

(Filing No. 7 at ECF 49-50.)

The language of the NFPL as enacted in 2006 stated:

Section 28-1320.01 – Unlawful picketing of a funeral; legislative findings.

(1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn

the death of relatives are violated when funerals are targeted for picketing or protest activities.

(2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor, the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.

Section 28-1320.02 – Unlawful picketing of a funeral; terms, defined.

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

Section 28-1320.03 – Unlawful picketing of a funeral; penalty.

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor.

Neb. Rev. Stat. §§ 28-1320.01 to 28-1320.03 (Reissue 2006).

On August 27, 2011, the amendment to the NFPL went into effect, and the buffer zone was increased from 300 feet to 500 feet. During a Judiciary Committee Hearing on February 4, 2011, regarding the amendment, Senator Tyson Larson and Senator Bob Krist (sponsor of the bill) had this exchange:

6

> Senator Larson: [500] feet was to try to strike a balance between First Amendment rights and family rights? Is that how you came up with 500 feet or …
>
> Senator Krist: … I believe that in looking at cemeteries around the area, when we truly respect the rights and privilege of those families and those that grieve, 500 feet may be more appropriate for our topography, our terrain, our geography. I think it's a good step in the right direction to enforce that distance.
>
> . . .
>
> Senator Larson: But you wouldn't be opposed to 1,000 or . . .
>
> Senator Krist: Oh, absolutely. I think it would be a great statement to go further than that. . . . But I would balance that, particularly in today's economic times with the potential of a lawsuit, that could balance. But that inherently was my rationale for the 500 foot.

(Filing No. 223-2 at ECF 47-48.)

Robert Swanson, a member of American Legion Post 1 in Omaha, stated during

the same hearing:

> In answer to your question on how we arrived at 500 feet: 500 feet is more than 300 feet. (Laughter) If you would suggest 1,000 feet, I'd be here again, or two miles for that matter. But the bottom line is the more protection, if you will, we can provide for the families of those who are going through what has to be just the most horrific time in their life, I think we have an obligation to do it.

(Filing No. 223-2 at 46.)

During the Floor Debate of February 24, 2011, Senator Krist said:

> LB284, my priority bill for this session is a bill I introduced on behalf of a constituent, Robert Swanson, who is a [member] and past commander of the American Legion Post 1 in Omaha. He also was a founding member of the American Legion Riders. Mr. Swanson worked with my predecessor, Senator Mike Friend, in 2006, to encourage the Legislature to enact laws to prohibit picketing within 300 feet of a funeral or memorial service. Mr. Swanson approached me this past summer and asked me to consider increasing the distance to 500 feet. This consideration I took very seriously, especially because it's based upon his own personal experience

7

and his safety concerns during actual funeral ceremonies that he participated in as a Freedom Rider.

(Filing No. 223-2 at ECF 63.)

During the Floor Debate on February 24, 2011, Senator Gloor said:

I can't imagine . . . in my mind's eye I can't imagine a protest group being within visibility or even sound of that event going on. And to me, 500 feet is not far enough. One-thousand feet, 1,500 feet, 1,500 miles is a little too close. Yet, I trust the judgment on this. I understand the rights of people to freedom of speech, yet on the other hand I am uncomfortable that 500 feet is a distance far too close for an event that we all should honor and respect, for this ... for a military funeral or any funeral as far as that goes. So I'll be monitoring this, asking questions, working with veterans' groups on it. I may, in fact, feel more comfortable coming back to expand on this at some future date.

(Filing No. 223-2 at ECF 66.)

Senator Annette Dubas agreed with Senator Gloor and said "If the body saw fit to expand that distance, I would have no problem supporting that." (*Id.* at ECF 67.) The late Senator Dennis Utter added:

I would say as we move to the more rural parts of our state there should also be consideration for strong justification of moving it on up to the 1,000-feet level as they have in our neighboring state to the north. And I would . . . if there were a movement in this body to increase that space to 1,000 feet, I certainly would support that too.

(Filing No. 223-2 at ECF 72.)

During the Floor Debate of February 24, 2011, Senator Krist said: "And the compelling argument that I heard from the law enforcement is its line of sight. If I can keep the two parties' line of sight away from each other, there's a respect given for the ceremony and a respect given for a person's right to exercise the First Amendment and protest." (Filing No. 223-2 at ECF 66.)

During the Floor Debate of February 24, 2011, Senator Bill Avery said:

8

It's interesting that I follow Senator Adams, because he and I both have spent a lot of time in the classroom probably having to defend this kind of speech. I know I used to have some vigorous debates with my students, because often the kinds of speech that we must be so careful about protecting is the most obnoxious. This kind of protest, as Senator Adams said, does not belong at these funerals. All of us know that. In fact, my office looked into possibly coming forward with some legislation this session, and we were looking at possibly defining this kind of protest as obscenity, and our objective was to bar it altogether. Because what is obscenity? It's foul. It's repulsive. It's detestable. It carries a strong moral repugnance. And I don't know anyone, except perhaps some of the people at Westboro, who would disagree that this is obscene. But Senator Adams is right. The First Amendment protects the most obnoxious speech, the most despicable, the most repulsive. And why is that so? It is important that we understand that if we protect the most repulsive, if we protect the most obnoxious among us through the First Amendment, if we do that than those of us who are more ordinary, those of us who express acceptable speech, those of us who are not going to engage in obnoxious and despicable and repulsive speech can be sure that our right to free speech is protected. One of the great difficulties in a democracy is balancing the rights of the minority against the rights of the majority. I don't think there's any doubt that the majority of us in this country condemn what Westboro group does. We condemn it. We find it repulsive. But if we protect that speech, then those of us who are more mainstream, those of us who are likely to engage in speech that is not so offensive, we can be sure that our right to free speech will be protected. The First Amendment sometimes is inconvenient, but nonetheless, it's important. It's what makes this country a viable democracy that Ronald Reagan used to say: a beacon on the hill. We are an example for the rest of the world because of the very things that we do in this country that other democracies don't do.

(Filing No. 223-2 at ECF 69-70.)

During the Floor Debate of February 24, 2011, Senator Dave Bloomfield said:

We have people going around, torturing the families of folks that have paid the ultimate price. I thank Senator Krist for bringing this bill. I wish it was five miles. If, God forbid, something should happen to my son, I certainly would not pretend to guarantee the safety of anybody protesting that funeral. I know too many of Mark's friends too well to guarantee that safety.

(Filing No. 223-2 at ECF 70.)

During the Floor Debate of February 24, 2011, Senator Krist then said:

9

In my opening I said I bring this on their behalf and for the families. In my closing, I'll talk to it again. I think this is what we need to do. I've been asked, off the mike *[sic, mic]*, at least twice, how did you pick 200? Why didn't you pick 15? Why didn't you pick five miles? Why didn't you pick another state? I drove around in Omaha and looked at the cemeteries that are in my district and those close. And I saw that along the outsides of some of the cemeteries themselves another 200 feet would potentially take you to the next row over, it would allow law enforcement to stand in between. I find that compelling. I find that the distance that we keep between is in the interest of public safety, and I wanted to say that one more time.

(Filing No. 223-2 at ECF 70.)

During the Floor Debate of February 24, 2011, Senator Scott Lautenbaugh said:

Any time we're limiting free speech, we have to be able to articulate why we chose one number over another number. And I think what we're looking at here is, very simply, in too many instances 300 feet is not very far away at all. And this does deal with public safety and this does deal with the rights of those who are there to mourn their lost loved ones. . . . Senator Krist, the 500 feet, how does that improve upon the 300 feet that we currently have?

(Filing No. 223-2 at ECF 70.)

Senator Krist then answered: "I'm told by the sheriffs, by the state association of sheriffs, the state association of funeral directors, and the Freedom Riders, that that extra 200 feet will represent a reasonable buffer. And I have to believe that those professionals that are out there every day can tell us what's appropriate." (Filing No. 223-2 at ECF 71.)

During the Floor Debate on February 24, 2011, Senator Adams said:

And here's how I see it. We picture these protestors at a funeral. We're angry about it. Maybe the first thing we say is this isn't speech. First Amendment says speech--the spoken word maybe. That's what it's supposed to mean. We all know better. A couple of hundred years of history with the First Amendment and the changes that we've experienced in this country say that just the armband is speech, the e-mail is speech, the parade is speech, the dress is speech. The list goes on. So this protest is speech. Now we can stand up and say: but it shouldn't be

protected speech; it's wrong; the First Amendment shouldn't protect speech like this. I would venture to say the First Amendment is designed to protect that speech which we most dislike, more than the speech that we most enjoy. And we dislike this kind of speech. So the First Amendment is there to protect it. The protestors are standing there at the funeral; maybe they're holding up placards. So we ask ourselves then is there a reasonable way to limit this kind of speech? Yes. If the speech is libelous and slanderous it potentially could be ended. If the speech is inciting violence and criminal action it could be prohibited. If the speech is obscene--broad definition there--but it could be limited. If the speech or the protest is an outright incite to violence and presents a clear and immediate danger to the crowd, to the community, to the funeralgoers, it could be stopped right then and there. But I'm going to suggest to you that potentially, in this case, we don't have any of those things. We don't have libel and slander; we don't have obscenity; we don't have an incite to violence. So how can we possibly, in some way, regulate this speech? So I ask you, if someone comes to town, any town, and says I want to march down main street, and I'm going march down main street and I'm not going to say a word, but the way that I dress, the placard that I carry, may be offensive. Do you have the right to walk down main street? Maybe. Does the city have the right to regulate the time of the march, the place of the march, and the manner of the march? Yes. Do they have a compelling interest to? Yes. Do the city authorities in that case have a compelling interest to protect not only the people on the sidewalk, but even the protestors themselves? Yes. Does the city have the right to regulate the time, place, and manner of certain kinds of adult entertainment within a community, by saying that it shouldn't be next to a church, that it shouldn't be next to day care? Is that reasonable? I think it is.

(Filing No. 223-2 at ECF 68-69.)

During the Floor Debate on February 24, 2011, Senator Lautenbaugh said:

And this does deal with public safety and this does deal with the rights of those who are there to mourn their lost loved ones. And I agree with everyone else: I find it horrific that anyone would ever choose to protest anyone's funeral, ever. I just . . .I can't get my head around that and understand why anyone would deem that to be acceptable behavior. But unfortunately we're stuck with tolerating some things that we find repugnant, because that's maybe the ugly side of the freedoms we have.

. . .

But that [fighting words] would have applied in a different time to what we're talking about here, because I can think of no legitimate person . . . or no legitimate reason to harass someone at a funeral.

11

(Filing No. 223-2 at ECF 71-72.)

During the Floor Debate on February 24, 2011, Senator Haar said: "I cannot, for the life of me, understand how these people, you know, come to these funerals time after time. I cannot understand what they're trying to prove or where they're coming from. But they are covered by that free speech." (Filing No. 223-2 at ECF 73.)

Senator Adams then said: "Is there a compelling interest? I think there is. I think there is. And it can be the safety of both parties involved, not only those at the service but the protestor or protestors." (Filing No. 223-2 at ECF 73.) Former Senator Tony Fulton said: "[W]e, through our legislative purview, have the authority to change this law—and we are—primarily for safety reasons . . . ."  (Filing No. 223-2 at ECF 74.)

During the Floor Debate of February 24, 2011, former Senator Brenda Council said:

> As badly as we consider this conduct and this behavior to be, the compelling state interests we are going to be relying on is, in this case, is the public safety interest, and just need to trust that if challenged judicially, that that will be found to be such a compelling interest that warrants the addition of 200 feet to the current statute.

(Filing No. 223-2 at ECF 74-75.)

During the Floor Debate of February 24, 2011, Senator Paul Schumacher said:

> We have, in the situation at hand here, a conflict between rights--the rights of the family to a decent, honorable burial and the people who are in support of the family to express their sentiments, their free speech; and what the courts have told us is a constitutional right on the part of those who are there who might be protesting. The duty of the state is to referee between those two particular situations to ensure that no one gets hurt, to ensure that it is orderly. And when we have the distance of a mere city block without even enough distance to put an intersection between the groups, and when the funeral could be very large and understandably emotionally charged, putting an intersection between them, which just about happens in the case of all cases with the 500-foot standard, gives law enforcement the ability to deploy its resources, to control a situation before someone gets hurt and it gets out of hand, and is necessary in order to maintain a free and orderly society that respects all rights. I did

contact the Platte County sheriff and asked for his opinion whether or not this was necessary. And he said that he felt that he could handle a situation much better and protect public safety to a far greater degree if he had the additional room. . . .

(Filing No. 223-2 at 75.)

During the Floor Debate of February 24, 2011, former Senator Scott Price said:

I did want to hit on conceptualizing 500 feet. What is 500 feet? How do you visualize that and what do you know? So I looked up...I used a trusty computer we have here. I got Google out, and I started measuring some landmarks around that we can...help us visualize what 500 feet is and what it isn't. Five hundred feet--from one side of a football stadium to the other. If you go right over here to Lincoln High School, it's less than 500 feet to be in the bleachers on one side and holler at the other side. How many of us have been to a football game and heard hollering from the opposing fans? It's very easy for your voice to travel that distance. Five hundred feet. Memorial Stadium almost completely fits within 500 feet from the upper deck to the upper deck, going across, obviously, the narrow end--not end zone to end zone. How many of us have been to a game at Memorial Stadium and heard the people on the other side, particularly when we have a chant going on. If you want to be at home and let's say you haven't been to Memorial Stadium and you're up in Omaha, Rosenblatt fits within 500 feet; Caniglia Field is almost less than 300 feet, sideline to sideline. The Qwest parking lots where they're putting in the new ball diamond is less than 500 feet. Or as Senator Schumacher said: one city block. It's not an impairment for other opposing teams to be heard, but what it does do again, it does provide that buffer for the family. I just wanted to share that with the members so they knew what 500 feet was going to be and what it wasn't going to be.

(Filing No. 223-2 at ECF 76.)

During the Floor Debate on February 24, 2011, Senator Brasch said: "It's a sad day in our country that we need to legislate respect and honor in our communities."

(Filing No. 223-2 at ECF 76.)

During the Floor Debate of February 24, 2011, Senator Lydia Brasch said:

I do believe that a family who has lost someone has a right to privacy to mourning in their own way without stepping on the toes of our constitution. I believe we are recognized globally as a kind, compassionate, and caring nation who renders assistance and helps our neighbors and countries,

that certainly, you know, this day, 500 feet at a minimum, more distance or just common sense to please stay away from our cemeteries.

(Filing No. 223-2 at ECF 76.)

During the Floor Debate of February 24, 2011, Senator Tom Carlson said:

And it's so easy, on a topic like this, for me to get into a frame of mind that we need to push them as far away as we can possibly push them--1,000 feet, 1,500 feet, or whatever it is--and shut them off. And then the good part of this discussion is we get balance. And I've spoken other times on this floor about the wonderful privilege that we have in freedom of speech, and we need to protect that to the very, very end. So with that in light, I think that this bill has been well-thought-out and it is about what it should be. I did contact law enforcement in my district and just asked them what their opinion was, and certainly they are in full support of the bill and would be in support of a distance that is even greater.

(Filing No. 223-2 at ECF 76-77.)

During the Floor Debate of February 24, 2011, Senator Pete Pirsch said: "… And as I think as we look at what the nature of the action in [sic] and weigh the compelling interests, I think those greater distances [1,000 feet, 1,500 feet] are ultimately going to be found to be constitutional. I think in the future we should consider those as well." (Filing No. 223-2 at ECF 77.) During the Floor Debate of February 24, 2011, Senator Jim Smith and Senator Krist had this exchange:

Senator Smith: Once the group or the family members arrive at the site of the funeral, is the distance the radius from the grave site?

Senator Krist: Technically, I think the actual ceremony is the center of the distances, and the actual ceremony being the burial or internment, and then that . . . I forget . . . it's one hour prior and two hours after the event that those distances stay in place.

(Filing No. 223-2 at ECF 78.)

During the Floor Debate of February 24, 2011, Senator Jim Smith also said:

. . . So you know, with the size of these funerals, you know, there could definitely be, in such a relatively confined space, intermingling of the

14

protestors with the family members and the people that are there to show their respects. And I believe my position on this, just … not only just from a human decency perspective, but there is a public safety issue here . . . ."

(Filing No. 223-2 at ECF 78.)

During the Floor Debate of February 24, 2011, Senator Krist closed the debate saying: ". . . I do appreciate all the questions and our deliberate, consistent attempt to show that we are serious about public safety and about the distance increasing to facilitate that public safety." (Filing No. 223-2 at ECF 79.)

### III.   WBC Protesting Activity

As of April 2014, the WBC participated in over 52,000 picketing activities since about 1990, including approximately 590 funeral-related pickets. Phelps-Roper and other WBC picketers engaged in picketing related to funerals, including funerals of military members. Phelps-Roper and other WBC members engaged in several pickets in Nebraska related to funerals between June 23, 2005, and April 2014, and they participated in over such 80 pickets since 1995. The United States Supreme Court has held that the content of WBC's picket signs relates to broad issues of interest to society at large, including the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy. *Snyder v. Phelps*, 131 S. Ct. 1207, 1216-17 (2011). Phelps-Roper never picketed inside the 300-foor buffer zone at a funeral-related picket in Nebraska after April 4, 2006. No member of the WBC, including Phelps-Roper, was arrested, charged or convicted for violating the NFPL. In support of her as-applied challenge, Phelps-Roper

15

detailed several instances of picketing. These instances, to the extent they are undisputed and supported by evidence in the record, are summarized below[1]:

- On July 23, 2005, WBC picketers conducted a funeral-related picket in Omaha, standing across and down the street from the church 30 minutes before the funeral started. On that day, at the time the WBC picketers were present, a woman who identified herself as the mother of the deceased crossed the street to the WBC picketers, saying she hated the war as much as they did, but it wasn't the time and place to demonstrate.

- On November 10, 2005, WBC members conducted a visitation-related picket in Beatrice, standing more than a block away, or nearly 500 feet away, 45 minutes before the visitation started.

- On December 10, 2005, WBC picketers, excluding Phelps-Roper, conducted a funeral-related picket in Papillion, standing at an intersection, across the street and approximately 500 feet from the high school property entrance where the funeral was held, 30 minutes before the funeral started. At the same time WBC was picketing, at least 50 other persons were on the school-side of the street, with flags and/or signs. At that picket, the father of the deceased soldier walked down the street, across the intersection, and up to the WBC picketers, offering them sheets of paper with Bible verses, and making comments to the WBC picketers about his religious views.

- On February 25, 2006, WBC picketers, excluding Phelps-Roper, conducted a funeral-related picket in Lincoln, standing across and down the street from the church, 30 minutes before the funeral started. The funeral was attended by U.S. Senator Chuck Hagel, U.S. Senator Ben Nelson, Defendant Heineman, Rep. Jeff Fortenberry and Lincoln Mayor Coleen Seng.

- On May 28, 2006, WBC picketers conducted a funeral-related picket in Bellevue, standing 300 feet from the curb line with the chapel set hundreds of feet off the road, 45 minutes before the funeral started. Phelps-Roper did not attend this picket, but asserts that at the same time WBC picketers were there, hundreds of others engaged in protest activity directly in front of the chapel, including on the sidewalk immediately in front of the chapel, with flags and/or signs.

- On June 20, 2006, WBC picketers conducted a funeral-related picket in Beatrice. At the time WBC picketers were there, hundreds of others were directly in front of the church, including on the sidewalk and in the street, with flags and/or signs. Part way through the WBC picket on June 20, 2006, some of the others who had

---

[1] In each instance, Phelps-Roper notes a time frame. It is unclear, however, whether her reference indicates the length of time the picketers engaged in their picketing activity, or the time the picketing began or ended in relation to the funeral or other event.

16

been in front of the church came down the street and stood across the street from the WBC picketers.

- On June 25, 2006, WBC picketers planned to conduct a funeral-related picket in the Village of Clarks in Merrick County. Phelps-Roper claims that local law enforcement applied the NFPL so broadly that WBC picketers were not able to conduct the picket.[2]

- On July 8, 2006, WBC picketers conducted a funeral-related picket in Omaha, standing at least 300 feet away, such that the funeral event was out of the picketers' sight, 45 minutes before the funeral started. Phelps-Roper did not attend this picket. At the time WBC picketers were present, hundreds of others stood in front of the church, including on the sidewalk, with signs and/or flags. For a period of time during the picket, others who had been in front of the church came down Farnam Street directly across the street from WBC picketers on the sidewalk and in the street.

- On August 10, 2006, WBC picketers conducted a funeral-related picket in Pender, standing at least two blocks from the church, in a park, surrounded by law enforcement, 45 minutes before the funeral started. Phelps-Roper did not attend this picket. At the same time WBC picketers were present, at least one hundred others were directly in front of the church, with flags and/or signs.

- On September 5, 2006, WBC picketers conducted a funeral-related picket in Minden, standing at least 300 feet away, down the block from the church and behind a line marked in paint by officials, 45 minutes before the funeral. At the same time WBC picketers were present, hundreds of others stood directly in front of the church, including on the sidewalk and on the street, some on motorcycles with engines running, and some with flags and/or signs. The funeral was attended by Rep. Tom Osborne and Lt. Gov. Rick Sheehy.

- On February 16, 2007, WBC picketers conducted a funeral-related picket in McCook, standing at least 300 feet from the McCook City Auditorium, surrounded by law enforcement, 45 minutes before the funeral started. Phelps-Roper did not attend this picket. At the same time WBC picketers were present, dozens of others were directly in front of the auditorium, including on the sidewalk and in the street, some on motorcycles with engines running/rumbling, with flags and/or signs. For a period of time during the picket, the others nearer the church came down to be nearer the WBC picketers.

- On April 17, 2007, WBC picketers conducted a funeral-related picket in York, standing more than 600 feet from the York City Auditorium in a place marked with tape by law enforcement, 45 minutes before the funeral started. Phelps-

---

[2] All claims against Defendants Anthony McPhillips and Steven M. Curry, law enforcement in Merrick County, were dismissed with prejudice (Filing No. 117).

Roper did not attend this picket. At the same time WBC picketers were present, hundreds of other people stood directly in front of the auditorium, including on the sidewalk and in the street, with flags and/or signs. Approximately 30 minutes into the WBC picket of April 17, 2007, some of the others near the auditorium moved down the street to stand nearer the WBC picketers, across the street (on the auditorium side).

- On June 5, 2007, WBC picketers conducted a funeral-related picket in Bellevue, standing between 500 and 1200 feet from the church, in a small area on the sidewalk marked in paint by law enforcement, 45 minutes before the funeral started. At the same time WBC picketers were present, at least 700 others were directly outside the building, along the drive and the sidewalk in front of the property and church, with flags and/or signs, along with 35 fire trucks, ambulances and other utility trucks from 11 agencies.

- On October 31 and November 1, 2008, WBC picketers planned to conduct funeral-related pickets in Cass County. Phelps-Roper claims that the actions of local officials under the statute prevented WBC picketers from conducting these pickets.[3]

- On June 22, 2010, WBC picketers conducted a funeral-related picket in Plattsmouth, standing several hundred feet from the building, as directed by law enforcement, 45 minutes before the funeral started. At the same time WBC picketers were present, dozens of others were immediately in front of the church, with flags and/or signs. Part way into the picket, the others who had been near the church came to the intersection where WBC picketers were standing, and stood on at least three corners of the intersection, yelling and chanting.

- On August 28, 2010, WBC picketers conducted a funeral-related picket in Omaha, standing away from the church, 45 minutes before the funeral started. At the same time WBC picketers were present, dozens of others were directly in front of the church, including on the sidewalk in front of the church, with flags and/or signs. Before the picket began, WBC asked law enforcement to keep a buffer or separation between picketers and counter picketers. Phelps-Roper asserts that this request was refused. During the picket, others (besides those directly in front of the church) surrounded and commingled with WBC picketers on both corners of the intersection, with law enforcement present. WBC picketers asked law enforcement to prevent others from crowding and jostling WBC picketers. Law enforcement declined the request. Near the end of the picket, a man drove by in a truck and sprayed bear mace, presumably targeted at the WBC picketers, instead hitting counter picketers and law enforcement. The man who sprayed the bear mace was caught and prosecuted.

---

[3] Phelps-Roper's claims against Cass County officials were dismissed with prejudice. (Filing No. 194.)

- On November 12, 2010, WBC picketers conducted a funeral-related picket in Omaha, standing hundreds of feet from where the funeral was held, 45 minutes before the funeral started. Phelps-Roper did not attend this picket. At the same time WBC picketers were present, at least 300 others stood within 150 feet of the church where the funeral was held, with flags and/or signs.

WBC engaged in other protests in Nebraska after the amendment to the NFPL extended the protest buffer-zone from 300 feet to 500 feet:

- On September 17, 2011, WBC picketers conducted a funeral-related picket in Pierce, standing several hundred feet from the property where the funeral was held, 45 minutes before the funeral started, surrounded by barricades and law enforcement officials. Phelps-Roper did not attend this picket. At the same time WBC picketers were present, dozens of others stood in front of the church, lining the streets, with flags and/or signs. During the picket, others, besides those in front of the church, came to the area where WBC was picketing, and stood across the street throughout the picket.

- On October 13, 2011, WBC picketers conducted a funeral-related picket in Omaha, standing several hundred feet from the property where the funeral was held, 45 minutes before the funeral. At the same time WBC picketers were present, at least 120 other people stood directly outside the church, with flags and/or signs.

- On July 6, 2012, WBC picketers conducted a funeral-related picket in York, standing several blocks from the church where the funeral was held, in an area set up by law enforcement with yellow tape, 45 minutes before the funeral started. At the same time WBC picketers were present, hundreds of other people stood directly outside the church, lining the sidewalks and streets; and later stood in the cemetery immediately by the burial site, with flags and/or signs.

- On August 13, 2012, WBC picketers conducted a funeral-related picket in Ashland, standing on a walking trail several hundred feet from the property where the funeral was held, 45 minutes before the funeral started. Plaintiff did not attend this picket. At the same time WBC picketers were present, hundreds of people stood immediately outside the high school where the funeral was held, including on sidewalks, with flags and/or signs, alongside two large fire truck ladders holding up a very large American flag.

At the WBC picketing activities at issue in this case, discussed above, the number of WBC picketers ranged from 3 to 16. Phelps-Roper and other WBC picketers have never picketed at a cemetery/burial in Nebraska.

19

## MOTION IN LIMINE

The State has identified three witnesses, Dr. Scott A. Bresler ("Bresler"), Ms. Phyllis V. Larsen ("Larsen"), and Mr. James Davidsaver ("Davidsaver"), as experts it intends to call to testify at trial. Phelps-Roper argues that the testimony of each of the State's designated experts is not reliable and should be ruled inadmissible. Phelps-Roper seeks an order in limine preventing these witnesses from testifying at trial, or from their reports being admitted as exhibits or referred to in any manner.

Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts "in admitting expert testimony, [have] the gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *First Union Nat. Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999)); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert,* 509 U.S. at 592).

20

District courts have "broad discretion" in determining whether an expert's testimony is admissible. *Weisgram v. Marley Co.,* 169 F.3d 514, 518 (8th Cir. 1999). Regardless of the factors the court evaluates in determining the admissibility of expert testimony, "the main inquiry is whether the proffered expert's testimony is sufficiently reliable." *First Union Nat. Bank*, 423 F.3d at 861 (citing *Unrein v. Timesavers, Inc.,* 394 F.3d 1008, 1011 (8th Cir. 2005) ("There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant"). "An expert's opinion should be excluded only if that 'opinion is so fundamentally unsupported that it can offer no assistance to the jury.'" *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (quoting *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001)). "[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Miles v. General Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001). This is particularly true in the context of a bench trial, where the *Daubert* gatekeeping function is lessened. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301–02 (Fed. Cir. 2002); *Gibbs v. General American Life Ins. Co.,* 210 F.3d 491, 500 (5th Cir. 2000); *Bublitz v. E.I. duPont de Nemours & Co.*, 4-00-CV-90247, 2002 WL 34371191, at *5 (S.D. Iowa Mar. 8, 2002). The Court will consider these standards with respect to each of the designated experts.

## I.    Dr. Scott Bresler

Phelps-Roper argues that Bresler's report has no probative value and contains hearsay from family members and strong emotive language, making the report prejudicial and unreliable. With respect to hearsay, "[t]he facts or data that form the basis for an expert opinion 'need not be admissible in evidence' in order for the expert's

21

opinion to be admitted so long as the evidence is a type reasonably relied on by the experts in the field." *United States v. LeClair*, 338 F.3d 882, 885 (8th Cir. 2003) (citing Fed. R. Evid. 703). "Once expert testimony has been admitted, the rules of evidence then place the full burden of exploration of facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." *Ratliff v. Schiber Truck Co.*, 150 F.3d 949, 955 (8th Cir. 1998).

The State has shown that Bresler's statements may be relevant to demonstrate the State's interest in protecting funeral attendees.[4] Phelps-Roper will have an opportunity to attack Bresler's report and testimony on cross-examination and through her own evidence. Accordingly, the Court will not issue an order in limine as to Bresler.

## II.   Ms. Phylllis V. Larsen

The State designated Larsen as an expert to testify on the availability of alternative methods of conveying the WBC message. Phelps-Roper argues that Larsen is in no position to speak to this issue because "[i]t is not [Larsen's] sincerely held religious belief that WBC is heart-bound to publish." (Filing No. 245 at 7.) Phelps-Roper apparently suggests that only a WBC member is in a position to testify as to whether alternative forms of communication are sufficient to convey their beliefs. However, Larsen's opinion directly relates to the ultimate issue of whether the NFPL leaves ample alternatives for dissemination of Phelps-Roper's message. *See* Fed. R. Civ. P. 704(a). Phelps-Roper has not demonstrated that Larsen's testimony is unreliable, and Phelps-Roper can attack Larsen's conclusions on cross-examination and through the

---

[4] See discussion regarding the State's significant governmental interest below.

presentation of contrary evidence. Accordingly, the Court will not issue an order in limine as to Larsen.

## III.   Mr. James Davidsaver

Phelps-Roper acknowledges Davidsaver's general experience in law enforcement and crowd control. However, Phelps-Roper argues that Davidsaver's testimony is not reliable because there is no indication that he had any experience in dealing with picketers or counter-picketers. Thus, Phelps-Roper argues that Davidsaver's opinion is abstract and generalized regarding the necessity of a 500-foot buffer zone for funeral picketing. These objections go to the factual basis of Davidsaver's testimony. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Synergetics*, 477 F.3d at 955-56 (quoting *Bonner,* 259 F.3d at 929). Because Phelps-Roper's objections go to Davidsaver's credibility, the Court concludes that cross-examination and the presentation of contrary evidence is sufficient to attack Davidsaver's testimony. Accordingly, the Court will not issue an order in limine as to Larsen.

**SUMMARY JUDGMENT**

**STANDARD OF REVIEW**

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "Summary Judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n. 2 (8th

23

Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S.Ct. 513 (2011)) (internal quotations omitted). In reviewing a motion for summary judgment, the court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id*. at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042) (internal quotations omitted). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1042) (internal quotations omitted). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)) (internal quotations omitted).

**DISCUSSION**

The NFPL, as it currently reads, states:

Section 28-1320.01 – Unlawful picketing of a funeral; legislative findings.

(1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.

(2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor, the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.

Section 28-1320.02 – Unlawful picketing of a funeral; terms, defined.

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within five hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

Section 28-1320.03 – Unlawful picketing of a funeral; penalty.

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor.

Neb. Rev. Stat. §§ 28-1320.01 to 28-1320.03 (Reissue 2008 & Cum. Supp. 2012).

The only meaningful change to the statute since the Court first addressed the NFPL, and since the NFPL was first enacted, was the expansion of the funeral buffer-zone to 500 feet. Following this amendment, and in light of the Eighth Circuit's holding in *Phelps-Roper v. City of Manchester, Mo.* 697 F.3d 678 (8th Cir. 2012), the Eighth Circuit remanded this case. The Eighth Circuit explained that it would not evaluate the amended NFPL, and concluded "that the better course is to afford the district court an opportunity to make appropriate findings of fact and conclusions of law before evaluating the validity of the new statute." *Phelps-Roper v. Troutman*, 712 F.3d 412, 417 (8th Cir. 2013). Accordingly, the Court will address whether, as a matter of law, Phelps-Roper has successfully challenged the NFPL on its face and as applied to her.

## I. Facial Challenge to the NFPL

### a. Level of Scrutiny

The Court must first determine the level of scrutiny it must apply in reviewing Phelps-Roper's facial challenges. The Court previously concluded that the NFPL should

26

be reviewed under intermediate scrutiny because the statute was content-neutral. (Filing No. 116 at 9-10.) The Court incorporates its previous analysis here, and includes further discussion to address new arguments and evidence submitted by Phelps-Roper. Phelps-Roper cites extensive legislative history, apparently to demonstrate, in part, that the specific purpose of the NFPL was to silence Phelps-Roper's speech. However, when deciding whether a statute is content-neutral, courts looks to the plain meaning of the statute, and the "legislature's specific motivation is not relevant, so long as the provision is neutral on its face." *City of Manchester, Mo.* 697 F.3d at 688 (quoting *Nixon*, 545 F.3d at 691). The United States Supreme Court has explained that "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989).

The Eighth Circuit has expressly determined that funeral picketing statutes are not content-based merely because they target funeral pickets and were enacted for the purpose of silencing the WBC's speech. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690-91 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012). In *City of Manchester*, the Eighth Circuit held that the funeral picketing law at issue was similar to the ordinance in *Thorburn v. Austin,* 231 F.3d 1114, 1117 (8th Cir. 2000), and was content-neutral because it applied "equally to anyone engaged in focused picketing without regard to his message." 697 F.3d at 689. In *Thornburn*, the Eighth Circuit analyzed a picketing ordinance that stated: "The practice of **focused** picketing before or about a dwelling, **targeted** at the occupant or occupants of such dwelling, causes emotional disturbance and distress to the occupant

or occupants, [and] disturbs the sense of peace and tranquility traditionally enjoyed by individuals in their dwellings." *Thorburn*, 231 F.3d at 1116 (emphasis added). The Eighth Circuit determined that this language did not express disagreement with a particular message and applied "equally to anyone engaged in focused picketing without regard to his message." *Id.* at 1117.

Like the funeral picketing laws addressed in *City of Manchester*, *Nixon*, *Thornburn*, and other cases, the NFPL is neutral on its face. Phelps-Roper's principal argument, as before, is that unlike other funeral picketing laws, the NFPL includes the term "targeted" in § 28-1320.01(1). However, as noted in *Thornburn*, the term "targeted" does not conclusively mean that a statute is content-based. Similar to the ordinance in *City of Manchester*, the NFPL "makes 'no reference to the content of the speech' and is only a 'regulation of the places where some speech may occur.'" *City of Manchester*, 697 F.3d at 689 (quoting *Hill v. Colorado,* 530 U.S. 703, 716 (2000)). Under the NFPL, "[a] person may be regulated under the [statute] for disrupting or attempting to disrupt a funeral or burial service with speech concerning any topic or viewpoint." *Id.* The asserted purpose of the NFPL—protecting the rights of families to mourn the death of relatives in peace and privacy—is unrelated to the content of the speech. *See id.* Accordingly, the Court concludes that the NFPL is content-neutral and intermediate scrutiny is the appropriate standard for analyzing Phelps-Roper's First Amendment claims. *See id.*

In her Reply Brief, Phelps-Roper cites the recently decided Supreme Court case, *McCullen v. Coakley*, 134 S. Ct. 2518, 2523 (2014), arguing that the NFPL's 500-foot buffer zone was similar to the unconstitutional 35-foot buffer zone contemplated in

*McCullen*. In *McCullen*, the Supreme Court considered a facial challenge to a Massachusetts statute which made it a crime to knowingly stand on a public way or sidewalk within 35 feet of an entrance or driveway to any non-hospital facility where abortions were performed. *McCullen*, 134 S.Ct. at 2525. The petitioners in *McCullen* were "individuals who approach and talk to women outside such facilities, attempting to dissuade them from having abortions." *Id.* Considering the "special position" of sidewalks and public ways in terms of First Amendment protection, the Supreme Court invalidated the statute. *Id.* at 2529, 2532-33.

Phelps-Roper argues that she is in the same position as the petitioners in *McCullen* because she seeks to deliver a specific message to those attending the funeral and individuals participating in patriotic events outside the funeral. However, the Supreme Court specifically distinguished the petitioners in *McCullen* from those engaged in protest activity. The Supreme Court explained:

> Some of the individuals who stand outside Massachusetts abortion clinics are fairly described as protestors, who express their moral or religious opposition to abortion through signs and chants or, in some cases, more aggressive methods such as face-to-face confrontation. Petitioners take a different tack.
>
> . . .
>
> Petitioners are not protestors.

*Id.* at 2527, 2536.

Unlike the petitioners in *McCullen*, Phelps-Roper does not dispute that she is a protester. There is no evidence that Phelps-Roper attempts to communicate her message through a "caring demeanor, a calm tone of voice" like the petitioners in *McCullen*. *Id.* at 2527. Rather, as part of her sincerely held religious beliefs, Phelps-

29

Roper regularly engages in protest activity. Phelps-Roper, as a protester, is in a position factually distinct from that of the petitioners in *McCullen*. Further, The Supreme Court has stated that the "[WBC]'s choice of where and when to conduct its picketing is not beyond the Government's regulatory reach—it is 'subject to reasonable time, place, or manner restrictions.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1211-12 (2011) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984)). Thus, the holding in *McCullen* is not dispositive of Phelps-Roper's claims and the Court must determine whether the NFPL subjects Phelps-Roper's speech to reasonable restrictions.

### b.    Application of Intermediate Scrutiny to Facial Challenge

To survive intermediate scrutiny, a statute must (1) be narrowly tailored to serve a significant governmental interest, and (2) allow for ample alternative channels for communication. *City of Manchester*, 697 F.3d at 689 (citing *Ward*, 491 U.S. at 791). Based on Eighth Circuit precedent, the Court concludes that the NFPL advances a significant governmental interest. However, factual issues remain as to whether the NFPL is narrowly tailored and allows for ample alternative channels for communication.

### 1.    Significant Governmental Interest

With regard to "significant governmental interests," the Eighth Circuit has held that "mourners attending a funeral or burial share a privacy interest analogous to those which the Supreme Court has recognized for individuals in their homes, and for patients entering a medical facility." *City of Manchester*, 697 F.3d at 692 (internal citations omitted). The Eighth Circuit reasoned that "[a] significant governmental interest exists in protecting their privacy because mourners are in a vulnerable emotional condition and

30

in need of 'unimpeded access' to a funeral or burial, quite like the patients entering medical facilities protected in *Hill.*" *Id.* (citing *Hill,* 530 U.S. at 715, 729).

The express purpose of the NFPL is to protect the privacy of grieving families and preserve the peaceful character of funerals, balanced against the rights of protesters and picketers. Neb. Rev. Stat. § 28-1320.01(2). Thus, like the ordinance in *City of Manchester*, the NFPL advances the "significant government interest in protecting the peace and privacy of funeral attendees for a short time and in a limited space so that they may express the 'respect they seek to accord to the deceased person who was once their own.'" *Id.* at 693 (quoting *National Archives & Records Administration v. Favish*, 541 U.S. 157, 168 (2004)).

### 2.    Narrowly Tailored

"A law regulating the time, place, or manner in which protected speech may occur 'must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . need not be the least restrictive or least intrusive means of doing so.'" *Phelps-Roper v. Koster*, 713 F.3d 942, 951 (8th Cir. 2013) (quoting *Ward,* 491 U.S. at 798). "However, the regulation may not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward,* 491 U.S. at 799). "Whether [a law] is narrowly tailored or not depends on what it seeks to regulate." *City of Manchester*, 697 F.3d at 693 (citing *Ward*, 491 U.S. at 798–99). Recent Eighth Circuit precedent demonstrates that the NFPL is narrowly tailored in several aspects. However, issues of fact remain as to whether the State's interest justifies a 500-foot buffer zone. *See McTernan v. City of York, PA*, 564 F.3d 636, 656 (3d Cir. 2009) (concluding that even where a court identifies a significant government

31

interest as a matter of law, factual issues on whether a law is narrowly tailored preclude summary judgment).

<em>a. Narrowly Tailored Aspects of the NFPL</em>

The NFPL is narrowly tailored in several ways. It states that a "person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral." Neb. Rev. Stat. § 28-1320.03(1). Time limitations similar to the NFPL's have been held to be narrowly tailored. *See City of Manchester*, 697 F.3d at 694. Further, the NFPL's time restriction is more narrow than other funeral picketing statutes because it terminates two hours from the commencement of the funeral, and does not depend on the time the funeral ends, which may vary from funeral to funeral. *See id.* (stating that ordinance was narrowly tailored because the restriction had a specific, limited time and a short duration).

The NFPL defines funeral to mean "ceremonies and memorial services held in connection with the burial or cremation of the dead," but specifically excludes funeral processions. Neb. Rev. Stat. § 28-1320.02(1). The NFPL is thus narrowed by eliminating any restriction on "floating zones."  *See City of Manchester*, 697 F.3d at 694 (stating that the ordinance was narrowly tailored because it eliminated restrictions on protesting funeral processions). Further, this definition limits protesting restrictions to an event rather than a location. *See id.* (stating that an ordinance was narrowly tailored because it restricted events rather than locations, and permitted protesters to picket through the area for most of the day, while placing a relatively brief restriction on speech).

32

The NFPL defines picketing of a funeral to mean "protest activities engaged in by a person or persons located within five hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral." Neb. Rev. Stat. § 28-1320.02(2). Phelps-Roper argues that the NFPL is not narrowly tailored because the definition of "picketing" is vague. The Eighth Circuit recently addressed Phelps-Roper's arguments with regard to the term "protest activities" in *Phelps-Roper v. Koster*, 713 F.3d 942, 951-52 (8th Cir. 2013). In *Koster*, Phelps-Roper argued that the Missouri statute at issue burdened more speech than necessary because the phrase "picketing and other protest activities" was not limited to speech which targeted and disrupted a funeral. *Id.* at 951-52. Following the principle that a court must "interpret statutes to avoid constitutional issues," the Eighth Circuit narrowly construed the Missouri statute to exclude "picketing and protest activities unwittingly occurring in the buffer zone." *Id.* at 952. Following the same principle of statutory interpretation, the NFPL is subject to a narrowing construction that avoids constitutional difficulties. Further, the NFPL limits its restrictions to picketing directed at or targeting a funeral for a relatively short period of time. The Court concludes that the NFPL is narrowly tailored in each of these aspects.

### b. The NFPL's 500-Foot Buffer Zone

A key difference between the NFPL and the ordinance at issue in *City of Manchester*, *Koster*, and others cases is the size of the buffer zone. In *City of Manchester*, the Eighth Circuit concluded that the city's significant interest in protecting the privacy of funeral attendees justified a 300-foot restriction "for a specific limited time and a short duration." *City of Manchester*, 697 F.3d at 693. The Eighth Circuit cited several cases in which a specified restricted area was held to be constitutional. *Id.*

33

(citing *Boos v. Barry*, 485 U.S. 312, 329–32 (1988) (holding that a 500-foot restriction on congregating outside foreign embassies was narrowly tailored to protect security interests); *Hill*, 530 U.S. at 726 (upholding a 100-foot buffer zone around health care facilities to protect patient privacy), *Frisby v. Schultz*, 487 U.S. 474, 485-88 (upholding a restriction on protests "before or about" a home to protect residential privacy)). The Eighth Circuit has held that buffer zones would likely restrict more speech than necessary if no time limits were set for the restrictions on protest activity. *Id.* (citing *Kirkeby v. Furness*, 92 F.3d 655, 660-61 (8th Cir. 1996). The Eighth Circuit explained that the ordinance at issue in *City of Manchester* was distinguished from the law addressed in *Kirkeby* because the Manchester ordinance was limited in time. *Id.* The Eighth Circuit also noted that the "size of a buffer zone necessary to protect the privacy of an entire funeral gathering can be expected to be larger than that necessary to protect the privacy of a single residence . . . ." *Id.* (citing *Phelps-Roper v. Strickland*, 539 F.3d 356, 371 (6th Cir. 2008))(internal citations omitted).

Phelps-Roper argues that the Nebraska Legislature's stated reason for the 500-foot buffer—public safety—was pretextual, and that its true purpose in increasing the distance to 500 feet was to move WBC picketers as far from funerals as possible to silence their speech. Phelps-Roper argues that the Legislature's public safety concern was unfounded and there was scant evidence that any funeral attendees were threatened or harmed.[5] *See, e.g. Hill*, 530 U.S. at 710 (describing confrontational

---

[5] Phelps-Roper states that the only instance of harm was an incident on August 28, 2010, when a man sprayed bear mace on protesters, including law enforcement. Phelps-Roper states that it appeared the WBC was the intended target, and that the man was prosecuted and convicted. Phelps-Roper argues that his conviction demonstrates other ways to improve public safety without extending the buffer zone to 500 feet.

interactions between anti-abortion protesters and patients entering a clinic). In support of her assertion, Phelps-Roper identifies several statements in the legislative record suggesting that the true purpose of the 500-foot buffer zone was to prevent the WBC from picketing at funerals. She also points to the dearth of legislative discussion regarding public safety and the lack of any actual incidents of risk to public safety during any WBC protest in Nebraska.

The State argues that its significant governmental interest in protecting mourners at a funeral justifies a 500-foot buffer zone. In support of its position, the State submits expert reports from two experts whom it intends to call at trial. The State identified Dr. Bresler as an expert in forensic psychology. (*See* Filing No. 238-2 at ECF 2.) The State argues that Bresler's testimony will show that funeral attendees suffered feelings of anxiety because they could see WBC picketers during the funeral, and a 500-foot buffer zone would provide better protection. (*Id.* at ECF  2-3, 6.) The State also has identified James Davidsaver as an expert on crowd management. (Filing No. 238-3.) The State argues that Davidsaver's testimony will further support the need for a 500-foot buffer zone. Davidsaver's expert report states "[a] buffer zone of five hundred feet would reasonably accommodate all involved. This buffer allows funeral attendees to pay their final respects and protestors to exercise their free speech rights with minimal disruption to the community at large." (Filing No. 238-3 at ECF 3.) The State also argues that the legislative history supports the need for a 500-foot buffer because it provides insight into the reasons a 500-foot buffer is particularly necessary in the State of Nebraska.

Whether the NFPL's 500-foot buffer is narrowly tailored to advance the State's legitimate interest in protecting funeral attendees is a factual question and inappropriate

35

for summary judgment. The credibility of each party's witnesses, and the weight to be afforded to each party's evidence, must be determined before the Court can decide whether the 500-foot buffer is justified. Accordingly, summary judgment will not be granted on this issue.

### 3.    Adequate Alternatives for Communication

Phelps-Roper argues that the NFPL fails to leave ample alternatives for communicating her message because it prevents her and the WBC from communicating with their target audience at the relevant time. Phelps-Roper explains that the purpose of a funeral-related picket is to convey a specific message about the death and the funeral, which can only be conveyed near the time and location of the funeral. In examining the ordinance at issue in *City of Manchester*, the Eighth Circuit stated:

> The narrow tailoring of Manchester's ordinance becomes even clearer upon examination of the closely related question of whether it leaves open "ample alternative channels" for speakers to disseminate their message. Manchester does not restrict individuals from publicizing their views. Like the protesters in *Frisby,* individuals "may go door-to-door to proselytize their views," "may distribute literature ... through the mails," and "may contact residents by telephone." 487 U.S. at 483–84, 108 S.Ct. 2495 (citation omitted). Dissemination of a message by letters to the editor or the internet is also possible. A picketer's speech is not restricted in its content and may be freely expressed anywhere in the city except during a short period immediately surrounding a funeral service. Otherwise individuals may picket in Manchester wherever and whenever they desire. Speakers retain great latitude to express any viewpoint or discuss any topic at nearly any location and nearly any time in the city of Manchester.

*City of Manchester*, 697 F.3d at 695 (citations omitted).

Phelps-Roper attempts to distinguish the NFPL from the ordinance in City of Manchester by arguing that "[i]f picketers are moved so far from the funeral that it is impossible for the public to tie the message to that event, the same message is not conveyed, and that is not an ample alternative." (Filing No. 223-1 at 61.) With respect to

ample alternatives, this argument is unavailing. Like the ordinance at issue in *Frisby*, 487 U.S. at 484, the NFPL does not completely ban protesters from the area surrounding the funeral or even from direct contact with mourners outside of the designated time period. Protesters can go door to door to spread their message and may use mail and telephone to contact their audience. *See id.* at 484. Like the ordinance at issue in *City of Manchester*, the NFPL "does not limit speakers or picketers in any manner apart from a short time and narrow space buffer zone around a funeral or burial service." *City of Manchester*, 697 F.3d at 695.

The State has identified Professor Phyllis V. Larsen as a witness who will testify about whether the NFPL prevents Phelps-Roper from spreading her message. (*See* Filing No. 238-4.) Larsen's report indicates that "the plaintiff is not hindered by the law restricting picketers to remain 500 feet away from funerals because effective communication is not dependent on close physical proximity of the message sender and the intended recipient." (*Id.* at ECF 3.) Phelps-Roper submits evidence that these types of alternative communication are not sufficient to publish her message. The competing evidence creates an issue of fact as to whether the NFPL leaves ample alternative channels of communication. Accordingly, summary judgment is improper on this issue.

### 4.    *Vagueness and Overbreadth*

Phelps-Roper argues the NFPL is vague and overbroad because it encourages discriminatory enforcement by failing to define key terms. A statute may be "impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352,

358 (1983)). Under the vagueness doctrine, legislatures must "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358. Such minimal guidelines are in place to prevent law enforcement from having absolute discretion as to the type of activity that violates a statute. *Morales*, 527 U.S. at 61.

"The overbreadth doctrine permits the facial invalidation of laws which inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973)). "Only substantial overbreadth supports facial invalidation, as there are significant social costs in blocking a law's application to constitutionally protected conduct." *Id.* (citing *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003)). Further, "the fact one can conceive of an impermissible application of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* (citing *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). To determine whether a statute is overbroad, the Court must construe the statute to determine what the statute covers, and examine whether the statute criminalizes a substantial amount of expressive activity. *Id.* at 1158 (citations omitted).

Phelps-Roper argues the NFPL is vague and overbroad because it fails to define key terms, thus encouraging arbitrary enforcement and burdening substantially more speech than necessary. Based upon the legal framework set forth above, the Court concludes that the NFPL is neither vague nor overbroad.

Phelps-Roper first argues that the NFPL is vague and overbroad because it does not define where the measurement of the buffer zone begins. Using principles of

38

construction established by Nebraska's highest court in evaluating its own statutes, the Court previously construed the NFPL to determine where the measurement began when it contained a 300-foot buffer. (*See* Filing No. 116 at 23-24.) The NFPL, as it now reads, restricts picketing and protest activities "within five hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral."  Neb. Rev. Stat. § 28-1320.02(2). It is true that the NFPL does not expressly state where the measurement begins from the cemetery, mortuary, church, or other place of worship. However, as this Court previously observed, the Nebraska Supreme Court's decision in *Calvary Baptist Church v. Coonrad*, 77 N.W.2d 821, 825 (Neb. 1956), suggests that the NFPL is capable of a definitive interpretation. Phelps-Roper has not demonstrated that the Court's previous analysis should be reconsidered in light of the amendment to the NFPL. Accordingly, the Court adopts its previous analysis regarding the measurement of the 300-foot buffer in concluding that the 500-foot buffer is capable of objective measurement.

Phelps-Roper next argues that the NFPL is vague and overbroad because it does not define the term "protest activities," leaving local law enforcement to decide who is engaged in protest activities and who is not. It is true that the NFPL does not specifically define protest activities. The term "protest activities" appears as part of the definition of picketing. Neb. Rev. Stat. § 28-1320.02(2). However, several courts have construed laws similar to the NFPL to define picketing and protest activities. For example, in *Thornburn*, the Eighth Circuit evaluated an ordinance that did not define "picketing," but concluded that picketing "may include marching, congregating, standing, parading, demonstrating, parking, or patrolling, with or without signs." *Thorburn*, 231

F.3d at 1118. Additionally, the Supreme Court in *Hill* explained that picketing, "does not cover social, random or other everyday communications." *Hill v. Colorado*, 530 U.S. at 721 (citing Webster's Third New International Dictionary 600, 1710 (1993) (defining 'demonstrate' as 'to make a public display of sentiment for or against a person or cause' and 'picket' as an effort 'persuade or otherwise influence")). *See also Douglas v. Brownell*, 88 F.3d 1511, 1521 (8th Cir. 1996) ("[P]icketing does not require that the protestors carry a sign,...and picketing can include a wide variety of activities, including a prayer."). Following this guidance, the Court concludes that the terms "picketing and protest activities" are not vague or overbroad.

As discussed above, the NFPL does not prohibit all picketing or protest activities within the buffer zone. The NFPL is limited to picketing or protest activity that targets a funeral. This limitation is similar to the statute in *Thornburn* that defined focused picketing as picketing "directed toward a specific person or persons." *Thornburn*, 231 F.3d at 1116. While the NFPL does not allow law enforcement to enforce the restriction based on the content of a speakers' message, it permits law enforcement to examine those engaged in picketing or protest activity to determine whether their conduct is unduly coercive to funeral attendees. *See Frisby*, 487 U.S. at 493 (stating "the government may prohibit unduly coercive conduct around the home, even though it involves expressive elements."); *see also Hill v. Colorado*, 530 U.S. at 721 ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."); *Thornburn v. Roper*, 39 F. Supp. 2d 1199, 1206 (D. Neb. 1999) *aff'd sub nom. Thornburn v. Austin*, 231 F.3d 1114 (8th Cir. 2000) ("The content of their message is not the

controlling factor in determining whether they are in violation of the ordinance. What is controlling is whether the picketers' conduct shows that they are engaged in focused picketing."). The NFPL thus does not afford law enforcement with absolute discretion to enforce arbitrary restrictions. Accordingly, the NFPL is susceptible of an interpretation that does not burden more speech than is necessary to advance the State's interest, and is neither vague nor overbroad.

## II.   As-Applied Challenges

Phelps-Roper argues that, on several occasions, law enforcement officers failed to enforce the NFPL against individuals who were engaged in protest activities within the 500-foot buffer zone, while enforcing the buffer zone against the WBC picketers.  In addition, she alleges that on several occasions WBC picketers were placed far beyond the statutory buffer zone. Phelps-Roper blames this application of the law principally on the wording of the law itself.[6] Having determined that the NFPL is neither vague nor overbroad, the Court turns to Phelps-Roper's claims that law enforcement has nevertheless applied the NFPL to Phelps-Roper in an unconstitutional manner.[7]

_____

[6] In this argument, Phelps-Roper weaves a facial challenge—that the NFPL is vague and overbroad on its face—with her as applied challenge. Having already addressed Phelps-Roper's vagueness arguments, the Court turns to her as-applied challenge.

[7] Courts have approached as applied challenges in two different ways, as discussed in *Mcguire v. Reilly*, 386 F.3d 45, 61-62 (1st Cir. 2004). One type of as applied challenge is based on the idea that even if "[t]he law itself is neutral and constitutional in all fact situations, it has been enforced selectively in a viewpoint discriminatory way." *Id.*   The other type of as applied challenge is an equal protection challenge for selective enforcement. *Id.* at 63. The major difference between the approaches is the role of intent. *Id.* In an equal protection challenge, the government must know a policy has a discriminatory effect and adopt a policy because of the discriminatory impact. *Id.* Phelps-Roper has not expressly stated which approach she asserts with her as applied challenge, and other courts have stated that "any difference between these two approaches is, at least in this case, semantic." *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). As discussed above, rather than delineate between the different approaches, the Court will analyze Phelps-Roper's claim under the Supreme Court's direction that in order to be successful in a viewpoint discriminatory enforcement challenge, the challenger would need to show "a pattern of unlawful favoritism." *Thomas v. Chicago Park Dist.*, 534 U.S.316, 325 (2002).

In an as-applied challenge, the challenger must show that the statute is unconstitutional "because of the way it was applied to the particular facts of their case." *U.S. v. Salerno*, 481 U.S. 739, 745 n. 3 (1937). If the as-applied challenge is successful, it "vindicates a claimant whose conduct is within the First Amendment but invalidates the challenged statute only to the extent of the impermissible application." *Turchick v. U.S.*, 561 F.2d 719, 721 (8th Cir. 1977). To sustain a challenge based on viewpoint discrimination, a plaintiff must establish a "a pattern of unlawful favoritism." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). The Supreme Court recently explained, "when someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen*, 134 S. Ct. at 2534 n. 4.

In several of her statements of fact, Phelps-Roper states that other people engaged in protest activity were permitted to be inside the NFPL's buffer zone, while WBC members, including Phelps-Roper, were at times far beyond the statutory restriction. In some instances, picketers were alleged to have come closer to WBC picketers, but still within the buffer zone, or at least closer to the funeral. For Phelps-Roper to establish a pattern of unlawful favoritism, she must demonstrate that the others inside the buffer zone were engaged in the activity prohibited by the NFPL, *i.e.*, picketing or protest activities targeting a funeral. In support of her argument, Phelps-Roper summarily states that these individuals were engaged in protest activities. Although there is evidence that the individuals were holding signs and waving flags—

conduct consistent with protest activities—questions of fact remain as to whether such activities targeted funerals in violation of the NFPL.

The State argues that individuals within the statutory buffer were invited guests, and thus outside the reach of the NFPL. As stated above, law enforcement may examine the totality of circumstances to determine wither the conduct of picketers violates the NFPL. *See Frisby*, 487 U.S. at 493 (stating "the government may prohibit unduly coercive conduct around the home, even though it involves expressive elements."). This evaluation may include a determination of whether other people are engaged in protest activities targeting a funeral. The record at this stage does not permit the Court to conclude that law enforcement demonstrated a pattern of unlawful favoritism against Phelps-Roper as a matter of law. Accordingly, summary judgment cannot be granted on Phelps-Roper's as-applied challenges.

## MOTION TO STRIKE

The State Defendants moved to strike Phelps-Roper's Index of Evidence (Filing No. 249) in support of her reply brief. The Court has not considered any of this evidence in reaching its decision on Phelps-Roper's Motion for Summary Judgment. Accordingly, the Motion to Strike will be denied as moot.

## CONCLUSION

With respect to Phelps-Roper's Motion in Limine, her objections go to each of the proposed experts' credibility, and are more properly addressed on cross-examination. Accordingly, the Motion in Limine will be denied.

With respect to Phelps-Roper's Motion for Summary Judgment, the Court concludes that the NFPL is content neutral and that the State has a significant

governmental interest in protecting the peace and privacy of funeral attendees. Questions of fact remain, however, as to whether the 500-foot buffer zone is narrowly tailored to further the State's interest and leaves Phelps-Roper with ample alternative channels of communication. Factual questions also remain as to whether the NFPL has been applied to Phelps-Roper in an unconstitutional manner.

With respect to the State's Motion to Strike, the Court has not considered the evidence the State wishes to strike, and the Motion will be denied as moot. Accordingly,

IT IS ORDERED:

1.      The Motion for Summary Judgment (Filing No. 223) filed by Plaintiff Shirley L. Phelps-Roper, is denied;

2.      The Motion in Limine (Filing No. 244) filed by Plaintiff Shirley L. Phelps-Roper, is denied without prejudice; and

3.      The Motion to Strike (Filing No. 249) filed by Defendants Jon Bruning and Dave Heineman is denied as moot.

Dated this 29th day of October, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

44