IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SHIRLEY L. PHELPS-ROPER,           )
                    Plaintiff,     )
                                   )
    vs.                            )      Case No. 4:09-CV-3268
                                   )
                                   )      **PLAINTIFF'S POST-**
PETE RICKETTS, et al.,             )      **TRIAL BRIEF**
                    Defendants.    )

Plaintiff submits the following Post-Trial Brief.

### *Introduction*

*Incorporation:*  Plaintiff incorporates all previous filings in this case, including specifically her motion for summary judgment and briefs in support; her motions in limine and responses to defendants' motions in limine and briefs in support; her motions for preliminary injunctive relief and briefs in support thereof; her memoranda of law in advance of trial; all objections and legal arguments made before, during and after the trial; her briefs before the Eighth Circuit Court of Appeals; and all other factual submissions and legal arguments and authorities filed herein, all as though set out verbatim below; none of which are abandoned whether are not addressed below.

1

*Preservation:*  Specifically plaintiff preserves her position that the Nebraska Funeral Picketing Law (NFPL) is content-based in every particular, including its inception, purpose, "targeted picketing" language and application; her position that 300 feet is unduly vague (including in its meaning of "targeted picketing," "protest activity," and where the 300/500 feet start), lacks a legitimate government basis, is not narrowly tailored, is overbroad, and does not leave ample alternatives; her position that the 300-foot law has been systematically discriminatorily applied against her and other WBC picketers, while systematically not applied against anyone else, on the basis of content of the message expressed at the time by WBC vis-à-vis others; and her position that the testimony of the expert witnesses should not have been allowed at trial given their irrelevance and lack of factual and legal foundation.  All these positions are preserved whether or not more fully set out below, incorporating past filings and arguments, in full, as though set out here verbatim.  Plaintiff specifically preserves all positions taken in this case, in full, for purposes of appeal at all levels.

*Overview:*  Nebraska, like all states of the union, began using soldiers' funerals to promote patriotism, the war, the military, and other pro-American stances, including the scripturally-unfounded claim that God is blessing America, specifically in connection with her soldiers.  Soldiers' funerals were and are public events with broad public interest,

2

heavily attended by many above and beyond the family, with extensive one-sided media coverage.  After watching these events unfold in this fashion for a period of many months, Phelps-Roper and other WBC members concluded they had a duty to attend these events, in respectful proximity, and speak to the very important public issues raised by these events, related to how God is dealing with this nation for its sins, particularly and specifically in connection with dying soldiers, with a specific message targeted to the messages being conveyed at these events, by those conducting, going to, participating in, and passing by these events.  Four times in late 2005 and early 2006, Phelps-Roper and other WBC picketers picketed in connection with these events, with no disruption, disturbance, interference, or threat to public safety occurring of any kind.  Yet those conducting the events outside and elected officials became angry over the message, and passed the first version of the law, targeted to Phelps-Roper and WBC's message.   The first law passed April 4, 2006, required those engaged in "targeted picketing" to stay 300 feet from some unspecified starting point away from the event.

The NFPL was not passed as a content-neutral law.  The "targeted picketing" has consistently been treated as meaning a prohibition against those with a "hostile" message directed at the funeral goers – up to and including during the trial.  This law is not comparable to others laws related to funeral picketing discussed in previous cases by the

3

Eighth Circuit, or opinions by the Supreme Court in cases involving laws limiting abortion picketing. Those laws all consistently address any picketer with any message. This law, by sharp contrast, addresses only those engaged in "targeted picketing," which everyone understands to mean those with a "hostile" message towards the funeral goers.

From April 4, 2006 until August 27, 2011, Phelps-Roper and/or other WBC members picketed in connection with these events 37 more times, again with no disruption, disturbance, interference or threat to public safety occurring of any kind. Throughout this time, virtually every time Phelps-Roper and/or other WBC members engaged in picketing at one of these events, others engaged in protest activity physically came to the location where WBC members were located (no matter how far away) and placed themselves in close proximity to WBC members, at times being allowed to surround and block them. Yet at no time did any disruption, fight, altercation, or other disturbance occur. Also in this time period, Phelps-Roper and and/or other WBC members were often required by law enforcement to be placed considerably further than 300 feet away, often out of sight and sound of the events and those participating in protest activity outside the funeral events. Also in this time period, according to what family members told the psychologist employed by the state as an expert witness, and consistent with Phelps-Roper and other WBC picketers' practices, no family member was approached, addressed, blocked, disrupted, or

4

had any aspect of the funeral or memorial events interrupted in the slightest by Phelps-Roper or other WBC picketers. Those family members only reported seeing WBC picketers from a distance, and in some cases not at all. Those family members all reported being angry and distressed by the content of Phelps-Roper/WBC's message, nothing more. And in each of those instances, in contrast to the very small number of WBC picketers present, dozens to a thousand of others were there with flags and signs, communicating a message of what they call respect for and support of the family. Notwithstanding no issues of safety arising, and no incidents occurring with family members[1], at the request of the Patriot Guard Riders (PGR) group who have conducted 500 funeral-related protest events, conveying a message with flags and signs, who disagree with Phelps-Roper/WBC's message; a legislator proposed expanding the distance to 500 feet.

Throughout the discussion in the legislature on this proposed expansion, Phelps-Roper/WBC's message was vilified and condemned, while the author of the bill (supported by several legislators) concocted public safety as the reason for the necessary expansion. The Court on the day of trial advised that the legislative record for the expansion would

---

[1] The only interaction that has ever occurred between WBC picketers and family members were when two parents initiated contact, voluntarily walked a distance to approach WBC members and have a calm interaction, both incidents occurring before the first law was passed.

5

also be read as again resting the law upon privacy concerns for the family, though that was the reason given for the first law. The only tangible public safety reason articulated during legislative discussion or during the trial by defendants, particularly through the law enforcement expert witness, was the need to keep the two groups separate; that is Phelps-Roper/WBC picketers separate from those engaged in activity in counter to Phelps-Roper/WBC. Remember, this is the group that made a practice of some of its members leaving the spot they had selected right outside of the event, to come to the spot where Phelps-Roper/WBC picketers were required to stand, so they could be in close proximity to Phelps-Roper/WBC. (Apparently this practice was designed to block Phelps-Roper/WBC's message from the view *of anyone*.) So even though the group asking for the expansion was the group who made it a practice to ensure the two groups were in close proximity, for a period of almost six years – without incident – the law was passed ostensibly to put a separation between these two groups. Yet nothing changed. Phelps-Roper/WBC members were still pushed a distance from the event, now 500 or more feet; and the counters still moved to the area where Phelps-Roper/WBC members were picketing to be in close proximity to them, again without incident. After August 27, 2011, Phelps-Roper and/or other WBC picketers conducted seven more funeral-related pickets; in most of them counters came to be near Phelps-Roper/WBC, in a wrongful, unconstitutional and

6

law-enforcement-sanctioned effort to block Phelps-Roper/WBC's message; and no disruption or threat to public safety occurred.

It is a sham to deny the law was passed in an effort to remove Phelps-Roper/WBC's message from the public discussion related to soldiers' funerals. It is a sham to pretend the law had to be expanded for public safety. It is a sham to pretend the law is applied to anyone but Phelps-Roper/WBC. It is a sham to pretend any disruption to anything – the funeral, the memorial, the burial, the family's participation, the activities of the funeral goers, the activities of those engaged in express activity outside the event, or otherwise – required either law to be passed. The law was passed to accommodate the PGR; show governmental enmity against Phelps-Roper/WBC's message; and to try to create an environment in which only one side of this debate – in short, whether God is blessing or cursing America, by killing these soldiers – is heard. That is why the law was passed; that is how the law was framed; and it's how the law has been applied. The law was invalid at its inception; is unconstitutional in every particular; is utterly lacking in any legitimate government need or interest; has been systematically applied from start to finish discriminatorily against only Phelps-Roper/WBC's message (as intended and designed); and should be stricken. No distance will keep family members from being angered or distressed over Phelps-Roper/WBC's *message*. No distance will stop the counters from

unlawfully trying to block Phelps-Roper/WBC's *message* by coming in close proximity and engaging in provocative behavior (to which Phelps-Roper/WBC refuse to respond); and those are *invalid purposes*.  The law should be declared unconstitutional facially and as applied and stricken.

In three ways the law is applied unconstitutionally.  First and foremost, it is applied only to Phelps-Roper and other WBC picketers.  Notwithstanding evidence in this record that others besides Phelps-Roper/WBC use flags, signs, message bearing garments, boom boxes, and revving motorcycles, to communicate messages to family members, funeral goers, the community, and WBC picketers, all inside the prohibited zone.  Second, Phelps-Roper and WBC picketers are often required to stand further away than the law requires. Defense counsel challenged Phelps-Roper and other WBC picketers to show they requested a closer location, or didn't adequately object by contentious communications with law enforcement, during trial.  On several occasions they did request a closer location; and for a variety of reasons it is not practical for Phelps-Roper and WBC picketers to wrangle with law enforcement on the scene, or in letters, lest they lose picketing time and lose any form of communication or working relationship with law enforcement.  Besides, the law does not require that people ask for the law to apply.  In many ways law enforcement have made it clear that they require Phelps-Roper and WBC picketers to stand where they have stood

8

in most instances, *above and beyond applying the law only to Phelps-Roper and WBC picketers*.   Third, counter protestors are often permitted to surround and block Phelps-Roper and other WBC picketers, blocking their message.   This notwithstanding that the prohibited distance was increased from 300 to 500 feet for the ostensible reason of needing more space between the two groups, which position was supported by the testimony of the law enforcement expert witness at trial.   Yet no matter the distance of the law, before the first law, after the first law, and after the second law, law enforcement – over requests by Phelps-Roper and WBC to prevent the same from happening – let counters surround and block Phelps-Roper and WBC picketers.   This is a further unconstitutional application of the law, because it is unlawful for those with a contrary message to conduct themselves in a manner that blocks the counter message; and law enforcement in Nebraska often permit this to happen.

This case was remanded by the Eighth Circuit on April 12, 2013, for the Court to address the expansion to 500 feet and Phelps-Roper's as-applied challenge.   The Court said:

> Phelps-Roper specifically raised an as applied challenge to the NFPL. The record, however, has not been developed as to whether and, if so, how the amended statute has been applied after August 2011. Nor has the district court considered the constitutionality of a 500 foot buffer zone, including arguments that Phelps-Roper now advances concerning

9

>the Nebraska legislature's alleged motivation in enacting the 2011
>statute and the response of Nebraska officials concerning the State's
>interests in the larger zone. We conclude that the better course is to
>afford the district court an opportunity to make appropriate findings of
>fact and conclusions of law before evaluating the validity of the new
>statute. See *Hadix, 144 F.3d at 935*. The district court may consider all
>of the evidence concerning application of the NFPL in resolving the as
>applied challenge.
>
>Accordingly, we remand this case to the district court to consider
>Phelps-Roper's facial and as applied *First Amendment* challenges to the
>amended NFPL

*Phelps-Roper v. Troutman, 712 F.3d 412, 417 (8ᵗʰ Cir. 2013)*.

On the eve of trial, the Court granted a defense motion in limine, holding that

incidents before August 27, 2011 would not be considered on the as-applied challenge.  At

trial March 17-19, 2015, the Court permitted evidence on those issues, on the question of

whether there was a need to expand the law to 500 feet, but not on the as-applied question.

In its order denying Phelps-Roper's motion for summary judgment, the Court said Phelps-

Roper must show a pattern of unlawful favoritism.  And that in doing so Phelps-Roper

must demonstrate that others inside the buffer zone were engaged in picketing or protest

activities targeting funerals in violation of the NFPL; and were not invitees.   We

respectfully submit it is reversible error to disallow evidence related to all funeral events

and related protest activity, given the burden imposed on Phelps-Roper.  Particularly since

this pattern did not change in any discernable fashion, except Phelps-Roper/WBC were required to stand *further* away, with the expansion of the law to 500 feet. Plaintiff preserves her position throughout that all incidents are relevant on the as-applied challenge. Not only did the Eighth Circuit so indicate in the above-quoted language, but common sense dictates the conclusion that the entire history of activity should be considered.

The state offered three expert witnesses at trial. The first, a law enforcement official, rested his opinion that 500 feet is needed on his position that he (and other law enforcement) lack the authority to separate a group of protestors from a group of counter protestors without this law. First, that is inaccurate; the rule of law and numerous state and local laws enable and require law enforcement to separate competing groups if needful for keeping the peace, *and* for ensuring *both sides* can publish. Second, the 500 feet does not require a separation between protestors and counter protestors (though some legislators said that was its purpose); rather it pushes those engaged in "targeting picketing" (applied to mean only Phelps-Roper/WBC) 500 feet away. It does not prevent some of the counter protestors from following/coming to them; and in fact, that is what routinely happens.

The second expert witness is a public relations professor and practitioner. She suggested that Phelps-Roper and WBC have an ample alternative to picketing in connection with funeral events, in the form of social media and traditional media. For a

11

multitude of reasons (enumerated below) this is an unrealistic position; and it is unwarranted under the facts and law to require Phelps-Roper/WBC to be removed from the sidewalks near the event, while allowing everyone else to remain. This expert witness misperceives the purpose and target audience, and offered clearly ludicrous alternatives (such as sending a text message to the personal mobile phones of family members – talk about an invasion of privacy! – and to all the unknown 1000+ funeral goers; or negotiating a contract for a billboard – provided there was one at the right location – getting copy done and the billboard up – provided the owner would agree to the same – within the average/typical 10-day maximum turnaround from notice of a funeral and the funeral itself; etc.).

The third expert witness is a psychologist who interviewed several family members of soldiers whose funerals (except one) had been picketed by Phelps-Roper/WBC. No one is disputing that there is a period of grief and bereavement after a loved one dies. The Supreme Court has held funeral picketing is allowed; the question is distance. What is clear from those interviews with the family members is that no distance will keep them from being distressed or angered by the words. What is equally clear is that there was no interaction between Phelps-Roper/WBC and these interviewed family members (except the one father who himself initiated contact before the first law was passed); that no aspect of

12

the events related to the visitation, funeral or burial was in any slightest manner disrupted or aborted by Phelps-Roper/WBC picketing; that family members either did not see the picketers, or only saw them passing by and/or at a distance, with distances ranging from 600 to 1500 feet; and that the 500-foot law does exactly *nothing* to impact those dynamics. Even if these funerals were private (they are not; when they are WBC doesn't go); nothing WBC does in any measure interferes with any ability by any family member or funeral goer to go into the funeral home, into the church, or into the cemetery, and have all the private grieving they desire. WBC pickets on public sidewalks a reasonable distance from the event. It is not the government's business to keep anyone – including bereaved and funeral goers – from seeing words with which they disagree, in whatsoever state they find themselves.

References to the record below as "Vol. ___," etc. and "Exhibit" refer to the testimony and exhibits from the trial in this matter of March 17-19, 2015. All relevant testimony and exhibits are incorporated in support of Phelps-Roper's position, whether or not sited below, as though all set out verbatim.

13

***Factual Statement***

1. Phelps-Roper is a member of the Westboro Baptist Church (WBC), has been for 48 years, and has picketed for 25 years, including in Nebraska, including funeral pickets in Nebraska. Vol. III, Shirley Phelps-Roper, 597-598.

2. Ricketts is the current Governor of the State of Nebraska. Order of Substitution filed 1/12/15, Doc. 260. The civil administration of the laws of the State of Nebraska is vested in the Governor of Nebraska. *Phelps-Roper v. Heineman, 57 F.Supp. 3d 1146, 1152 (D.Neb. 2014)*.

3. Peterson is the current Attorney General of the State of Nebraska. Order of Substitution filed 1/12/15, Doc. 260. Neb. Rev. Stat. § 84-203 (Reissue 2008) provides, in part, "The Attorney General is authorized to appear for the state and prosecute and defend, in any court or before any officer, board or tribunal, any cause or matter, civil or criminal, in which the state may be a party or interested." *Phelps-Roper v. Heineman, supra.*

4. Schmaderer is the current Chief of Police for the City of Omaha. Order of Substitution filed 2/20/15, Doc. 272. Because Omaha is a Metropolitan Class City, the Omaha police have the power to arrest persons for violations of state

14

laws and city ordinances. See Neb. Rev. Stat. §14-606 (Reissue 2012). *Phelps-Roper v. Heineman, supra.*

5. The defendants all admit that this Court has jurisdiction and venue is proper with this Court.   State Defendants' Answer filed 9/16/13, Doc. 156, para. 3; Defendant Omaha Police Chief's Answer filed 9/17/13, Doc. 158, para. 3.

6. Nebraska has a statute against disturbing the peace (Neb. Rev. Stat. §28-1322).

7. Nebraska has statutes against assault (Neb. Rev. Stat. §§28-308, 309 and 310).

8. Nebraska has statutes against criminal trespass (Neb. Rev. Stat. §§28-520, 521 and 522).

9. Nebraska has statutes against resisting arrest (Neb. Rev. Stat. §28-904) and obstructing a peace officer (Neb. Rev. Stat. §28-906).

10. The city of Omaha has local ordinances against disorderly conduct (Section 20-42); failure to disperse (Section 20-43); obstructing public ways (Section 20-44); refusing lawful request to move (Section 20-45); disrupting a meeting or procession (Section 20-47); an unlawful assembly (Section 20-48); assault and battery (Section 20-61); trespass (Section 20-47); and, failing or refusing to leave (Section 20-155).

15

11. The city of Omaha has an ordinance that requires a permit for a "public assembly" defined as any meeting, demonstration, picket line, rally or gathering of more than 25 persons on city property for a common purpose as a result of prior planning that interferes with the normal use of such city property (Section 20-291), which can be revoked if conditions or standards for issuance are violated; when a public emergency arises where the police or other resources required for that emergency are so great that deployment of city services for the public assembly would have an immediate and adverse effect upon the welfare and safety of persons or property; or, if other unforeseen conditions exist that may render the event unsafe (Section 20-307).

12. Phelps-Roper and other WBC members have engaged in over 55,000 pickets; less than ten times was there any violence in response to the picketing, whether funeral or non-funeral-related, and whether across the street or a mile away, Vol. I, Rebekah Phelps-Davis, 21, 99, 110; Timothy Phelps, 177-178. See below for more details at specific funeral-related pickets in Nebraska reflecting no violence or disruption.

13. Phelps-Roper and WBC take steps to prevent violence from occurring, in recognition that people disagree with their message, including self-regulating

16

their distance so they are not directly outside the front door or on top of the events; writing and calling law enforcement in advance, working with law enforcement before and during the event, obeying all law enforcement orders, writing thank you letters after the pickets thankfully encouraging any slight facilitation of their picketing activity, and working to maintain good relationships with law enforcement without being contentious; being circumspect and disciplined during the pickets, diffusing, and not responding to provocation.  Vol. I, Rebekah Phelps-Davis, 14-16, 19-21, 99, 110; Timothy Phelps, 142-145, 161-164, 168; Sam Phelps-Roper, 116-117, 138.

14. Specifically in their contact with law enforcement, Phelps-Roper and WBC make it a practice to forecast the possible need for a separation or "dead zone," preemptively to keep order, and often this is done successfully.  Separations have been successfully maintained by a chalk line, yellow tape, barricades, a driveway, or a street, thousands of times during WBC's pickets.  If law enforcement decline the request, in advance or on the scene, Phelps-Roper/WBC go forth with the picket and do what they can to keep themselves separate from counter protestors, including by moving away from them.  Vol. I, Rebekah

17

Phelps-Davis, 16-20; Timothy Phelps, 145-146; 161-164, 172-176; Vol. II,

Jonathan Phelps, 295-300, 351-352.

15. Phelps-Roper/WBC send thank you letters to law enforcement, even when they

are hostile; even when they require them to stand further away than the statute

requires; encouraging, reinforcing and praising any slightest assistance on their

part in facilitating First Amendment activity; and do not complain about where

they were required to stand, or become litigious; because otherwise

communication with law enforcement would be strained or non-existent;[2] and

---

[2] One good example of this was described by Jonathan Phelps, a 55 year old criminal defense attorney who has daily contact with law enforcement, has been picketing since 1991, and is one of the few WBC members who works with law enforcement in advance of pickets all over the country, who said it this way:

Q:    In your experience … is it effective with law enforcement to threaten to sue them?

A:    It has never had any success with that kind of tactic.

Q:    What is the impact if you take a litigious tone in dealing with law enforcement?

A:    Typically they're not going to respond to you at all.  Communication is going to be cut off.  It's going to be a level of hostility at best that's uncomfortable.
          You don't – you're not going to get anywhere with that tactic if you threaten to sue them, pointing out every single little detail where they've not done what you wanted them to do.

Q:    So why not just remain silent?  Why not just not send the thank-you letter?

A:    Well, because there are things that are helpful that – everybody appreciates getting a kind word when they've done something helpful.
          And we want to foster the best relationship as possible because for all I know, I'll be there next week in that same city.  *** [W]e have a daily ministry.  We don't

because it is proper in Phelps-Roper/WBC picketer's religious views to be thankful.  In addition, Phelps-Roper/WBC picketers have traveled many miles to picket, and have limited time, so they opt to engage in their picketing, rather than argue with law enforcement, especially because the die is cast by the time they arrive, and law enforcement have settled on where they expect WBC to stand. Vol. I, Rebekah Phelps-Davis, 10-11, 18-21, 27, 76, 93-95, 99, 107; Vol. II, Jonathan Phelps, 295-300, 336, 353-354; Vol. III, Shirley Phelps-Roper, 609, 650-651, 680-684.

16. Phelps-Roper and other WBC picketers, when conducting funeral-related pickets, do not approach family members or funeral goers; do not go on private property; do not block ingress/egress; do not engage in civil disobedience; do not disobey police orders; do not engage with people who are angry, confrontational, provocative or disruptive; remain on the public sidewalk or public right of ways/easements; and leave the area at the announced time for the

---

have time to turn aside to every single detail to try to train every single law enforcement agency.  It's not our job.  It's too exhausting to do that.

Vol. II, Jonathan Phelps, 296-297.

funeral to start, and at funeral pickets in Nebraska are typically outnumbered with 4-6 WBC picketers compared to 100-1000 counters.   Vol. I, Rebekah Phelps-Davis, 14-15; Sam Phelps-Roper, 116-117, 134-135, 138; Timothy Phelps, 145; Vol. II, Jonathan Phelps, 282.

17. The United States Supreme Court has held that the content of WBC's signs plainly relate to broad issues of interest to society at large, including the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy; and that WBC picketers have a right to participate in funeral-related picketing, *Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011).*

18. The specific message unique to funeral related events delivered by Phelps-Roper and WBC picketers was described at trial as related to the event itself, including the very occurrence of the funeral and the patriotic displays outside the funeral; directed to funeral goers, those putting on the event, those participating in the event, and those passing by.   E.g., see detailed doctrinal descriptions at Vol. I, Sam Phelps-Roper, 114-116; Timothy Phelps, 147, 164; Steve Drain, 182-183, 224-226; Vol. II, Jonathan Phelps, 277-279; Vol. III, Shirley Phelps-Roper, 646-648.

20

19. Phelps-Roper/WBC began picketing in connection with funerals of soldiers after a period of observing through extensive media coverage that these events had turned into patriotic displays, with a one-sided message that God is blessing the nation.  E.g., Vol. I, Rebekah Phelps-Davis, 80-81; Vol. II, Jonathan Phelps, 277-280; Vol. III, Shirley Phelps-Roper, 607-608.

20. The specific message unique to funeral related events delivered by others including the PGR is a pro-USA and "respect" message directed to the funeral goers, the family members, those participating in events outside the funeral, and the community at large.  Vol. I, Rebekah Phelps-Davis, 104; Vol. II, John Scott Knudsen, 420-422.

21. When the PGR attend funerals, they use their flags to convey their message to the family and the community.  Vol. II, John Scott Knudsen, 421-422.

22. If the family invites the PGR to form a flag line outside the location of the funeral, anyone who arrives with a flag is allowed to join them, Vol. II, John Scott Knudsen, 416-417.

23. If someone presented with the flag held upside down, they would be asked to leave and not be part of the invited group, even if they were standing on a public

21

sidewalk; the PGR would ask law enforcement to have them removed, Vol. II, John Scott Knudsen, 417-418.

24. If a person is holding a sign, the PGR captain for Nebraska stated that the person with the sign would not be part of the invited group, and the PGR would ask law enforcement to have them removed, Vol. II, John Scott Knudsen, 417.

25. See specific instances below where persons with signs, standing next to or near persons with flags, were photographed inside the 300-foot or 500-foot zone.

26. See specific instances below where persons with flags and signs were observed within the zone, on the public sidewalk and other public right of ways, including the streets.

27. Law enforcement are not trained in what "targeted picketing" means.  Vol. II, Steven Hecker, 395, 398-399; Vol. III, James Davidsaver, 485; Vol. III, Jay Leavitt, 584.

28. The State's expert witness, who was employed by the Lincoln Police Department from the time the first NFPL was passed until October 2014 (Vol. III, James Davidsaver, 473), testified that "targeted picketing" meant someone who is there with a specific intent to deliver their message at a specific point at a specific time, including "he's a hero," "we respect him, "rest in peace," thank

you soldier X," "he died for the sins of America," or "thank God for dead soldiers." Vol. III, James Davidsaver, 485-487. See specifics below where the law was not applied in this manner during Lincoln pickets.

29. The NFPL does not include an exception for an invitee, and law enforcement are not trained in what an "invitee" means. Vol. II, Steven Hecker, 399; Vol. III, Jay Leavitt, 584.

30. Phelps-Roper and other WBC members have engaged in 46 events where they engaged in protest activity in Nebraska related to funerals since June 23, 2005. Exhibit 6. No WBC picketer has ever been harmed at a Nebraska funeral picket, Vol. I, Rebekah Phelps-Davis, 21. No WBC picketer has ever violated the NFPL, Vol. III, Shirley Phelps-Roper, 665.

31. Others including the PGR have engaged in at least 500 events where they engaged in protest activity in Nebraska related to funerals since at least 2006. If the PGR arrives and WBC is not present, PGR does not leave. Vol. II, John Scott Knudsen, 415.

32. The first version of the NFPL was enacted on April 4, 2006, to restrict "targeted picketing" at a funeral from one hour before the funeral until two hours afterward. (Neb. Rev. Stat. § 28-1320.03.)

23

33. During a March 22, 2006 Floor Debate on the first version of the law, legislators were critical of Phelps-Roper/WBC's message, Exhibit 453, Transcript of 3/22/06 Floor Debate, pp. 11132 ("The group's hate speech is despicable and deplorable"); 11133 ("This hatemonger 'reverend' and his family are trespassers, not protesters.  They have no right to be there."); 11134-11135 (several statements disagreeing with WBC's doctrinal position about God's hate).

34. Also during a January 25, 2006 Judiciary Hearing on the law, the proponent of the law (offered in behalf of a PGR) stated:  "There is one particular group that travels the nation to a degree, and lately the Midwest, to protest funerals, and notably military funerals.  They have visited Nebraska on a couple occasions, and last month, I guess, they were in Papillion.  Their speech is utterly despicable and to me it's deplorable."  Exhibit 453, Transcript of 1/25/2006 Judiciary Hearing, p. 164.

35. At no place in the legislative history is any information provided suggesting there had been any interference, disruption or breach of the peace at any funeral-related picket necessitating the passage of the law.

36. During the March 22, 2006 Floor Debate, the legislators concluded that the distance needed to provide privacy to family members was 300 feet (increased from the original proposal of 100 feet).  Exhibit 453, Transcript of Floor Debate of 3/22/06, at 11131 ("to protect family privacy and prevent emotional distress at funerals or memorial services"); 11135 ("people have a substantial right to grievance"); 11137 ("allowing families who have suffered a loss to grieve with some form of dignity" and "The folks can still have the ability to protest, as they should, and yet family members can grieve with some sense of dignity").  Exhibit 453, Executive Session, Judiciary Committee, 3/1/06, p. 3.

37. It is unclear in the legislative record when and why "targeted picketing" was included in the law.  In the March 22, 2006 Floor Debate one senator said:

> And the question goes to the definition of picketing.  It indicates that picketing means protest activities engaged in by a person or persons located within a certain distance from certain places.  Let me give you a hypothetical example.  Let's say an individual dies or was murdered, and that individual was involved in a very controversial cause.  At the funeral, nobody shows up who was against that person and that person's causes, but a lot of people show up who appreciated what that person did, and appreciated his cause, and showed up with banners, et cetera, for that cause.  The widow, if it was a widow, or the widower, wasn't offended in any way.  They appreciated the support.  Nonetheless, hundreds of these people who showed up had no personal relationship with the deceased, other than

25

the connection with the cause.  Under your definition of picketing, would those people be allowed to be there?  And the dilemma that I see here is that it seems to me that if you say they should be allowed to be there, then you're kind of creating a one-sided free speech situation.  If a funeral is allowed to be used by the family for free speech purposes, then how can you deny the free speech to the other side?  Or does your definition of picketing mean you can't do it, either way?

The proponent of the law answered:

…. I believe that not only do we have a different definition of what a protest … I mean, those particular individuals wouldn't fall under the definition of what a protest is.  Now is that a Pandora's box, Senator Beutler?  I don't know.  I don't believe that it is, and here's why I would think that.  We're not … those particular individuals under that hypothetical that you laid out are not, I would say for all intents and purposes, in a protest mode.  …. That would be disturbing to me if that confusion …

Exhibit 453, Transcript of 3/22/06 Floor Debate, 11141-11142.  This indicates the purpose of the "targeted picketing" language was designed to remove a specific content – someone not deemed as supportive of the deceased or family – demonstrating the law was intentionally content-based, knowing it created "a one-sided free speech situation."

38. The final language of the 2006 version of the NFPL stated:

Section 28-1320.01 – Unlawful picketing of a funeral; legislative findings.

26

(1) The Legislature finds that families have a legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives and that the rights of families to peacefully and privately mourn the death of relatives are violated when funerals are targeted for picketing or protest activities.

(2) The Legislature also recognizes that individuals have a constitutional right to free speech and that in the context of funeral ceremonies, the competing interests of picketers and funeral participants must be balanced. Therefor [sic], the Legislature declares that the purposes of sections 28-1320.01 to 28-1320.03 are to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral while still providing picketers and protestors the opportunity to communicate their message at a time and place that minimizes the interference with the rights of funeral participants.

Section 28-1320.02 – Unlawful picketing of a funeral; terms, defined.

For purposes of sections 28-1320.01 to 28-1320.03, the following definitions apply:

(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but does not include funeral processions on public streets or highways; and

(2) Picketing of a funeral means protest activities engaged in by a person or persons located within three hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.

Section 28-1320.03 – Unlawful picketing of a funeral; penalty.

(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing from one hour prior to through two hours following the commencement of a funeral.

(2) Unlawful picketing of a funeral is a Class III misdemeanor.

27

39. Before the first version of the NFPL was passed, on July 23, 2005, Phelps-Roper and 10-12 WBC picketers conducted a funeral-related picket in Omaha, standing across and down the street from the church.  Vol. III, Shirley Phelps-Roper, 600-604; Exhibits 8-10.

40. On July 23, 2005, at the same time WBC picketers were there, a lot of people were outside the church, people from branches of the military, and others, who stayed outside of the funeral with flags on the sidewalk and in the street.  Vol. III, Shirley Phelps-Roper, 600-604; Exhibits 8-10.

41. On July 23, 2005, during the picket, a woman who identified herself as the mother of the deceased came across the street and spoke with Phelps-Roper; she was cordial and sad; she said she disagreed with the war; she said she agreed with some sentiment on Phelps-Roper's sign; it was not a hostile confrontation. Vol. III, Shirley Phelps-Roper, 602-603.

42. The picket was completed without disruption or any breach of the peace, in spite of a hostile response by law enforcement.  Vol. III, Shirley Phelps-Roper, 600-603.

43. Also before the first version of the NFPL was passed, on November 10, 2005, Phelps-Roper and other WBC members conducted a visitation-related picket in Beatrice.  They stood out of sight and sound of the incident; more than a block away; at least 500-600 feet.  Vol. I, Sam Phelps-Roper, 117-122; Vol. III, Shirley Phelps-Roper, 606-607; Exhibits 12-19.

44. At the November 10, 2005 visitation-related picket in Beatrice, multiple bikers placed themselves directly in front of Phelps-Roper and other WBC picketers. The WBC picketers were 6-7 in number, ranging in age from 7 years old to early 80's.  The bikers revved their motorcycle engines, with their bikes in the street, during the picket.  *Ibid.*

45. Despite the close physical proximity of the counters to the WBC picketers, no altercation occurred; there was no breach of the peace by WBC picketers; and no threat to public safety.  *Ibid*.

46. On November 11, 2005, at the funeral of the soldier whose visitation was on November 10, 2005, at least hundreds engaged in protest activity outside St. John Lutheran Church in Beatrice, stringing along 6th Street/Highway 77, with flags and signs.  WBC did not picket this funeral.  Vol. III, Shirley Phelps-Roper, 606-607; Exhibits 20, 22, 23.

29

47. Also before the first version of the NFPL on December 10, 2005, 6-8 WBC picketers conducted a funeral-related picket in Papillion, standing 500-600 feet from the high school where the memorial was held.  Vol. I, Sam Phelps-Roper, 122-125.

48. On December 10, 2005, at the same time WBC was picketing, counter picketers appeared holding flags and with message bearing garments.  They stood across the street from WBC and strung down on the same side of the street, some standing in the street, others on the public sidewalk, within 30 feet of WBC picketers.  Vol. I, Sam Phelps-Roper, 122-125; Exhibits 25-30.

49. On December 10, 2005, the father of the deceased soldier walked hundreds of feet to the WBC picketers, going from person to person in the WBC group offering a writing; WBC picketers quietly and politely declined, without incident.  Vol. I, Sam Phelps-Roper, 125-127.

50. The State's psychologist expert witness testified that he spoke with this father, who confirmed that he left the memorial and walked up to the picketers with a piece of paper with verses about God's love and offered it to the picketers, who declined, Vol. III, Scott Bresler, 568.

51. Also before the first version of the NFPL, on February 25, 2006, WBC picketers conducted a funeral-related picket in Lincoln, standing across the street and down from the church.  Vol. II, Jonathan Phelps, 280-284.

52. On February 25, 2006, at the same time WBC picketers were there, at least a hundreds others were on the church property, including directly in front of the church; and on the public sidewalk on the church side, across the street from WBC picketers, with signs and flags. Vol. II, Jonathan Phelps, 280-284; Exhibits 36-40.

53. This February 25, 2006 funeral was attended by several elected officials, including several members of Congress and the Governor of Nebraska. Vol. II, Jonathan Phelps, 284-285.

54. In spite of the close proximity between the two groups with competing messages about the soldier's death and funeral, as one headline about the event said, "Opinions, not fists, clash before soldier's memorial," and there was no threat to safety and no disruption of the funeral.  Vol. II, Jonathan Phelps, 284-286; Exhibits 43-49.

55. After the passage of the NFPL, Phelps-Roper and other WBC picketers have on numerous occasions (some itemized below) observed various people, including

31

bikers (including the PGR) and citizens, inside the zone (300 feet or 500 feet) with message bearing garments, flags and signs, revving motorcycles and boom boxes, communicating support for the family.  Vol. I, Rebekah Phelps-Davis, 17-18; 43, Timothy Phelps, 148-149; Vol. II, Jonathan Phelps, 282-283.

56. At times PGR and other bikers have revved their motorcycle engines during the entirety of WBC's picket.  Vol. I, Rebekah Phelps-Davis, 18, 43; Sam Phelps-Roper, 120; Vol. II, Jonathan Phelps, 309; Vol. III, Shirley Phelps-Roper, 605-606; Vol. II, John Scott Knudsen, 416, 424-425.

57. On June 20, 2006, Phelps-Roper and other WBC picketers conducted a funeral-related picket in Beatrice.  They stood about 1000 feet away, at the express written direction of local law enforcement, after Phelps-Roper requested a different and closer location, Vol. III, Shirley Phelps-Roper, 609-611, Exhibits 70-71.  (Phelps-Roper still sent a thank you letter per her/WBC's custom as discussed otherwise here in an effort to be thankful and foment positive relations with law enforcement, Vol. III, Shirley Phelps-Roper, 610-611; Exhibit 73.)

58. At the same time WBC was conducting a picket on June 20, 2006, in Beatrice, others were present on the sidewalk in front of the church, on the church property, and on the sidewalk, with some coming down towards the WBC

32

picketers, with flags and signs during part of the picket.  Vol. III, Shirley Phelps-
Roper, 611-612.

59. On the same day – June 20, 2006 – Phelps-Roper and other WBC picketers
planned to conduct a funeral-related picket in Merrick County.  However (while
simultaneously articulating visceral disagreement with Phelps-Roper/WBC's
religious expressions), law enforcement interpreted the NFPL in a way that
prevented that picket from happening.  Yet 1000 others showed up from the
community to participate in the funeral, inside and out, which much activity
inside the 300-foot zone, and large media coverage of the event.  Vol. I, Rebekah
Phelps-Davis, 36-40; Exhibits 74-77.

60. On July 8, 2006, about 10 WBC picketers conducted a funeral-related picket in
Omaha.  In advance of the picket, WBC contacted law enforcement,[3] and had an

---

[3] Consistent with strategies to engage in peaceful picketing described in paragraphs 13-15
above, a few WBC members contact law enforcement in advance of going into any
jurisdiction, in an effort to work with law enforcement to identify a location to picket that
is within the law and acceptable to law enforcement, using Google maps and in
consideration of the existence of easements to try to identify these locations, deferring to
law enforcement's directives.  There has been confusion with some law enforcement
agencies in Nebraska as to where the 300/500 feet start; at times challenging to get a
commitment from them as to what they consider to be a lawful location; and always with
WBC picketers preferring a closer location, but being required to work within the law.

agreement where WBC would stand.  When the WBC picketers arrived, they have been moved by law enforcement further away from 300 feet (and the 300-foot spot was marked in chalk), putting them out of sight and sound of the event. Vol. I, Rebekah Phelps-Davis, 41-42, 44; Exhibits 79-83.

61. Before beginning their picket, WBC picketers observed that there were hundreds of others with flags, signs and revving motorcycles, all over the place, not organized, immediately outside the front door of the church.  Vol. I, Rebekah Phelps-Davis, 42-44; Exhibits 84-85.

62. During part of the WBC picket, some of the counters streamed down and stood near the WBC picketers, Vol. I, Rebekah Phelps-Davis, 45; Exhibit 86.  There was no violence or confrontation or disruption from the counters being near the WBC picketers, and the funeral procession was held back by law enforcement until WBC picketers were gone, Vol. I, Rebekah Phelps-Davis, 46-47.

63. On August 10, 2006, WBC picketers conducted a funeral-related picket in Pender.  When the WBC picketers arrived in town, they noticed a lot of demonstrators with flags and other things lining the streets and congregation.

---

E.g., Vol. I, Rebekah Phelps-Davis, 11-13, 26-27, 34-34, 77-78; Sam Phelps-Roper, 135, 137; Vol. II, Jonathan Phelps, 342-344, 351-352.

They contacted their law enforcement contact (prearranged), who instead of taking them to Main Street as planned, took them to Thurston Avenue adjacent to Pender Park; had them park; and had them follow him into the park in a wooded area on the other side in the middle of the woods where no one could see them on a dead end street with a little bridge, out of sight and sound of the event, well past 300 feet, Vol. I, Sam Phelps-Roper, 127-129; Exhibits 92-97. One WBC picketer asked if they could be closer, and law enforcement refused, and made it clear that if WBC was going to picket anywhere in the town of Pender, it was going to be at that place in the park.  Vol. I, Sam Phelps-Roper, 131.

64. What WBC picketers observed out of the other group engaged in activity right outside the church on August 10, 2006, is reflected in Exhibits 99, 100 and 102, large numbers of people engaged in activity with flags on the public streets.

65. There were no threats or altercations or safety concerns during the Pender picket of August 10, 2006, Vol. I, Sam Phelps-Roper, 133.

66. On September 5, 2006, Phelps-Roper and two other WBC picketers conducted a funeral-related picket in Minden, and they were placed by law enforcement more than 1000 feet away, out of sight and sound, and also blocked by a large

35

fire truck spread across the intersection, at the back of all the activity.  When they arrived, law enforcement told them where to stand; Phelps-Roper asked to be moved closer, and law enforcement refused.  Vol. III, Shirley Phelps-Roper, 613-614, 660; Exhibit 108.

67. Phelps-Roper testified that she was fairly certain she tried in Minden to get a different location; but that overall the reaction is so viscerally negative it's a waste of time; it's not worth getting arrested; she can't preach to anyone sitting in a jail cell; by the time you're at the scene, the die is cast; the only thing she has experienced is that they move her further away; she can stand there and argue or get her signs out and be thankful to be there with the signs; she often travels a distance to get to the location, and has a finite amount of time to picket before it's time to head home, so she doesn't want to waste time arguing with law enforcement about what they require of her and other WBC picketers.  Vol. III, Shirley Phelps-Roper, 650-651, 659-660.   Other WBC picketers provided similar testimony, e.g., Vol. I, Rebekah Phelps-Davis, 12-13, 95; Vol. II, Jonathan Phelps, 332-333, 353-354.

68. On September 5, 2006, at the same time WBC picketers were there, at least hundreds of others stood directly in front of the church, including on the

36

sidewalk, and on the street, with flags, signs, military regalia and rumbling motorcycles.  Vol. III, Shirley Phelps-Roper, 615; Exhibits 116, 118.

69. The September 5, 2006 funeral was attended by a member of Congress and the Lieutenant Governor of Nebraska.  Exhibit 118.

70. On February 16, 2007, WBC picketers conducted a funeral-related picket in McCook.  The event was held in a government building, the city municipal auditorium; WBC picketers stood 500-600 feet away, where law enforcement told them to stand.  Vol. II, Jonathan Phelps, 286-287; Exhibits 122-125.

71. Others were engaged in activity on February 16, 2007, in McCook, including directly in front of the government building; and on the sidewalks and streets streaming down from the government building, with flags and signs.  Vol. II, Jonathan Phelps, 290-292; Exhibits 126-130.  Exhibit 129 shows a group of non-bikers with flags and a large sign, described by the WBC picketer present as being within the 300-foot zone, standing in the street, Vol. II, Jonathan Phelps, 292.

72. Notwithstanding the large number of counters, some of whom stood in close proximity to WBC picketers, on three sides of them; and some of whom verbalized disagreement with WBC's message including their expressive use of

the flag; there was no altercation, disruption or breach of the peace, Vol. II, Jonathan Phelps, 292-293.

73. On April 17, 2007, WBC picketers conducted a funeral-related picket in York. The event was held in a government building, the municipal building. WBC picketers stood around the corner and down a block to a block and a half, roughly 1000 feet away, as directed by law enforcement. Vol. II, Jonathan Phelps, 301-303; Exhibit 142; Vol. I, Rebekah Phelps-Davis, 53, Exhibit 157.

74. While WBC was picketing, others were inside the 300-foot zone engaged in activity with signs and flags. After WBC picketers began picketing, some members of the other group left the area near the auditorium and came and stood near WBC picketers. Vol. II, Jonathan Phelps, 303-306; Exhibits 143-149, 152-154.

75. Notwithstanding the size of the counters, and how close some of them came to the WBC picketers, there was no violence, and no disruption of public safety; also there also was no disruption by WBC of the proceedings held in the government building. Vol. II, Jonathan Phelps, 306.

76. On June 5, 2007, Phelps-Roper and other WBC picketers conducted a funeral-related picket in Bellevue. In advance of the picket, law enforcement identified

38

a spot that was 300-500 feet away (depending on if you go as the crow flies or follow the drives/sidewalks), and then picked and marked a spot another 300 feet (at least) from the property line (with the church set hundreds of feet back from the property line as is often the case).  Law enforcement required WBC to obtain a permit in advance of the picket, and put the location where WBC had to stand on the permit.  When WBC arrived, law enforcement had marked a small area by spraying pink paint on the sidewalk, and required all 8 WBC picketers to stay in that confined area that was hundreds, if not over a thousand feet away from the church.   Vol. I, Rebekah Phelps-Davis, 54-56; Exhibit 187-188; Vol. III, Shirley Phelps-Roper, 617-620; Exhibits 159-167.

77. At the same time WBC picketers were picketing[4], hundreds of people with flags and signs lined up outside the church, down the drive from the church, and all along the sidewalk on the same side of the street as the church, together with

---

[4] And Phelps-Roper was being arrested for her son standing expressively on an American flag, which led to two separate federal lawsuits resulting in the charges being dismissed and a finding that the flag desecration law of Nebraska is unconstitutional, Vol. III, Shirley Phelps-Roper, 617-618, 663-664; Vol. II, Jonathan Phelps, 300, 338; and see *Phelps-Roper v. Bruning, No. 4:10-CV-3131* and *Phelps-Roper v. Polikov, No. 4:10-CV-3154.*

scores of law enforcement/responder vehicles, Vol. III, Shirley Phelps-Roper, 621-624; Exhibits 168-169, 171-172, 174-175, 182.

78. Notwithstanding the large crowd of counters; how far down towards WBC many of them came; and the hostility of law enforcement; there were no altercations and no breach of the peace; and WBC had no interaction with funeral goers. Vol. III, Shirley Phelps-Roper, 624.

79. On July 30, 2007, WBC picketers conducted a picket in Norfolk.[5]  There were five WBC picketers, and they stood 50-150 feet down the block from an

---

[5] One WBC picketer who worked with law enforcement in advance of the Norfolk picket, and one WBC picketer who attended, testified they did not use flags expressively during this picket because Norfolk law enforcement advised they would be arrested if they did so, because of what happened in Bellevue.  The Norfolk law enforcement who WBC contacted testified that he told the WBC picketers they would stop stomping on the flag when they wanted to stop stomping on the flag; but that the picket would be videotaped, and depending on what happened in Bellevue the use of the flag would be turned over to the local prosecutor to determine whether to prosecute WBC picketers for expressive use of the flag (even though he agreed he knew the Supreme Court had held that citizens could expressively use the flag, and he was not under any authority of Bellevue).  The difference between how WBC picketers described Norfolk law enforcement's position vis-à-vis how Norfolk law enforcement described it is a distinction without a meaning.  All agree that if WBC picketers had used the flag expressively in Norfolk on July 30, 2007, they faced the possibility of being prosecuted.  Vol. I, Rebekah Phelps-Davis, 51-52; Vol. II, Jonathan Phelps, 307-308; Steve Hecker, 363-365, 396-398.  Denying WBC picketers their constitutional right to expressively use the flag – while thousands of others expressively use the flag – is not directly at issue in this case, but it does contribute to an understanding of the relationship between WBC picketers and Nebraska law enforcement (against which

intersection of the street that led to the church, in a residential area.  Vol. II, Jonathan Phelps, 307-310.

80. While WBC was picketing, there was a solid mass of humans and motorcycles all the way from the intersection near WBC up to directly in front of the church, including people with flags and signs, and sustained revving of motorcycles.[6] Vol. II, Jonathan Phelps, 308-310.

---

backdrop the State and Omaha now insist Phelps-Roper and other WBC picketers should pester law enforcement to move them closer when they've clearly indicated they will not); and it is part of the pattern of how WBC picketers are treated differently in their protest activity vis-à-vis others with a message that is seen as supportive of the deceased and deceased's family.  Other testimony at trial showed that besides the incidents in Bellevue and Norfolk, Omaha in particular for years disallowed WBC picketers to expressively use the flag – before and after Bellevue and until WBC got an injunction against enforcement of the flag law – while permitting the counters to routinely use their flags.  Vol. II, Jonathan Phelps, 299-300, 307-308, 321, 338.  Also on the day this suit was filed, a state trooper approached Phelps-Roper as she picketed outside the statehouse and informed her that per the Nebraska Attorney General if she used the flag expressively anywhere in the state she would be arrested.

[6] A WBC picketer participating in the picket described the sustained revving motorcycles.  Media reports shown to the Norfolk law enforcement person in charge the day of the picket reported sustained revving of 130 motorcycles, though he said this did not happen, while agreeing the motorcycles were parked taking up the whole street, and that he did not know why anybody would misreport this revving happened.  The testimony of the WBC picketer present and the media reports are consistent with other testimony (including of the captain of the Nebraska PGR) showing it is the pattern of the PGR and other bikers to sustain revving of their engines during funeral pickets.

41

81. An extensive amount of media occurred in advanced of the funeral in Norfolk – unrelated to WBC's picketing – and the funeral was attended by 500-1000 people from the community.  Law enforcement escorted the PGR with their 200 motorcycles to a place in front of the church; and the PGR formed lines on both sides of the street for blocks.   Vol. II, Steve Hecker, 368-374, 382.   Law enforcement chose not to use barricades, though they were available, Vol. II, Steve Hecker, 383.  A total of twenty law enforcement were present that date for crowd and traffic control; 15 for the crowd unrelated to WBC, and those 5 assigned to WBC were watching the crowd for people who did not belong in the area, Vol. II, Steve Hecker, 375-376, 392.

82. The law enforcement person in charge of the events that day stood 360-400 feet away from the WBC picketers, and he could not see the content of the signs, Vol. II, Steve Hecker, 387.  In consistent testimony, Phelps-Roper testified that in her many years of picketing at many different types of location, 500 feet generally puts her out of sight and sound of the event, Vol. III, Shirley Phelps-Roper, 629.  This is also consistent with the many times described otherwise at trial and in this document where WBC picketers were placed out of sight and sound from the event when placed 500 or more feet away.  And it is consistent

42

with comments by legislators about their desire to place the picketers out of sight and sound when increasing the limit to 500 feet, as set forth below.

83. Notwithstanding the close proximity between WBC picketers and the hundreds of others lined up from the church down to WBC with flags and signs, there was no physical altercation, no disruption of the peace, and no threat to public safety. Vol. II, Jonathan Phelps, 310.

84. On June 22, 2010, WBC picketers conducted a funeral-related picket in Plattsmouth, standing 800 feet from the building, as directed by law enforcement. Vol. III, Shirley Phelps-Roper, 625-628; Exhibits 196, 199-200, 201, 207.

85. On June 22, 2010, at the same time WBC picketers were there, at least dozens of others with flags and signs were immediately in front of the church. *Ibid*; Exhibit 201 shows a large sign right outside the church.

86. After WBC began picketing, more counters came to the immediate intersection where WBC was located, situating themselves on all four corners, including the same corner where WBC stood, just a few feet away.  Law enforcement set up barricades (readily available to law enforcement) to separate the groups; the counters engaged in chanting and yelling, including as cars went by honking;

this continued until WBC was finished picketing. Notwithstanding this close proximity (and the state's law enforcement expert witness saying, upon viewing video of the scene, it made him "uncomfortable"), the peace was kept, the expert witness agreed the peace was kept, and the picketing was completed. *Ibid;* Vol. III, James Davidsaver, 479-481; Shirley Phelps-Roper, 628.[7]

87. On August 28, 2010, WBC picketers conducted a funeral-related picket in Omaha. Shortly before this picket, legal proceedings in state court in Sarpy County had winded up involving Phelps-Roper, with charges (for her son

---

[7] As shown by video footage of this event, and as Phelps-Roper testified, as the picket ended one of the WBC picketers worked with law enforcement for the WBC picketers to exit without disruption or breach of the peace. It is not uncommon for WBC picketers to in advance discuss parking (for quicker exit), or at the time of the picket discuss exit strategies including an escort if there are indications counters or others will follow; this is safe and efficient. In much cross-examination about the Omaha picket of October 13, 2011, Omaha Police Chief's counsel (in particular) suggested that a top priority for WBC picketers is parking close. The testimony of WBC picketers is otherwise. A place to park is an item to be discussed with law enforcement if they are willing. If not, WBC picketers have various strategies to employ, including leaving one WBC person with the vehicle(s), driving around during the picket, etc. The picket location is not driven by the parking place. Nor is addressing parking/exit anything but prudent. More often law enforcement suggest an escort; at times WBC will if someone is trailing them, for the safety of others on the road. See, e.g., Vol. I, Rebekah Phelps-Davis, 100; Timothy Phelps, 143-144, 162, 169-171, 177; Vol. II, Jonathan Phelps, 341. This is just another example of how Phelps-Roper/WBC use strategies to ensure no breach of the peace, which strategies have been successful, because in all 46 funeral-related pickets conducted by WBC in Nebraska, there has not been a single altercation, confrontation, disruption or breach of the peace.

expressively standing on the flag in Bellevue) being dismissed.   In close proximity to that outcome, a federal judge in this Court declared the Nebraska flag statute unconstitutional, and enjoined its enforcement against Phelps-Roper and other WBC members.   As WBC members testified, the community was angered and stirred up over these legal matters, and WBC's expressive use of the flag.   As a consequence, when a WBC member contacted law enforcement in Omaha to arrange for this picket, the WBC member proposed an intersection about a half mile from the church at an intersection.   The WBC member testified if he did not have to work with a 500-foot law he would have preferred to be right across the street from the church with a separation between the two groups. He chose the more distant location to afford law enforcement ample ability to maintain a separation, given the tension in the community.   Instead, law enforcement declined in advance, and during the picket (in spite of repeated requests) to make a separation.   WBC members went to the picket, and stood on two corners of the intersection.   Upon their arrival, people standing on the sidewalk up by the church with flags trailed down to the WBC picketers.   And an unrelated group of (primarily but not exclusively) young people came to the other corner (cattycorner) where WBC picketers were standing, and engaged in

45

horn-blowing and provocative commentary, commingling closely with WBC picketers.   On the corner where the flag-holders streamed down, they commingled with WBC picketers, jostling and blocking them.  Law enforcement stood and saw all this and did nothing.   When the WBC group catty corner headed to their vehicles, the counters/horn-blowers followed, and a law enforcement is seen on video following a distance behind not intervening.  These events were captured by photos and video.  As one WBC group was leaving, they recorded video footage of people standing right in front of the church on the public sidewalk with flags.  Vol. I, Timothy Phelps, 153-159, 211; Vol. II, Jonathan Phelps, 320-328, 337-353; Exhibits 211, 215, 223, 225.

88. Near the end of WBC's pickets in Omaha on August 28, 2010, a man named George Vogel came by in his truck, and sprayed bear mace, hoping to hit WBC picketers.  Instead he hit 16 others, who had commingled themselves with WBC picketers (putting them in the bear mace range).  Law enforcement chased him down and arrested him; he was in jail for four days; he was permitted to plea to three counts, and required to pain a fine and take an anger management class. Omaha had ample opportunity to take this gentleman to trial and hold him accountable for his criminal behavior – which was not prohibited by the NFPL

46

– but missed this opportunity, leaving him apparently justified in and even seemingly proud of his criminal behavior.  Vol. II, George Vogel, 426-445; Vol. III, Jeffrey Baker, 591.

89. After the gentleman sprayed bear made, striking 16 of the commingling flag-holders, picketers kept picketing; flag holders kept holding flags; the events after the macing were pretty consistent with what was happening prior to the macing; traffic kept flowing; the funeral continued in progress; no one at the church stopped and came running down to the scene.  Vol. III, Jeffrey Baker, 593-594; Exhibit 217.

90. Phelps-Roper never picketed inside 300 feet at a funeral-related picket in Nebraska after April 4, 2006.  Exhibit 490.

91. No WBC picketer ever picketed inside 300 feet at a funeral-related picket in Nebraska after April 4, 2006.  Exhibit 490.

92. Phelps-Roper was never arrested, charged or convicted for violating the NFPL. Exhibit 490.

93. No WBC picketer was ever arrested, charged or convicted for violating the NFPL.  Exhibit 490.

94. On August 27, 2011, an amendment to the NFPL went into effect, which extended the distance from 300 feet to 500 feet. See *Phelps-Roper v. Heineman, supra, 712 F.3d at 415*.

95. The legislative history does not reflect a single instance of a breach of the peace or a threat to public safety by any WBC picket; no legislator, including the author of the extension, or the Freedom Rider who requested the extension, suggested any breach of the peace had occurred or any threat to public safety had occurred.

96. Phelps-Roper and WBC picketers have never conducted a picket in Nebraska a cemetery/burial, *Phelps-Roper v. Heineman, 57 F.Supp. 3d 1146, 1163 (D.Neb. 2014).* Thus on those occasions when the legislators in the Floor Debate as part of the legislative history for the extending the distance to 500 feet spoke of the need to protect cemeteries, there was no need for such a protection since Phelps-Roper and WBC were not picketing cemeteries. See, e.g., Exhibit 452, Floor Debate of February 4, 2011, pp. 6, 29-30, 37.

97. Multiple times during the Floor Debate legislators stated that the purpose of the extension from 300 to 500 feet was public safety (including the author/sponsor). E.g., Exhibit 452, Floor Debate of February 4, 2011, p. 26 (it's a public safety issue); p. 27 (protect people on the sidewalk and the protestors themselves); 29

48

(guarantee safety); 29-30 (public safety at cemeteries); 30 (public safety); 30
(reasonable buffer); 32 (safety of both parties involved, those at service and
protestors); 33 (primarily for safety reasons); 32-33 (the state interests we are
going to be relying on is, in this case, the public safety interests); 34 (law
enforcement ability to deploy resources and control a situation before someone
gets hurt, and protect public safety); 37 (could be intermingling of protestors
with family members and [funeral goers] … there is a public safety issue); 38
(the author, shows we are serious about public safety and about the distance
increasing to facilitate public safety).

98. Also during the legislative history, comments by legislators showed a desire to
put the WBC picketers out of sight and sound, and to continue to increase the
distance.  E.g., Exhibit 452, Floor Debate of February 4, 2011, p. 6 (500 feet is
a good step in the right direction); 6-7 (wouldn't be opposed to 1000 feet); 25
(keep the two parties' line of sight away from each other); 25 (500 feet is not
enough; 1000, 1500 feet, 1500 miles is a little too close; I'll be monitoring and
may expand on this at some future date); 25 (I can't imagine a protest group
being within visibility or even sound of the event); 26 (500 feet is not enough);
31 (if there were a movement in this body to increase the space to 1000 feet I

would support it); 35 (at 500 feet they can be heard); 36 (should consider 1000, 1500 feet later).

99. Also during the Floor Debate, the hostility towards Phelps-Roper/WBC's religious expressions continued (as with the first version of the law).  E.g., Exhibit 452, Floor Debate of February 24, 2011, 28 (WBC's speech is obscene, foul, repulsive, detestable, carries a strong moral repugnance; 23 (need to do something about them); 26 (difficult to understand the type of hatred that is expressed by this small group of picketers); 27 (we dislike this kind of speech); 30 (horrific that they protest a funeral; not acceptable behavior; repugnant; ugly side of the freedoms we have); 31 (harassing); 32 (can't understand what they're trying to prove); 35 (have to legislate respect and honor because of them); 35 (need to shut them off).

100.   During the February 4 hearing on the expansion proposal, the person who requested the expansion through the authoring/sponsoring senator was asked how they arrived at 500 feet.  "In answer to your question on how we arrived at 500 feet; 500 feet is more than 300 feet.  (Laughter.)  If you would suggest 1,000 feet, I'd be there again, or two miles for that matter."  Exhibit 452, February 4 hearing, p. 5.

50

101.   On September 17, 2011, WBC picketers conducted a funeral-related picket

in Pierce.  Law enforcement directed them to stand 1000 feet from the church,

with no indication this location could be negotiated, and no option but to stand

there, where barricades had been set up, and large fire trucks at the sides of the

area where WBC was to stand.  Vol. II, Jonathan Phelps, 311-319; Exhibits 237,

238, 239, 240, 243.

102.   While WBC was picketing on September 17, 2011, hundreds of others were

standing inside the 500 foot zone with flags and signs, on sidewalks, and with

motorcycles parked in the street, outside the church.  Vol. II, Jonathan Phelps,

313-314.

103.   Also while WBC was picketing on September 17, 2011, a large group of

people – besides those right outside the church – came to the area where WBC

was picketing and stood on both sides of the street (across from and on the same

side as), with flags and signs, within 50-150 feet from WBC picketers.  Vol. II,

Jonathan Phelps, 315-316.  In spite of this close proximity, the large number of

counters, and the smallness of the local police force, there were no physical

altercation, confrontations or breaches of the peace.  The 500-foot expansion in

the law did not have the effect of keeping the two groups 500 feet apart.  Vol. II,

Jonathan Phelps, 315-316; Vol. III, James Davidsaver, 477-478.

104.    On October 13, 2011, Phelps-Roper and two other WBC picketers conducted

a funeral-related picket in Omaha.  In advance of the picket Phelps-Roper

reviewed the area via Google maps; consulted with another WBC member;

identified a spot outside 500 feet; and the other WBC member contacted Omaha

law enforcement and requested that spot.  Instead, Omaha law enforcement

identified a location that was at least 2000 feet away for the three picketers to

stand, and offered a parking plate in a private lot.  Phelps-Roper asked to picket

along 108th closer to the event, and it was noted during testimony that Harney &

108th or Farnam and Harney were outside the 500-foot zone.  Once Omaha law

enforcement said where the picket should be, and the other WBC member

notified Phelps-Roper, she accepted this location and went to the picket.  Vol. I,

Rebekah Phelps-Davis, 57-60, 86-98; Vol. III, Shirley Phelps-Roper, 629-631,

653-654, 667-676.

105.    When the three picketers arrived, they found the parking lot empty, save for

an Omaha law enforcement, who stayed in his vehicle; when Phelps-Roper

caught his eye to confirm the parking was acceptable, he nodded.  The parking

was a block away.  (As noted above, Phelps-Roper and other WBC picketers are accustomed to dealing with parking issues; they would never have selected a private parking lot; this was the brain child of the Omaha law enforcement.) *Ibid.*

106.    While the three WBC picketers were picketing – nowhere in physical proximity to the church where the event was taking place – hundreds were lining the streets with flags outside the church, and a thousand attending the funeral. *Ibid*; Exhibits 244, 247, and 248.

107.    On July 6, 2012, WBC picketers conducted a funeral-related picket in York. They were placed over 1000 feet from the York City Hall where the event was held.  The location was "suggested" by York law enforcement in a letter in advance; Phelps-Roper and other WBC picketers viewed this as non-optional, given that it was the same place the York law enforcement had them stand at a previous funeral-related picket in York.  Vol. I, Rebekah Phelps-Davis, 61-63, 109; Vol. III, 631-635; Exhibits 256-268.

108.    WBC's area designated by law enforcement was marked off by yellow tape; while WBC picketed others with flags came to the area where WBC was picketing, and the only thing separating them was the yellow tape and a

53

sidewalk.   Also during WBC's picket, bikers made a loop, driving their motorcycles, continuously revving their engines, repeatedly returning to and passing the area where WBC was picketing.  In spite of all this, there were no fights, confrontation, altercations or breaches of the peace.  Vol. III, Shirley Phelps-Roper, 605-606, 632-635.  Thus, the 500-foot expansion did not have the effect of keeping a 500-foot separation between WBC picketers and counters.

109.   While WBC was picketing, hundreds were directly outside the York City Hall lining the sidewalks and streets; and later stood in (not outside of, in) the cemetery immediately by the burial site, with flags and signs.  Vol. III, Shirley Phelps-Roper, 632-635; Exhibits 260-265.

110.   On August 13, 2012, WBC picketers conducted a funeral-related picket in Ashland, standing on a walking trail over a thousand feet from the property where the funeral was held, at a spot designated by law enforcement.  When Phelps-Roper and the other handful of WBC picketers arrived, law enforcement directed them to a location behind a split-rail fence, and told them the counters would be kept separate.  Within minutes, the counters were first standing directly on the other side of the split-rail fence; and then came inside the area behind the split-rail fence, and began surrounding Phelps-Roper; as she began walking

within her area, to move from the counters, they followed her during the entire picket.  Vol. III, Shirley Phelps-Roper, 636-642; Exhibits 270-279.  Phelps-Roper did not ask to be moved because the die was cast; she was there to get her signs in the air; a spot had been designated.  Vol. III, Shirley Phelps-Roper, 659-660.  Thus, the 500-foot expansion did not result in a separation of 500 feet between WBC picketers and the counters.

111.   While WBC was picketing over a thousand feet away, surrounded by counters, numerous people were directly outside the high school where the funeral-related event was being held, with signs and flags.  E.g., Exhibit 274 shows a woman right in front of the high school with a large sign; see Exhibits 274-279.

112.   On August 8, 2014, Phelps-Roper and other WBC picketers conducted a picket in Lincoln.  Though Phelps-Roper requested a closer location, she and the other WBC picketers were required to stand at least 2000 feet from the church where the funeral was held.  Before beginning their picket, WBC picketers filmed footage of dozens of persons with flags standing outside the church including in the drive leading up to the church.  Vol. III, Shirley Phelps-Roper, 642-645; Exhibit 282.   While this picket was underway, the state's law

enforcement expert witness went by and observed that the WBC picketers were, in his words, a quarter of a mile away, and that there was a small group of counters across the street from them.  Vol. III, James Davidsaver, 460.

113.   The Court questioned Phelps-Roper during trial about whether the area where she asked to stand was undeveloped.  Phelps-Roper testified that it was in development; and that there is always something on the side of the road where they could stand; and that WBC picketers have stood in these kinds of spots many times.  Vol. III, Phelps-Roper, 651-653.  Defense counsel during cross-examination challenged Phelps-Roper about whether she knew the property laws of Nebraska; she responded that she has picketed all around the country and law enforcement have always agreed, and never questioned, that there is an easement or setback for people to engage in picketing.  Vol. III, Phelps-Roper, 654-657.  The defendants did not produce any evidence that there was not an easement, or that Phelps-Roper's requested location to picket closer to 500 feet was denied because of the lack of an easement.  Supreme Court jurisprudence that public easements are held in trust for robust public debate would be sharply diminished if niggling easement/no easement debates could disable public right of ways for this purpose.

56

114.   The state defendants offered a law enforcement expert witness who, while agreeing a buffer zone between groups is a sound law enforcement practice, said a 500-foot distance was necessary to keep separation between the two groups – that is, the WBC picketers and the counters.  The expert witness' premise rested on his position that he had no authority to separate groups, including individuals who were blocking and jostling, in the absence of such a law.  Vol. III, James Davidsaver, 461-462, 464, 470, 483-484.  This is an inaccurate statement of the law, and ignores both the inherent authority of law enforcement, as well as the statutes and ordinances available to law enforcement to prevent assaults, batteries, disorderly conduct, and other breaches of the peace caused by those who would commingle and jostle and block, or otherwise demand to be right up next to counter picketers.

115.   The NFPL does not require a buffer zone between WBC picketers and counter protesters; or any two group of protesters.  And, as noted in the factual statements above, since the 500-foot expansion was passed, law enforcement has not maintained a separation between WBC picketers and counters, in most instances.

116.    The state defendants offered a public relations expert witness, who suggested

an ample alternative to using the public sidewalks held in trust for public debate,

a traditional public forum, to picket in proximity to the event being picketed,

would be found in social media, traditional media, and such things as fliers and

billboards.  Vol. III, Phyllis Larsen, 491-508.  She agreed she was not familiar

with WBC's purpose, which is not to get people to accept the message (which is

the purpose of her chosen specialty of public relations).  Vol. III, Phyllis Larsen,

524.  She agreed that the literature she used in her classroom showed that you

could not determine from social media metrics (how many followers on Twitter,

how many likes on Facebook, how many hits on Websites, etc.) that you were

reaching your target audience because there is no way of knowing who is

viewing a tweet or a Facebook page or a blog.  Vol. III, Phyllis Larsen, 513-518.

She agreed she did not understand the concept of a traditional public forum and

did not factor this concept into her opinion.  Vol. III, Phyllis Larsen, 520-521.

She agreed there is no way to make any radio program agree to have a WBC

picketer on the air to publish.  Vol. III, Phyllis Larsen, 521.  She agreed she has

never tried to get a billboard put up within 500 feet of a funeral.  Vol. III, Phyllis

Larsen, 522.  She agreed there is no way of knowing the mobile phone numbers

58

of everybody going into a funeral, so there was no way to use the tool of a group text.  Vol. III, Phyllis Larsen, 522.  She tried to suggest it might be possible to get the emails of the thousand unknown strangers coming from the community to do a group email, but ultimately admitted this strategy would be very difficult. Vol. III, Phyllis Larsen, 523.  She agreed that no media would report on WBC picketing if WBC didn't picket.  Vol. III, Phyllis Larsen, 525.

117.   A blog on the Internet or one of the WBC websites is not a viable substitute for picketing the target audience at a funeral for the same reason it is not an ample alternative for those participating in the events outside the funeral.  WBC picketers have to be where the sin is taking place if they want to warn against the sin.  So if they are warning against the sins the government commits against God, they go to the seat of government.  If they are warning against the sins of the churches in lying to people about what God Almighty requires of them, they go to the churches to picket.  Vol. I, Timothy Phelps, 150.

118.   A letter to the editor is not sufficient, because there is no guarantee it will be published, or when it will be published, or of knowing that the target audience will see the letter.  The target audience at funerals includes funeral goers, the crowd outside the event, and the passersby.  Vol. I, Timothy Phelps, 150-151.

59

119.   WBC picketers do not know family members' names, or where they live; and even if they did they would not go to their homes and communicate with them or pass out fliers in their neighborhood, because that would bae a waste of energy and create an unmanageable level of conflict.  Going to a public sidewalk is much more reasonable under the law.  Vol. I, Timothy Phelps, 151-152.

120.   WBC could not do a direct mailer in lieu of picketing because they do not know who the funeral goers are; and don't have the resources to develop and push out the mailers even if they did.  Especially when the typical time from notice of the funeral to the funeral being held is ten days.  Vol. I, Timothy Phelps, 152-153.

121.   WBC goes to different events with different signs and to focus on specific sins, with different messages for the different venues.  So, WBC goes to churches to talk about false doctrines and warn the congregants they are being lied to about the Bible and to warn the preachers they will be held accountable to God for their actions. That is a specific message that can only really be delivered at a church.  Similarly, WBC goes to the Super Bow to say because people give more reverence and attention and spend money and time going to the Super Bowl instead of sincerely study the Scriptures, and but for that this

nation wouldn't be in the situation it is in with God; that's a specific form of idolatry; you have to go to the Super Bowl to deliver that message, and there is no effective alternative to picketing at the Super Bowl.  Vol. I, Steve Drain, 183-185.  It is important to go to the funeral to picket because the people going to the funeral and conducting the funeral are the target audience, and suggesting that the picket be done by Twitter is like suggesting trial testimony be put on Twitter and hope the judge follows the witness.  Vol. I, Steve Drain, 186-187.

122.   WBC has no control over the media, how they publish or if they publish WBC's message.  Most media about WBC is less favorable, and there is no way to ensure amidst the vilifying, marginalizing and demonizing of the church to ensure the content of the picket signs will go into the story.  Vol. I, Steve Drain, 186.

123.   Social media has many weaknesses in general; for WBC members; and as a replacement for – vis-à-vis an augmentation of – WBC's picketing, including funeral picketing.  To see a tweet, you have to follow the account or specifically search for the tweets.  Social media is centered around groups with common interest.  The number of followers means nothing, with 7000, 8000 or 9000 followers not being a drop in the bucket, and there is no significant until you

61

start to talk about President Barack Obama kind of numbers.  Just because you follow someone doesn't mean you're hanging on their every word; it's a fast and furious media; stuff ends up in your feed and it comes and goes, so much of it that you often scroll.  Facebook is worse; the whole concept is friending; it's a popularity contest; WBC's message is probably amongst the least popular doctrines every spoken; you're not going to build a base on Facebook with such an unpopular message.  Vol. I, Steve Drain, 188-190, 200-202.

124.   Even if WBC knew the names of the funeral goers, and the funeral goers were on Twitter, and you could find them on Twitter, and you sent them an "at mention" message, that doesn't ensure they see it, they can block you, and they can complain to Twitter and get your account suspended.  Vol. I, Steve Drain, 190-191.

125.   The rules of social media are capricious; and you cannot start "at mentioning" a lot of people on Twitter or your account will be suspended.  Twitter will shut down accounts and not give a reason and there is no appeal and no way to communicate.  WBC accounts have been shut down, including the main WBC account and WBCShirl (Phelps-Roper's account).  Other WBC social media accounts have been shut down, including Facebook, YouTube (multiple times),

Vimeo, Twitvid, Tumblr, Instagram (multiple times), SoundCloud.  Vol. I, Steve Drain, 191-196.  Specifically Phelps-Roper's accounts have been shut down numerous times, with suspensions building on suspensions; so that social media as a way for her to communicate her message is basically nothing.  Vol. III, Shirley Phelps-Roper, 648-650.  Also on social media there are imposter accounts with inaccurate messages, claiming to be WBC; mainstream media has quoted these imposters as though they are WBC accounts, on numerous occasions.  Vol. I, Steve Drain, 221.

126.   WBC cannot send faxes, group texts, emails or do telemarketing calls to funeral goers, because they do not know their email or phone numbers; and with a soldier's funeral, there is a time element.  Vol. I, Steve Drain, 191.

127.   Social media used by WBC is a small part of the overall publishing, and it augments the picketing, which is the linchpin of all the rest of the publishing.  All the rest of the media springs forth from the street preaching.  Nobody would be interested in www.GodHatesFags.com as a website, for instance, without WBC standing on the street corner holding God Hates Fags signs.  Twitter is used, for instance, to say, "Hey we're out here picketing," live from the sidewalk,

63

which cannot happen if WBC is not out on the sidewalk.  Vol. I, Steve Drain, 196-197.

128.    If social media does not close or suspend accounts, they remove content from the account, including photographs and written words, music, sermons, and pictures.  It is their vehicle, and they have total control over it and can turn it off. Vol. I, Steve Drain, 199-200.

129.    WBC's websites were not designed as a substitute for the picket signs.  You have to go to the website to see it; there is no way to reach people going to or outside funerals because they would have to go to the Website, search it out, and open it up.  Also it takes an awful lot of work to be timely and topical.  And, the WBC websites are constantly under attack, with frequent streams of attacks, because of the unpopularity of the message.   WBC spends considerable resources, capital and human, to keep the sites from being taken down, and the websites have been hacked in a very high profile way in front of national and international media.  WBC has to spend ten times as much as an average person would have to spend, using a company that is specifically skilled at warding off attacks; and that company has come under scrutiny in such a measure that it

64

publicly announced it was donating WBC's payment to veteran and LGBTQ causes.  Vol. I, Steve Drain, 202-207.

130.    In no more than five instances, of the 600 plus funeral-related pickets WBC has done, radio stations have offered air time in exchange for the picket.  The air time was negotiated to be close in time to the funeral, and broadcast to the same community where the funeral would be held.  There is no way to know if/when this will happen again, and WBC has no control over it happening.  Vol. I, Steve Drain, 207-210.

131.    Concerning the expert witness saying she found many hits on the Internet about Fred Phelps, WBC's purpose is not to promote the name of Fred Phelps (former pastor of WBC, now deceased), or any other church member; and that is not the message to be conveyed at funeral pickets.  Vol. I, Steve Drain, 211.

132.    Concerning billboards or bus signage as an alternative, Steve Drain, a WBC member who has production and marketing experience (Vol. I, Steve Drain, 179-182), and who has put up billboards, testified that the billboard would have to be right next to the church or funeral home; the bus driver would have to drive up and down the street where the event is taking place; production time is at least 30 days *after* a contract has been negotiated; and the owner of the billboard or

65

bus can you turn you away for any reason or no reason.  So these are not viable alternatives.  Vol. I, Steve Drain, 212-213.

133.   Direct mail is not an alternative to WBC picketing at funerals, because you would have to have a mailing list of those going into the funeral or presiding over the funeral including the activity out on the sidewalk.  WBC has no way of knowing the names and addresses of these people.  Vol. I, Steve Drain, 214.

134.   Telemarketing would be even less of an alternative because of the national no-call list, which has made telemarketing a thing of the past.  Vol. I, Steve Drain, 215.

135.   Sending a group email is not an alternative to WBC picketing at funerals, because you would have to have an email list, and there are rules against spamming.  Vol. I, Steve Drain, 215.

136.   Group texting is not an alternative to WBC picketing at funerals, because you would have to have phone numbers of all the people.  And we would cringe to think of a grieving family member looking up and seeing a text message from WBC the day of the funeral; it's ridiculous to think of texting a family member unsolicited (even if we knew who they were or their phone numbers).  Vol. I, Steve Drain, 215.

137.   A news conference is not an alternative to WBC picketing at funerals, because there is no way to control if the media is going to show up.  It is way less likely that any media would pay any attention without the signs.  Peaceful picketing is the most effective way to be sure the signs and the message on the signs are published.  Vol. I, Steve Drain, 216-217.

138.   Because of the unpopularity of WBC's message, traditional means of marketing are not effective.  Vol. I, Steve Drain, 218-219.

139.   The state defendants offered an expert witness who is a psychologist who spoke with family members of some of the deceased whose family members' funerals were picketed by WBC.  He testified that when people are bereaved they have an emotional vulnerability, that can have physical aspects, and that can render the person more irritable and maybe even more likely to be angry or even become violent.  And that there is a cultural assumption that the community comes together and supports the bereaved at the funeral; and that right after death the deceased can be over-idealized so that signs that are demeaning could be seen as inflammatory.  Vol. III, Scott Bresler, 529-546.  He also testified that when he talked with these family members they were angry or distressed, some still to the day of the interview, some remembering specific signs, because they

67

saw, or heard about, or were aware of the WBC picketers.  Vol. III, Scott Bresler, 547-555.  The expert did not feel it was in his area of expertise to render an opinion on whether the proximity made a difference in exacerbating the vulnerability of the bereaved.  Vol. III, Scott Bresler, 558.

140.   The expert witness psychologist agreed that when he interviewed family members they said they agreed WBC picketers had a right to picket, but wanted them kept at a distance on the days in which they were struggling to cope with the death of their relatives.  Vol. III, Scott Bresler, 559.

141.   He agreed that based upon his interviews, no family member was confronted by a WBC picketer; no WBC picketers went into the funeral event or disrupted the event; that the family members were able to carry out the ceremony as planned; no WBC picketer tried to block their vehicle or ingress/egress; no WBC picketers sent them an email, tried to give them a brochure, showed up at their house, or called them on the day of the funeral.[8]  Vol. III, Scott Bresler, 560-563.

---

[8] Some family members were called by counsel because they were listed as witnesses.  One was angry about this, as she reported it to the expert witness when he interviewed her, and she freely expressed her anger when she got the call.  Vol. III, Scott Bresler, 562-563.

142.   The range of distance from the funerals of those deceased whose family members were interviewed by the expert witness was from 600 feet to 1000 feet to not present at all.  Vol. III, Scott Bresler, 565-568.  Family members were upset even if they took a route that did not actually pass WBC picketers, if they just heard tell or were aware they were there.  Vol. III, Scott Bresler, 572.

143.   During the funerals of the deceased whose family members were interviewed, there were crowds of dozens to hundreds and even a thousand present to comfort them, and the family members told the expert witness they were comforted by the crowd and the outpouring of community support.  Vol. III, Scott Bresler, 570.

144.   No family member reported to the expert witness angrily confronting any WBC picketer; or any event of violence or breach of the peace occurring.  Vol. III, Scott Bresler, 569.

***Legal Arguments & Authorities***

<u>The NFLA is not Content-Neutral</u>

The Court in *City of Manchester* said the constitutionality of a law regulating the exercise of protected speech in a public forum depends in large part on whether it is content based, 697 F.3d at 686. Further, that whether exacting or intermediate scrutiny should be applied depends on whether the law is content based or content neutral, 697 F.3d at 687.

The NFPL is not content-neutral. It applies when "funerals are targeted for picketing." The Court said "targeted" meant a hostile message, Transcript, Motion for Preliminary Injunction, May 10, 2010, 29-30, Doc. No. 130. The state defendants treat the law as applying to a hostile message, witnessed in its arguments before the Eighth Circuit, Audio of Hearing, Online: http://1.usa.gov/1pCcgpO (last visited July 16, 2015), at 30:30-30:38; and its questions to the captain of the Nebraska PGR, Vol. II, John Scott Knudsen, 408. The PGR believe they are eligible to be inside the zone because they do not deliver a hostile message, but instead one of "honor and respect," because a message that would be hostile is "lack of honor and respect," Vol. II, John Scott Knudsen, 423. The Nebraska legislature intended "targeted" to only apply to messages that were not supportive of the family, see fact 37 above.

70

The NFPL is unlike *City of Manchester* or *Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), where the restrictions applied equally to all demonstrators, regardless of viewpoint, and where the statutory language made no reference to the content of speech, 697 F.3d at 688. The NFPL by its "targeted" language applies only to messages deemed hostile. That makes this law more like the law forbidden in *Boos v. Berry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 33 (1988)* (law struck that prohibited displays of signs tending to bring a foreign government into public odium or public disrepute). For a law to be content neutral, it must not be adopted because of disagreement with the message; the restriction must apply regardless of viewpoint; and the government interest must be unrelated to the content of the speech, *Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 120 S.Ct. 2480 (2000).* The NFPL fails on all three counts. The law was adopted because of disagreement with WBC's message. The restrictions only apply to the "hostile" viewpoint. The government interest – as clearly announced by the author of the first bill – is *not* in stopping speech that is supportive of the family, but only in stopping speech that is not supportive of the family. See *Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)* (law that prohibited picketing except labor picketing content based).

71

<u>Nebraska has no Compelling (*or* Significant) Government Interest in Extending the Distance to 500 Feet</u>

Without waiving claims that the 300-foot law is unconstitutional, or that the law is content-based, Phelps-Roper contends the 500-foot expansion lacks a government interest.

The Nebraska legislature already identified 300 feet as adequate to protect the privacy and dignified burial interests.  Nothing changed from 2006 to 2011 on that issue to require an expansion of the distance for this purpose.  Family members (and everybody else, for that matter) do not like WBC's message; they do not want to hear any words suggesting a sin is afoot; they will get distressed and angry at the words in some measures at 300 feet, 500 feet, or any other feet.  Footage is not the issue.  Whether they see the WBC picketers; hear about them; are aware of them; are even so much as suspect they are in the vicinity; they will be distressed.  A 500-foot law does not change this; and it is not necessary to go beyond a distance that permits family members and funeral goers to get to and from the funeral without interference to afford privacy.  (That is assuming these events are private.  When they are private, WBC does not come.  These events are not private, by any definition.  Maybe the family members still retain some right to grieve in private, but they have not through their interviews with the expert witness expressed a desire to have a quiet private funeral, to grieve alone or with a few close loved ones.  Rather, they want the

72

community outpouring and presence.  And according to the PGR, they invite them to come in large numbers with all their pomp and noise.  Otherwise, if they wanted a private quiet funeral, they would not publish the date, time and location of the funeral.  So be it.  But they cannot have the big splashy public event, and then claim they need privacy and quiet. They cannot use the funeral to engage in speech, and then insist there be no counter speech.)

The weight of the legislative record in 2011 shows that the proffered reason is public safety.  There is no evidence of any breach of public safety at any Nebraska funeral picket, by Phelps-Roper, WBC picketers, or those engaged in flag holding, sign waving, motorcycle revving, or other forms of expressive activity in connection with funerals.  It was a pretext.  All 46 of WBC's funeral-related pickets were conducted without any breach of the peace.  The only act that occurred at any of them was the bear macing incident, which was not covered by the first law, or second law, and for which criminal conduct law enforcement have sufficient remedy.  And this incident was not mentioned by the legislature.  Also it did not disrupt the funeral or the counter protesting occurring in connection with the funeral.

Unlike *Hill v. Colorado*, *supra*, or *McCullen v. Coakley, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014),* there is no history of unlawful or disruptive behavior by Phelps-Roper/WBC picketers, or of threats to public safety, justifying the original or expanded

73

law.  Laws must have some basis in fact, e.g., *Survivors Network of Those Abused by Priests, Inc. ("SNAP") v. Joyce, No. 13-3036, 2015 WL 1003121, at *8 (8th Cir. Mar. 9, 2015); see also Kitchen v. Herbert, 755 F.3d 1193, 1223 (10th Cir.), cert. denied, 135 S.Ct. 265 (2014) (*quoting *Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997).* "But even under more relaxed forms of scrutiny, a challenged classification "must find some footing in the realities of the subject addressed by the legislation" based on a "reasonably conceivable state of facts." (Quoting *Heller v. Doe ex rel. Doe, 509 U.S. 312, 320, 321 (1993)*).

The state's law enforcement expert witness believed the purpose of the law was to put a distance between the WBC picketers and counters, and that he could not put such a buffer without such a law.  That is not what the law says; and that is not what the law has accomplished.  Further, law enforcement already have all they need to put a buffer when public peace and safety call for such a buffer, and WBC picketers routinely bring this potential need to law enforcement's attention, request it when circumstances make it necessary, and fully cooperate when law enforcement choose to do it.

Aside from state and local laws prohibiting such things as assault, battery, disorderly conduct, unlawful assembly, and so forth, case law requires law enforcement to maintain the peace, including by a separation between groups with competing views.  And case law

74

requires law enforcement to prevent one speaker from by his conduct interfering with another speaker.  Also case law prohibits law enforcement allowing someone who disagrees with speech to effect a "heckler's veto" by a violent disorderly reaction, which is then used as a justification for silencing speech. "As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective,'" *Heffron v Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)*.  In *Grider v. Abramson, 994 F.Supp. 840 (W.D.Ky. 1998), affirmed by Grider v. Abramson,* 180 F.3d 739 (6th Cir. 1999), *cert. denied, Grider v. City of Louisville*, 528 U.S. 1020, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999), the Court held that police acted properly in making a separation between two groups, the KKK and those who countered their rally.  The two groups were kept across the street from each other with fencing keeping them separate.  The court noted they were still in sight and sound of each other, so that if either wanted to convey a message to the other they could.  This was done by the police, along with some other safety planning and measures, because of a history and threat of violence. Despite the possibility of violence, officials did not prevent either rally from using its choice of forum or its selected time-slot. Changing the time or place of either rally would have reduced the threat of violence but also would have been more restrictive and inconsistent with the goal of fostering public

debate.  Instead, authorities simply put up fencing to keep the rallies separate, but within view and hearing of each other.  By keeping the rallies separate, the police lessened the threat of violence.  By allowing the rallies to take place across the street from each other, the police encouraged the very robust debate the *First Amendment* is designed to protest and encourage.  Certainly, a debate is more vigorous when the opponent is within range, but a genuine debate is less likely when participants are afraid for their safety.

> *** The state's overriding interest was public safety, which, in turn, was essential to the exercise of everyone's *First Amendment* rights.  Thus, keeping the rallies separate serve equally the state's interest of public safety and of free unimpeded speech.  *** The separation was one of the least restrictive means possible for protecting the participants and seems directly related to the state's interest in controlling mob violence.  …  In fact, the separation would probably encourage the debate, rather than inhibit it.  994 F.Supp. at 845.

Similarly in *Startzell v. City of Philadelphia*, *533 F.3d 183 (3rd Cir. 2008),* the Court affirmed the grant of summary judgment against Repent America members who entered a permit area during an OutFest by Philly Pride, and then began disrupting the OutFest.  The leader was ordered to move, and when he didn't, he was arrested.  After the police let Repent America members into the permitted area, over the objection of Philly Pride (who had a permit), they stood 20 feet from the main stage, singing loudly, playing instruments, showing signs, and using microphones and bullhorns.  When the main events began on the

76

stage, the police told Repent America to move, and they moved a block. Philly Pride had

50 or so pink angels surround them with Styrofoam signs and whistles. The whole group

stood in front of vendors, and confrontations broke out. There had been physical

confrontations between Repent America and homosexual activist groups in the past. So

the police told Repent America to move to the edge of the permit area, in front of a popular

gay bar, to continue their protest. The leader refused, and headed back toward the main

stage. He was arrested, put in jail for 21 hours, and then let go with no charges. He sued

and summary judgment was awarded against him. The Court held that it was proper to let

Repent America into the permit area, so long as they were not keeping OutFest from having

its event; but that it was also proper to require Repent America to move to a different

location when they began disrupting the event.

> Even in a traditional public forum, the government may impose
> content-neutral time, place, or manner restrictions provided that the
> restrictions 'are justified without reference to the content of the
> regulated speech, that they are narrowly tailored to serve a significant
> governmental interest, and that they leave open ample alternative
> channels for communications of the information," *Ward v. Rock
> Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661
> (1989).*
>
> ***
>
> The right of free speech does not encompass the right to cause
> disruption, and that is particularly true when those claiming protection

of the *First Amendment* cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

In the case before us, the video shows that the Repent America contingent used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway. The police had ample justification to direct Appellants to move when they interfered with the permitted event's activities by expressing their message with loud bullhorns right next to the main stage where musical performances were held, directly confronting a transgendered individual, and blocking access to the vendors who had applied for booths at OutFest. 533 F.3d at 197-199.

"A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect from violence persons exercising their constitutional rights," *Glasson v. City of Louisville,* 518 F.2d 899, 906 (6th Cir. 1975), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975).

500 Feet is Not a Reasonable Time, Place and Manner Restriction, Narrowly Tailored, Leaving Ample Alternatives to Reach a Specific Audience

While approving 300 feet in the abstract in *Manchester,* the concurring opinion cautioned against the expansion of limits against speech for emotional offense alone, and

78

extending the circumference of the government interest: "To keep the footing on this precedential slope sure, a significant government interest must not be diminished any more than these facts permit," 697 F.3d at 697. This is not a hypothetical concern; the legislative record when the distance was expanded from 300 to 500 feet shows that legislators were considering and anticipating increasing the distance even further.

Five hundred feet does not impact public safety. Five hundred feet does not keep counter protesters separated from WBC picketers. Five hundred feet does not prevent family members from being angry or distressed at the message. The only thing five hundred feed does is remove WBC picketers from sight and sound of their target audience, which is forbidden by *Coakley, supra.*

The NFPL does not provide an ample alternative. The state defendants will rely on the below quoted language from *Manchester* at 697 F.3d 678, 695 (8th Cir. 2012), to suggest social media, other forms of contacting family members and funeral goers, marketing, and traditional media suffice as ample alternatives.

> The narrow tailoring of Manchester's ordinance becomes even clearer upon examination of the closely related question of whether it leaves open "ample alternative channels" for speakers to disseminate their message. Manchester does not restrict individuals from publicizing their views. Like the protesters in Frisby, individuals "may go door-to-door to proselytize their views," "may distribute literature . . . through

the mails," and "may contact residents by telephone." 487 U.S. at 483-84 (citation omitted). Dissemination of a message by letters to the editor or the internet is also possible. A picketer's speech is not restricted in its content and may be freely expressed anywhere in the city except during a short period immediately surrounding a funeral service. Otherwise individuals may picket in Manchester wherever and whenever they desire. Speakers retain great latitude to express any viewpoint or discuss any topic at nearly any location and nearly any time in the city of Manchester. For these reasons, Manchester's ordinance does not restrict "substantially more speech than is necessary." Ward, 491 U.S. at 799.

In *Frisby* that the issue was whether to let the picketers stand directly in front of the residence. The alternatives spoken of were ways to still reach *the same audience* – that is the doctor the abortion picketers were protesting and his neighbors. To the extent *Frisby's* language is applied to mean anything more, it is a misapplication, and misperceives the point of ample alternative. It is not an ample alternative if it does not permit the speaker to convey the specific message to the specific audience intended.

In *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the Court found that municipal ordinances prohibiting persons in public streets from handing circulars, handbills, etc. to those willing to receive them, the purpose of which was to prevent littering, violated the constitution. The Court addressed ample alternative this way:

80

> It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places.  But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.  308 U.S. at 163.

In *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994)*,* the Court considered an ordinance that prohibited plaintiff placing a sign bearing a message against the war in the Persian Gulf on her front yard.  Upholding the trial court's preliminary injunction, the Court said:

> Here … Ladue has almost completely foreclosed a venerable means of communication that is both unique and important.  It has totally foreclosed that medium to political, religious, or personal messages.  Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community. ….
>
> ***
>
> *** Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a common means of speaking, such measures can suppress too much speech.  512 U.S. at 54-55.

Further:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying

81

the same text or picture by other means.  Precisely because of their location, such signs provide information about the identity of the "speaker."  As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade. ….

Residential signs are an unusually cheap and convenient form of communication.  Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute.  [Citations omitted.]  Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a hand-held sign may make the difference between participating and not participating in some public debate.  Furthermore, a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means.  512 U.S. at 56-57; emphasis in original.

In *Olivieri v. Ward,* 801 F.2d 602 (2d Cir. 1986), *cert. denied, Ward v. Olivieri,* 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987), the Court reviewed the decision to grant a permanent injunction to a group of homosexual picketers who wanted to use the public sidewalk in front of St. Patrick's Cathedral in New York city during a march (that involved 12,000 marchers, to conduct a peaceful demonstration for two hours while the parade passed by.  Law enforcement had concerns about keeping the peace because for years a counter group that included Catholic War Veterans, Orthodox Jews and others, had counter protested, and there had been confrontations.  804 F.2d at 603-604.  Ultimately the Second Circuit affirmed the finding that the defendants' order closing the sidewalk infringed

82

plaintiff's civil rights, but reversed the permanent injunction that prevented defendants from preventing 100 of plaintiffs' members to demonstrate before the cathedral, because this part of the trial court's decision encroached on the ability of the counterdemonstrators to convey their message at the cathedral. In the course of this ruling, the Court said:

> A court's power to review government restrictions imposed on the exercise of a *First Amendment* right occupies middle ground between extremes. It does not kowtow without question to agency expertise, nor does it dispense justice according to notions of individual expediency "like a kadi under a tree," *Terminiello v. Chicago, 337 U.S. 1, 11, 93 L.Ed. 1131, 69 S.Ct. 894 (1949)* (Frankfurther J., dissenting). "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine," *Olivieri v. Ward, 766 F.2d 690, 691 (2d Cir. 1985).* ….

> When *First Amendment* concerns are involved a court "'may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.'" [Citations omitted.] *** In the instant case, we agree with the district court that the restrictions imposed were not drawn solely to further the government's conceded interest in public safety.

> Thus, here the district court properly reviewed the proposed restriction and correctly concluded that Dignity's presence on the walk is assured as an exercise of its members' constitutional rights. Insofar as the trial court went on to find that the counterdemonstrators had no real interest of their own in being on the sidewalk – but simply wanted to keep Dignity's members off – its opinion and order did not protect the constitutional rights of the … counterdemonstrators to convey their

83

message in opposition to that expressed by Dignity. In this respect, we believe the district court erred.

> The message that plaintiffs seek to convey is that they are members of the Catholic Church which they do not forsake because of their homosexuality. Since St. Patrick's Cathedral is the see for the Roman Catholic Archdiocese of New York and serves, the [counterdemonstrators believe], as a symbol of religious and family values they think is under attack by the gay demonstrators, the potential for confrontation and violence is obviously present when the opposing groups share the same public forum at the same time. It is not up to the city or its officials to determine those issues worth debating in a public forum. …. [B]oth groups are entitled to be present before St. Patrick's Cathedral during the Gay Pride Parade. 801 F.2d at 606.

In *Spartacus Youth League v. Board of Trustees,* 502 F.Supp. 789 (N.D.Ill. 1980), the court granted a preliminary injunction against a university's regulations governing the sale and distribution of literature, in behalf of two students and two non-students. One of the court's findings:

> Defendants seek to bolster their argument … that alternative distribution sites are adequate substitutes. *** We are [] unconvinced that off-campus distribution of newspapers on a surrounding street is remotely akin to distribution of those materials in a building used by 10,000 persons per day and in an area specifically reserved for discussions and distribution of literature. In addition, an individual "is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State, 308 U.S. 147, 163, 60 S. Ct. 146, 151, 84 L. Ed. 155 (1939).* 502 F.Supp. at 801.

84

In *Coalition to Protest the Democratic National Convention v. City of Boston*, 327 F.Supp.2d 61 (D.Mass. 2004), *affirmed by* Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8 (1st Cir. 2004), the court considered challenges to the denial of permits for parade routes immediately next to the outer security perimeter of the FleetCenter, and the demonstration zone constructed for protesters at the Democratic National Convention in Boston.   In granting a preliminary injunction to one of the parties, the court addressed ample alternative, saying:

> *C. Adequacy of alternatives*
> The Coalition plaintiffs contend that an important part of their expressive message is that they are able to march to the "doorstep" of the DNC.
>
> I note at the outset that the City has provided nuanced, reticulated options for many different types of expression within the soft zone and, of course, outside it.   Inside it, plaintiffs may conduct small demonstrations with no permits whatsoever, and may conduct 21-50 person stationary demonstrations on an expedited permitting basis. Anyone may distribute leaflets, or hold signs.
>
> Turning to Causeway Street itself, although the hard zone perimeter and the two-story "media village" interposed between it and the FleetCenter virtually guarantee that no DNC delegate will directly observe demonstrators on Causeway Street, there is expressive value in passing a particular destination even if no one is home. For instance, protesters often picket the White House when the President is out of town. Plaintiffs contend that the opportunity to march on the street that fronts the FleetCenter -- and, perhaps, to be photographed there by reporters -- has symbolic value not replaceable by a march down an

85

alternate route one block to the south. It is well established that the location of a demonstration may be "an essential part of the message sought to be conveyed," as well as "essential to communicating with the intended audience." *Nationalist Movement v. City of Boston, 12 F. Supp. 2d 182, 192 (D. Mass. 1998); see also Schneider v. New Jersey, 308 U.S. 147, 163, 84 L. Ed. 155, 60 S. Ct. 146 (1939)* ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place").

On these facts, the difference in practical effect between the approved route and the route plaintiffs seek may be modest. *** In any event, while the *practical* differences between the contested parade routes may be small, the *symbolic* differences loom larger. There is a symbolic importance to marching right next to the site of the DNC to bring to the attention of those who would listen the protesters' concerns about the direction of the Democratic Party. Even marching next to an opaque fence itself tells a story. And it is a story that the Coalition plaintiffs want to tell.

Causeway Street feels like the doorstep of the DNC, where an organized group can convey its message, if not to those in power, then through the fence that surrounds them. Although I suggested at one point during the hearing that Valenti Way might then be viewed as the "stoop" to the DNC, I am satisfied that it is sufficiently attenuated from the FleetCenter that the symbolic dimension to the Coalition plaintiffs' parade is substantially dissipated by its use.

On the basis of the specific facts presented, I find that Valenti Way and the other soft zone speech opportunities may not, in themselves, be adequate alternatives to a march along Causeway Street. Furthermore, I find that denial of permission to march along Causeway Street could irreparably harm plaintiffs. 327 F.Supp. at 71-72.

Ample alternative is contextual.  As the facts in this case reflect, Phelps-Roper and WBC picketers have a specific message about the funeral, about the events outside the funeral, targeted to the funeral goers, those conducting the funeral, and those engaged in activity outside of the funeral.  Just as the others with flags and signs have a message for the family, for the funeral goers, for the community, and for WBC.  The proffered ample alternatives have been demonstrated to be inadequate in every sense.  They do not reach the target audience at the time the target audience is engaged in the activity that is the topic of WBC's message.  There is no way to identify this target audience independent of the event itself.  There is no way to reach this target audience separate from when they are attending the event itself.  And it would be a *far* greater invasion of privacy to communicate with family members or funeral goers by going to their homes, going to their neighbors, contacting them by email, contacting them by text, contacting them by mailer, or putting a message on the obituary page next to the obituary of their loved one.  The proposals offered by the public relations expert witness are impractical, unrealistic, and inadequate.  Social media, traditional media, and marketing methods are not ample alternatives to the lawful and peaceful use of public sidewalks within a reasonable sight and sound distance of the event which is at issue, where all of the rest of the dialogue/speech on the topic/event is occurring.

87

Five hundred feet is too far.  As noted above, it removes WBC picketers from sight and sound of their audience.  (On those rare occasion when law enforcement actually let WBC stand at the 500-foot line.)  When the United States Supreme Court has upheld distance limits, it has been narrow and under circumstances where there was specific behavior by the picketers requiring this distance.  *Hill v Colorado* upheld a 100-foot limit that was passed into law after a long history of disruption, blocking, and dogged importuning by abortion picketers, who directly approached, and became physically and loudly verbal with those going in to have an abortion or other medical procedure.[9]  *Only* because of that history of disruptive behavior was the very narrow provision of 100 feet (within which a person could not be approached within 8 feet unless the person consented) upheld.  The application of the captive audience principle fit; the behavior of the picketers over a long period of time reflected that the audience was captive.  The law was not passed to remove the message; it was passed to regulate established longstanding disruptive

---

[9] For instance, a nurse practitioner testified that some antiabortion protesters yelled, thrust signs in faces, and generally tried to upset the patient as much as possible.  A volunteer who escorted patients testified to a mother and her daughter being immediately surrounded and yelled and screamed at.  530 U.S. 703 at 710, 120 S.Ct. 2480 at 2486, footnote 7. People on both side of the debate testified that demonstrations in front of abortion clinics impeded access to the clinics and were often confrontational. 530 U.S. 703 at 709-710, 120 S.Ct. 2480 at 2486.

behavior. There the right to be left alone was directly imperiled by the behavior of the picketers; and that right to be left alone was not the equivalent of the right to be shielded from words with which the people going into the abortion clinic disagreed.

> Furthermore, whether there is a "right" to avoid unwelcome expression is not before us in this case. The purpose of the Colorado statute is not to protect a potential listener from hearing a particular message. It is to protect those who seek medical treatment from the potential physical and emotional harm suffered when an unwelcome individual delivers a message (whatever its content) by physically approaching an individual at close range, i.e., within eight feet. In offering protection from that harm, while maintaining free access to health clinics, the State pursues interests constitutionally distinct from the freedom from unpopular speech to which Justice KENNEDY refers. 530 U.S. 703 at 718, 120 S.C. 2480 at 2491, footnote 25.

In *Boos v. Berry*, 485 U.S. 312, 329-32, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) the Court considered two 500-foot provisions. One provision made it unlawful to display within 500 feet of a foreign embassy any sign tending to bring a foreign government into public odium or public disrepute (the "display" clause). The other made it unlawful to congregate within 500 feet of any foreign embassy and refuse to disperse after having been ordered to do so by the police (the "congregation" clause). The display clause was invalidated; the congregation clause was upheld. Noting that the display clause prohibited classically public speech in traditional public fora, and that the law was content-based, the Court invalidated that law. The government argued that the display clause was necessary

89

to eliminate a secondary effect, namely, our international obligation to shield diplomats from speech that offends their dignity, relying on *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), which allowed a prohibition on movie theatres specializing in adult films because of the secondary effects of the theatres in surrounding communities (higher crime, lower property values, etc.).  "Regulations that focus on the direct impact of speech on its audience present a different situation.  Listeners' reactions to speech are not the type of 'secondary effects' referred to in *Renton*," 485 U.S. 312 at 320, 108 S.Ct. 1157 at 1160, 99 L.Ed.2d 333, 344.  The Court rejected the claim that the law was necessary to protect the dignity of foreign diplomatic personnel for the sake of international relations.

While the display clause was invalidated, the congregation clause was saved only by a narrowing construction.

> Standing alone, this text is problematic both because it applies to any congregation within 500 feet of an embassy for any reason and because it appears to place no limits at all on the dispersal authority of the police.  The Court of Appeals, however, has provided a narrowing construction that alleviates both of these difficulties.

> …. [T]he Court of Appeals circumscribed police discretion by holding that the statute permits dispersal only when the police reasonably believe that a threat to the security of peace of the embassy is present. 485 U.S. 312 at 330, 108 S.Ct. 1157 at 1168, 99 L.Ed.2d 333 at 350.

The NFPL is Applied to Phelps-Roper/WBC Unconstitutionally

Phelps-Roper alleges that the law is applied unconstitutionally in three ways:  1) it is applied only to WBC picketers, no one else; 2) it is applied over broadly, moving WBC picketers further than 500 feet, sometimes all the way out of town; 3) it is applied in a manner that permits those with a competing view to block WBC's message.

Concerning reason one, the Court previously stated that Phelps-Roper must establish a pattern of unlawful favoritism; that she was prevented from speaking while someone espousing another viewpoint was permitted to do so; and:  "For Phelps-Roper to establish a pattern of unlawful favoritism, she must demonstrate that the others inside the buffer zone were engaged in the activity prohibited by the NFPL, i.e., picketing or protest activities targeting a funeral," *Phelps v. Heineman, supra, 57 F.Supp.3d at 1175*.

The trial record shows that each time Phelps-Roper/WBC picketed at a funeral-related event, the law was applied to their speech.  And that at the same time others were using flags, signs, message-bearing garments, boom boxes, and motorcycles to convey a message inside the zone.  Further, on many more occasions when Phelps-Roper/WBC were not present, the PGR were permitted in the zone to convey a message by flags.  And that on numerous occasions others, beyond the PGR, were permitted in the zone to convey a message by flags.   And that on numerous occasions others, beyond the PGR, were

91

permitted in the zone to convey a message by signs.  Even with the Court holding on the eve of trial that only events after the 2011 500-foot expansion would be considered on the as-applied challenge, a pattern has been shown.  It is reversible error not to consider the full pattern given the fact that the pattern remained the same from the time the first law was passed making the evidence highly relevant.  The trial evidence, including testimony by Phelps-Roper, testimony by other WBC picketers, testimony by the PGR state captain, and testimony by law enforcement, shows that the law is applied to WBC, and to no one else.

Concerning reasons two, beyond applying the law only to Phelps-Roper/WBC, on most occasions when Phelps-Roper/WBC picketed at funeral-related events in Nebraska, they were required to stand further away than 300 or 500 feet.  In most instances it is clearly documented that law enforcement made this decision and insisted and enforced their decision.  In some instances, Phelps-Roper or other WBC members asked for a closer location, and were denied this request.  The law does not require people to ask before it is followed.  Further, there are practical reasons no further asking occurred, including the need to maintain as good a relationship as possible with law enforcement; the fact that upon arrival the WBC location was set, often with demarcations (such as barricades, yellow ribbon, fire trucks, etc.); that asking never netted anything but being moved further away; that Phelps-Roper/WBC picketers had traveled many miles and had a limited amount of

92

time to picket; that they would risk being arrested; and so forth.  Whether these reasons are deemed acceptable are not is beside the point.  Just like it is beside the point that in spite of these events, WBC chose to send thank you letters to be as positive, encouraging and reinforcing of any constitutional behavior discerned.  Picketers are not required to ask, press, and risk arrest to have the 500-foot limit applied.  There is no explanation for why it was not, and often it was simply an arbitrary extension of the distance by law enforcement.  (In one instance Omaha claims to have been acting in behalf of WBC picketers by finding them a prime location.  The testimony by the WBC member who worked with law enforcement in advance, and Phelps-Roper who attended the picket in October 2011, question this purpose; but even so, the law does not contain an exception when law enforcement think a distance further than 500 feet is prime.)  This overbroad application of an already overbroad law is unconstitutional.

Concerning reason three, the authorities above show that it is improper for law enforcement to allow the counters to block Phelps-Roper and other WBC picketers.  The irony that this is routinely allowed, when the 500-foot expansion was ostensibly to put a buffer between these two groups is noteworthy.  Apparently the PGR, other counters, and law enforcement, just assume it is perfectly fine for people who disagree with WBC's message to block them, under the auspice of "protecting the family" from their words.  It

93

is no more appropriate for counters to crowd, surround, jostle and block WBC picketers to "protect the family" from the words than it is the government.  This behavior is unlawful, unconstitutional, and the Court should put a stop to it.  In spite of this behavior by the counters, by bent of Phelps-Roper/WBC's circumspect behavior, no breaches to peace or safety have occurred.  So even though the counters crowd and surround; law enforcement often decline to impose or enforce or a buffer between the groups; and no breaches to safety have occurred in spite of that, the Nebraska legislature expanded the distance to push WBC back from 300 to 500 feet to provide a buffer for public safety.  And it did not work.  This law has been grossly unconstitutionally applied.

The Nebraska Funeral Picketing Law is Unconstitutionally Vague

The law does not designate where the measurement is to begin.  The Court has indicated it will cure this defect by a definitive interpretation pursuant to *Calvary Baptist Church v. Coonrad, 163 Neb. 25, 77 N.W.2d 821, 825 (Neb. 1956)*, see *Phelps-Roper v. Heineman, supra, 57 F.Supp. 3d at 1173*.  This definitive interpretation has yet to happen, and for years the law has been applied in varying ways, generally always to put the most distance possible between the building where the event is occurring and Phelps-Roper/WBC picketers.

94

The law does not define "targeted" picketing, and law enforcement have received no training on what it means.  That compounds and facilitates the unconstitutional discriminatory application.  By leaving it to the discretion and imagination of law enforcement, the "hostile" definition of "targeted" thrives.

Respectfully submitted,

/s/Margie J. Phelps
_____
Margie J. Phelps, Ks. #10625
Attorney at Law
P. O. Box 3725
Topeka, KS 66604
785-408-4598 (ph)
785-233-0766 (fx)
margie.phelps@cox.net
Attorney for Plaintiff

Certificate of Service

I hereby certify that service was made of the foregoing Post-Trial Brief on July 16, 2015, through the Court's CM/ECF system on counsel of record.

/s/Margie J. Phelps
_____
Margie J. Phelps