## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **SHIRLEY L. PHELPS-ROPER,** | **Case No. 4:09CV3268** |
| **Plaintiff,** | |
| **v.** | **STATE DEFENDANTS'** |
| | **POST-TRIAL BRIEF** |
| **PETE RICKETTS, et al.,** | |
| **Defendants.** | |

State Defendants Pete Ricketts and Doug Peterson submit the following post-trial brief.

### FACTS

1.    Defendant Pete Ricketts is the Governor of the State of Nebraska, and is named in his official capacity. Pretrial Order Uncontroverted Facts ("PTO"), Filing 278, at ¶ 3.

2.    Defendant Doug Peterson is the Attorney General of Nebraska, and is named in his official capacity. The NFPL contains no provision that the Attorney General is responsible for the enforcement of the NFPL. PTO, at ¶ 4.

3.    Defendant Schmaderer is the Chief of Police for the City of Omaha, and is named in his official capacity.  Because Omaha is a Metropolitan Class Home Rule Charter City, the Omaha police have the power to arrest persons for

violations of state laws and city ordinances, per Neb. Rev. Stat. § 14-102(2) and § 14-606 (Reissue 2012) and Omaha Home Rule Charter § 3.11. PTO, at ¶ 6.

4.      The City of Omaha, through the City Prosecutor's Office, has the authority to prosecute non-domestic violence misdemeanor and traffic offenses and the City of Omaha Ordinance violations that occur within the City of Omaha. PTO, at ¶ 7.

5.      The current version of the Nebraska Funeral Picketing Law ("NFPL"), Neb. Rev. Stat. §§ 28-1320.01 through 28-1320.03 (Reissue 2008; Cum. Supp. 2014), became effective August 27, 2011. PTO, at ¶ 1.

6.      The NFPL provides for a buffer zone of 500 feet for those engaged in protest activities targeted at a funeral. The 500 foot buffer zone is from the location of a cemetery, mortuary, church, or other place of worship during a funeral. Neb. Rev. Stat. § 28-1320.02; Filing 116 at 23-24.

7.      Plaintiff agrees a "normal block" is approximately 500 feet. Tr. 659:12-14; Tr. 469:16-19.

8.      The NFPL is limited to the actual ceremonies or memorial services and to one hour prior to through two hours following the commencement of a funeral. Neb. Rev. Stat. § 28-1320.03.

9.      The NFPL does not restrict picketing or protesting funeral processions. Neb. Rev. Stat. § 28-1320.02.

2

10.    The NFPL does not bar picketers from the vicinity of funerals or burials. Funeral attendees could see and hear picketers from 500 feet. Ex. 480 at 4-5; Tr. 387:3-16.

11.    The NFPL does not limit the number of picketers or their noise level.

12.    The NFPL does not limit the number, size, text, or images of signs.

13.    The NFPL protects the rights of funeral attendees to mourn in peace and privacy for a limited time and in a limited space.

14.    The testimony of Dr. Scott A. Bresler, a duly qualified expert in forensic psychology, was reliable and credible.  Dr. Bresler's testimony showed that a decedent's mourning family members and friends are in a particularly vulnerable emotional condition when attending a funeral, they can be easily emotionally injured by protestors at the funeral, and they are in need of access to the funeral that is unimpeded by protestors. The mourning family members and friends generally feel victimized by protesters at the funeral. Keeping protestors at a distance of 500 feet from the funeral helps address the legitimate emotional needs of those grieving and struggling to cope with the death of their loved one, as well as helping prevent family members and friends, in their emotional state, from attacking funeral protestors. Ex. 480.

15.    Regarding the particular sensitivities of individuals in the funeral context, Dr. Bresler testified that bereavement -- the phenomenon of a person's

experience when someone dear to them dies -- can be expressed through grief, manifested emotionally, physically, and behaviorally. Tr. 535:25-537:17.

16.     Dr. Bresler testified that the intensity of a bereaved's grief can lead to adverse subsequent reactions, including acute stress disorder, post-traumatic stress disorder, and traumatic confusion. Tr. 538:5-540:2.

17.     According to Dr. Bresler, the funeral setting itself is, in the majority of cases, significant in terms of the bereaved's emotional vulnerability given its closeness in time to the loved one's death. Tr. 540:21-541:6.

18.     Outbursts of anger are possible in the bereavement context, and in some instances during the bereaved's period of vulnerability, expressions of grief through physical violence are also possible. Tr. 541:9-542:7.

19.     Funeral pickets, in particular, can serve as the trigger for such possible outbursts of anger and/or violence, given their incongruity to the nature of the funeral itself. Tr. 542:8-543:13.

20.     In support of his conclusions, Dr. Bresler interviewed multiple Nebraskans who experienced picketers at the funeral of a loved one to determine what emotional impact the pickets had. Tr. 546:11-548:13.

21.     The majority of the individuals interviewed by Dr. Bresler indicated that they suffered emotionally as a result of the picketers' presence at their loved ones' respective funerals. Tr. 549:11-15; 550:23-551:3; 551:17-19; 552:18-20.

22.    In at least one instance, an interviewee reported he was very concerned that one of the bereaved at the funeral might become angry and explosive and act out against the picketers. Tr. 550:3-9.

23.    In contrast, where one interviewed couple had no memory of having seen the picketers present at their son's funeral, no adverse emotional impact attributable to the picketers was reported. Tr. 553:2-11.

24.    Dr. Bresler's general conclusion, from his interviews and based on his experience and expertise, was that a subgroup of the interviewees were either angry and/or very anxious about the presence of the funeral picketers, with at least one indicating concern that violence could have broken out as a result. Tr. 553:12-554:1.

25.    Ultimately, Dr. Bresler concluded that there is a subgroup of the population that may be uniquely vulnerable to the visible or audible presence of funeral picketers, which vulnerability could manifest itself in expressions of physical violence. Tr. 558:3-8.

26.    When asked if he believed WBC funeral-related pickets cause pain for family members of the decedent, Timothy Phelps acknowledged it "makes people mad." Tr. 164:9-13.

27.   The Westboro Baptist Church ("WBC") has participated in over 55,000 picketing activities nationally since 1990. Approximately 1% of those pickets, 590 pickets, were funeral-related pickets in various states.  PTO, at ¶ 8.

28.   It is the standard practice for funeral picketing in Nebraska by the WBC to picket 45 minutes before a funeral and voluntarily cease picketing once the funeral commences. Tr. 83:18-84:9; Tr. 134:13-15; Tr 243:22-244:1.

29.   Funeral-related pickets are more likely to have a big crowd of people counterpicketing the WBC. Tr. 662:15-20.

30.   If there is a crowd, a "mob," the crowd moves towards where WBC members are picketing. Tr. 662:2-25; Tr. 156:8-18; Tr. 611:19-25.

31.   According to Timothy Phelps, "the counterpicketers are going to go wherever we are. And you're going to need to have security there." Tr. 144:15-19.

32.   Based on his picketing experience, Timothy Phelps stated there are typically four to ten WBC picketers at an event and anywhere from one hundred to thousands of counterpicketers. Timothy asserts that mass of people impacts the need for law enforcement to do traffic control. Tr. 144:20-145:4.

33.   During funeral-related pickets, when counterpicketers were conducting their own demonstration by chanting "USA, USA" or waving a flag, the target of that demonstration was the WBC, not the funeral. Tr. 104:2-22; Tr. 490:6-8.

6

34.     The Patriot Guard and its members were invited guests at funerals. Tr. 368:6-25; Tr. 401:2-4; Tr. 409:1-2; Tr. 410:16-19; Tr. 411:10-15; Tr. 415:16-17; Ex. 484-489.

35.     According to John Scott Knudsen, State Captain of the Nebraska Patriot Guard Riders since 2008, the Patriot Guard Riders' presence is not to convey any message, other than honor and respect for the hero and family, or target any particular audience. Tr. 408:13-409:8.

36.     Patriot Guard members were not picketing or otherwise engaging in protest activities targeting the funerals they attended.

37.     The evidence reflects that there were third parties inside the buffer zone at funerals who were not WBC members, but those third parties were not engaged in the activity prohibited by the NFPL, i.e., picketing or protest activities targeting a funeral.  Tr. 104:2-22.

38.     At a funeral-related picket on August 28, 2010, a group of counterpicketers moved towards the WBC picket and commingled with WBC picketers. Tr. 157:14-18; Tr. 324:7-12.

39.     While picketing, WBC members have been threatened with violence and encountered physical violence. Tr. 160:21-161:11; Tr. 292:22-293:2.

40.     After reviewing information on WBC pickets prior to the funeral-related picket on July 30, 2007, in Norfolk, Nebraska, Norfolk Police Department

Captain of Operations, Steve Hecker, was concerned about the potential for violence at the picket and the safety of the WBC picketers. Tr. 375:11-376:2.

41.    For the funeral-related picket on July 30, 2007, the Norfolk Police Department assigned 20 out of its 42 officers to funeral duties. Tr. 370:3-14.

42.    The 300 foot buffer zone at the July 30, 2007 picket was extremely tight for the Norfolk Police Department with a lot of people in a very small and confined area. A larger buffer zone would have enabled law enforcement to do a more adequate job of providing protection. Tr. 381:25-382:24.

43.    According to Steve Hecker, a buffer zone larger than 300 feet would have provided police a better opportunity to respond to any potential incident, reduced congestion, and allowed police to better visualize potential threats before they materialized. Tr. 384:5-22.

44.    On August 28, 2010, George Vogel, a Marine Corps veteran from Omaha, Nebraska, sprayed bear mace at a group of WBC picketers conducting a funeral-related picket in Omaha, Nebraska. Tr. 431:11-13. It was not a planned event, it was an emotional, angry, response to the picketing. Tr. 429:25-431:2. Prior to this event, Mr. Vogel had never attended a funeral where WBC had been present. Tr. 428:23-25. Mr. Vogel was not related to the deceased. Tr. 429:21-24. Mr. Vogel was not a member of the Patriot Guard. Tr. 431:3-5. Mr. Vogel was immediately arrested by the Omaha Police Department, charged with assault,

fined, and spent four days in jail. Tr. 434:21-435:8; Ex. 410. Prior to this incident Mr. Vogel did not have a criminal record. Tr. 435:9-12.

45.    Mr. Vogel expressed his belief that somebody is going to shoot WBC members in the future and that others had contacted him encouraging more violence against WBC. Tr. 435:22-436:20; Tr. 439:7-11. Even at the time of trial, five years after the incident, Mr. Vogel was so angry with the WBC that he could not guarantee he would not act out against the WBC again in the future. Tr. 439:14-15.

46.    The testimony of James Davidsaver, a duly qualified expert in crowd control and crowd management, was reliable and credible.  Davidsaver's testimony showed that a 500-foot buffer zone reasonably accommodates all involved and provides reasonable space for crowd control and crowd management at a funeral where there are a large number of funeral attendees along with protest activities. This buffer allows funeral attendees to pay their final respects, protestors to exercise their free speech rights with minimal disruption to the community at large, and helps improve the ability of law enforcement to protect the protestors as well as preserve the peace. Ex. 482.

47.    Mr. Davidsaver agreed with the WBC that it is a sound practice of law enforcement to establish a place for each group demonstrating. Tr. 461:25-462:22. He testified about the need to ensure the safety of a large number of people within

a city block, Tr. 469:7-470:4, especially when one group notifies law enforcement in advance about the potential for violence. Tr. 463:1-8. He described how the lack of a defined zone could lead to arbitrary enforcement or present staffing difficulties in smaller jurisdictions. Tr. 465:2-466:13.

48.    Mr. Davidsaver noted that a 500-foot buffer zone reasonably accommodates all involved but that too much space, such as a mile, would actually be more difficult. Tr. 466:14-467:5. He discussed how a 500 foot buffer is an adequate distance to preserve the peace, address any traffic control issues, and allow protesters to express their free speech rights while providing a standard that could be applied statewide. Tr. 470:3-471:5.

49.    Rebekah Phelps-Davis, who has done "the lion's share" of the WBC's communication with law enforcement for the Nebraska funeral-related pickets, views suggestions from law enforcement on where to conduct the picket as requirements. Tr. 10:6-25; Tr. 65:19-66:2.

50.    For a funeral-related picket on July 30, 2007, Rebekah Phelps-Davis picked the location for the WBC picket. Tr. 361:22-362:1.

51.    The evidence reflects that on at least multiple occasions in Nebraska, law enforcement did not direct the WBC where to picket. Tr. 322:5-6; Tr. 330:12-18; Tr. 343:19-24; Tr. 361:22-362:1; Ex. 467; Ex. 468; Ex. 505; Ex. 506.

52.    "More often, almost a hundred percent of the time," the WBC picks the location for the WBC picket. Tr. 674:5-7.

53.    For a funeral-related picket on August 28, 2010, Jonathan Phelps picked the location for the WBC picket that was more than 500 feet away. He was able to deliver the WBC message at that picket. Tr. 330:12-331:10; Tr. 343:19-24.

54.    The WBC, in advance of their funeral-related pickets, request that law enforcement create a dead zone between groups. Tr. 71:2-11; Tr. 75:13-16. The WBC see potential for disturbances at their pickets and agree that when dealing with larger groups that do not agree, more space is needed to keep them separate. Tr. 162:5-163:5.

55.    The WBC describes it as a sound and simple practice for law enforcement to establish a place for each group demonstrating and place a dead zone between groups to deter attacks against WBC members. Tr. 73:8-25.

56.    The WBC, in advance of their funeral-related pickets, alert law enforcement that their experience over the years indicates that sometimes people who oppose their message are tempted to try violence to silence it. Tr. 72:19-73:7.

57.    The WBC, since at least 2005, has warned Nebraska law enforcement that third parties may try violence to silence their message at their pickets. Ex. 33. Since at least 2006, the WBC has requested Nebraska law enforcement establish a dead zone to deter violence. Ex. 50; Ex. 468. These warnings and requests from

WBC occurred before the 300 foot buffer, after the 300 foot buffer, and have continued after the 500 foot buffer was enacted. Ex. 50; Ex. 139; Ex. 266.

58.    Due to safety concerns, the WBC prefers to work with law enforcement prior to a picket to make sure their vehicles are close enough in proximity to the picket to allow for a rapid exit, if needed. Tr. 143:7-19.

59.    The testimony of Professor Phyllis V. Larsen, a duly qualified expert in communications, was reliable and credible.  Professor Larson's testimony showed that the plaintiff and WBC members are not hindered by the NFPL's 500 foot buffer zone, in part because effective communication is not dependent on close physical proximity of the message sender and the intended recipient. Professor Larson explained that there numerous open and alternative channels available to the plaintiff and WBC members for communicating their message and viewpoints, many of which are used by WBC members. Ex. 478.

60.    Professor Larsen noted that WBC frequently gives prior notice to communities when they are going to picket and that news media frequently covers the picketing. Tr. 500:13-21. She learned that on at least one occasion, the WBC accepted radio air time in lieu of picketing a funeral. Tr. 500:22-24. Professor Larsen described how effectively the WBC has used social media and websites to convey their message and described the WBC accounts as richly populated and impressive. Tr. 503:1-504:18. With the vast alternative methods of communication

available, Tr. 508:1-25, and currently in use by the WBC, Professor Larsen does not feel the 500 foot buffer hinders Plaintiff from conveying her message to her target audience. Tr. 506:15-507:1.

61.    WBC members, including Plaintiff, use the same signs at funeral-related pickets and non-funeral-related pickets. Tr. 660:13-661:2; Tr. 166:22-24. WBC members use their signs over and over until they are no longer useable. Tr. 166:5-16. There is not a lot of thought put in to which signs are used at funeral pickets and non-funeral pickets. 166:25-167:3.

62.    The WBC believes their duty is to publish their message to as many people as possible. Tr. 81:11-82:9.

63.    In attempting to publish their message, a factor in WBC's choice of picketing location is traffic volume. Tr. 136:19-22; Tr. 343:19-24; Ex. 467; Ex. 468.

64.    WBC's target audience at funeral-related pickets includes funeral goers, the counterpicketers, and any passersby. Tr. 151:1-16; Tr. 226:14-18. The WBC's number one priority in choosing a location to picket is visibility to the target audience. Tr. 170:5-6; Tr. 339:16-340:9.

65.    When asked if it made any difference how far away from the funeral itself a WBC picket took place, Steve Drain replied that "as long as I'm not out of sight and sound of my target audience, I'm good." Tr. 263:18-23. Steve Drain

13

testified that as long as the target audience can see the sign and hear the WBC, the distance is sufficient. Tr. 263:24-264:2.

66.    In advance of funeral-related pickets, it is a common practice for the WBC to send press releases to local media and advertise that they will be conducting a picket. Tr. 81:21-82:2; Tr. 237:25-238:19. The WBC puts press releases out "all the time." Tr. 216:4.

67.    The WBC operates at least eight separate websites. Tr. 82:18-20; Tr. 227:13-16. The WBC has a Facebook account. Tr. 248:2. The WBC and its members operate a Twitter account and approximately 20 Twitter subaccounts. Tr. 247:2-17. The WBC has uploaded videos to Youtube. Tr. 249:3-12. The WBC and its members convey the WBC message by Vine videos. Tr. 253:20-22. The WBC has made at least one "feature-length" documentary and multiple shorter films. Tr. 256:1-7. The WBC makes videos about signs that are held at funeral pickets. Tr. 256:18-257:10.

68.    Every time the WBC pickets, there is a likelihood that somebody might shoot a video and publish that video of the WBC conveying their message. Tr. 236:4-15.

69.    It is a "somewhat regular occurrence" for third parties to take a video from a WBC website and distribute it to others. Tr. 251:16-24.

14

70.     Plaintiff, and other members of WBC, have been interviewed many times on national television concerning the views of the WBC. Tr. 661:3-7; Tr. 260:3-8. The WBC has received national and international media coverage of their funeral pickets. Tr. 240:24-241:3.

71.     Steve Drain has watched and read tens of thousands of articles about the WBC. Tr. 185:21-22.

72.     As soon as media publishes WBC's core message, to the WBC, it is like they have already picketed. Tr. 241:15-22.

73.     The statutory change from 300 to 500 feet has not changed the WBC's ability to use other non-picketing channels of communication. Tr. 267:18-21.

74.     The WBC has never attempted to place an advertisement on the obituary page of a newspaper or been denied any request to place an advertisement on the obituary page. Tr. 264:6-15.

75.     Plaintiff has engaged in three funeral-related pickets in Nebraska since August 27, 2011. Tr. 631:24-632:1; Tr. 636:15-17; Tr. 642:6-8.

76.     At the three funeral-related pickets attended by Plaintiff in Nebraska since August 27, 2011, third parties allegedly inside the buffer zone were there to counterpicket the WBC, not engage in protest activities targeting the funeral. Tr. 623:1-3; Tr. 639:6-641:8; Tr. 643:1-14.

15

77.     In none of the three funeral-related pickets in Nebraska attended by Plaintiff since August 27, 2011, did Plaintiff ask law enforcement is WBC picketers could move closer to the funeral. Tr. 659:18-660:12.

78.     Plaintiff has never been arrested, charged or convicted of violating the NFPL. Tr. 665:17-19; PTO, at ¶ 10.

79.     On September 17, 2011, WBC picketers conducted a funeral-related picket in Pierce, for approximately 45 minutes during the 45 minutes before the funeral started. Plaintiff did not attend this picket. PTO, at ¶ 11.

80.     On October 13, 2011, WBC picketers, including Plaintiff, conducted a funeral-related picket in Omaha, for approximately 45 minutes during the 45 minutes before the funeral. PTO, at ¶ 12. Law enforcement did not instruct WBC picketers where to stand. Tr. 580:17-25. The WBC chose a location that anybody trying to get to the church or other office buildings in the business park would have to pass the location of their picket. Tr. 582:4-20; Tr. 586:25-587:9. Following the picket, the WBC thanked the Omaha Police Department for their professionalism and for their dedication to the WBC's First Amendment rights. Ex. 252.

81.     On July 6, 2012, WBC picketers, including Plaintiff, conducted a funeral-related picket in York, for approximately 45 minutes during the 45 minutes before the funeral started. PTO, at ¶ 13. In advance of the picket, the WBC warned the York Police Department that third parties may try violence to silence their

16

message at their pickets and requested the York Police Department establish a dead zone to deter violence. Ex. 266. During this picket, counterpicketers waving flags and signs targeting the WBC moved near the WBC. Tr. 633:18-634:3. Following the picket, the WBC thanked the York Police Department for their professionalism and for their dedication to the WBC's First Amendment rights. Ex. 268.

82.   On August 13, 2012, WBC picketers conducted a funeral-related picket in Ashland, for approximately 45 minutes during the 45 minutes before the funeral started.  The Plaintiff did not attend this picket. PTO, at ¶ 14.

83.   On August 8, 2014, WBC picketers, including Plaintiff, conducted a funeral-related picket in Lincoln, for approximately 45 minutes during the 45 minutes before the funeral started. Tr. 643:10-11. During this picket, counterpicketers waving flags and signs targeting the WBC moved near the WBC. Tr. 643:12-14. To the extent Exhibit 282 shows any third party inside the 500 foot buffer allegedly engaged in protest activities, such video footage was taken more than one hour prior to the funeral. Tr. 643:1-11.

## BACKGROUND

When denying Plaintiff's motion for summary judgment, this Court accurately determined intermediate scrutiny applies to Plaintiff's facial challenge of the Nebraska Funeral Picketing Law ("NFPL") (Filing 258 at 26-30); the term "targeted," as used in the NFPL, was content neutral (*Id.*); and that the NFPL

advances a significant government interest in protecting the privacy of grieving families and preserving the peaceful character of funeral, balanced against the rights of protestors and picketers (*Id.* at 30-31).

Further, the Court correctly held that several aspects of the NFPL were narrowly tailored, e.g., its restrictions are limited to a defined period of time; it does not attempt to regulate any floating zones such as funeral processions; its restrictions are limited to specific events rather than locations, so protesters can protest at the locations outside the regulated window of time; and the protest activities addressed by the NFPL were capable of definition. *Id.* at 32-33. The Court also correctly held that the amended NFPL was neither vague nor overbroad. *Id.* at 33.

The Court explained that the remaining issues for trial on Plaintiff's facial challenge were "whether the State's significant governmental interest in protecting mourners at a funeral justifies a 500-foot buffer zone, and whether the amended NFPL leaves ample alternative channels for communication . . . and whether the amended NFPL has been unconstitutionally applied to Phelps-Roper." Filing 300 at 2. These issues are addressed below.

# ARGUMENT

## I.  Facial Challenge.

To survive intermediate scrutiny, a statute must (1) be narrowly tailored to serve a significant governmental interest, and (2) allow for ample alternative channels for communication. *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 689 (8th Cir. 2012). "Remaining before the Court for determination at trial on Phelps-Roper's facial challenge is whether the State's significant governmental interest in protecting mourners at a funeral justifies a 500-foot buffer zone, and whether the amended NFPL leaves ample alternative channels for communication." Filing 300 at 2.

### a.  The State's interest in protecting mourners at a funeral justifies a 500-foot buffer zone.

The NFPL advances the "significant government interest in protecting the peace and privacy of funeral attendees for a short time and in a limited space so that they may express the 'respect they seek to accord to the deceased person who was once their own.'" *City of Manchester*, 697 F.3d at 693 (quoting *National Archives & Records Administration v. Favish*, 541 U.S. 157, 168 (2004)). A bereaved family will never get a "second shot" to bury a loved one; a funeral service can occur during only one particular time and place.

"Mourners have a significant and legitimate interest in avoiding potential trauma when attending a funeral or burial." *City of Manchester*, 697 F.3d at 692.

At trial, Dr. Scott A. Bresler, Ph.D., a licensed psychologist, discussed the traumatic grief bereaved persons have suffered when faced with the experience of seeing protestors at family members' funerals. Dr. Bresler interviewed numerous individuals in Nebraska to discuss their experiences with the presence of protestors at funerals or memorial services. Dr. Bresler's report details those interviews, including specific examples of individuals who stated that they felt anxiety about the presence of protestors, that "the image of those children and those horrible signs have never left my mind," and that it was "heartbreaking" to see protestors when she was "just getting ready to lay my son to rest and to see things like that you know hurts." Ex. 480 at 3-4.

Dr. Bresler's testimony showed that a decedent's mourning family members and friends are in a particularly vulnerable emotional condition when attending a funeral, they can be easily emotionally injured by protestors at the funeral, and they are in need of access to the funeral that is unimpeded by protestors. Regarding the particular sensitivities of individuals in the funeral context, Dr. Bresler testified that bereavement -- the phenomenon of a person's experience when someone dear to them dies -- can be expressed through grief, manifested emotionally, physically, and behaviorally. Tr. 535:25-537:17. Dr. Bresler testified that the intensity of a bereaved's grief can lead to adverse subsequent reactions, including acute stress disorder, post-traumatic stress disorder, and traumatic confusion. Tr. 538:5-540:2.

20

According to Dr. Bresler, the funeral setting itself is, in the majority of cases, significant in terms of the bereaved's emotional vulnerability given its closeness in time to the loved one's death. Tr. 540:21-541:6. The majority of the individuals interviewed by Dr. Bresler indicated that they suffered emotionally as a result of the picketers' presence at their loved ones' respective funerals. Tr. 549:11-15; 550:23-551:3; 551:17-19; 552:18-20.

The mourning family members and friends generally feel victimized by protesters at the funeral. Keeping protestors at a distance of 500 feet from the funeral helps address the legitimate emotional needs of those grieving and struggling to cope with the death of their loved one, as well as helping prevent family members and friends, in their emotional state, from attacking funeral protestors. Outbursts of anger are possible in the bereavement context, and in some instances during the bereaved's period of vulnerability, expressions of grief through physical violence are also possible. Tr. 541:9-542:7. Funeral pickets, in particular, can serve as the trigger for such possible outbursts of anger and/or violence, given their incongruity to the nature of the funeral itself. Tr. 542:8-543:13. The WBC acknowledges their funeral-related picketing "makes people mad." Tr. 164:9-13. In at least one instance, an interviewee reported he was very concerned that one of the bereaved at the funeral might become angry and explosive and act out against the picketers. Tr. 550:3-9.

Dr. Bresler's general conclusion, from his interviews and based on his experience and expertise, was that a subgroup of the interviewees were either angry and/or very anxious about the presence of the funeral picketers, with at least one indicating concern that violence could have broken out as a result. Tr. 553:12-554:1. Ultimately, Dr. Bresler concluded that there is a subgroup of the population that may be uniquely vulnerable to the visible or audible presence of funeral picketers, which vulnerability could manifest itself in expressions of physical violence. Tr. 558:3-8.

Dr. Bresler did note that, out of the individuals he interviewed, none believed that the free speech rights of protestors should be completely curtailed, but only asked "that these funeral protestors be kept at a distance on the days in which bereaved are struggling to cope with the tragic death of their dead relatives." Ex. 480 at 6. The State's interest in protecting mourners at a funeral and in minimizing the possibility of physical violence therefore justifies a 500-foot buffer zone.

### b. The State's interest in safety for all persons justifies a 500-foot buffer zone.

The buffer zone in the NFPL is approximately one city block. Tr. 659:12-14; Tr. 469:16-19. Around that city block surrounding a funeral can be upwards of one hundred to thousands of people. Tr. 144:20-145:4. The State has a significant interest in ensuring the safety of all persons around the funeral.

During floor debate on February 24, 2011, the legislature discussed the State's safety concerns for all persons at the scene:

> We have, in the situation at hand here, a conflict between rights--the rights of the family to a decent, honorable burial and the people who are in support of the family to express their sentiments, their free speech; and what the courts have told us is a constitutional right on the part of those who are there who might be protesting. The duty of the state is to referee between those two particular situations to ensure that no one gets hurt, to ensure that it is orderly. And when we have the distance of a mere city block without even enough distance to put an intersection between the groups, and when the funeral could be very large and understandably emotionally charged, putting an intersection between them, which just about happens in the case of all cases with the 500-foot standard, gives law enforcement the ability to deploy its resources, to control a situation before someone gets hurt and it gets out of hand, and is necessary in order to maintain a free and orderly society that respects all rights. I did contact the Platte County sheriff and asked for his opinion whether or not this was necessary. And he said that he felt that he could handle a situation much better and protect public safety to a far greater degree if he had the additional room.

Statement of Senator Schumacher, Filing 223-2 at 75.

Plaintiff argues the State's public safety concerns are "concocted." Filing 317 at 5. The evidence at trial contradicts Plaintiff's representation. At funeral-related pickets, the WBC has been threatened with violence and encountered physical violence. Tr. 157:14-18; Tr. 160:21-161:11; Tr. 292:22-293:2; Tr. 324:7-12; Tr. 431:11-13. Due to their own safety concerns, the WBC prefers to work with law enforcement prior to a picket to make sure their vehicles are close enough in proximity to the picket to allow for a rapid exit, if needed. Tr. 143:7-19.

If there is a crowd, a "mob," the crowd moves toward where WBC members are picketing. Tr. 662:2-25; Tr. 156:8-18; Tr. 611:19-25. According to Timothy Phelps, "the counterpicketers are going to go wherever we are. And you're going to need to have security there." Tr. 144:15-19.Based on his picketing experience, Timothy Phelps stated there are typically four to ten WBC picketers at an event and anywhere from one hundred to thousands of counterpicketers. Timothy asserts that mass of people impacts the need for law enforcement to do traffic control. Tr. 144:20-145:4. These safety concerns are why the WBC, in advance of their funeral related pickets, request that law enforcement establish a dead zone between groups to deter attacks against WBC members, Tr. 73:8-25, and alert law enforcement that in their experience third parties are tempted to try violence to silence the WBC message. Tr. 72:19-73:7.

Since at least 2005, the WBC has warned Nebraska law enforcement that third parties may try violence to silence their message at their pickets. Ex. 33. Since at least 2006, the WBC has requested Nebraska law enforcement establish a dead zone to deter violence. Ex. 50; Ex. 468. These warnings and requests from WBC occurred before the 300 foot buffer, after the 300 foot buffer, and have continued after the 500 foot buffer was enacted. Ex. 50; Ex. 139; Ex. 266.

Notably, on August 28, 2010, George Vogel, a Marine Corps veteran from Omaha, Nebraska, sprayed bear mace at a group of WBC picketers conducting a

24

funeral-related picket in Omaha, Nebraska. Tr. 431:11-13. This was not a planned event; rather, it was an emotional and angry response to the picketing. Tr. 429:25-431:2. Prior to this event, Mr. Vogel had never attended a funeral where WBC had been present. Tr. 428:23-25. Mr. Vogel was not related to the deceased. Tr. 429:21-24. Mr. Vogel was not a member of the Patriot Guard. Tr. 431:3-5. Mr. Vogel was immediately arrested by the Omaha Police Department, charged with assault, fined, and spent four days in jail. Tr. 434:21-435:8; Ex. 410. Prior to this incident Mr. Vogel did not have a criminal record. Tr. 435:9-12.

At trial, Mr. Vogel expressed his belief that somebody is going to shoot WBC members in the future and that others had contacted him encouraging more violence against WBC. Tr. 435:22-436:20; Tr. 439:7-11. Even at the time of trial, five years after the incident, Mr. Vogel was so angry with the WBC that he could not guarantee he would not act out against the WBC again in the future. Tr. 439:14-15.

In 2007, in preparation for a WBC picket in Norfolk, Nebraska, and after reviewing incidents nationwide, Norfolk Police Department Captain of Operations, Steve Hecker, developed a concern for potential violence at the picket and the safety of WBC picketers. Tr. 375:11-376:2. Out of concern, for the funeral-related picket on July 30, 2007, the Norfolk Police Department assigned 20 out of its 42 officers to funeral duties. Tr. 370:3-14. The 300 foot buffer zone at the July 30,

2007 picket was extremely tight for the Norfolk Police Department with a lot of people in a very small and confined area.

Mr. Hecker testified that based on his experience a larger buffer zone would have enabled law enforcement to do a more adequate job of providing protection. Tr. 381:25-382:24. According to Mr. Hecker, a buffer zone larger than 300 feet would have provided police a better opportunity to respond to any potential incident, reduced congestion, and allowed police to better visualize potential threats before they materialized. Tr. 384:5-22.

At trial, James Davidsaver, a former police Captain and expert and instructor in crowd management, agreed with Mr. Hecker. Mr. Davidsaver testified about the need to ensure the safety of a large number of people within a city block, Tr. 469:7-470:4, especially when one group notifies law enforcement in advance about the potential for violence. Tr. 463:1-8. He described how the lack of a defined zone could lead to arbitrary enforcement or present staffing difficulties in smaller jurisdictions. Tr. 465:2-466:13. Mr. Davidsaver agreed with the WBC that it is a sound practice of law enforcement to establish a place for each group demonstrating. Tr. 461:25-462:22.

In Davidsaver's expert opinion, "[a] buffer zone of 500 feet reasonably accommodates all involved. This buffer allows funeral attendees to pay their final respects and protestors to exercise their free speech rights with minimal disruption

26

to the community at large." Ex. 482 at 3. Mr. Davidsaver acknowledged that while a 500-foot buffer zone reasonably accommodates all involved, that too much space, such as a mile, would actually be more difficult. Tr. 466:14-467:5. He discussed how a 500 foot buffer is an adequate distance to preserve the peace, address any traffic control issues, and allow protesters to express their free speech rights while providing a standard that could be applied statewide. Tr. 470:3-471:5.

Accordingly, the State's interest in safety for all persons justifies a 500 foot buffer zone.

### c.  The NFPL leaves adequate alternatives for communication.

The NFPL leaves adequate alternatives for communication. Plaintiff's assertion that the purpose of a funeral-related picket is to convey a specific message about the death and the funeral at a particular time and location is belied by the evidence.

The evidence at trial showed that WBC members, including Plaintiff, use the same signs at funeral-related pickets and non-funeral-related pickets. Tr. 660:13-661:2; Tr. 166:22-24. WBC members use their signs over and over until they are no longer useable, Tr. 166:5-16, and there is not a lot of thought put in to which signs are used at funeral pickets and non-funeral pickets. 166:25-167:3. Funeral-related pickets represent approximately 1% of the total pickets WBC has participated in to convey their message. PTO, at ¶ 8.

27

Further, as this Court has held, the "NFPL does not limit speakers or picketers in any manner apart from a short time and narrow space buffer zone around a funeral or burial service." Filing 258 at 37 (citing *City of Manchester*, 697 F.3d at 695). The testimony of Professor Phyllis V. Larsen, a duly qualified expert in communications, at trial showed that the Plaintiff and WBC members are not hindered by the NFPL's 500-foot buffer zone, in part because effective communication is not dependent on close physical proximity of the message sender and the intended recipient. Professor Larson explained that there numerous open and alternative channels available to the plaintiff and WBC members for communicating their message and viewpoints, many of which are used by WBC members.

These alternative channels include at least eight separate websites, (Tr. 82:18-20; Tr. 227:13-16), a Facebook account (Tr. 248:2), a WBC Twitter account and approximately 20 Twitter subaccounts, (Tr. 247:2-17), uploaded videos to Youtube, (Tr. 249:3-12), Vine videos, (Tr. 253:20-22), one "feature-length" documentary and multiple shorter films, (Tr. 256:1-7), videos about signs that are held at funeral pickets, (Tr. 256:18-257:10), press releases to local media, (Tr. 81:21-:82:2; Tr. 216:4), radio air time, (Tr. 500:22-24), national and international media coverage of funeral pickets and interviews, (Tr. 240:24-241:3; Tr. 661:3-7), tens of thousands of articles, (Tr. 185:21-22), and third party redistribution of

28

WBC content, (Tr. 251:16-24). Professor Larsen described the WBC use of alternative channels of communication as "richly populated" and "impressive." Tr. 503:1-504:18. So impressive that Professor Larsen, in her expert opinion, does not feel the 500-foot buffer hinders Plaintiff from conveying her message to her target audience. Tr. 506:15-507:1.

The NFPL does not limit the number of picketers, their noise level, or the number, size, text, or images of signs. Moreover, the NFPL does not prohibit the WBC from going door-to-door, using the mail or telephone, or placing an advertisement on the obituary page of a newspaper to reach their target audience. Tr. 264:6-15.

When questioned about their target audience, WBC members repeated it is their duty to publish their message to as many people as possible, Tr. 81:11-82:9, including picking a picketing location based on traffic volume for maximum effect. Tr. 136:19-22; Tr. 343:19-24; Ex. 467; Ex. 468. After all, the WBC target audience includes funeral goers, counterpicketers, and any passersby. Tr. 151:1-16; Tr. 226:14-18.

With such a large target audience, it is not surprising that to the WBC, as soon as media publishes WBC's core message, it is like the WBC has already picketed. Tr. 241:15-22. Steve Drain, who organizes WBC's alternative publishing strategies, agreed that when it comes to picketing, "as long as I'm not out of sight

and sound of my target audience, I'm good." Tr. 263:18-23. This is because, as Professor Larsen explained, effective communication is not dependent on close physical proximity of the message sender and the intended recipient. Ex. 478.

It is clear from the record that the NFPL leaves vast alternative methods of communication available to the WBC and that their message, even at 500 feet, has been seen and heard by their broadly defined target audience. Ex. 480 at 4-5; Tr. 387:3-16.

## II.    The amended NFPL has not been unconstitutionally applied to Plaintiff.

In an as-applied challenge, the challenger must show that the statute is unconstitutional "because of the way it was applied to the particular facts of their case." *U.S. v. Salerno*, 481 U.S. 739, 745 n. 3 (1937).  In order to be successful in her viewpoint discriminatory enforcement challenge, Plaintiff needed to show a pattern of unlawful favoritism. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). Plaintiff failed to meet this burden at trial. The evidence clearly demonstrated the NFPL has not been applied in an unconstitutional manner towards Plaintiff.

"For Phelps-Roper to establish a pattern of unlawful favoritism, she must demonstrate that the others inside the buffer zone were engaged in the activity prohibited by the NFPL, *i.e*., picketing or protest activities targeting a funeral." Filing 258 at 42. At trial, Plaintiff neglected to show a pattern or unlawful

favoritism. In fact, there is no basis on which to sustain a judgment against Defendants on this matter.

Plaintiff has only engaged in three funeral-related pickets in Nebraska since August 27, 2011. Tr. 631:24-632:1; Tr. 636:15-17; Tr. 642:6-8. When the WBC attends a funeral, "more often, almost a hundred percent of the time" the WBC picks the location for the WBC picket. Tr. 674:5-7. At the three funeral-related pickets attended by Plaintiff in Nebraska since August 27, 2011, third parties allegedly inside the buffer zone were there to counterpicket the WBC, not engage in protest activities targeting the funeral. Tr. 623:1-3; Tr. 639:6-641:8; Tr. 643:1-14. Also, in none of the three funeral-related pickets in Nebraska attended by Plaintiff since August 27, 2011, did Plaintiff ask law enforcement if WBC picketers could move closer to the funeral. Tr. 659:18-660:12. Further, Plaintiff has never been arrested, charged or convicted of violating the NFPL. Tr. 665:17-19; PTO, at ¶ 10.

i.    Picket No. 1

On October 13, 2011, WBC picketers, including Plaintiff, conducted a funeral-related picket in Omaha, for approximately 45 minutes during the 45 minutes before the funeral. PTO, at ¶ 12. Law enforcement did not instruct WBC picketers where to stand. Tr. 580:17-25. The WBC chose a location that anybody trying to get to the church or other office buildings in the business park would have

to pass the location of their picket. Tr. 582:4-20; Tr. 586:25-587:9. Following the picket, the WBC thanked the Omaha Police Department for their professionalism and for their dedication to the WBC's First Amendment rights. Ex. 252.

###        ii.     Picket No. 2

On July 6, 2012, WBC picketers, including Plaintiff, conducted a funeral-related picket in York, for approximately 45 minutes during the 45 minutes before the funeral started. PTO, at ¶ 13. In advance of the picket, the WBC warned the York Police Department that third parties may try violence to silence their message at their pickets and requested the York Police Department establish a dead zone to deter violence. Ex. 266. During this picket, counterpicketers waving flags and signs targeting the WBC moved near the WBC. Tr. 633:18-634:3. Following the picket, the WBC thanked the York Police Department for their professionalism and for their dedication to the WBC's First Amendment rights. Ex. 268.

###        iii.    Picket No. 3

On August 8, 2014, WBC picketers, including Plaintiff, conducted a funeral-related picket in Lincoln, for approximately 45 minutes during the 45 minutes before the funeral started. Tr. 643:10-11. During this picket, counterpicketers waving flags and signs targeting the WBC moved near the WBC. Tr. 643:12-14.

The evidence at trial showed that third parties at these three funerals Plaintiff picketed were either invited guests or counterpicketers, or otherwise not engaged in protest activities targeting a funeral in violation of the NFPL.

### a.  Invited guests.

Plaintiff asserts that it was unlawful for law enforcement in Nebraska to permit those with a contrary message to conduct themselves in a manner that blocks Plaintiff's message and/or to allow them within the 500-foot statutory limit. However, one clear distinction can be made - Plaintiff, and other WBC members, were not invited guests of the funerals and/or memorials in which they would protest. Alternatively, the individuals within the statutory buffer were invited guests, and thus outside the reach of the NFPL.

The evidence at trial clearly demonstrated the Patriot Guard, for instance, and its members were invited guests at the funerals.  Tr. 368:6-25; Tr. 401:2-4; Tr. 409:1-2; Tr. 410:16-19; Tr. 411:10-15; Tr. 415:16-17; Ex. 484-489. Thus, the evidence shows individuals within the statutory buffer zone were invited guests and thus outside the reach of the NFPL.

### b. Third parties were not targeting the funeral, but the funeral procession or even WBC.

Much of Plaintiff's arguments center around the fact that counterpicketers surround and block Plaintiff and other WBC picketers, blocking their message. If there is a crowd, a "mob," the crowd moves towards where WBC members are

picketing. Tr. 662:2-25; Tr. 156:8-18; Tr. 611:19-25. Based on his picketing experience, Timothy Phelps stated there are typically four to ten WBC picketers at an event and anywhere from one hundred to thousands of counterpicketers. Tr. 144:20-145:4. According to Timothy Phelps, "the counterpicketers are going to go wherever we are. And you're going to need to have security there." Tr. 144:15-19. Plainly, the target of the counterpicketers is the WBC, not the funeral.

Law enforcement may examine the totality of circumstances to determine wither the conduct of picketers violates the NFPL. *See Frisby*, 487 U.S. at 493, 108 S.Ct. 2495 (stating "the government may prohibit unduly coercive conduct around the home, even though it involves expressive elements."). "This evaluation may include a determination of whether other people are engaged in protest activities targeting a funeral." Filing 258 at 43.

While there were third parties inside the buffer zone at funerals who were not WBC members, those third parties were not engaged in the activity prohibited by the NFPL, i.e., picketing or protest activities targeting a funeral. Tr. 104:2-22. As testified to at trial, to the extent counterpicketers were conducting their own demonstration by chanting "USA, USA" or waving a flag, the target of that demonstration was the WBC, not the funeral. Tr. 104:2-22; Tr. 490:6-8. According to John Scott Knudsen, State Captain of the Nebraska Patriot Guard Riders since 2008, the Patriot Guard Riders' presence is not to convey a message

34

or target any particular audience. Tr. 408:13-409:8. Therefore, when the Patriot Guard members attended a funeral, not only were they invited guests, but they were not picketing or otherwise engaging in protest activities targeting the funeral.

Lastly, the NFPL does not restrict picketing or protesting funeral processions. Neb. Rev. Stat. § 28-1320.02. To the extent there is any third party identified in the massive record of this case that was not an invited guest or a counterpicketer, Plaintiff has failed to present any evidence that such third party was picketing the funeral inside the buffer zone as opposed to picketing some other activity such as the funeral procession.

On this record, Plaintiff has failed to demonstrate a pattern of unlawful favoritism. Accordingly, judgment cannot be granted against Defendants for Plaintiff's as-applied challenges.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Defendants.

**PETE RICKETTS and DOUG PETERSON, Defendants.**

By:   DOUGLAS J. PETERSON, NE #18146
       *Attorney General of Nebraska*

By:   *s/ Ryan S. Post*
       Ryan S. Post, NE #24714
       *Assistant Attorney General*

James D. Smith, NE #15476
*Solicitor General*

Stephanie A. Caldwell, NE #22994
David A. Lopez, NE #24947
Jessica M. Forch, NE #24912
*Assistant Attorneys General*

2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
James.Smith@nebraska.gov
Stephanie.Caldwell@nebraska.gov
Dave.Lopez@nebraska.gov
Ryan.Post@nebraska.gov
Jessica.Forch@nebraska.gov

Attorneys for Defendants
Pete Ricketts and Doug Peterson

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2015, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, using the CM/ECF system, causing notice of such filing to be served upon all parties' counsel of record.

By:    *s/Ryan S. Post*